```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3   TQP DEVELOPMENT LLC        *    Civil Docket No.
                               *    2:11-CV-248
 4   VS.                        *    Marshall, Texas
                               *
 5                             *    November 25, 2013
     NEWEGG, INC.               *    1:15 P.M.
 6
                       TRANSCRIPT OF TRIAL
 7       BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP
                 UNITED STATES DISTRICT JUDGE
 8

 9   APPEARANCES:

10   FOR THE PLAINTIFFS:    MR. MARC FENSTER
                           MR. ALEXANDER GIZA
11                          MR. ADAM S. HOFFMAN
                           MR. BENJAMIN WANG
12                          MR. PAUL KROEGER
                           MR. MICHAEL T. BOARDMAN
13                          MS. JUDITH L. MEADOW
                           Russ August & Kabat
14                          12424 Wilshire Blvd., Suite 1200
                           Los Angeles, CA   90025
15
                           MR. ANDREW SPANGLER
16                          Spangler Law Firm
                           202 N. Green Street, Suite 300
17                          Longview, TX   75601

18

19   APPEARANCES CONTINUED ON NEXT PAGE:

20

21   COURT REPORTER:        MS. SHELLY HOLMES, CSR
                           Official Court Reporter
22                          100 East Houston, Suite 125
                           Marshall, TX   75670
23                          903/935-3868

24

25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
```

```
 1
 2   APPEARANCES CONTINUED:
 3   FOR THE DEFENDANT:      MR. ALAN D. ALBRIGHT
                             Bracewell & Giuliani, LLP
 4                           111 Congress Avenue, Suite 2300
                             Austin, TX   78701
 5
                             MR. ANTHONY W. BROOKS
 6                           MR. KENT E. BALDAUF, JR.
                             MR. DANIEL H. BREAN
 7                           MR. JAMES L. BOSCO, JR.
                             The Webb Law Firm
 8                           One Gateway Center, Suite 1200
                             420 Ft. Duquesne Blvd.
 9                           Pittsburgh, PA   15222

10                           MR. EDWARD R. REINES
                             Weil, Gotshal & Manges
11                           201 Redwood Shores Pkwy
                             Redwood City, CA   94065
12
                    ***********************************
13
14                        P R O C E E D I N G S
15                 (Jury out.)
16                 COURT SECURITY OFFICER:  All rise.
17                 THE COURT:  Be seated, please.
18                 All right.  Earlier this morning, some
19   several hours ago, as a matter of fact now, I met with
20   Counsel in chambers and we reviewed their joint
21   submission with regard to the final jury instructions
22   and verdict form.  And the Court conducted an informal
23   charge conference.
24                 The Court heard numerous comments from
25   both parties with regard to the charge and the verdict
```

1  form as well as submission of several authorities, which

2  the Court's had a chance to look at.  And the Court has

3  taken all those comments and assertions and authorities

4  into account and has generated a revised final jury

5  instruction charge and verdict form based on my

6  consideration and review of all the matters raised in

7  the informal charge conference.

8            I'm now prepared to go on to the record

9  and have a formal charge conference where each matter

10  may comment -- not comment, but each party may offer any

11  objections to the charge and the verdict form in their

12  present form for the Court to consider.

13            I assume we'll have one representative of

14  each trial team handling this, and so probably the most

15  efficient way is to ask both of those attorneys to go to

16  the podium and stay there, and we'll review these

17  documents on a page-by-page basis.  And then I'll hear

18  from both or both sides as we come to whatever matters

19  they believe warrant objection.

20            So if a representative of both Plaintiff

21  and Defendant would go to the podium, we'll conduct the

22  formal charge conference.

23            All right.  Turning first to the final

24  jury instructions, I'll ask if there are any objections

25  with regard on any matter on Page 1.

```
 1                    MR. REINES:  No.

 2                    MR. WANG:  No, Your Honor.

 3                    THE COURT:  Page 2?

 4                    MR. REINES:  No.

 5                    MR. WANG:  No.

 6                    THE COURT:  Page 3?

 7                    MR. REINES:  No.

 8                    MR. WANG:  No.

 9                    THE COURT:  You know, Counsel, we're

10  outside the jury's presence, so I'm not going to insist

11  a whole lot of formality, but no is probably not a good

12  answer.  No, Your Honor, would probably be better.

13                    Anything on Page 3?

14                    MR. REINES:  No, Your Honor.

15                    MR. WANG:  No, Your Honor.

16                    THE COURT:  Anything on Page 4?

17                    MR. REINES:  No, Your Honor.

18                    MR. WANG:  No, Your Honor.

19                    THE COURT:  Page 5?

20                    MR. REINES:  No, Your Honor.

21                    MR. WANG:  No, Your Honor.

22                    THE COURT:  Page 6?

23                    MR. REINES:  No, Your Honor.

24                    MR. WANG:  No, Your Honor.

25                    THE COURT:  Page 7.
```

1            MR. REINES:  Yes, Your Honor.

2            With respect to the claim constructions,

3    we are preserving our positions as set forth during the

4    claim construction proceedings, and we understand

5    they're not going to be reconsidered now, but just want

6    to be clear for the record on that.

7            In addition, based on the record created

8    here, we would request a supplemental instruction.  Not

9    a change of instruction, but a supplemental instruction.

10   And this is moving through the different claim

11   constructions.

12           On the new one of said key, which appears

13   now on Page 8, and we would request that that be

14   supplemented with the statement that the new key value

15   has to be used in the transmitter and receiver at the

16   time required by the claim construction, or at the time

17   required by the definition of -- provided above.

18           Other than that, that's all we have on 7

19   and 8.

20           THE COURT:  Was that raised in the

21   informal conference, Counsel?

22           MR. REINES:  I did not --

23           THE COURT:  I don't recall you raising

24   that then.

25           MR. REINES:  I did not propose that

```
1    specific construction, but in looking at the record, I
2    think it's important.
3                    THE COURT:  All right.  Anything from the
4    Plaintiff on Pages 7 and 8?
5                    MR. WANG:  No, Your Honor.
6                    THE COURT:  All right.  Defendant's
7    objection with regard to Pages 7 and 8 is overruled.
8                    Anything on Page 9?
9                    MR. REINES:  No, Your Honor.
10                   THE COURT:  Anything from the Plaintiff
11   on Page 9?
12                   MR. WANG:  Sorry, Your Honor.
13                   No, Your Honor.
14                   THE COURT:  Page 10.
15                   MR. REINES:  No, Your Honor.
16                   MR. WANG:  No, Your Honor.
17                   THE COURT:  Page 11?
18                   MR. REINES:  No, Your Honor.
19                   MR. WANG:  No, Your Honor.
20                   THE COURT:  Page 12?
21                   MR. REINES:  No, Your Honor.
22                   MR. WANG:  No, Your Honor.
23                   THE COURT:  Page 13?
24                   MR. REINES:  No, Your Honor.
25                   MR. WANG:  No, Your Honor.
```

```
 1                    THE COURT:   Page 14?  And note, Counsel,
 2   that there's a 6.1.1 heading there that was not taken
 3   out.  That's -- that's an error on our part.  That will
 4   be removed when the final versions are printed, but
 5   other than that, is there anything else on Page 14?
 6                    MR. REINES:   Your Honor, this is the
 7   begin -- this is the beginning of the discussion on the
 8   various prior art legal instructions, and they --
 9   includes the secret -- the nature of the secretiveness
10   that is permissible in order for something to be prior
11   art or not.  And we note that in general that the Court
12   seems to have ruled with the Plaintiff on that.  And we
13   object to that.  I can specify the places, but that is a
14   general objection that begins with the non-secret on
15   Page 14, but really on 15 it's, you know, there and then
16   so on and so forth 16, 17, and 18.
17                    THE COURT:  Well, to the extent that's
18   not too general to respond to, it's overruled.  If you
19   want to make a specific objection as we go through each
20   page --
21                    MR. REINES:  Okay.
22                    THE COURT:   -- it's however you want to
23   preserve your -- your record, Counsel.
24                    MR. REINES:  I understand.
25                    THE COURT:   All right.  And is there
```

1  anything on Page 15?

2          MR. REINES:  Just more precisely this --

3  secret use by a third-party other than the inventor's

4  not public would be objected to.

5          THE COURT:   Okay.  Anything from

6  Plaintiff on 15?

7          MR. WANG:   Your Honor, for the record,

8  the top paragraph on Page 15, we would propose adding a

9  statement that in this case, however, because the

10 invention covers a process, the processor must have --

11 the process must have been carried out or performed in

12 public.  It's the issue that we raised with Your Honor

13 in the informal conference.  We just wanted to have that

14 clear -- clear for the sake of the record.

15          THE COURT:  And both of those positions

16 were discussed in the formal -- informal charge

17 conference, and the Court's carefully considered your

18 various positions, but your objections to Page 15 are

19 overruled.

20          Page 16.

21          MR. REINES:   Your Honor, the bottom

22 paragraph, starting with if you find -- I can read the

23 whole thing, if necessary, but ends up with are also

24 satisfied, that contains the various points that were

25 discussed previously regarding of -- of what degree of

```
 1   secretiveness is permitted or now permitted and we

 2   object to that.

 3              THE COURT:   All right.  Anything from --

 4   anything from the Plaintiff on Page 16?

 5              MR. WANG:  No, Your Honor.

 6              THE COURT:   All right.  Defendant's

 7   objection on the bottom page of the Page 16 of the

 8   charge is overruled.

 9              Anything on Page 17?

10              MR. REINES:  No, Your Honor.

11              MR. WANG:  No, Your Honor.

12              THE COURT:  Page 18?

13              MR. REINES:  Yes, Your Honor.  The

14   statement in the first paragraph, last sentence,

15   starting with however, which is however a finding of

16   suppression or concealment is not negated merely because

17   the invention has been commercialized through a secret

18   use outside the public domain.  We object to that as --

19   pursuant to the prior deliberations.

20              THE COURT:  Plaintiff have any objection

21   on Page 18?

22              MR. WANG:  No objection, Your Honor.

23              THE COURT:  All right.  Defendant's

24   objection is overruled.

25              Anything on Page 19?
```

1          MR. REINES:  No, Your Honor.

2          MR. WANG:  No, Your Honor.

3          THE COURT:  Page 20?

4          MR. REINES:  No, Your Honor.

5          MR. WANG:  No, Your Honor.

6          THE COURT:  Page 21?

7          MR. REINES:  Yes, Your Honor.  The

8   secondary considerations portion which begins on Page

9   21, starting with in making these assessments and then

10  it lists 1 through 11 and goes through October 6th,

11  1989, we object to those on the grounds that nexus

12  hasn't been laid for that and then -- and highlight, as

13  I did, informally that what's numbered here is No. 8,

14  whether or not others sought or obtained rights to the

15  patent from the patentholder.  We would definitely

16  object to any -- any instruction that permits the

17  licenses to be considered for support of validity of the

18  patent.

19          THE COURT:  All right.  Any objection

20  from Plaintiff?

21          MR. WANG:  No, Your Honor.

22          THE COURT:  All right.  Defendant's

23  objection with regard to the bottom of Page 21 and top

24  of Page 22, particularly the area known as secondary

25  considerations, is overruled.

```
 1                      Anything on Page 23?

 2                      MR. REINES:  No, Your Honor.

 3                      MR. WANG:  No, Your Honor.

 4                      THE COURT:  Page 24?

 5                      MR. REINES:  No, Your Honor.

 6                      MR. WANG:  No, Your Honor.

 7                      THE COURT:  Page 25?

 8                      MR. REINES:  No, Your Honor.

 9                      MR. WANG:  No, Your Honor.

10                      THE COURT:  Page 26?

11                      MR. REINES:  No, Your Honor.

12                      MR. WANG:  No, Your Honor.

13                      THE COURT:  Page 27?

14                      MR. REINES:  No, Your Honor.

15                      MR. WANG:  No, Your Honor.

16                      THE COURT:  Page 28?

17                      MR. REINES:  No, Your Honor.

18                      MR. WANG:  No, Your Honor.

19                      THE COURT:  Any other objections from

20   either party to the proposed final jury instructions?

21                      MR. REINES:  That is it.

22                      MR. WANG:  No, Your Honor.

23                      THE COURT:  All right.  Turning to the

24   proposed verdict form, is there objection from either

25   party as to Page 1?
```

1          MR. WANG:  No, Your Honor.

2          THE COURT:  Heading -- heading for

3    Question 2 should have been carried forward to the top

4    of the next page.  I'll correct that in final print.

5          MR. REINES:   Your Honor, just subject to

6    the JMOL objections that we made, which I don't think

7    there's any need to repeat, we don't have any objection

8    beyond that.

9          THE COURT:  All right.  Anything from the

10   parties on Page 2 or 3 of the verdict form then?

11         MR. REINES:  Again, not beyond the JMOL,

12   Your Honor.

13         MR. WANG:  No, Your Honor.

14         THE COURT:  All right.  That will

15   conclude the formal charge conference.

16         We'll stand in recess for a few moments

17   while the Court makes these minor changes and reproduces

18   enough copies so that each member of the jury can have

19   one of the final instructions during deliberations.

20         I understand there are some disputes

21   regarding slides to be used in closing argument.  What

22   I'd like to do is recess, start the printing process, if

23   you will, for the final instructions, and I'll come back

24   in and we'll take those up if they're still surviving.

25   I gather they are or not.  What's the status?

1               MR. REINES:  There's one, Your Honor.

2   There's one slide and one objection.

3               THE COURT:  Okay.  I was given a larger

4   number earlier.  Can somebody produce the one surviving

5   slide there's an objection to so that I can review it?

6               I'll be back in here shortly, and we'll

7   take it up.

8               MR. WANG:   Your Honor, I have a hard

9   copy.

10              THE COURT:  And this is Plaintiff's slide

11  that Defendant objects to; is that correct?

12              MR. WANG:   That's correct, Your Honor.

13              MR. REINES:  That's correct.

14              THE COURT:  If you'll approach, just hand

15  that up, we'll make a copy of it and I'll bring it back

16  to you.

17              MR. WANG:  Okay.

18              THE COURT:  Also, the parties need to see

19  Ms. Lockhart with regard to their final exhibit lists.

20              And I'll call for those to be read into

21  the record after the jury retires to deliberate.  Then

22  whatever you need to do as far as a written

23  documentation of your final exhibit list for the

24  Courtroom Deputy, I'll assume you're going to consult

25  with her.  And if she's happy, I'm happy.

1                    MR. WANG:  Your Honor, may I raise one

2    thing?

3                    THE COURT:  Yes.

4                    MR. WANG:  You -- you may not even need

5    to make a copy of that one slide.

6                    THE COURT:  I've seen this.  Is this the

7    same slide?  It hasn't changed any?

8                    MR. WANG:  That's right, and it -- it

9    relates exactly to the JMOL issue that the Defendant

10   raised earlier and the Court has already ruled on.  I

11   believe that the Defendant just wants to state his

12   objection for the record.

13                   THE COURT:   Is that correct?

14                   MR. REINES:  Well, yes.

15                   THE COURT:   I mean, I'm not going to

16   change my JMOL ruling.

17                   MR. REINES:  No, I understand that.  So I

18   just -- I do want -- I think it's important enough to

19   put on the record it -- it relates to the fact that

20   there's no factual basis to show that the block has

21   already been on the link at the time that the new key is

22   being used.  Very deceptive and given the claim

23   construction, a substantial concern.

24                   THE COURT:  All right.  Well, let's do

25   this.  I'm going to recess.  We'll start printing the

1  final copies of the -- the jury charge and the verdict

2  form.  I'll be back in.  We'll take this up.

3          Is there anything else Counsel's aware of

4  that needs to be covered before we bring the jury in for

5  final argument?

6          MR. FENSTER:  Your Honor, may I just

7  inquire if it's the Court's intention that the jury will

8  have a copy during -- of the --

9          THE COURT:  No.

10          MR. FENSTER:  Thank you.

11          THE COURT:  No, I will give it to them --

12  I will give it to the Court Security Officer when they

13  are instructed to retire and deliberate.  He'll hand

14  them a clipped version when he takes them to the jury

15  room with eight copies of the final instructions and one

16  clean copy of the verdict form.

17          MR. FENSTER:  Thank you, Your Honor.

18          MR. WANG:  Your Honor, one last thing

19  with respect to that slide, if I may.

20          THE COURT:  Yes, go ahead.

21          MR. WANG:  It was -- that slide is

22  actually just a shrunken down version of the board that

23  Dr. Jaeger actually put on the easel in front of the

24  jury and walked them through when he was testifying.

25          THE COURT:  All right.  Who's going to

1   present closing arguments for the Plaintiff?

2                    MR. FENSTER:  I will, Your Honor.

3                    THE COURT:  Are you going to share your

4   time with anyone?  Are you doing it all?

5                    MR. FENSTER:  I'm going to take it all.

6                    THE COURT:  All right.  You need to use

7   at least 50 percent of your time in your first argument.

8                    What was your -- what is your preference

9   with regard to warning on your time, Mr. Fenster?

10                   That's 17-and-a-half minutes.  I can tell

11  you it's 17-and-a-half minutes so you'll know you've

12  passed halfway, or you tell me what you want.

13                   MR. FENSTER:  17-and-a-half minutes would

14  be perfect, Your Honor.

15                   THE COURT:  And then on final argument.

16                   MR. FENSTER:  And then on final argument,

17  if you'd give me a warning at 5 and 2.

18                   THE COURT:  5 and 2.

19                   And who's going to present closing

20  arguments for the Defendant?

21                   MR. BALDAUF:  I am, Your Honor.

22                   THE COURT:  All right.  What would you

23  like as far as a warning, Mr. Baldauf?

24                   MR. BALDAUF:  5 minutes and 2 minutes,

25  Your Honor.

```
 1                    THE COURT:  5 and 2.

 2                    MR. BALDAUF:  Yes.

 3                    THE COURT:   All right.  Then we'll stand

 4   in recess, and I'll be back in in a minute.  We'll take

 5   up this final demonstrative for closing argument.

 6                    COURT SECURITY OFFICER:  All rise.

 7                    (Recess.)

 8                    (Jury out.)

 9                    COURT SECURITY OFFICER:  All rise.

10                    THE COURT:  Be seated, please.

11                    All right.  With regard to the disputed

12   demonstrative for use in closing arguments, the Court's

13   considered the same, and given that it is almost

14   identical to a jury aid used during the trial without

15   objection, the Court's going to overrule the objection

16   to this as a demonstrative during closing arguments.

17                         Is there anything else that we should

18   take up, Counsel, before we proceed to bring the jury

19   in?

20                    MR. REINES:  Your Honor, on that front,

21   would you mind if we submit an objection with the

22   document so the record shows the posterity to the actual

23   demonstrative that we've objected to?

24                    THE COURT:  You know, if you want to file

25   something to document the actual demonstrative, that's
```

```
 1   fine.
 2                   MR. REINES:  That's all I'm saying.
 3   Thank you.
 4                   MR. WANG:  Your Honor, I just wanted to
 5   read the exhibit we used into the record.
 6                   THE COURT:  We can do that now or we can
 7   do it after the closing argument, if you're prepared.
 8                   Is the other side prepared to do that?
 9   There shouldn't be many.
10                   MR. BREAN:  Yes, there's one, and there's
11   no dispute on this.
12                   THE COURT:  Okay.  Go ahead, Mr. Wang.
13                   MR. WANG:  DX 22.
14                   THE COURT:  No objection from the
15   Defendant?
16                   MR. BREAN:  No, Your Honor.
17                   THE COURT:  Defendant have anything
18   additional for the record?
19                   MR. BREAN:  No, Your Honor, we do not.
20                   THE COURT:  And both sides have consulted
21   with the courtroom deputy with regard to your final
22   jury -- final exhibit list; is that correct?
23                   MR. BREAN:  Yes, Your Honor, Newegg has.
24                   THE COURT:  All right.
25                   MR. WANG:  Yes, Your Honor.
```

```
 1                    THE COURT:  Okay.  Then are we ready to
 2  bring in the jury?
 3                    MR. FENSTER:  We are, Your Honor.
 4                    MR. BALDAUF:  Yes, Your Honor.
 5                    THE COURT:  If you'd bring in the jury,
 6  please, Mr. McAteer.
 7                    COURT SECURITY OFFICER:  Yes, sir.
 8                    All rise for the jury.
 9                    (Jury in.)
10                    THE COURT:  Be seated, Ladies and
11  Gentlemen.
12                    Members of the Jury, you have now heard
13  the evidence in this case, and I will now instruct you
14  on the law that you must apply to that evidence.  It's
15  your duty to follow the law as I give it to you.
16                    However, as I've said previously, you,
17  the jury, are the judges of the facts.
18                    Do not consider any statement that I have
19  made during the trial or make in these instructions as
20  an indication that I have an opinion about the facts of
21  this case.
22                    Also, Ladies and Gentlemen, each of you
23  will be given a written copy of these instructions when
24  you have retired to the jury room.  So unless you just
25  want to, there's no express need that you make notes as
```

1   I go through these final instructions now, because

2   you'll each have your own copy when you retire to

3   deliberate.

4          The attorneys will soon make their

5   closing arguments.  The closing arguments of the

6   attorneys are not evidence and are not instructions on

7   the law.  They are intended only to assist you in

8   recalling and understanding the evidence and the

9   parties' contentions.

10          A verdict form has been prepared for you.

11  You will take this form with you to the jury room, and

12  when you have reached unanimous agreement as to your

13  verdict, you will have your foreperson fill in, date,

14  and sign the verdict form.  Answer each question on the

15  verdict form from the facts as you find them to be.

16          Do not decide who you think should win

17  the case and then answer the questions accordingly.

18          Your answers and your verdict must be

19  unanimous.

20          In determining whether any fact has been

21  proven in this case, there are two types of evidence

22  that you may consider in properly finding the truth as

23  to the facts of this case.

24          One is direct evidence, such as the

25  testimony of an eyewitness.  The other is indirect or

1  circumstantial evidence -- that is, the proof of a chain

2  of circumstances that indicates the existence or

3  non-existence of certain other facts.

4          Now, as a general rule, the law makes no

5  distinction between direct or circumstantial evidence,

6  but simply requires that you find the facts based on the

7  evidence presented, both direct and circumstantial.

8          You may, unless otherwise instructed,

9  consider the testimony of all the witnesses, regardless

10 of who may have called them, and all the exhibits

11 received into evidence, regardless of who may have

12 introduced them.  You may also consider any stipulations

13 or agreements of the parties in this case.

14          Additionally, when knowledge of a

15 technical subject may be helpful to the jury, a person

16 who has special training or experience in that technical

17 field, called an expert witness, is permitted to state

18 his or her opinions on those technical matters.

19          However, you're not required to accept

20 those opinions.  As with any other witness, it is solely

21 up to you to decide whether to rely upon those opinions

22 or not.

23          In determining the weight to give to the

24 testimony of a witness, you should ask yourself whether

25 there was evidence tending to prove that the witness

1  testified falsely concerning some important fact or

2  whether there was evidence that at some other time the

3  witness said or did something or failed to say or do

4  something that was different from the testimony the

5  witness gave before you during this trial.

6          Certain testimony in this case has been

7  presented to you through depositions.  A deposition is

8  the sworn, recorded answers to questions asked of a

9  witness in advance of the trial.  If a witness cannot be

10 present to testify in person from the witness stand,

11 then the witness's testimony may be presented under oath

12 in the form of a deposition.

13         Before this trial began, attorneys

14 representing the parties in this case questioned these

15 deposition witnesses under oath.  A court reporter was

16 present and recorded their testimony.  Deposition

17 testimony is entitled to the same consideration as

18 testimony given by a witness in person from the witness

19 stand.  Accordingly, you should judge the credibility of

20 and weigh the importance of deposition testimony to the

21 best of your ability just as if the witness had

22 testified before you in open court during this trial.

23         While you should consider only the

24 evidence in this case, you are permitted to draw such

25 reasonable inferences from the testimony and exhibits as

1 you feel are justified in the light of common

2 experience.  In other words, ladies and gentlemen, you

3 may make deductions and reach conclusions that reason

4 and common sense lead you to draw from the facts that

5 you have established by the testimony and evidence in

6 the case.

7           You may properly determine that the

8 testimony of a single witness may be sufficient to prove

9 any fact, even if a greater number of witnesses may have

10 testified to the contrary, if after considering all the

11 other evidence, you believe that single witness.

12           By allowing testimony or other evidence

13 to be introduced over the objection of an attorney, the

14 Court did not indicate any opinion as to the weight or

15 effect of such evidence.  As stated before, you are the

16 sole judges of the credibility of all the witnesses and

17 what weight and effect to give to all of the evidence in

18 this case.

19           When the Court sustained an objection to

20 a question addressed to a witness, you must disregard

21 the question entirely and may draw no inference from its

22 wording or speculate about what the witness would have

23 said if he or she had been permitted to answer the

24 question.

25           Now, at times during the trial, it was

1  necessary for the Court to talk to the lawyers here at

2  the bench out of your hearing or by calling a recess and

3  talking to them when you were in the jury room and not

4  in the courtroom.  This happened because often during a

5  trial some things come up that do not involve the jury.

6  You should not speculate on what was said during these

7  discussions that took place outside of your presence.

8              Certain exhibits shown to you are

9  illustrations.  We call these types of exhibits

10 demonstrative exhibits.  Demonstrative exhibits are a

11 party's description, picture, or model to describe

12 something involved in the trial.  If your recollection

13 of the evidence differs from the demonstrative exhibit,

14 rely on your recollection.  Demonstrative exhibits are

15 not evidence.

16             I will now turn to the issue of the

17 burden of proof which I discussed with you at the outset

18 of the case.  The Plaintiff, TQP, has the burden of

19 proving infringement by a preponderance of the evidence.

20 Preponderance of the evidence means the evidence that

21 persuades you that a claim is more likely true than

22 untrue.

23             In determining whether any fact has been

24 proved by a preponderance of the evidence, you may,

25 unless otherwise instructed, consider the stipulations,

1 the testimony of all the witnesses, regardless of who

2 called them, and all the exhibits received into

3 evidence, regardless of who may have produced them.

4          The Defendant, Newegg, bears the burden

5 of proving invalidity by clear and convincing evidence.

6          Clear and convincing evidence means

7 evidence that produces in your mind a firm belief or

8 conviction as to the matter at issue.  When a party has

9 the burden of proving any claim or defense by clear and

10 convincing evidence, it means that the evidence must

11 have persuaded you that the claim or defense is highly

12 probable.

13          In determining whether any fact has been

14 proven by clear and convincing evidence, you may, unless

15 otherwise instructed, consider the stipulations, the

16 testimony of all witnesses, regardless of who called

17 them, and all exhibits received into evidence,

18 regardless of who may have produced them.

19          Although proof to an absolute certainty

20 is not required, the clear and convincing evidence

21 standard requires a greater degree of persuasion than is

22 necessary for a preponderance of the evidence standard.

23          If the proof establishes in your mind a

24 firm belief or conviction, then the standard has been

25 met.

1                    Plaintiff, TQP Development, LLC, which

2    you've heard referred to throughout the trial as TQP,

3    con -- contends that the Defendant, Newegg, Inc., who

4    you've heard referred to throughout the trial simply as

5    Newegg, infringes Claims 1, 6, 8, and 9 of United States

6    Patent 5,412,730, or the '370 pat -- the '730 patent.  I

7    may refer to the '730 patent as the patent-in-suit.

8                    Collectively, I may refer to Claims 1, 6,

9    8, and 9 of the '730 patent as the asserted claims.

10                   The '730 patent covers a method of

11   transmitting data in encrypted form as set forth in the

12   claims.  As you've heard, TQP says that the way Newegg

13   encodes or encrypts communications with its website

14   systems using SSL or TLS in combination with RC4 and

15   when coupled with its customer's computers, infringe the

16   claims of the '730 patent.  TQP is seeking damages for

17   Newegg's alleged infringement.

18                   Newegg denies that it has infringed the

19   '730 patent.  Newegg also denies that it has induced

20   others to infringe the '730 patent.  Newegg denies that

21   TQP is entitled to any damages or any other relief.

22                   Furthermore, Newegg contends that the

23   asserted claims of the '730 patent are invalid.

24                   Invalidity is a defense to infringement.

25   Generally, Newegg contends that the asserted claims are

1  invalid because they were not new or would have been

2  obvious to one of ordinary skill in the art.

3            Therefore, even though the United States

4  Patent Mark and -- Patent and Trademark Office or PTO

5  has allowed the asserted claims, you, the jury, must

6  decide whether those claims are invalid.

7            Your job is to decide whether the

8  asserted claims have been infringed and whether any of

9  the asserted claims are invalid.  If you decide that any

10  claim of the patent has been infringed and is not

11  invalid, you will then need to decide what amount of

12  money damages, if any, are to be awarded to TQP as

13  compensation for such infringement.

14            Before you decide many of the issues in

15  this case, you will need to understand the role of

16  patent claims.  The patent claims are the numbered

17  sentences at the end of each patent.  The claims are

18  important because it is the words of the claims

19  themselves that define what the patent covers.  The

20  figure and the text -- the figure and the text in the

21  rest of the patent provide a description and/or examples

22  of the invention and provide a context for the claims.

23  But it is the claims that define the breadth of the

24  patent's coverage.

25            Each claim is effectively treated as if

it were a separate patent, and each claim may cover more

or less than another claim.  Therefore, what a patent

covers collectively depends on what each of its claims

covers.  I'll now explain how a claim defines what it

covers.

A claim sets forth in words a set of

requirements.  Each claim sets forth its requirements in

a single sentence.  If a device satisfies each of these

requirements in that sentence, then it is covered by the

claim.

There can be several claims in a patent.

A claim may be narrower or broader than another claim by

setting forth more or fewer requirements.  The coverage

of a patent is assessed on a claim-by-claim basis.  In

patent law, the requirements of a claim are often

referred to as the claim elements or claim limitations.

For example, a claim that covers the

invention of a table may recite the tabletop, four legs,

and the glue that secures the legs on the tabletop.  The

tabletop, legs, and glue are each an element or

requirement of the claim.

When a product meets all of the

requirements of a claim, the claim is said to cover that

product and that product is said to fall within the

scope of that claim.  In other words, a claim covers a

1    product where each of the claim elements or limitations

2    is present in that product.  If a product is missing

3    even one limitation or element of a claim, the product

4    is not covered by the claim.  If the product is not

5    covered by the claim, that product does not infringe

6    that claim.

7              Patent claims may exist in two forms

8    referred to as independent claims and dependent claims.

9              An independent claim does not refer to

10   any other claim of the patent.  It is not necessary --

11   necessary to look at any other claim to determine what

12   an independent claim covers.  Asserted Claim 1 in this

13   case is an independent claim.

14             The '730 patent also contains dependent

15   claims.  Each dependent claim refers to or depends from

16   an independent claim.  A -- a dependent claim includes

17   each of the requirements of the independent claim to

18   which it refers as well as the additional claims

19   described in the dependent claim itself.

20             In order to find infringement of a

21   dependent claim, you must first decide whether the

22   independent claim to which it refers has been infringed.

23             In this case, if you decide that the

24   independent claim, Claim 1, has not been infringed, then

25   the independent claims, Claims 6, 8, and 9, cannot have

1   been infringed.

2              If you decide that the independent claim,

3   Claim 1, has been infringed, then you must separately

4   determine whether each additional requirement of the

5   dependent claims has been included in the accused

6   product.  If each additional requirement has been

7   included, then the dependent claim has been infringed.

8              Sometimes the words in a patent claim are

9   difficult to understand, and, therefore, it's difficult

10  to understand what requirements those words impose.  By

11  understanding the meaning of the words in a claim and by

12  understanding what the words in a claim set forth, the

13  requirements that a product must meet in order to be

14  covered by the claims, you'll be able to understand the

15  scope of coverage for each claim.

16             Once you understand what each claim

17  covers, then you are prepared to decide the issues that

18  you will be asked to decide, such as infringement and

19  invalidity.

20             You first need to understand what -- what

21  each claim covers in order to decide whether or not

22  there is infringement of the claim and to decide whether

23  or not the claim is invalid.  The law says that it is my

24  role to define the terms of the claims, and it is your

25  role to apply my definitions to the issues that you have

1  been asked to decide in this case.

2              Therefore, as I explained to you at the

3  start of the case, I have determined the meaning of the

4  claims, and I have provided for you or to you my

5  definitions of certain claim terms.  These are in your

6  juror notebooks.  You must accept my definitions of

7  these words in the claims as being correct.

8              It's your job to take these definitions

9  that I have supplied and apply them to the issues that

10  you are asked to decide, including the issues of

11  infringement and invalidity.

12             I will now explain to you the meaning of

13  some of the words of the claim in this case.  In doing

14  so, I will explain some of the requirements of the

15  claims.  As I have previously instructed you, you must

16  accept my definition of these words in the claims as

17  correct.  For any words in the claim for which I have

18  not provided you with a definition, you should apply

19  their common and ordinary meaning.

20             You should not take my definition of the

21  language of the claims as an indication that I have a

22  view regarding how you should decide the issues that you

23  are being asked to decide, such as infringement and

24  invalidity.

25             These issues are yours to decide alone,

1  not mine.

2           You have been provided with copies of the

3  '730 patent and copies of the claim term definitions,

4  and you may use them in your deliberations.

5           The following definitions apply to the

6  language in Claim 1, the sole independent claim asserted

7  in this case.

8           The beginning portion or preamble of

9  Claim 1 uses the word comprising.  The word comprising,

10 when used in the preamble, means including or

11 containing.  As a result, a device that includes all the

12 limitations of the claim as well as additional elements

13 is covered by that claim.

14          The term sequence of blocks in encrypted

15 form means sequence of two or more blocks that have been

16 encrypted.

17          The term block means a group of bits such

18 as a character, word, or other unit of data.

19          The phrase providing a seed value for

20 both said transmitter and receiver means providing the

21 same seed value to both the transmitter and receiver.

22          The phrase seed value has its plain

23 meaning.  However, you should note that the seed value

24 is provided to the transmitter prior to generating the

25 first sequence of pseudo-random key values, and the seed

1  value is provided to the receiver prior to generating

2  the second sequence of pseudo-random key values.

3          The term pseudo-random key values means a

4  sequence of numbers that are generated by supplying a

5  seed value to an algorithm.  A sequence of numbers have

6  no apparent regularities, unless the seed value and

7  algorithm are known or determined.

8          The phrase based on said seed value means

9  based exclusively on said seed value.

10          The term each new key value in said

11  sequence being produced at a time dependent upon said

12  predetermined characteristic of said data transmitted

13  over said link means a new key value in the second

14  sequence is produced each time a condition based on a

15  predetermined characteristic of the transmitted data is

16  met at the receiver.

17          The term predetermined means determined

18  before any communication of a sequence of encrypted

19  blocks.

20          The term encrypting the data means

21  covering cleartext data -- converting, rather --

22  converting cleartext data into ciphertext.

23          The phrase a new one of said key values

24  in said first and second sequences being produced each

25  time a predetermined number of said blocks are

transmitted over said link means a new key value in the

first and second sequence is used each time a

predetermined number of blocks have been sent from the

transmitter over the communication link.

You should note as to the determination

of whether a predetermined number of said blocks have

been transmitted over said link, the claim explicitly

refers to transmission, not to encryption or to some

other step of preparing for transmission.

The term decrypting the data means

converting ciphertext into cleartext.

The phrase found in Claim 6, quote, said

provided seed value is one of a number of seed values of

a plurality of remote locations with which secured

communication is required, close quote, means when

secured communication is required with two or more

remote locations, providing more than one seed value for

a number of remote locations for which secured

communications is required.

The phrase found in Claim 8, quote,

associating different ones of seed values with each of a

plurality of remote locations with which secured

communication is required, close quote, means when

secured communication is required with two or more

remote locations associating a different seed value with

1    each of the remote locations.

2              As established by the United States Code,

3    Title 35, Section 271, a patent owner has a right to

4    exclude others from making, using, or selling the

5    invention covered by the patent claims during the

6    20-year life of the patent throughout the United States.

7              Infringement occurs when a person without

8    the patent owner's permission makes, uses, sells, or

9    offers for sale something that is within the scope of

10   what the patent covers.

11             Only the claims of a patent can be

12   infringed.  To determine whether there is infringement,

13   you must compare the allegedly infringing product with

14   the patent claims as I've defined them for you.

15             In order to infringe a patent claim, a

16   product or method or process must include each and every

17   element of the claim.  I'll refer to the separate

18   paragraphs of each of the claims at issue in this case

19   as steps.  Sometimes in this case the parties have

20   referred to the steps of the claims as limitations.

21             That's a common patent law expression,

22   but I'll avoid it in the interest of clarity.  A claim

23   step is present if it exists in the accused product or

24   process as it is described in the claim language.

25             So in determining whether Newegg

infringes TQP's asserted claims, you must determine whether each and every method step recited in the claims in the manner required by the claims is performed by Newegg's accused website systems when coupled with its customers' computers.

In order to prove infringement, TQ -- TQP must prove this by a preponderance of the evidence.  If any requirement recited in the asserted claims is omitted, then there is no infringement of that claim. You must consider each claim individually.

A claim may be infringed directly or indirectly.  TQP alleges that Newegg infringes directly by performing some of the claimed method steps itself and by directing or controlling others to perform the remaining steps, such that Newegg should be held responsible for such actions.

TQP also alleges that Newegg infringes indirectly by engaging in active inducement of infringement of the claimed invention.  I will explain active inducement later.

TQP need only show that any one of the claims is infringed to be entitled to damages.  In addition, TQP does not need to show that Newegg intended to infringe or knew of the '730 patent.

I'll now instruct you on how to decide

whether or not Newegg has directly infringed one or more
of the asserted claims of the '730 patent.

Infringement is assessed on a
claim-by-claim basis.  Therefore, there may be
infringement of one claim, but no infringement of
another claim.  However, the fact that others have
licensed the '730 patent is not evidence of whether
Newegg infringes the asserted claims.

In order to prove direct infringement of
the asserted method claims, TQP must prove by a
preponderance of the evidence that Newegg or those it
directs or controls, as I will describe in further
detail below, actually performed each and every step of
the claimed method in the United States.

In determining whether a Newegg accused
product or service infringes one or more of TQP's
asserted claims, you must compare the accused product or
service with each and every one of the requirements of a
claim to determine whether an accused product or service
contains each and every requirement recited in a claim.

A claim requirement is present if it
exists in an accused product or service or its method of
use is just as -- as it is described in the claim
language, either as I have explained the language to you
or if I did not explain it, as it would be understood by

1    one of skill in the art.

2              If any of the accused products or

3    services omit even a single requirement recited in a

4    claim, then you must find that the particular product or

5    service does not infringe the patent claim.

6              The specific Newegg websites accused of

7    infringing the asserted claims of the '730 patent are

8    known as www.newegg.com and www.newegg.business.com.

9    TQP also claims that Newegg has actively induced others

10   to infringe the '730 patent.

11             Direct infringement that -- excuse me,

12   direct infringement requires that a party perform or use

13   every step of a claimed method.  Where no single party

14   performs every step of a claimed method but more than

15   one party performs every step of the method, the claim

16   nonetheless may be directly infringed if one party has

17   control over the entire method so that the steps are

18   attributable to the controlling party.

19             If you find that Newegg itself has not

20   performed every step of the claimed method, you may find

21   that Newegg has directly infringed the claimed method if

22   TQP has proved by a preponderance of the evidence that

23   Newegg directed or controlled its customers' computers

24   to perform the remaining steps of the method so that

25   performance of the entire method is attributable to

1  Newegg.

2              On the other hand, if you find that

3  Newegg itself has not performed every step of the

4  claimed method and Newegg's customers' computers in

5  performing the remaining steps of the method did not act

6  at the direction of or under the control of Newegg, then

7  Newegg is not liable for direct infringement.

8              Mere arm's length cooperation between

9  Newegg and its customers is insufficient to prove Newegg

10  directed or controlled its customers for purposes of

11  direct infringement.

12              TQP alleges that Newegg is liable for

13  infringement by actively inducing its customers to

14  infringe the '730 patent.  As with direct infringement,

15  you must determine whether there has been active

16  inducement on a claim-by-claim basis.  Liability for

17  active inducement of infringement also requires that all

18  of the claimed method steps were performed.

19              To prove that Newegg induced patent

20  infringement of any of the asserted claims, TQP must

21  prove that it is more likely than not that, one, Newegg

22  knew of the '730 patent; two, Newegg performed some of

23  the steps of the asserted claims; three, Newegg induced

24  its customers to perform the remaining steps of the

25  claim; and four, Newegg's customers, in fact, performed

1   such steps.

2              Newegg induces its customers if it

3   causes, urges, encourages, aids, advises, or otherwise

4   induces them to perform the remaining steps of the

5   claim, knowing that the result constitutes infringement.

6              A find -- a finding of inducement

7   requires both knowledge of the existence of the patent

8   and knowledge that the induced acts constitute patent

9   infringement.  The knowledge requirement may be

10  satisfied by showing actual knowledge or will -- willful

11  blindness.

12             A party is willfully blind if it believed

13  there was a high probability that the acts constituted

14  patent infringement and took deliberate actions to avoid

15  learning of the infringement.

16             Active inducement of infringement cannot

17  occur unintentionally.  Rather, to find such, you must

18  find that Newegg specifically intended its customers to

19  infringe the '730 patent or that Newegg believed that

20  there was a high probability that its customers would

21  infringe the '730 patent but remained willfully blind to

22  the infringing nature of its customers' acts.

23             In considering whether or not Newegg had

24  a specific intent to induce infringement, you may

25  consider evidence as to whether Newegg had a good-faith

1    belief that they did not infringe any claims of the

2    patent and whether Newegg had a good-faith belief that

3    the patent claims are invalid.

4                     TQP must prove that each of the above

5    requirements is met by a preponderance of the evidence;

6    that is, more likely than not that the requirements have

7    been met.  In addition, you must determine whether there

8    has been active inducement on a claim-by-claim basis.

9                     To be clear, all the steps of a claimed

10   method must be performed in order to find induced

11   infringement, but it is not necessary to prove that all

12   the steps were committed by a single entity.

13                    Newegg contends that all of the claims of

14   the '730 patent that TQP is asserting are invalid.

15                    Patent invalidity is a defense to patent

16   infringement.  As the '730 patent was issued by the

17   United States Patent and Trademark Office, it is

18   presumed to be a valid patent.  That means that the fact

19   that a patent was issued to a particular person does not

20   guarantee that the patent is valid.

21                    But once it issues, the law says that if

22   a challenger wants to show that it is invalid, the

23   challenger has to make that showing by clear and

24   convincing evidence.  So patent invalidity is one of the

25   issues in this case to which the clear and convincing

1    evidence standard applies.

2              In deciding whether particular claims are

3    invalid, you will interpret the claims in the same way

4    that you have in deciding infringement.

5              I will now instruct you on the rules that

6    you must follow in deciding whether Newegg has proven

7    that Claims 1, 6, 8, and 9 of the '730 patent are

8    invalid.

9              To prove that any claim in a patent is

10   invalid, Newegg must persuade you by clear and

11   convincing evidence.  Even though the PTO Examiner has

12   allowed the claims of a patent and the patent is

13   presumed valid, you have the responsibility for deciding

14   whether the claims of the patent are valid.

15             For a patent to be valid, the invention

16   claimed in the patent must be new and non-obvious.  The

17   terms new and nonobvious have special meanings under the

18   patent laws, and I'll explain those terms to you as we

19   discuss Newegg's grounds for asserting invalidity.

20             Newegg contends that the asserted claims

21   are invalid as being anticipated and/or obvious in view

22   of the prior art.  Prior art may include items that were

23   publicly known or that have been used or offered for

24   sale, publications, or patents that disclose the claimed

25   invention elements or elements of the claimed invention.

1              To be prior art, the item or reference

2   must have been made, known, used, published, or patented

3   before October the 6th, 1989.

4              In order for someone to be entitled to a

5   patent, the claimed invention must be actually new or

6   novel, meaning that it is not present or disclosed in

7   the prior art.  In general, inventions are new when the

8   claimed product or process has not been made, used or

9   disclosed before?

10             If a claimed invention does not exist in

11  the prior art -- excuse me -- if a claimed invention

12  does exist in the prior art, it is said to be

13  anticipated.  Anticipation must be determined on a

14  claim-by-claim basis.

15             For the asserted claim to be invalidated

16  as anticipated, Newegg must show that all of the

17  requirements of that claim were present in a single

18  previous device or method that was known of, used, sold,

19  offered for sale, or described in a single pre -- piece

20  of prior art, such as a printed publication, patent,

21  product, or process that predates the claimed invention.

22             We refer to such prior art as

23  anticipating prior art.  To anticipate the invention,

24  the prior art does not have to use the same words as the

25  claim, but all of the requirements of the claim must

have been disclosed or present in a single piece of
prior art.

Each and every claim limitation must
expressly be present or implied to a person having
ordinary skill in the art of the technology of the
invention so that looking at that piece of prior art,
that person could make or use or practice the claimed
invention.

Newegg contends that Claims 1, 6, 8, and
9 of the '730 patent are invalid because the claimed
invention is anticipated or because TQP lost the right
to obtain a patent.  Newegg must convince you of this by
clear and convincing evidence.

Here is a list of the ways that Newegg
can show that Claims 1, 6, 8, and 9 of the '730 patent
are invalid as anticipated because they were not new or
novel.

1.  If the claimed invention was known to
or used by others in the United States before October
the 6th, 1989.  An invention is known when the
information about it was reasonably accessible to the
public on that date.

2.  If the claimed invention was already
patented or described in a printed publication anywhere
in the world before October the 6th, 1989.  A

description it a printed publication only if it was
publicly accessible.

       3.   If the claimed invention was already
described in a printed publication anywhere in the world
more than a year before October the 6th, 1989, which is
the effective filing date of the application for the
'730 patent.

       4.   If the claimed invention was publicly
used, sold, or offered for sale in this country more
than one year before October the 6th, 1989, which is the
effective filing date of the application for the '730
patent; or.

       5.   If the claimed invention was already
made by someone else in the United States before October
the 6th, 1989, who had not abandoned, suppressed, or
concealed the invention.

       A patent claim is also invalid, if the
invention recited in that claim was publicly known or
publicly used in the United States by someone other than
the inventor before the patent applicant invented it,
which here is October the 6th, 1989.

       An invention was in public use by another
if the claimed invention was accessible to the public or
commercially exploited in a non-secret way.  Factors
relevant to the determination of whether a use was

 1   public include the nature of the activity -- activity

 2   that occurred in public, public access to the use,

 3   confidentiality obligations imposed upon observers,

 4   commercial exploitation, and the circumstances

 5   surrounding testing and experimentation.

 6              An invention is publicly used if it is

 7   used by the inventor or by a person who is not under any

 8   limitation, restriction, or obligation of secrecy to the

 9   inventor.  The absence of affirmative steps to conceal

10   the use of the invention is evidence of a public use.

11              However, secret use by a third party

12   other than the inventor is not public, unless members of

13   the public have access to the invention.  As long as the

14   use of the invalidating aspects of the prior art was

15   public, access to the inner workings of the prior art is

16   not required for use to be considered a public use for

17   purposes of determining invalidity.

18              In order to be a public use, the

19   invention must also have been ready for patenting at the

20   time of the alleged public use.  An invention is ready

21   for patenting either when it is reduced to practice or

22   when the inventor has prepared drawings or other

23   descriptions of the invention sufficient to allow a

24   person of -- person of ordinary skill in the art to make

25   or use the invention.

1                An -- an invention is reduced to practice

2  when it has been (1) constructed or performed within the

3  scope of the patent claims; and (2) determined that it

4  works for its intended purpose.

5                The claimed invention is ready for

6  patenting when there is reason to believe that it would

7  work for its intended purpose.

8                Finally, to show anticipation of the

9  patented invention based on public -- excuse me -- prior

10 public knowledge or use by another, Newegg must show by

11 clear and convincing evidence that the process publicly

12 known or used by another disclosed all of the elements

13 of each claim of the patent that Newegg contends is

14 invalid.

15               Newegg contends that Claims 1, 6, 8, and

16 9 of the '730 patent was anticipated because the

17 invention defined in that -- in those claims was on sale

18 in the United States more than one year before the

19 patentee filed his patent application on October the

20 6th, 1989.

21               A patent claim is invalid if more than

22 one year before the filing date of the patent the

23 claimed invention was both (1), subject to commercial

24 offer for sale in the United States, and (2) ready for

25 patenting.  Such is called the on-sale-bar.

1              An invention was subject to a commercial

2    offer for sale if the claimed invention was embodied in

3    an item that was actually sold or offered for sale.

4              A sale, for purposes of the on-sale-bar,

5    is a contract between parties to give and to pass rights

6    of property for consideration which the buyer pays or

7    promises to pay the seller for things bought or sold.

8              An offer for sale is made if another

9    party could make a binding contract by simply accepting

10   the offer.  It is not required that a sale was actually

11   made.

12             In this case, the claimed invention

13   involves a method or process.  A method or process is

14   not sold in the same sense as a tangible item is sold.

15   Merely granting a license to a process to allow the

16   licensee to commercialize the process without more does

17   not constitute a sale for purposes of the on-sale-bar.

18             However, a commercial transaction

19   arranged or described as a license may nonetheless

20   amount to a sale.  For example, a standard computer

21   software license may be considered -- can be considered

22   a sale because the product is just as immediately and

23   completely transferred to the buyer as if it were sold.

24             Further, merely providing the buyer or

25   licensee with knowledge of the process and granting him

or her the freedom to carry it out pursuant to the terms
of the transaction without more does not constitute a
sale for purposes of the on-sale-bar.

However, a seller or licensor actually
performing the process himself for consideration would
constitute a sale of the process for purpose of the
on-sale-bar.

In this case, Newegg contends that the
license and development agreement between RSA and Lotus
Corporation was an offer for sale of the RC4 algorithm.
Newegg also contends that a software development
agreement between Lotus Corporation and
Iris Associates, Inc., was a sale of technology that
would invalidate the '730 patent.

If you find that neither agreement
constitutes a sale or offer for sale of the claimed
process, then neither agreement will trigger invalidity
based upon the on-sale-bar.  If, on the other hand, you
find that either or both agreements constitute a sale or
offer for sale of the claimed process, you need to
additionally consider whether the process sold or
offered for sale was kept secret and remained secret
even after the sale.

If the process was kept secret and
remained secret even after the sale, such sale or offer

1   for sale does not trigger invalidity, based upon the

2   on-sale-bar.  However, if the process was not kept

3   secret or did not remain secret after the sale, such

4   sale or offer for sale will trigger invalidity, based

5   upon the on-sale-bar, given that all other requirements

6   of the on-sale-bar are also satisfied.

7                    If you find that the claimed process was

8   subject to one or more non-credit commercial offers for

9   sale more than one year before the patentee filed his

10  U.S. patent application on October the 6th, 1989, to

11  invalidate the patent claimed -- the claimed process

12  must also have been ready for patenting more than one

13  year before October the 6th, 1989.

14                   An invention is ready for patenting

15  either when it is reduced to practice or when the

16  inventor has prepared drawings or other descriptions of

17  the invention sufficient to allow a person of ordinary

18  skill in the art to make or use the invention.

19                   An invention is reduced to practice when

20  it has been (1) constructed or performed within the

21  scope of the patent claims, and (2) determined that it

22  works for its intended purpose.  The claimed invention

23  is ready for patenting when there is reason to believe

24  that it would work for its intended purposes.

25                   In this case, Ladies and Gentlemen, the

1    Court has already determined and you are instructed that

2    RC4 was ready for patenting more than one year before

3    October the 6th, 1989.

4              Finally, to show anticipation of the

5    patented invention, based upon the on-sale-bar, Newegg

6    must show by clear and convincing evidence that the

7    process sold or offered for sale disclosed all of the

8    elements of each claim of the patent that Newegg contend

9    system invalid.

10             Newegg contends that various claims of

11   the patent-in-suit are invalid because the inventions

12   defined by those claims were invented by another person

13   before the patentee invented his invention.

14             A patent claim is invalid if the

15   invention defined by that claim was invented by another

16   person in the United States before it was invented by

17   the patentee, and that other person did not abandon,

18   suppress, or conceal the invention.

19             Newegg must show by clear and convincing

20   evidence either that before the patentee invented his

21   invention another person reduced to practice a method

22   that included all of the elements of the relevant claims

23   or that the other person was first to conceive the

24   invention and that he exercised reasonable diligence in

25   later reducing the invention to practice.

1          In addition, Newegg must show that the

2    other person's device was sufficiently developed that

3    one skilled in the art would have recognized that it

4    would work for its intended purpose.

5          If the prior invention was abandoned,

6    suppressed, or concealed, it cannot invalidate the

7    claims.  An invention was abandoned, suppressed, or

8    concealed if (1) the other person actively concealed the

9    invention from the public; or (2) the other person

10   unreasonably delayed in making the invention publicly

11   known.

12          Generally, an invention was not

13   abandoned, suppressed, or concealed if the invention was

14   made public, sold, or offered for sale or otherwise used

15   for a commercial purpose.  However, a finding of

16   suppression or concealment is not negated merely because

17   the invention has been commercialized through a secret

18   use outside the public domain.

19          Finally, to show anticipation of the

20   patented invention, Newegg must show by clear and

21   convincing evidence that the prior invention disclosed

22   all of the elements of each claim of the patent that

23   Newegg contends is invalid.

24          Even though an invention may not have

25   been identically disclosed or described before it was

1  made by an inventor in order to be patentable, the

2  invention must also not have been obvious to a person of

3  ordinary skill in the field of technology of the patent

4  at the time the invention was made.

5           This means that even if all the

6  requirements of the claim cannot be found in a single

7  prior art reference that would anticipate the claim, a

8  person of ordinary skill in the field of the invention

9  who knew about all of the prior art would have come up

10 with the claimed invention.

11          Newegg contends that the asserted claims

12 of the patent are invalid because the inventions were

13 obvious.  Newegg may establish that a patent claim is

14 invalid by showing by clear and convincing evidence that

15 the claimed invention would have been obvious to persons

16 having ordinary skill in the art at the time the

17 application was filed.

18          In determining whether or not Newegg has

19 established obviousness of a claim of the patent-in-suit

20 by clear and convincing evidence, you must consider the

21 following:

22          1.  The scope and content of the prior

23 art;

24          2.  The level of ordinary skill in the

25 field of technology at the time the invention was made;

1  and.

2              3.  The differences if -- if any, between

3  each claim of the patent and that prior art;

4              4.  Any secondary considerations relating

5  to obviousness or non-obviousness of the invention.

6              I will now describe in more detail the

7  specific determinations you must make in deciding

8  whether or not the claimed invention would have been

9  obvious.  A claim does not need to be both anticipated

10 and obvious in order to be invalid.

11             In determining whether or not the

12 invention is invalid, you must determine the scope and

13 content of the prior art at the time the invention was

14 made.  You must decide whether the specific references

15 relied upon by Newegg in this case are prior art of the

16 invention described in the asserted claims of the '730

17 patent.

18             Prior art includes previous devices,

19 articles, and methods that were publicly used or offered

20 for sale and printed publications or patents that

21 disclose the invention or elements of the invention.

22             Once you decide whether or not specific

23 references are prior art, you must also decide what

24 those references would have disclosed or taught to one

25 having ordinary skill in the field of technology of the

1    patent at the time the invention was made.

2              You have heard the term a person or -- a

3    person of ordinary skill in the field or the art a lot

4    in this case.  That term gets used frequently in patent

5    law, and it is particularly important in deciding

6    whether an invention would have been obvious at the time

7    it was invented.

8              A person of ordinary skill in the art is

9    a hypothetical person of average education and training

10   in the particular field, but who is aware of all the

11   relevant prior art.

12             In deciding what the level of ordinary

13   skill in the field is, you should consider all the

14   evidence introduced at trial, including but not limited

15   to, one, the levels of education and experience of the

16   inventors and other persons actively working in the

17   field.  Two, the types of problems encountered in the

18   field.  Three, prior art solutions to those problems.

19   Four, rapidity with which innovations are made.  And

20   five, the sophistication of the technology.

21             The actual inventor's skill is irrelevant

22   to this -- to this inquiry.

23             The next question you must answer in

24   determining whether or not the invention was obvious at

25   the time it was made is what differences there are, if

1   any, between the prior art and the patented invention.

2                    In analyzing this issue, do not focus

3   solely on the differences between the prior art and the

4   invention because the test is not whether there are

5   differences.  Rather, the test is whether or not the

6   invention as a whole would have been obvious to one

7   having ordinary skill in view of all the prior art at

8   the time the invention was made.

9                    If you conclude that the prior art discloses

10  all the elements of the claimed invention, but those

11  elements are in separate items, you must then consider

12  whether or not it would have been obvious to combine

13  those items.  A claim is not obvious merely because all

14  of the -- all of the elements of the claims already

15  existed.

16                    In determining whether an invention is

17  obvious, it can be important to identify a reason that

18  would have prompted a person of ordinary skill in the

19  relevant field to combine the elements in a way that the

20  claimed new invention does.  This is also because

21  inventions in most, if not all, instances rely upon

22  building blocks long since uncovered and claimed

23  discoveries almost of necessity that will be

24  combinations of what in some sense is already known.

25                    One way to decide whether one of ordinary

1  skill in the art would combine what is described in

2  various items of prior art is whether there is some

3  teaching, suggestion, or motivation in the prior art for

4  a skilled person to make the combination covered by the

5  patent claims.  Motivation can be implicit or explicit.

6          In considering whether a claimed

7  combination of prior art elements is obvious, you must

8  consider whether the improvement is more than the

9  predictable use of prior art elements, according to

10 their established functions.  When a patent simply

11 arranges old elements with each performing the same

12 function it had been known to perform and yields no more

13 than one would expect from such an arrangement, the

14 combination is obvious.

15         It is common sense that familiar items

16 may have obvious uses beyond their primary purposes, and

17 a person of ordinary skill often will be able to fit the

18 teachings of multiple patents together like pieces of a

19 puzzle.  Multiple references in the prior art can be

20 combined to show that a claim is obvious.  Any need or

21 problem known in the field and addressed by the patent

22 can provide a reason for combining the elements in the

23 manner claimed.

24         To determine whether there was an

25 apparent reason to combine the known elements in the way

1   the patent claims, you can look to interrelated

2   teachings of multiple patents to the effects of demands

3   known to the design community or present in the

4   marketplace and to the background knowledge possessed by

5   a person of ordinary skill in the art.

6               Neither the particular motivation, nor

7   the alleged purpose of the patentee controls.  One of

8   ordinary skill in the art is not confined only to prior

9   art that attempts to solve the same problem as the

10  patent claim.  Teachings, suggestions, and motivations

11  may also be found within the knowledge of a person of

12  ordinary skill in the art, including inferences and

13  creative steps that a person of ordinary skill in the

14  art would employ.

15              You may also consider such additional

16  factors, whether the prior art teaches or suggests the

17  desirability of combining elements in the claimed

18  inventions, whether the prior art teaches away from

19  combining elements in the claimed inventions, whether it

20  would have been obvious to try the combinations of

21  elements, such as where there is a design need or market

22  pressure to solve a problem -- and there are -- and

23  there are a finite number of identified, predictable

24  solutions, and whether the change resulted more from

25  design incentives or other market -- or other market

1    forces.

2                   To find that prior art rendered the

3    invention obvious, you must find that the prior art

4    provided a reasonable expectation of success.  Obvious

5    to try is not sufficient in unpredictable technologies.

6    In -- in determining whether a claimed invention was

7    obvious, consider each claim separately.  Do not use

8    hindsight -- that is, consider only what was known to a

9    person of ordinary skill in the field of the invention

10   at the time the claimed invention was made.

11                  In making these assessments, you should

12   take into account any objective evidence, sometimes

13   called secondary considerations, that may have existed

14   at the time of the invention and afterwards that may

15   shed light on the obviousness or not of the claimed

16   invention, such as, one, whether or not the invention

17   have achieved commercial success based on the merits of

18   the claimed invention, rather than design needs or

19   market pressure, advertising, or similar activities.

20                  Two, whether or not the invention

21   proceeded in a direction contrary to accepted wisdom in

22   the field.  Three, whether or not the invention

23   satisfied a long-felt need.  Four, whether or not others

24   had tried but failed to make the invention.  Five,

25   whether or not others copied the invention.  Six,

whether or not the invention achieved any unexpected

results.  Seven, whether or not the invention was

praised by others.  Eight, whether or not others sought

or obtained rights to the patent from the patentholder.

Nine, whether or not experts or those skilled in the

field at the making of the invention expressed surprise

or disbelief regarding the invention.  10, whether or

not others had an ordinary skill in the field of the

invention independently made the claimed invention at

about the same time the inventor made the invention.

11, whether there were changes or related technologies

or market needs contemporaneous with the invention.

The presence or absence of any of the

above factors may help you decide whether or not the

invention was obvious.  Even if you conclude that some

of the above indicators have been established, those

factors should be considered along with all the other

evidence in this case in determining whether Newegg has

proved that the claimed invention would have been

obvious as of October the 6th, 1989.

I have now instructed you as to the law

governing TQP's claims of patent infringement and

Newegg's claims of invalidity.  If you determine that

TQP has proved any of its patent infringement claims

against Newegg and that the claims of the '730 patent

1  that are infringed are not invalid, you must determine

2  the amount of damages to which TQP is entitled.

3          You should not interpret the fact that I

4  am giving you instructions about damages as any

5  indication that TQP should win on its patent

6  infringement claims.  It is your task first to decide

7  whether Newegg is liable for the claims asserted against

8  them.  Only if you find Newegg liable on one or more of

9  the patent infringement claims will you need to turn to

10 the question of damages.

11         The damages you award must be adequate to

12 compensate TQP for the infringement.  They are not meant

13 to punish an infringer.  Your damages award, if you

14 reach this issue, should put TQP in approximately the

15 same financial position that it would have been in had

16 the infringement not occurred.

17         TQP has the burden to establish the

18 amount of its damages by a preponderance of the

19 evidence.  In other words, you should award only those

20 damages that TQP establishes that it more likely

21 suffered than not.

22         The patent owner is not entitled to

23 damages that are remote or speculative.  If you decide

24 to award compensatory damages, you should be guided by

25 dispassionate common sense.

```
 1                   Computing damages may be difficult, but
 2   you must not let that difficulty lead you to engage in
 3   arbitrary guesswork.  On the other hand, the law does
 4   not require that a party prove the amount of its losses
 5   with mathematical precision but only with as much
 6   definiteness and accuracy as the circumstances permit.
 7                   Difficulty in ascertaining the amount of
 8   damages is not to be confused with the right of
 9   recovery.
10                   Under the patent laws, TQP cannot recover
11   damages for any direct infringement that occurred more
12   than six years prior to the -- to the date it filed this
13   lawsuit, on May the 6th, 2011, or after the expiration
14   date of the patent, May the 2nd, 2012.  Thus, the
15   relative timeframe for calculating direct infringement
16   damages from Newegg is May the 6th, 2005 to May the 2nd,
17   2012.
18                   If you find that Newegg is not liable for
19   direct infringement, but is liable for active inducement
20   of infringement, then the relative damage period begins
21   only after TQP gave notice of its patent rights by
22   filing this lawsuit against notice and once Newegg then
23   developed the requisite intent to cause infringement of
24   the patent.
25                   Thus, the earliest date for damages
```

1   resulting from inducement would be May the 6th, 2011,

2   the date this lawsuit was filed.  And no damages may be

3   awarded for act -- active inducement after the patent

4   expired on May the 2nd, 2012.  Thus, in considering

5   damages for inducement of infringement, the relevant

6   time period is no earlier than May the 6th, 2011, and no

7   later than May the 2nd, 2012.

8                     There are different types of damages that

9   TQP may be entitled to recover.  In this case, TQP seeks

10  a reasonable royalty.  A reasonable royalty is defined

11  as the money amount TQP or the predecessor patent owner

12  and Newegg would have agreed upon as a fee for use of

13  the invention at the time prior to when infringement

14  began.

15                    A reasonable royalty can be a single lump

16  sum amount, or it can be a running royalty.  A lump sum

17  amount is a royalty payment where the patent owner

18  receives a single upfront payment.  A running royalty is

19  a royalty where the patent owner collects ongoing per --

20  per-unit or percentage payments over a period of time.

21                    I will give you more detailed

22  instructions regarding damages shortly.  Note, however,

23  that if you find Newegg is liable for infringement, then

24  TQP is entitled to recover no less than a reasonable

25  royalty to compensate for the infringement.

1          A royalty is a payment made to a patent

2  holder in exchange for the right to make, use, or sell

3  the claimed invention.  A reasonable royalty is the

4  amount of royalty payment that a patent holder and the

5  infringer would have agreed to in a hypothetical

6  negotiation taking place between them at a time prior to

7  when the infringement first began.

8          In considering this hypothetical

9  negotiation, you should focus on what the expectations

10  of the patent holder and the infringer would have been

11  had they entered into an agreement at that time and had

12  they acted reasonably in their negotiations.

13          In determining this, you must assume that

14  both parties believed the patent was valid and

15  infringed, and the patent holder and infringer were

16  willing to enter into an agreement.

17          The reasonable royalty you determine must

18  be a royalty that would have resulted from this

19  hypothetical negotiation and not simply a royalty either

20  party would have preferred.  Evidence of things that

21  happened after the infringement first began can be

22  considered in evaluating the reasonable royalty to the

23  extent that the evidence aids in assessing what royalty

24  would have resulted from a hypothetical negotiation.

25          In this case, the parties agree that the

hypothetical negotiation for the licensing of the '730 patent would have taken place in January of 2004.  The parties disagree on whether the hypothetical negotiation for the '730 patent would have resulted in a lump sum or a reasonable royalty.  In determining the reasonable royalty, you should consider all the facts known and available to the interested parties at the time of the hypothetical negotiation.

I will list for you a number of factors you may consider.  This is not every possible factor, but it will give you an idea of the kinds of things to consider in setting a reasonable royalty.

1.  Any royalties received by TQP or its predecessors for licensing the patents-in-suit, providing or tending to prove an established royalty -- proving or tending to prove an established royalty;

2.  Any rates paid by Newegg for the use of other patents comparable to the patent-in-suit;

3.  The nature and scope of the license as exclusive or non-exclusive or as restricted or unrestricted in terms of territory or with respect to the parties to whom the product may be sold;

4.  Whether or not TQP or any of its predecessors had an established policy and marketing program to maintain its patent exclusivity by not

1 licensing others to use the inventions or by granting

2 licenses under special conditions designed to preserve

3 that exclusivity;

4             5.   The commercial relationship between

5 the licensor and licensee, such as whether they are

6 competitors in the same territory and the same line of

7 business;

8             6.   The effect of selling the patented

9 inventions in promoting sales of other products or

10 inventions of Newegg, the existing value of the

11 inventions to TQP, and its predecessors as a generator

12 of sales of its non-patented items, and the extent to

13 which such -- such derive -- and the extent of such

14 derivative or convoyed sales;

15             7.   The duration of the patent and the

16 term of the hypothetical license;

17             8.   The established profitability of the

18 inventions, their commercial success, and their current

19 popularity;

20             9.   The utility and advantages of the

21 patented inventions over the old modes or devices, if

22 any, that had been used for achieving similar results;

23             10.   The nature of the patented

24 inventions, the character of the commercial embodiment

25 of the inventions as owned and produced by TQP, and its

1  predecessors and the benefits to those who have used the

2  inventions;

3              11.  The extent to which Newegg has made

4  use of the patented inventions and any evidence that

5  shows the value of that use;

6              12.  The portion of the profit or of the

7  selling price that may be customary in the particular

8  business or in comparable businesses to allow for the

9  use of the inventions or analogous inventions;

10             13.  The portion of the profits that is

11  due to the patented inventions as compared to the

12  portion of the profits due to other factors, such as

13  unpatented elements or unpatented manufacturing

14  processes or features or improvements developed by

15  Newegg;

16             14.  Expert opinions as to what a

17  reasonable royalty would be;

18             15.  The amount that a licensor and

19  licensee would have agreed upon, if both parties had

20  been reasonably and voluntarily trying to reach an

21  agreement.

22             In determining a reasonable royalty, you

23  may also consider whether Newegg had commercially

24  acceptable non-infringing alternatives that were

25  available at the time at which the interested parties

1   would have negotiated a license and whether that would

2   have affected the reasonable royalty the parties would

3   have agreed upon.

4           A non-infringing alternative must be an

5   alternative solution that does not infringe the patent

6   because it is licensed under the patent or it does not

7   perform all the steps required by the claims of the

8   patent.  A non-infringing alternative is available if

9   Newegg had all the necessary equipment, know-how, and

10  experience to use the alternative at the time of the

11  hypothetical negotiation.  The alternative must also be

12  acceptable to Newegg's customers, but not the public in

13  general.

14          No one factor is dispositive, and you can

15  and should consider the evidence that is presented to

16  you in this case on each of these factors.  You may also

17  consider any other factors which in your mind would have

18  increased or decreased the royalty the infringer would

19  have been willing to pay and the patent holder would

20  have been willing to accept acting as normally prudent

21  business people.

22          The final factor establishes the

23  framework which you should use in determining a

24  reasonable royalty -- that is, the payment that would

25  have resulted from negotiation between the patent holder

1    and the infringer taking place at a time prior to when

2    the infringement began.

3              These complete my instructions at this

4    point, Ladies and Gentlemen, and we will now hear

5    closing arguments for the attorneys from the parties.

6              We will first hear closing arguments from

7    the Plaintiff.

8              Mr. Fenster, you may address the jury.

9              MR. FENSTER:  Thank you, Your Honor.  May

10   I have just a moment?

11             THE COURT:  You may.

12             MR. FENSTER:   Your Honor, may I access

13   the board and the ELMO throughout?

14             THE COURT:  Without leave necessary.

15             MR. FENSTER:  Thank you.

16             THE COURT:  All right.  You may proceed,

17   Counsel.

18             MR. FENSTER:  Thank you, Your Honor.  May

19   it please the Court.

20             May it please you, Ladies and Gentlemen.

21             Ladies and Gentlemen, on behalf of Erich

22   Spangenberg and TQP and the inventor, Michael Jones, I

23   want to thank you.  It's been a long week and I see that

24   you have paid attention and you have done such a service

25   and we appreciate everything that you've done in this

1    case and your consideration.

2            Ladies and Gentlemen, Michael Jones is

3    not famous.  He doesn't seek fame and fortune.  He's a

4    humble inventor who worked hard to develop a new

5    technology to address problems that he recognized.  And

6    when he did develop a new solution that he thought was

7    useful, he did what he was supposed to do.  He described

8    it in a patent and filed it with the Patent Office and

9    told the world how to do it.  And the Patent Office saw

10   fit to grant him a patent, as we've heard many times

11   throughout this trial, twice.

12           You've heard a lot about cryptography in

13   this case, more than I know -- that I suspect you've

14   ever wanted to.  But at base, this case is about

15   Newegg's infringement of a constitutionally protected

16   property right, TQP's property right, and whether Newegg

17   should be held responsible for its actions.

18           Newegg has tried from the beginning to

19   misdirect you and distract you with things that its own

20   experts have admitted on the stand have nothing to do

21   with infringement.

22           Public key cryptography.  This is a

23   symmetric key encryption.  Modems, closed systems,

24   whether the -- whether the customer logs in.  None of

25   those things are in the claims.  And the Court has

1    instructed you this is all that matters.  If they do

2    these things, they infringe.

3                    So why did they spend so much time

4    talking about everything else except the claims?

5                    Ladies and Gentlemen, let's direct our

6    attention to what's at issue here, and it's that

7    infringement.

8                    They told you from the start that they

9    didn't know about the patent.  They never heard of the

10   patent.  They didn't intend to hear about the patent.

11                   Well, you just heard the Judge instruct

12   you, doesn't matter.  For direct infringement, all we

13   have to show right here, that they met these elements of

14   the claim.

15                   They tried to avoid responsibility by

16   blaming their customers, saying they're not responsible

17   for the system that they admit that they own, that they

18   administer their own security, and they didn't bring a

19   single technical witness to tell you that their

20   technical system doesn't work.

21                   Instead, they brought Mr. Cheng, who is a

22   very nice man, but admitted that he doesn't know

23   anything about the technology, didn't read the patent,

24   and couldn't tell you that they don't infringe.  They

25   never brought Mr. Wu.

1            Ladies and Gentlemen, the truth of this

2    case is that Newegg infringed the '730 patent by setting

3    up its websites to require SSL and TLS, by setting up

4    its servers to select RC4.  And the truth of this case

5    is that Newegg has failed to establish invalidity by

6    clear and convincing evidence because the RC4 algorithm

7    and the Notes with RC4 is undisputed that it was kept

8    secret.

9            Secret art is not prior art.  Efforts to

10   commercialize, if done in secret, not prior art.

11           They've distracted you about whether it

12   was ready for patenting.  We didn't waste your time with

13   that.  The only question for you is whether they have

14   proven by clear and convincing evidence that RC4 and

15   Notes are prior art.

16           Can they prove -- have they proven to you

17   that they were not abandoned, suppressed, or concealed?

18   The evidence shows that it was suppressed, and it was

19   concealed.  It's undisputed that RC4 was a trade secret,

20   and they didn't show you the on sale, as we'll get to.

21           First, let's go to infringement.  Dr.

22   Jaeger showed you that -- demonstrated that their use of

23   SSL with TLS or -- and RC4 meets every one of the

24   elements of Claims 1, 6, 8, and 9.

25           Now, because of this claim covers steps

1    performed by the transmitter, Newegg's server, and its

2    customer's computer, we have to show you that they,

3    Newegg, directs or controls the customer's computer.

4    And we did that by showing you that Newegg selects SSL

5    and TLS and that it selects RC4.

6              Now, you heard some instructions about

7    intent with respect to inducement.  We haven't talked a

8    lot about inducement in this case.  Inducement requires

9    intent, direction, and control.  Direct infringement, do

10   not.  We do not have to show intent to show infringement

11   -- direct infringement by direct and control.  All we

12   have to show is that they do direct and control these

13   steps.

14             Slide 5, please.

15             It's undisputed that every one of the

16   accused websites is an HTTPS website.  They set it up

17   this way.  It's only the secure sites of newegg.com and

18   neweggbusiness.com that are accused.  By setting it up

19   this way, it's undisputed.  Their experts agreed,

20   admitted, that it requires the use of SSL and TLS.  And

21   we showed you that they direct and control because it's

22   the server that selects the cipher suite.  Dr.

23   Stubblebine admitted it in his report.  He tried to

24   equivocate.  We'll get to that in a minute.  And Dr.

25   Jaeger testified and showed you that it's the Newegg's

1    server that selects the server suite.

2                    Slide 7, please.

3                    You'll remember that we showed you that

4    with the -- with the Wireshark, that even though there

5    were 19 cipher suites submitted by the client, the

6    server selected No. 19.  And once it selected it, Dr.

7    Stubblebine admitted -- next slide -- that after the

8    cipher suite is selected by the server, then each of the

9    remaining steps -- each of the steps of the claim occurs

10   without any further action by the customer; correct?

11                   The customer doesn't have to click on

12   anything else, correct?

13                   ANSWER:  That's correct.

14                   That's critical, Ladies and Gentlemen,

15   because what it means is once they select the server,

16   every one of these steps happens automatically without

17   any involvement by the customer.  That is direction and

18   control.  Once they select the server suite, this

19   happens.  It just happens.  They don't have to do

20   anything.  The customer doesn't have to click anything.

21   They can't opt out of it.  It just happens.  And that's

22   direction and control.

23                   Now, let's show how we --

24                   Next slide, please.

25                   So Dr. Jaeger explained using his slide

1  how every one of these elements is met, that the -- the

2  seed is provided to both sides, that the sequence is

3  generated at the pseudo-random generator here based

4  exclusively on the seed on the server write -- server

5  write key.  Same thing happens over here and how the

6  keys are used.

7              And you'll remember that Dr. Stubblebine

8  on the stand admitted the same thing with his slide.

9              Next slide, please.

10             Remember, he admitted that they had a

11 pseudo-random number generator, that it was based on the

12 seed.  The server write key at both sides.  Same

13 sequence both sides; that a new sequence is used to

14 encrypt each block here and to decrypt each block here

15 (indicating).  He admitted every one of those steps.

16             I submit to you that we proved our case

17 that their use of SSL and TLS with RC4 meets every one

18 of these elements.

19             So what is Newegg -- what's their

20 response?

21             They have two arguments.  First, they say

22 that the generating of the sequence is not based

23 exclusively on the seed.

24             Next slide.

25             But Dr. -- thank you -- but Dr. Jaeger

1   testified very clearly, is the sequence of pseudo-random

2   key values based exclusively on the seed?

3                   Yes, the key values are based on the

4   server write key.  This value is the only value that is

5   used in producing the key values.  Dr. Stubblebine

6   disputed that.  But Dr. Diffie, their validity expert,

7   admits it.  He admits that RC4 meets -- based

8   exclusively on because he said it invalidates it.

9                   Does it invalidate because it's not prior

10  art, but there's no dispute from their expert, their

11  validity expert, that it's based exclusively on said

12  seed.

13                  Now, their next argument -- next slide,

14  please.

15                  This one was a timing one.  He set up

16  this argument.  This is -- this is from the language in

17  (1)(e), the generating at the receiver.  And he set up

18  this argument saying that this can't happen until

19  it's -- the keys can't be produced until they have been

20  transmitted.

21                  But, Ladies and Gentlemen, you know how

22  this claim is structured.  You provide a seed to both

23  sides.  (1)(c) talks about what happens at the

24  transmitter.  You generate the first sequence here at

25  the transmitter.  Each new key value being produced at

1  the transmitter to encrypt.

2              (1)(e) is what's happening at the

3  receiver.  It's generating the second sequence of

4  pseudo-random key values at the receiver.  It's

5  producing this key at the receiver.  It's talking about

6  when this key is produced.

7              And Dr. Jaeger used this slide, and he

8  showed you how that element is met, and that when this

9  new key is produced, each time the predetermined number

10 comes across, it's used to decrypt as in (1)(f).

11             Slide 14.

12             Now, here's what they argued in opening

13 statement.  Like anyone else that bias a NetScaler from

14 Citrix, Newegg doesn't know exactly how it works.

15             They tried to tell you that this

16 electronics company with 11 to 1200 employees doesn't

17 know how it works, yet they admit -- even Mr. Cheng

18 admitted, that they have control over the configuration

19 settings.  They could have changed it, but they didn't.

20             And they never brought Mr. Wu to tell you

21 how it works.

22             The testimony in this case is that Mr. Wu

23 architectured that site.  He built their site.  He

24 administers the security on that site.  And you've got a

25 picture of him in your jury book, and they didn't bring

1    him here to tell you that they don't infringe and that

2    he couldn't change those settings.

3              Why?  Because their expert admitted that

4    they could change those settings.  They have control

5    over those settings.  Ladies and Gentlemen, it's time

6    for them to take responsibility for their actions in

7    infringing TQP's patent.

8              That's Claim 1.  We showed you with

9    respect to the dependent claims, Slide 17.  We gave you

10   evidence and showed you that every one of these steps

11   were met, and this wasn't even disputed, so I'm not

12   going to waste -- spend your time on it.

13             Dr. Stubblebine admitted that every one

14   of these steps are met.  If you find infringement of

15   Claim 1, you should find infringement of Claims 6, 8,

16   and 9 as well.

17             Ladies and Gentlemen, you're going to be

18   asked to fill in the verdict form, and when you do, we

19   ask you to write yes, that we met our burden of proving

20   by a preponderance of the evidence that each one of

21   these claims were infringed directly, because they

22   performed each one of these steps or directed it or

23   controlled the performance of these steps by setting up

24   their site to require SSL and by selecting that cipher

25   suite, which directed the computer to perform the rest

1  of these steps.

2           Their next excuse, Ladies and Gentlemen,

3  is validity.  Validity they have to prove by clear and

4  convincing evidence.  And they asked you to do that

5  based on Dr. Diffie's testimony.  Dr. Diffie is a very

6  smart man, and he's contributed a lot to cryptography,

7  but he does not know patent law.  He told you that.

8           What happened in this case is that

9  Newegg's lawyers took advantage of an inexperienced

10 expert.  He auditioned for the role.  He signed his name

11 to a report that these lawyers wrote, and he read the

12 script to you that they wrote.

13          But the problem, Ladies and Gentlemen, is

14 that they didn't tell him everything.  They didn't give

15 him the right law.  He told you he didn't understand the

16 concepts of anticipation, and he'd never gotten a clear

17 understanding of what abandoned, suppressed, or

18 concealed meant.

19          And I'll tell you that what he did

20 testify, the vague testimony that he gave, is

21 inconsistent with the Court's construction.  And they

22 didn't give him all the facts.  When they told him to

23 tell you about all the agreements that he has no

24 personal knowledge of or legal opinion about, they

25 didn't point him to the right provisions.  They didn't

1   show him -- they didn't ask him to tell you and point

2   out the confidentiality provisions.

3                   And they're going to try to tell you that

4   those confidentiality provisions are not relevant.

5   Maybe that's what they told Dr. Diffie.  But it's

6   inconsistent with the Court's instructions, and I will

7   show you and you will see them, when you go back there.

8                   Each of their theories for invalidity

9   requires that it was public, that it was not secret,

10  that it was not abandoned, suppressed, or concealed.

11  And if it was, they lose.

12                  They cannot prove their invalidity case.

13                  So let's look at Denning.  First, he --

14  first, Dr. Diffie testified that he admitted it had to

15  be one system that has it all.  He pointed you to

16  Pages 138 and 139.  That's at the trial transcript at

17  Page 80.

18                  But you heard from Dr. Rhyne today, who

19  does know patent law, that that book, this book right

20  here (indicating) does not describe a single system that

21  meets every one of the elements of this claim.  It's

22  only by mixing and matching from different parts of this

23  book that he was able to pull this together.

24                  And the -- the parts of the claims

25  that -- the parts of the book that he did point to,

1  Dr. Rhyne testified, don't give enough of a description

2  to allow one of ordinary skill in the art to make it, to

3  make this with every one of these elements.

4         And because of that, the Denning book is

5  not an anticipatory reference.  And to the extent they

6  ask you, when they get up here to fill out obviousness

7  for anticipation -- for Dr. Denning's book, they did not

8  give you any evidence about obviousness.  Dr. Diffie

9  didn't say a word about obviousness.  And when you look

10  at the jury instruction that you just heard that lays

11  out all the evidence that they should have provided to

12  find obviousness, they didn't do a bit of that.

13         Next, the heart of this case is RC4.  The

14  heart of their case is RC4 and Notes.

15         Slide 24, please.

16         The Court will instruct you that it has

17  to be -- in order to be prior art, secret use by a third

18  party is not public.  An invention was in public use by

19  another, if the claimed invention was accessible to the

20  public or commercially exploited in a non-secret way.

21  Maybe this is what Dr. Diffie was trying to get at, that

22  it was being commercially exploited or commercialized,

23  but that requires that it was in a non-secret way.  And

24  I showed you that black triangle where they had every

25  single leg of those triangles locked up with

1  confidentiality agreements as tight as they could be.

2            It was never commercially used or

3  commercially exploited in a non-secret way, until it was

4  first sold to the public in December 1999.

5            THE COURT:  You've now used 18 minutes,

6  Counsel.

7            MR. FENSTER:  Thank you, Your Honor.

8            Slide 25.

9            It's undisputed in this case, Ladies and

10 Gentlemen, that it can't really be disputed that RC4 was

11 kept as a trade secret.  Dr. Rivest admitted it.

12           Dr. Stubblebine admitted it.  Dr. Diffie

13 admitted it.

14           And that is the dispositive fact that

15 kills their case for invalidity, because if RC4 was

16 secret, it was not public.  And if it was secret, it

17 can't be prior art under public use, under prior

18 invention.  And the fact that it was kept secret, how

19 these steps were performed was never made available to

20 the public.

21           I'd like to show you the jury instruction

22 that you'll see.  This is going to be at Page 18 of your

23 jury instruction, and this is what they have to show for

24 prior invention, that it was not abandoned, suppressed,

25 or concealed.

1          If it was abandoned, suppressed, or

2    concealed, it cannot invalidate the claims.  An

3    invention was abandoned, suppressed, or concealed if the

4    other person, Dr. Rivest and Lotus and Iris, actively

5    concealed the invention from the public.  We showed you

6    that they did.

7          Generally, an invention was not

8    abandoned, suppressed, or concealed if the invention was

9    made public, didn't happen; sold, didn't happen until

10   after; offered for sale, didn't happen until after; or

11   otherwise used for a commercial purpose.

12          We showed you that it was never

13   commercially performed.  Nobody every performed the

14   steps of this for money.  I'll show you that in a

15   minute.

16          And the Court will instruct you a finding

17   of suppression or concealment is not negated merely

18   because the invention has been commercialized through a

19   secret use.  If it was secret, it's not invalid, even if

20   it was for the purpose of developing Notes which would

21   later be sold to the public.

22          Slide 27.

23          This is what proves their case fails.

24   Every single one of these agreements was an effort to

25   conceal, to actively conceal, to keep it secret.  Notes

never saw the light of day, until it was sold to the

public in December '89.  And that means that they can't

prove any one of their defenses.

Slide 31, please.

Dr. Diffie admits that RC4 was never

publicly disclosed prior to 1994.

Now, Slide 33, please.

This is where Dr. Diffie admits that the

method was never performed for money.  This is a method

claim, and to show that it was in public use, they have

to show that these steps were performed for money.  And

he says:  You're not aware of the method, the service

ever being offered for sale prior to either of the

relevant dates?

ANSWER:  I'm not aware of anything but

the products being offered for sale.

And this you know is December 1989, which

was too late.

Ladies and Gentlemen, they -- they tried

to show you an offer for sale.  They'll point to two

things.  One, the license agreement between Lotus and

RSA.  The Court will instruct you that if it's a

license, it's not a sale.  And this is DX 17 at Page 5.

It says it's a license of software, and

it says that RSA retains the right title and interest to

1  RC4.  It was never a sale.  It was only a license.  And

2  under the Court's instructions, a license is not a sale.

3            The next thing that they'll point to is

4  the software development agreement with Iris.  And that

5  sale was not -- that development agreement was a

6  co-development agreement.  It was not a sale.  It

7  specifically provides that they would jointly own the

8  product.  They were jointly develop -- developing

9  something, co-developing it so that they could sell

10  Notes to the public later, after the critical date.

11  And, of course, it was locked up by a confidentiality

12  agreement all along.

13            Slide 35, please.

14            Ladies and Gentlemen, I submit to you

15  that when you go back and deliberate and ask yourselves

16  whether they proved that this patent was invalid by

17  clear and convincing evidence, applying the Court's

18  instructions, that they haven't done so.

19            And we ask you to fill out no to each of

20  the questions regarding validity, because they haven't

21  proved their case by clear and convincing evidence.

22            Now, quickly, let's go to damages.

23            Slide 36.

24            Dr. Becker talks to you about damages.

25            Slide 37.

He testified about the extent of their use.  He testified to you about the basis for his calculation of a reasonable royalty.

Slide 39, please.

And he showed you his calculations.  He laid it out.  And, Ladies and Gentlemen, when you get to the verdict, Slide 40, we ask you to write in $5.1 million.  You've heard no contrary evidence in this case.

I look forward to talking with you again after Newegg gets their chance.  Thank you.

THE COURT:  All right.  The Defendant may now present its final closing argument to the jury.

MR. BALDAUF:  Hello, everybody.  Excuse me.

I told you at the beginning of last week that TQP was trying to stretch its patent to cover technology that Mr. Jones just did not invent.  And that's exactly what you have seen here.

Mr. Jones did not invent SSL.  He did not invent RC4.  And the patent does not cover that combination.

And in addition, you have learned that someone else invented RC4 before he invented that patent, and you've learned that someone else has

```
1   invented RC4 and Lotus Notes before that patent.
2               Now, you've learned a little bit about
3   the parties during the course of last week.  You've
4   learned that TQP is in the business of suing.
5               Mr. Spangenberg, he sues companies and
6   demands a license for his patents.  He then settles
7   these cases for an amount that's less than what it would
8   cost these companies to defend themselves.
9               But Newegg didn't want to do that.
10  Newegg just didn't want to settle because it was
11  cheaper.  Newegg wanted to prove that this patent was
12  invalid, and Newegg wanted to prove to you that this
13  patent was not infringed.  And that's what we have done.
14              We've shown you three different reasons
15  why this patent is invalid and many different reasons
16  why there can be no infringement.
17              Now, the first witness we heard was
18  Mr. Jones, and he explained to you how his patent
19  worked.  What he told you was that this was a closed
20  system where the keys had to be supplied to both the
21  transmitter and the receiver before there could be any
22  communication.
23              And he also told you that there would be
24  a number that would be given to these block counters,
25  and what they would do is that they would count the
```

1  number of blocks that would go from the encryptor to the

2  decryptor.  So let's say that number is three.  There

3  would be three blocks -- one, two, three -- and then

4  that block counter would count those and then it would

5  switch the key.

6              Now, when I first read this patent, I

7  thought to myself, if there's an invention at all -- at

8  all here, it has to do with that block counter because

9  that seems to be the only thing that seems to be a

10  little different.

11             Let's look at the claim, please.

12             Now, if we look at the claim, TQP has

13  been telling you all week that there's nothing in this

14  claim that says block counter.  However, this is a

15  method claim, and the function of that block counter is

16  throughout here.  A time dependent on the predetermined

17  characteristic, each time a predetermined number of said

18  blocks are transmitted over the link.

19             What are those predetermined

20  characteristics?  What are those blocks?

21             That's the function of that block

22  counter.  It's counting the blocks.

23             Now, you notice what TQP did to the block

24  counter.  This the first slide that you saw from Dr.

25  Jaeger.  There's the block counter in both of them.

1          It's clearly part of the mechanism on

2    both ends, but I want to get this right.  Dr. Jaeger

3    said, well, we don't need that because it's not a

4    requirement of the claims that we're looking at, so

5    we'll just use this somewhat simpler figure.  And there

6    we go.  It just gets rid of the block counter

7    altogether.

8          How can he do that?  How can he just get

9    rid of part of the patent?  Well, he had to do this to

10   try to convince you that there was infringement because

11   today's systems just don't work like this.

12         In today's systems, the keys change every

13   time a block is encrypted, so there's no reason for a

14   block counter.  There's nothing to count.  And then when

15   he told you -- he said, well, we're just going to assume

16   that this predetermined number is always going to be one

17   block.  So essentially he did that to wipe the block

18   counter out of the patent and out of the claims.

19         So if we look back at Figure 1 of the

20   patent without the block counter, that's what it looks

21   like.  But by doing that, in making that decision to

22   read out the block counter to try to prove infringement,

23   this patent is unquestionably invalid.

24         Dr. Diffie, he told you a lot about a

25   book that his friend Dorothy Denning wrote, a textbook.

1   And this was written in 1982, seven years before this

2   patent.

3                    The evidence shows that this one figure

4   alone, Figure 3.3, as Dr. Diffie explains, meets every

5   limitation of Claim 1.

6                    Now, Mr. Fenster just told you that Dr.

7   Diffie was looking at all sorts of different figures and

8   different systems.  No. 1, that's not true.  He was

9   talking to you only about this system with respect to

10  Claim 1.

11                   And No. 2, he's just wrong on the law.

12  You heard what the Judge told you.  To anticipate, it

13  only has to be with one -- within one single reference

14  and that book is one single reference.  It's irrelevant

15  if you're looking at different systems within it.

16                   Now, Dr. Diffie explained to you in

17  detail that the evidence shows that this figure alone

18  anticipates Claim 1 of the patent.  If we look at this

19  together, the Denning textbook and the figure of the

20  patent with the block counter removed, you can see that

21  they're the same thing.  We've got here the transmitter,

22  here the transmitter, receiver, receiver, transmission

23  link, transmission link.  And in both of these, you get

24  the stream of pseudo-random key values there and there,

25  there, there, and then you've got the encryptor,

encryptor, decryptor, decryptor.

The only thing -- the only thing at all that Dr. Rhyne told you was different that would make this a patent, have only one thing, he said, that's different than what's in Denning was this idea of based exclusively on the seed value.  He's trying to convince you that right here that IO, that that is not being based exclusively on the seed value.

Please go back and look at what Dr. Diffie told you, specifically -- it's Page 138 of the Denning book where it says specifically that the key generator is initiated by a seed, IO.  Dr. Rhyne went on to talk about all these different things that are in the Denning book.  Dr. Diffie himself, he didn't rely upon any of that.  It's only this thing, the IO.  It's solely the seed value.

The evidence plainly shows that when they made the decision to read this block counter out of their patent, that it's invalid and the Denning book satisfies every single claim limitation.

Now, Dr. Diffie also talked to you a little bit about the dependent claims.  These dependent claims really don't add much of significance.  6 and 8, they only add the idea that you can do this at remote locations, multiple receivers.  That's clearly in the

1  Denning book.

2             Claim 9 adds this concept of error

3  control.  That's in the Denning book, as well.

4             Dr. Diffie explained to you that the

5  evidence is clear and convincing, the patent is invalid

6  over Denning alone.

7             Now, let's turn now to RC4 and Lotus

8  Notes.  The Judge has instructed you about many ways

9  that we submit that RC4 alone and RC4 in Lotus Notes

10 invalidate the patent.  Prior invention, prior use,

11 prior sale.  I don't have a lot of time here, so I'm

12 only going to talk to you about prior invention, but the

13 RC4 and Lotus Notes story encompasses all of those

14 facts.

15            Before I get to those facts, I'd like to

16 talk about this one issue that TQP keeps throwing out

17 there, and that's this idea that this invention was

18 somehow abandoned, suppressed, or concealed, or it was a

19 trade secret.

20            Ladies and Gentlemen, this argument is

21 nothing more than smoke and mirrors that's intended to

22 confuse you.  The Judge read to you the law on this

23 point, and he told you -- and you can verify this on

24 Page 18 of the jury instructions -- that he would tell

25 you and did tell you that an invention is not abandoned,

1    suppressed, or concealed if -- if it is used for a

2    commercial purpose.

3            Think about this, Ladies and Gentlemen,

4    every bit of evidence that you have heard has been that

5    RC4 has been used for a commercial purpose.  From the

6    day that Dr. Rivest invented it until today, we're --

7    we're using it today, and that's what they accuse of

8    infringement.  I don't see how they can say that it has

9    not been used for commercial purpose.  That's all it's

10   ever been used for.

11           And this idea about whether the RC4 code

12   is a trade secret is really -- it's just silly.  Think

13   about this for a second.  If we had to show you the RC4

14   code to prove to you that the patent was invalid, that

15   the claims needed that, they would have to show you that

16   RC4 code itself to prove infringement.

17           How much RC4 code did they show you

18   that's on the Newegg system?  It's a big fat zero.  You

19   didn't see any of it.  It's not in the claims, and it's

20   not required.

21           Likewise, whether the RC4 code itself was

22   provided to the public is completely irrelevant.  On

23   Page 15 of the jury instructions, the Court's instructed

24   you that as long as the use of Notes and RC4 was public,

25   access to the inner workings is not required.  And

1  that's the law.

2            So this whole triangle of

3  confidentiality, this is completely irrelevant.  What

4  they're telling you is there are these agreements

5  between Iris, between RSA and Lotus, and they were bound

6  by confidentiality.  They were bound by confidentiality

7  to not disclose the source code to anyone.  And that

8  just simply doesn't matter.

9            And one final point on that is whether

10  there were secrecy agreements or not has absolutely

11  nothing to do with whether or not there was a prior

12  sale.  It's not an issue.

13            Now, with respect to -- if we could turn

14  that.  This is how Dr. Jaeger applied RC4 and SSL to the

15  claim.  He said RC4 gives us every limitation except the

16  top two.  And that's the transmitter and the receiver

17  that's providing the seed.

18            You heard Dr. Rhyne this morning, though,

19  say that those are absolutely provided by Lotus Notes.

20  So once Lotus Notes is combined with RC4, Dr. Rhyne

21  admitted to you that they satisfy every limitation of

22  every claim, and all he's arguing about are the dates.

23            However, RC4 alone satisfies everything

24  but the transmitter and the receiver and the seed.  Dr.

25  Diffie explained to you that that's inherent or at least

obvious because anyone skilled in the art with RC4 would understand that to use it, you needed a transmitter and a receiver and a seed.  Otherwise, it's worthless, and that's the only intended purpose for RC4.

So the only relevant issue that they're arguing is whether or not we can prove to you that RC4 was invented before October of 1989 and whether RC4 and Lotus Notes was invented before that same day.  You've heard a lot about those dates, and you've seen a lot of evidence corroborating those dates.

In fact, you've heard nothing to dispute the fact that RC4 was invented, completely finished, and operable no later than the spring of 1988 and that the patent wasn't filed until almost a year and a half later.  Ladies and Gentlemen, these dates are clear and they are convincing.

You've heard from these three gentlemen who talked to you about it.  They told you what they invented and why.  These guys have no reason to lie. They don't have a dog in this fight.  They have no interest but to tell you the truth.  In fact, Mr. Eldridge flew all the way down here from New Hampshire to talk to you in person, to tell you what really happened.

Now, Dr. Rivest, his evidence is

1  uncontradicted.  He told you that he invented RC4, 1987,

2  but certainly no later than 1988.

3              Next, you heard from Mr. Eldridge.

4  Mr. Eldridge told you that it was delivered by

5  Dr. Rivest to him in December of '87 or January of '88.

6              Mr. Eldridge then told you that he

7  himself wrote the code and incorporated RC4 into Lotus

8  Notes no later than February 22nd, 1988.  He even showed

9  you the code he himself wrote to do this.  And, in fact,

10 confirmed that date that RC4 was operable in the Lotus

11 Notes product no later than February 22nd, 1988.

12             Could you flip it, please?

13             So here's a timeline for you.  We've just

14 shown you and the evidence has shown you that the

15 invention of Lotus Notes and -- with RC4 and the

16 invention of RC4 were unquestionably long before this

17 patent.  And from this point on, every fact does nothing

18 but confirm that the Notes product was being used --

19 publicly used and was the subject of ongoing

20 commercialization efforts.

21             You saw a letter that was written by

22 Dr. Rivest to Lou Giles at the NSA dated April 4th,

23 1988, and he told you that this letter was accompanied

24 with the RC4 code, and the evidence was undisputed that

25 he sent this to the NSA to get export approval so they

1   could start commercializing the RC4 code.

2           You heard a lot from these two gentlemen.

3   They explained to you exactly what they were doing to

4   try to commercialize the Lotus Notes product with RC4.

5   You heard them tell you that they were using it long

6   before the '730 patent was filed.

7           Mr. Eldridge told you about beta-testing

8   the Notes product in 1988 with Lotus' customers to

9   commercialize the product.  Mr. Ozzie told you that he

10  passed out copies of Notes with RC4 in 1988 to potential

11  customers so they could try it with no confidentiality

12  obligation whatsoever.

13          They both told you that they themselves

14  were using the Notes product to communicate with people

15  at Lotus as of 1988.  And you heard both -- you heard

16  both of these gentlemen tell you that they personally

17  disclosed the product with RC4 in it to people at

18  Microsoft with no confidentiality obligation.

19          Mr. Ozzie told you that he demonstrated

20  it to Bill Gates himself in a hotel room in 1988.  Now,

21  he said the RC4 function was turned off, but so what.

22  It was still in there.

23          Mr. Eldridge told you that he gave a copy

24  of Lotus Notes with RC4 to a Darryl Rubin from Microsoft

25  with no restrictions whatsoever.  And we even had a

1    letter coming back from Mr. Rubin dated April 28th,

2    1988, that discloses this and talks about his use of the

3    Lotus Notes and RC4 in this product.

4                    Now, you also saw a number of

5    agreements -- probably too many to go through here --

6    but you saw the agreements whereby the Lotus Notes

7    product was being developed specifically by Iris to be

8    sold to Lotus.  And that was in 1988.

9                    And Mr. Eldridge told you that he, in

10   fact, did make that delivery and they sold the RC4

11   product with Lotus Notes to Lotus.  Again, it doesn't

12   matter if it's secret or anyone knows anyone -- anything

13   about that.  That product was sold as of that date.

14                   Now, I think the evidence is certainly

15   undisputed, clear and convincing that RC4/Lotus Notes

16   certainly invented, developed, commercialized long

17   before the patent.

18                   So what do we hear?

19                   We hear a lot about the re-examination,

20   and because it's been re-examined, that means this

21   patent is valid.

22                   You heard from Dr. Rhyne this morning,

23   and he himself told you that the Patent Office can only

24   consider patents and printed publications.  They cannot

25   consider any of the information you've heard here.  They

1  can't answer prior sale, prior invention or prior use.

2  And they can't consider any of the testimony of any of

3  these witnesses.

4           Ladies and Gentlemen, the Patent Office

5  was the final decision-maker in this.  Why would we be

6  here with you?  The jury system exists for you to make

7  this decision.

8           I'd like to turn to infringement now.  As

9  the Court explained to you, for infringement to exist,

10  TQP must prove that every single claim limitation is

11  satisfied by Newegg.  99 percent isn't good enough.  It

12  has to be all or nothing.

13           We've shown you many different reasons

14  through the last week why there can be no infringement.

15  I'd like to start with this one, part (1)(e), the

16  highlighted portion, it's a mouthful, but it's a new one

17  of said key values.

18           The Court has construed this for us.

19  Here's what the Court said:  That this means a new key

20  value in the first and second sequence as used each time

21  a predetermined number of blocks have been sent from the

22  transmitter over the communication link.

23           There's a real easy reason in here why

24  there can't be infringement.  Look at this sentence.  It

25  says -- where did it go -- each time a predetermined

number of blocks, plural.  What are they accusing of

infringement?

A single block.  This says blocks,

plural.  They aren't even accusing a single block.  For

that reason alone, infringement can't exist.

And in addition to this, the Newegg

system doesn't work this way.  And you don't have to

take my word for this.  Their own expert told you.

We spent a lot of time on this one.  I

asked him in his demonstrative:  So block 2, the blue

block, is being encrypted using a new key value before

block 1 has been transmitted across the communication

link, correct?

And he said:  That's correct.

Look at this limitation.  Counsel tried

to tell you that this only applies on the receiver end.

That's absolutely not true.  Look at the construction.

It says a new key value in the first and second

sequence.  The first sequence comes from the

transmitter.

And what does it say?

It says that a new key value can only be

used when the prior block has already been transmitted

across the link, which is shown in the little red

circle.  So for infringement to exist, that blue block,

No. 2, cannot be encrypted with a new key value until the prior block, the green one, has been transmitted over the link.

Their own expert shows you -- has shown you that this limitation is not satisfied.  And infringement cannot exist for this reason alone. Nobody's doing this.

We asked Dr. Stubblebine about this, same -- he concluded -- he said what Dr. Jaeger was accusing as a predetermined number is one block.  And so one block has got to be sent before you use the next key to encrypt the next block, and that's not what's going on.

He showed you his own demonstrative.  But what does this show you?

It shows you that new keys are continuously being used to encrypt blocks of data, and they're all being sent together all at once across the link.  They're not -- this does not satisfy the limitation of a new key value only being used once the previous one has been sent across the communications link.  So infringement is avoided for this reason alone.

Now, the second thing I'd like to talk to you about is this same limitation of based exclusively on the seed value.  We asked Dr. Stubblebine about this

1 and we asked him, is this satisfied?  Did Dr. Jaeger

2 prove this?

3            And he said, well, no, he didn't because

4 he didn't look.  He said the only way you could find out

5 if this was satisfied or not was to get down to the chip

6 layer of the NetScaler to find out exactly what was --

7 what was happening, and Dr. Jaeger never did that.

8            Instead, he relied upon open SSL code

9 that he could not confirm was even being used on the

10 Newegg system.  So as a backup plan, he shows you some

11 testimony from Dr. Rivest that says:  Is there an input

12 to the RC4 setup algorithm?

13            Yes.

14            And he said:  Would it be fair to call

15 that a seed value?

16            Okay.  Great.  That -- that in no way

17 says that the key values are exclusively based on the

18 seed value.  We then showed you the rest of Dr. Rivest's

19 testimony and he told you that, in fact, there are three

20 inputs to the key generation step.  So it's not based

21 exclusively on the seed value.  Infringement is avoided

22 for this reason as well.

23            Now, the remaining bases of

24 non-infringement deal with this issue of control or

25 direct.  As they've told you, they contend that a number

103

of these steps are being satisfied, if at all, by the customer.  They're asserting that Newegg controls or directs its customers to do this.

We've heard the Judge tell you in his instruction is that arm's length cooperation is not enough for control or direct.

With respect to this 1(b) limitation, providing a seed value, how did Dr. Jaeger say that that was satisfied?  He said that's from the SSL handshake, and that that is initiated when the customer initiates the SSL handshake by clicking on the encrypted link.  He said that's what does it.

So for Newegg to be controlling or directing that step, you would have to believe that Newegg somehow can control its customer's computers to click on an encrypted link to start that process.

Ladies and Gentlemen, that just isn't possible.  At most, there's arm's length cooperation to make this happen, but there's nothing Newegg can do to control or direct its customers' computers to initiate this process.

Now, the remaining steps at the end, the decrypting, we've talked a lot -- all week about this, about RC4 and where it comes from.  I don't want to belabor this point, but I think the evidence is very

1   clear that RC4 cannot be used at all unless it first

2   comes over in the cipher list from the customer.

3               And, again, there's nothing that Newegg

4   can do to direct or control its customers' computers to

5   send over RC4 and its cipher list.  Again, at best, this

6   is an arm's length negotiation.  Infringement is avoided

7   for all of these reasons.

8               Now, you didn't hear really anything

9   about inducement during the course of this week.  You're

10  hearing about it for the first time now.  But for

11  inducement, there has to be underlying infringement.

12  All the claim limitations have to be satisfied by

13  somebody.  They also have to prove to you that Newegg

14  knew of the patent and Newegg had an intent that it be

15  infringed.

16              Ladies and Gentlemen, there's absolutely

17  no evidence of any of that.  There cannot be inducement.

18              Now, we've already established for you

19  that the patent is invalid and it's not infringed.  So

20  what did we hear about?  Oh, we heard, oh, well, Mr. Wu

21  wasn't here.  Well, if Mr. Wu was so important after

22  already hearing from Mr. Chong, they could have called

23  him them self.  Mr. Chong told you everything you needed

24  to know about the Newegg technology.

25              So what else did they tell you?  What did

they tell you, well, 125 people have licensed the '730

patent, and that's got to mean something.  And they

throw out some big names here.  I think that's supposed

to get your attention.

For example, Target.  Do you see Target

on there?  You can look up Target and what they paid in

Plaintiff's Exhibit 42 and Plaintiff's Exhibit 43, and

you will find that Target paid a grand total of $40,000

to settle this lawsuit against TQP.

So let's say you're in charge of

litigation at Target.  Mr. Spangenberg sues you and

you're faced with a possibility of spending two, three

million dollars to defend yourself or paying $40,000 to

get rid of the case.  What would you do?  I think most

people would just decide to settle.  And I can't imagine

Target in any way thinks that they infringe or that the

patent is valid because of that.

This is irrelevant.  It doesn't mean a

thing.  And, in fact, the Court has instructed you on

Page 10 that the fact of these licenses in no way means

that Newegg has infringed.  Their own damage expert, he

agreed.  He told you that these licenses were irrelevant

and he couldn't get away from them fast enough to try to

embrace these unrelated RSA licenses to try to jack this

number up somehow to $5 million.  He said that the

1  $500,000 paid by Amazon, Newegg's most direct

2  competitor, was irrelevant because they just settled to

3  get out of litigation, that that in no way meant that

4  Amazon thought this patent was invalid or infringed.

5             Mr. Spangenberg told you that he's filed

6  over 800 lawsuits without contacting the Plaintiff

7  first.  And in every one of the licenses that we've

8  heard about in this case, the settlements -- the

9  licenses were a result of those companies being sued

10 first or their customers being sued and that company

11 settling for less than it would cost to fight.

12            Again, you've heard that it cost anywhere

13 from two to three million dollars to defend one of these

14 cases, and even if you win, you don't get your money

15 back.  There's no mechanism where a Defendant

16 automatically gets their money back.  So when Amazon,

17 Target, the rest of those companies took those licenses

18 for far less than it would have cost them to fight, I

19 think you can figure out why they settled.  Newegg just

20 wasn't interested in doing the same thing.

21            Now, when I first addressed you on

22 Tuesday, I asked you to read the patent.  Read it and

23 see if there's any mention of SSL, any mention of RC4,

24 any mention of the Internet, any mention of encrypting

25 credit cards.  If you read it, you'll see that none of

 1  that is in there.  And that's because it was not

 2  invented by Mr. Jones.  I think he probably has a fine

 3  invention, but it involves the use of this block

 4  counter.  He did not invent SSL, and he did not invent

 5  its use with RC4.  And that's not what this patent

 6  covers.

 7           We brought you the man that actually did

 8  invent these inventions, Dr. Whitfield Diffie, who's

 9  breakthrough public key cryptography invention is what

10  enabled the use of SSL today.  And they're saying public

11  key cryptography has nothing to do with this patent, but

12  yet they still point to the SSL handshake as forming

13  part of their infringement claim.

14           Dr. Rivest, unquestionably the inventor

15  of RC4.

16           Doctor -- I'm sorry, Mr. Eldridge and Mr.

17  Ozzie, the two gentlemen who in the first instance used

18  RC4 and used it in the Lotus Notes product which is

19  certainly one of the most famous software products of

20  all time.

21           THE COURT:  You have five minutes

22  remaining, Counsel.

23           MR. BALDAUF:  Thank you, Your Honor.

24           These men came here to tell you the

25  facts, the facts about what they did in the 1980s.  I

believe we've -- what we've talked about is very clear.

With respect to RC4, with respect to RC4 and Lotus Notes, TQP admits that if we can prove those dates, that they were earlier, that all the claims are invalid.

As I mentioned before, please read the jury instructions closely.  This trade secret idea, it's nothing but a red herring.  The jury instructions explain that if RC4 was the product of commercialization and that the -- if the public was getting the benefit of the use of the invention, it does not matter if the RC4 code was kept as a trade secret.  Please read the jury instructions.  It explains it very, very clearly.

On infringement, we just went through a number of different reasons why there can be no infringement, but a couple of them are really, really simple.  They have been sent.  Their expert's own demonstrative shows that that is not satisfied by anybody.  I think that one is very, very clear.

And with respect to this idea of who performs the steps and whether Newegg is controlling or directing, as Mr. Fenster is trying to imply, this is not a cop out.  Newegg is not blaming its customers.  It's the law.  And you're required to apply the law as provided by the Court.

```
 1              And the Court has told you that mere

 2  arm's length cooperation is not direction and control.

 3  And that's all they can point to.  As you've seen, for

 4  the SSL handshake to happen and the seed to be provided,

 5  it's the customer's computer that has to initiate that

 6  transaction by clicking on a secured link.  And there's

 7  not a thing in the world that Newegg can do to control

 8  or direct its customers to do that.

 9              Ladies and Gentlemen, TQP is asking for

10  millions of dollars for the alleged infringement based

11  upon the use of SSL and RC4.  But that doesn't appear

12  anywhere in this patent.  And there's absolutely no

13  evidence that the patent covers that stuff.

14              THE COURT:  Two minutes, Counsel.

15              MR. BALDAUF:  Thank you.

16              So there's no infringement.  And beyond

17  that, we've shown to you that what they say is covered

18  by the patent -- namely RC4 was invented by Dr. Rivest

19  almost two years before this patent and it's never been

20  abandoned, suppressed, or concealed.  It's been the

21  basis of ongoing commercialization efforts from the day

22  it was invented, and it's still being used today.

23              Likewise, Lotus Notes, that product, it

24  was at least -- at the very least given to Microsoft,

25  and Mr. Ozzie told you that he distributed copies to
```

1  various customers without -- without any confidentiality

2  obligation whatsoever, and those gentlemen were, in

3  fact, using it in 1988 with Lotus.  And the evidence is

4  clear that there was also a sale.

5           Look at the jury instructions.  They're

6  trying to tell you a license is not a sale.  That

7  doesn't apply to software.  Please read the

8  instructions.  There, in fact, was a sale of this

9  product in 1988 from Iris to Lotus.

10           Ladies and gentlemen, thank you so much

11  on behalf of everyone associated with Newegg for your

12  attention over the last week.  We know this is a

13  sacrifice, especially this time of year.  But your

14  service is vital.  It's so important to the American

15  justice system.  So we ask that when you go back to

16  deliberate, you find, as the evidence has shown, that

17  this patent is not infringed by Newegg in any way and

18  that the claims are invalid.

19           Thank you.

20           THE COURT:  All right.  The Plaintiff may

21  present their final closing argument.  You have 11

22  minutes remaining, Mr. Fenster.

23           MR. FENSTER:  Thank you.

24           57, please.

25           Ladies and Gentlemen, the misdirection

continues.  They started, they ended talking about whether or not Mr. Jones invented SSL and RC4.  But Dr. Stubblebine had to admit on that stand on cross-examination whether or not Mr. Jones invented RC4 or SSL is completely irrelevant to infringement, correct?

I agree.

Why are they talking about this?  Because they don't want to talk about the claims.  He came up here and talked about counters and blocks, block counters and closed systems and Figure 1.  And the Judge -- and they said why are -- why did we get rid of the block counter because the Judge told you -- is going to tell you and has told you it's the claims that control.  Dr. Stubblebine admitted there is no block counter.  There is no closed system.  We're talking about the claims.

The -- until the very last second it sounded like they were only talking about prior invention and gave up on public use, gave up on public -- on sale.  Public -- prior invention requires that they not abandon, suppress, or conceal.  This is the instruction that I showed you before, and it's going to be at Page 18 of the copy that you get.

They said that the agreements of confidentiality are irrelevant, that all they have to

1   show is that it existed before.  No.  They have to show

2   that it existed before and that it was not abandoned,

3   suppressed, or concealed.  If it was any of those

4   things, if it was suppressed, if it was concealed, not

5   prior art.

6            He put up that black chart and stamped

7   irrelevant over my nice chart.  It's not.  The -- the

8   Court's construction -- instruction talks about if it

9   was concealed, if it was actively concealed, if it was

10  secret use.  The Court's instruction tells you that

11  those things are directly irrelevant, and they're asking

12  you only to ignore it.

13           On infringement, he tried to tell you

14  that there was not a predetermined number of blocks

15  because the predetermined number was 1.  That's the

16  first that I've heard one is not a number.  It's a

17  predetermined number of blocks.  It doesn't say multiple

18  blocks.  It says a predetermined number of blocks, and

19  there's no -- I don't think anyone can really dispute

20  that one is a number.

21           So here's what they said on infringement.

22           Slide 42, please.

23           So first they talked about based --

24  second, they talked about based exclusively on and they

25  showed you a slide from Dr. Rivest who said that they're

1  inputs.  Dr. Rivest never said that the sequence of keys

2  is generated based on those inputs.  The only testimony

3  from Dr. Rivest is the one that we showed you, and Dr.

4  Stubblebine -- Stubblebine admitted he didn't show you,

5  which is this, that the key sequence is generated from

6  the seed and only from the seed, consistent with what

7  Dr. Jaeger told and you Dr. Diffie told you.

8              Now, let's go to Slide 43 and go to their

9  timing issue.

10             Dr. Stubblebine's construction and

11  Newegg's argument apparently is that the second -- is

12  that this language in 1(e) that's talking about what

13  happens at the receiver somehow dictates the timing of

14  the key in the transmitter.  According to their

15  understanding, what they're trying to tell you is that

16  the key up here can't be used -- used until the block

17  has already been transmitted.

18             If the block's been transmitted, that key

19  can't be used for encrypting and this preamble is all

20  about transmitting a sequence of blocks in encrypted

21  form.  It's no wonder that Dr. Stubblebine reaches the

22  conclusion that this claim is impossible to infringe

23  under his nonsensical interpretation.  It's because it

24  doesn't make any sense.  This element, this structure of

25  the claim is so logical.  This is what happens at the

1  transmitter.  This is encrypting at the transmitter.

2  This is what happens at the receiver.  And this is

3  decrypting.

4                 The new -- it says -- it does say a new

5  one -- here, I'll do it here -- a new key value in the

6  first and second sequence is used each time a

7  predetermined number of blocks have been sent from the

8  transmitter.  Why?  Because this language says the first

9  sequence of keys and the second sequence of keys are

10  identical to one another.

11                 So this second key that's used at the --

12  at the receiver does appear in the first sequence.  It

13  was the one that was used to encrypt that block of data.

14  And they have to match because it's a symmetric key

15  encryption system, and that's why their system is met.

16  That's why they infringe.  That's why Dr. Stubblebine's

17  non-infringement argument doesn't work.

18                 Let's go back to Microsoft real quick.

19  They talked about RC4, and they said that there was a

20  non -- that despite their non-disclosure agreements and

21  on all the confidentiality, that nonetheless it was

22  disclosed to Microsoft.

23                 THE COURT:  Five minutes, counsel.

24                 MR. FENSTER:  Thank you, Your Honor.

25  Let's hit that real quick.

1              Slide 29.

2              This is Mr. Eldridge admitting that --

3    that how RC4 functioned was never disclosed.  The way in

4    which RC4 functioned, I might not have even been aware

5    of at the time, and I didn't go into detail with that

6    with Microsoft.

7              And then they talked about the Lotus

8    Week.

9              And let's go to Slide 30.

10             This is what Mr. Ozzie said about whether

11   or not it was disclosed -- it was displayed -- demoed at

12   Lotus Week.  I almost certainly did not demonstrate it.

13   And then Dr. Bal -- or Mr. Baldauf said, yeah, it was

14   turned off, but so what?  So what?  So what means it

15   wasn't demonstrated.  This is a method claim and if it

16   was turned off, these steps were not demonstrated.  They

17   did not demonstrate the steps of this claim.  And

18   because of that, there was never a public disclosure.

19             Instead, it was suppressed and concealed.

20             Ladies and Gentlemen, there is no dispute

21   that RC4 -- how it functioned was always kept as a trade

22   secret.

23             Slide 49, please.

24             Dr. Diffie, we saw, had a similar

25   situation.  Remember Dr. Diffie's patent?  He disclosed

1   his in 1976, and it turned out that someone had done it

2   before, Mr. Ellis, but he kept it secret.  And so Dr.

3   Diffie's patent was valid.  It was valid until the day

4   it expired.  And the reason is because our patent system

5   rewards disclosure, and Dr. Diffie did what he was

6   supposed to do.  He disclosed it.  Just like Michael

7   Jones did.  And just like Dr. Diffie's patent was valid

8   even though there was secret prior art, Mr. Jones's

9   patent is valid even though RC4 was secret.

10                  Next slide -- can you take that down,

11  please?

12                  Let's talk real quick about damages.

13  There was no contrary evidence to rebut Dr. Becker's

14  analysis.  He explained why the settlement agreements

15  shouldn't -- shouldn't be considered as a basis for the

16  reasonable royalty.  He's not running away from them.

17  He's applying the law as the Judge will instruct you,

18  based on the hypothetical negotiation.  And he explained

19  why those are different.

20                  I didn't come up here and tell you that

21  those licenses proved that they infringe.  We prove that

22  they infringe because Dr. Jaeger showed you how they do

23  based on their testimony, based on their documents.  The

24  licenses just showed that other people respect that

25  patent.

1          And one of those licensees was IBM.  And

2  you know who IBM is?  IBM is the one that bought Lotus.

3          THE COURT:  Two minutes, counsel.

4          MR. FENSTER:  Thank you, Your Honor.

5          And if IBM was the one that bought Lotus,

6  they would have all this prior art.  They knew about

7  Lotus Notes.  They knew about Dr. -- Mr. Ozzie, they

8  knew about Mr. Eldridge.  They didn't come into Court

9  saying that it was invalid.  They took a license.

10          It is time, Ladies and Gentlemen, for

11  Newegg to take responsibility for its actions.  It is

12  the one that selects the cipher.  It is the one that

13  administers its own security, and they are the ones who

14  refuse to change it even after they knew about the

15  patent.

16          Mr. Spangenberg has a valid,

17  constitutionally protected property right.  It's being

18  infringed.  I think we've shown that.  And because it

19  is, the law requires that if you do find infringement

20  and you do find that it was not valid, that you grant a

21  reasonable royalty for their infringement.

22          You heard Mr. Spangenberg tell you we

23  tried to reach out.  They reached out to TQP no than --

24  no less than 15 times -- T -- to Newegg.  Newegg never

25  responded.  Once they found out about this patent, they

1  hid.  They did not want to take a call.  They did not

2  want to resolve it.  They did not want to look into it.

3  And so we're here.  And now we trust you to weigh the

4  evidence, to weigh the credibility of each of the

5  witnesses that you've heard, to see who has been being

6  straight with you and who's been trying to misdirect

7  you, who's been giving you the full truth and who's been

8  giving you half truths.

9           Ladies and Gentlemen, TQP and I thank you

10  very much for your consideration in this case, and we

11  trust you and put this in your hands.

12           Thank you.

13           THE COURT:  All right.  Ladies and

14  Gentlemen, when you retire to the jury room to

15  deliberate on your verdict, you may take this charge

16  with you.  And as I said, you will each have a single

17  individual copy of these final jury instructions or the

18  charge.

19           One of the first things you should do

20  when you retire to deliberate is to select your

21  foreperson from among the eight of you.  The foreperson

22  will be responsible for signing the verdict form, once

23  you've reached unanimous verdict, and for signing any

24  notes or messages that are sent to the Court.  After

25  you've selected your foreperson, you should begin your

1  deliberations.

2  You must perform your duties as jurors

3  without bias or prejudice as to any party.  The law does

4  not permit you to be controlled by sympathy, prejudice,

5  or public opinion.  All the parties expect that you will

6  carefully and impartially consider all of the evidence,

7  follow the law as I have given it to you, and reach a

8  just verdict regardless of the consequences.

9  Once you retire to deliberate, it then

10 becomes your sworn duty to discuss the case with one

11 another in an effort to reach an agreement, if you can

12 do so.  Each of you must decide the case for yourself,

13 but only after full consideration of the evidence with

14 the other members of the jury.

15 While you are discussing the case, do not

16 hesitate to re-examine your own opinions or change your

17 mind if you become convinced that you were wrong.

18 However, do not give up on your own

19 honest beliefs solely because the others think

20 differently or merely to finish the case.

21 Your verdict on each issue must be

22 unanimous.  When you've -- when you have reached a

23 unanimous verdict as to each question on the verdict

24 form, your foreperson is to fill in the answers on the

25 verdict form, sign it, and date it.  Make sure that you

1  read the questions carefully, as some of them do not

2  require answers depending on how you answer the other

3  questions.  Do not reveal your answers to any questions

4  until you are discharged by me.

5              Also, you should not reveal your

6  numerical division on any issue during the course of

7  your deliberations to anyone, even to me.

8              Once you begin your deliberations in the

9  jury room, you may feel a little overwhelmed, but this

10  is a complicated case.  There's a lot of evidence and a

11  lot of argument to think about.  But I think you will be

12  surprised as you start working methodically through the

13  case that things will come to you and become more

14  manageable.  I hope and expect you'll listen to one

15  another's views even if you initially think differently

16  or disagree.  Discussing the issues from different

17  perspectives can often help you formulate your own ideas

18  about how particular issues should be decided.

19              If you want to communicate with me at any

20  time during your deliberations, please have your

21  foreperson sign a written note or message and give it to

22  the Court Security Officer who will bring it to me.

23  If a note is sent by you to me during your

24  deliberations, I will respond as promptly as possible.

25              But I will always review your question or

1    your message with the lawyers before I respond to you.

2                   As I mentioned, Ladies and Gentlemen,

3    this is an important case and you are an important part

4    of our jury system.  I want you to remember, trust your

5    common sense throughout the deliberation process.  Our

6    founding fathers in our country had great confidence in

7    the sound common sense of an American jury.  And we have

8    the same confidence in your common sense in this case.

9    The parties have confidence in you, and so do I.

10                   I will now hand eight copies of the final

11   instructions or charge and a clean copy of the verdict

12   form to the Court Security Officer, Mr. McAteer.  And

13   I'll ask him to deliver that to you once you have

14   retired to the jury room to begin your deliberations.

15                   Ladies and Gentlemen, all of us look

16   forward to receiving your verdict.  You may now retire

17   to the jury room to begin your deliberations.

18                   COURT SECURITY OFFICER:  All rise.

19                   (Jury out.)

20                   THE COURT:  All right.  Counsel, we stand

21   in recess awaiting either a note or a verdict from the

22   jury.

23                   MR. ALBRIGHT:  Your Honor, I just --

24                   THE COURT:  I'll see you in a minute.

25                   (Recess.)

1                  * * * * * * * * * * * * * * * * * * * * * * * * *

2

3

4

5                               CERTIFICATION

6

7              I HEREBY CERTIFY that the foregoing is a

8    true and correct transcript from the stenographic notes

9    of the proceedings in the above-entitled matter to the

10   best of my ability.

11

12

13

14   /s/_____                  _____
     SHELLY HOLMES, CSR                        Date
15   Official Court Reporter
     State of Texas No.:  7804
16   Expiration Date  12/31/14

17

18

19

20

21

22

23

24

25