IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| TQP DEVELOPMENT, LLC,<br><br>    *Plaintiff*,<br><br>    v.<br><br>1-800-FLOWERS.COM, INC., et al.,<br><br>    *Defendants*. | NO. 2:11-CV-248-JRG |

**NEWEGG'S REPLY BRIEF IN SUPPORT OF MOTION
FOR JUDGMENT OF LACHES**

TQP's opposition ("TQP Br.") avoids the dispositive evidence—the constructive knowledge of Newegg's alleged infringement before May 2005, the lack of proper notice to Newegg of the ultimate infringement claim, and Newegg's foregone ability to avoid or more robustly prove non-infringement. Instead, TQP tries to excuse its failure to meet its legal obligations and to misdirect the Court's attention to evidence from 2013 that is taken out of context and is not informative on what Newegg might have done if put on notice of infringement or sued long before 2011.[1]

## I. TQP and its Predecessors Had Constructive Notice of the Alleged Infringement More than Six Years Before this Lawsuit was Filed

TQP does not dispute that Newegg's use of SSL and encryption was open, and the evidence thereof was publicly available since 2004. TQP Br. at 6; Newegg Br. at 9-10. The functionality was even expressly touted on Newegg's website. Newegg Br. at 9-10. TQP's brief merely quibbles over whether Newegg's activity was sufficiently "pervasive" or "notorious."

In fact, the SSL/encryption usage was pervasive and notorious. Exhibit 1 to TQP's Brief shows that in 2006 Newegg was highly successful, and was the fifth largest online computer and electronics retailer in the United States, ahead of Best Buy and Apple. Newegg's sales were nearly $1 Billion in 2004 and $1.3 Billion in 2005. Exhibit A, at 6, 12 (Newegg's March 15, 2010 S1/A SEC filing noting that Newegg has "been profitable every year since launching our e-commerce platform in 2001 and ha[s] grown rapidly"). By May 2005, Newegg's business was quite successful and pervasive. And, again, since at least 2004, Newegg consistently touted using the SSL and encryption functionality on its website. Newegg Br. at 10 (citing and quoting Trial Tr. Nov. 20, 2013 PM, at 51:4-52:10; PX56); Exhibit B, at 2 (Internet archive of 2004 Newegg.com privacy page,

---

[1] Newegg has always disputed and continues to dispute TQP's claims of infringement. Newegg's motion for judgment of laches never conceded that "Newegg started infringing in 2004" (TQP Br. at 1), but only made clear that *if*, as TQP contends, Newegg began using RC4 and SSL in 2004, and *if* such usage actually constituted infringement, laches would apply. *See, e.g.,* Newegg Br. (Dkt. No. 432) at 8 ("To the extent the encryption algorithm(s) used included RC4, as TQP contends, such information was publicly available."); *id.* at 1 (referring to Newegg's "alleged infringement").

explaining that its customers' "information is encrypted and is protected with the best encryption software in the industry - SSL. Our SSL technology is the most advanced 128bit encryption by Verisign."). These "pervasive, open, and notorious activities" prevent TQP from pleading ignorance on the part of Telequip. *Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1337-39 (Fed. Cir. 1998).

TQP also disputes whether Telequip would have discovered the accused infringement upon reasonable diligence since the inventor, Mike Jones, left his active role with Telequip before 2004, and since the encryption-oriented division of Telequip had been shut down by then. TQP Br. at 6-7. Mr. Jones's retirement from his Telequip position and Telequip's closing its secure co-processing division is not dispositive. The test of reasonable diligence charges a patentee "with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." *Wanlass*, 148 F.3d at 1338. Telequip owned the patent before May 2005 and had a duty to reasonably inquire concerning possible infringement. Given Newegg's open, pervasive, and notorious activities, it was unreasonable for Telequip not to inquire by at least May 2005. Such an inquiry which would have revealed Newegg's use of SSL and encryption (and, possibly, RC4 if TQP's theory of the case were correct).

A reasonable patentee would have had inquiry notice of SSL and encryption functionality usage by an entity as pervasively successful and public as Newegg. Because the constructive notice of use was more than 6 years before the lawsuit was filed, laches is presumed. Newegg Br. at 7-9.

**II.     TQP's Litigation and Reexamination Activities Do Not Excuse the Delay Because TQP Never Gave the Requisite Notice to Newegg**

TQP contends that since Erich Spangenberg began asserting the '730 Patent shortly after acquiring it, it did not unreasonably delay providing notice of infringement to Newegg. But, as TQP concedes, three years elapsed after TQP acquired the '730 Patent before TQP brought suit against

Newegg, and TQP already sued many, many other companies in those three years, including Newegg's most direct competitor, Amazon. TQP Br. at 2.

While TQP relies on its prior litigations and reexamination to excuse the delay in suing Newegg, TQP attempts to avoid the requirement that it must provide adequate notice of such prior proceedings and its intent to enforce the patent against Newegg for such delay to be excused. *Vaupel Textilmaschinen v. Meccanica Euro Italia SPA*, 944 F.2d 870, 877 (Fed. Cir. 1991). TQP relies on statements in *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (Fed. Cir. 1992) to excuse its notice obligations. But *Aukerman* merely states that "[t]he equities *may or may not* require that the plaintiff communicate *its reasons for delay* to the defendant" and did not eliminate the requirement to provide notice of a claim against the defendant. *Id*. at 1033 (emphasis added).

At most, *Aukerman* recognized that if the reason for delay is pending litigation, the patentee need not strictly provide notice *of the litigation* if, e.g., the defendant was aware of the litigation through other sources. *Id.* Similarly, if there are pre-suit communications between a patentee and alleged infringer, the patent owner should explain why it is delaying filing suit. *Id.* at 1039 (explaining that, in contrast to a situation where the prior litigation becomes known to the defendant from other sources, "[w]here there is prior contact, the overall equities may require appropriate notice [of the litigation], as in [*Jamesbury Corp. v. Litton Industrial Products, Inc.*, 839 F.2d 1544 (Fed. Cir. 1988)]"). An accused infringer, on notice of a potential claim, must also be notified of pending litigation so that "the infringer understands that the patentee is not acquiescing in the infringement." *Jamesbury*, 839 F.3d at 1552. TQP failed to provide such notice, and its delay cannot be excused.

### III. Newegg Was Materially Prejudiced by the Unreasonable Delay

TQP contends that Newegg would not have done any further investigation into its encryption, or made any changes to its website systems to avoid or minimize infringement, even if TQP had

brought suit earlier. TQP Br. at 2-3. TQP quotes witnesses out of context and fails to acknowledge that the cited testimony and actions taken in 2012 and 2013, after the patent expired, say nothing as to how Newegg would have behaved if the lawsuit was brought before May 2005. TQP's delay caused Newegg to suffer both evidentiary and economic prejudice. Newegg Br. at 12-14.

Albert Chong, Newegg's technical witness, did testify that Newegg doesn't "need to care" what encryption algorithms its NetScalers use. TQP Br. at 2. But that statement is from a business perspective—as an online retailer, Newegg's NetScalers simply have to work for their intended purposes. Newegg Br. at 3. Newegg is not indifferent toward third party intellectual property rights, as TQP misleadingly suggests, but respects and frequently licenses intellectual property. *See* Trial Tr. Nov. 21, 2013 AM, at 18:14-20:19. Likewise, Newegg did not gather and maintain past metrics on its encryption usage because there was no business reason for Newegg to do so. Indeed, Newegg did not even know how to track encryption usage metrics until TQP's counsel provided specific instructions to Newegg in 2013. Newegg Br. at 4-5. The failure to track such data was clearly not an intentional ploy to stifle TQP's discovery efforts, as TQP misleadingly suggests on page 4 of its brief. Having that information any earlier would have *benefitted* Newegg, so there is no sensible reason for Newegg to have avoided or withheld such investigation or discovery. By the time Newegg learned how to gather the data and reconfigure its NetScalers to remove RC4 from the cipher lists, the '730 Patent expired so there was no reason to make that change. Newegg Br. at 14.

TQP did not dispute at trial that Newegg could have been used non-infringing alternatives to RC4.[2] Newegg Br. at 3-4. Although Mr. Cheng was not aware of those non-infringing alternatives in

---

[2] In footnote 3 of TQP's Brief, TQP relies on Dr. Becker's supposedly "unrebutted" opinion that the alternative ciphers 3DES and AES were commercially unacceptable. In fact, Dr. Becker never made more than a passing reference to 3DES being supposedly less efficient than RC4, which does not in and of itself make it commercially unacceptable. Trial Tr. Nov. 20, 2013 PM, at 55:12-56:4. Moreover, this testimony was in fact rebutted—Newegg's expert Dr. Stubblebine explained how 3DES could have been used by Newegg in 2004, and that 3DES would not reduce

his 2013 deposition, this does not change the undisputed evidence at trial that such non-infringing alternatives existed, nor does it change the fact that litigation beginning in 2004 or 2005 would have likewise revealed the existence of such non-infringing alternatives. TQP Br., Ex. 2. While Mr. Cheng testified at trial that after being sued in 2011 Newegg did not change its systems to disable SSL and RC4, he explained that this was because Newegg did not believe it infringed TQP's patent at that time. Trial Tr. Nov. 21, 2013 AM, at 31:21-32:13. Had Newegg been sued earlier, Mr. Cheng testified that Newegg "might have been [in] a different frame of mind at that time," explaining that in the past, for example, Newegg had licensed patents even when Newegg "would have won" the underlying infringement lawsuits. Exhibit C, April 11, 2013 Deposition of Lee Cheng, at 38-39.

There were several reasons for Newegg to have a different frame of mind before May 2005 that would cause Newegg to monitor and/or change its NetScalers instead of litigate through trial. First, Newegg was not sued by its first patent assertion entity until it was sued by Soverain Software in 2007, after which time Newegg was repeatedly sued by similar patent holders and formulated a policy to not automatically settle frivolous lawsuits and to defend such lawsuits vigorously so as not to "invite[] more lawsuits." Trial Tr. Nov. 21, 2013 AM, at 17:12-18:13. Second, it was not until 2006 that the Supreme Court decided *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006), which eliminated the presumption of injunctive relief and made it virtually impossible for patent assertion entities to obtain injunctions against infringers. Third, in May 2005, the '730 Patent still had seven years left on its term, instead of the one year left when Newegg was actually sued.

Had this action be brought before May 2005, the vastly different circumstances in fact and law would have resulted in Newegg taking steps to avoid prejudice that it did not take in 2013, when the patent's expiration had rendered such efforts futile.

---

efficiency at all as compared to RC4—in fact, 3DES to this day is FIPS compliant and approved for U.S. government use but RC4 is not. Trial Tr. Nov. 21, 2013 PM, at 50:21-52:9.

| | |
|---|---|
| Dated: February 3, 2014 | Respectfully submitted, |
| | By: /s/ Daniel H. Brean |
| | Kent E. Baldauf, Jr. |
| | James J. Bosco, Jr. |
| | Daniel H. Brean |
| | Anthony W. Brooks |
| | **THE WEBB LAW FIRM** |
| | One Gateway Center |
| | 420 Ft. Duquesne Boulevard, Suite 1200 |
| | Pittsburgh, PA 15222 |
| | Tel: (412) 471-8815 |
| | Fax: (412) 471-4094 |
| | kbaldaufjr@webblaw.com |
| | jbosco@webblaw.com |
| | dbrean@webblaw.com |
| | abrooks@webblaw.com |
| | |
| | Alan Albright |
| | **BRACEWELL & GUILIANI** |
| | 111 Congress Avenue |
| | Suite 2300 |
| | Austin, TX 78701-4061 |
| | Tel: (512) 494-3620 |
| | Fax: (512) 479-3920 |
| | alan.albright@bgllp.com |
| | |
| | Edward R. Reines |
| | **WEIL, GOTSHAL & MANGES LL**P |
| | 201 Redwood Shores Parkway |
| | Redwood Shores, CA 94065 |
| | Tel: (650) 802 3000 |
| | Fax: (650) 802 3100 |
| | edward.reines@weil.com |
| | |
| | Trey Yarbrough (Texas Bar No. 22133500) |
| | Debra E. Gunter (Texas Bar No. 24012752) |
| | **YARBROUGH WILCOX GUNTER PLLC** |
| | 100 E. Ferguson St., Ste. 1015 |
| | Tyler, Texas 75702 |
| | Tel: (903) 595-3111 |
| | Fax: (903) 595-0191 |
| | trey@yw-lawfirm.com |
| | |
| | *Counsel for Newegg Inc.* |

NO. 2:11-CV-248-JRG

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was served on February 3, 2014 upon all counsel of record via the Court's ECF system and via email.

/s/ Daniel H. Brean
*Counsel for Newegg Inc*.