**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **TQP DEVELOPMENT, LLC,** | |
| *Plaintiff*, | |
| v. | **NO. 2:11-CV-248-JRG** |
| **1-800-FLOWERS.COM, INC., et al.,** | |
| *Defendants*. | |

## NEWEGG'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW

# TABLE OF CONTENTS

I. LEGAL STANDARD ................................................................................................. 2

II. ARGUMENT ......................................................................................................... 3

    A. NO REASONABLE JURY COULD HAVE FOUND INFRINGEMENT OR ACTIVE INDUCEMENT OF
INFRINGEMENT ................................................................................................. 3

        1. *TQP Failed to Prove that Newegg's Accused Website Systems Satisfied All
Claim Requirements* ................................................................................ 4

            a. TQP Failed To Prove The "Have Been Sent" Requirement ................................... 4

            b. TQP Failed to Prove the "Predetermined Number of Blocks" Requirement .......... 9

            c. TQP Failed to Prove the "Generating First/Second Sequence[s]" Requirements . 10

        2. *There is No Evidence that Newegg Performed, or Controlled or Directed, All the Steps
of the Claimed Method* ............................................................................ 10

        3. *TQP Presented No Evidence of Even a Single Instance of Direct Infringement
During the Patent Term* ........................................................................... 13

            a. TQP Failed to Prove That Newegg Or Its Customers Actually Used RC4 During
the Patent Term ................................................................................... 14

            b. TQP Failed to Prove How SSL was Implemented on the Accused NetScalers
During the Patent Term ......................................................................... 17

        4. *TQP Failed to Present Sufficient Evidence that Newegg is Liable for Active Inducement
of Infringement* ..................................................................................... 19

    B. NO REASONABLE JURY COULD HAVE FOUND THE ASSERTED CLAIMS VALID OVER THE
PRIOR ART OF RECORD ................................................................................... 21

        1. *The Prior Inventions of RC4 and Lotus Notes Including RC4 Invalidate the Asserted
Claims Under 35 U.S.C. § 102(g)* .............................................................. 22

            a. RSA Invented The Claimed Subject Matter Of The '730 Patent First ................. 23

            b. RSA Did Not Abandon, Suppress, Or Conceal RC4, and Iris Associates Did Not
Abandon Suppress or Conceal Lotus Notes With RC4 ........................................ 25

        2. *The Prior Public Knowledge or Use of RC4 or Lotus Notes with RC4 Invalidate the
Asserted Claims Under 35 U.S.C. §§ 102(a)/(b)* ............................................ 31

i

3. *The Prior Offers for Sale and Sale of RC4 and Lotus Notes Incorporating RC4 Invalidate the Asserted Claims Under 35 U.S.C. § 102(b)* ........................................... 34

4. *The Asserted Claims Are Invalid Over the 1982 Denning Textbook, a Prior Printed Publication, Under 35 U.S.C. § 102(a)/(b)* ..................................................................... 36

   a. Denning Anticipates All Asserted Claims of the '730 Patent ............................... 38

   b. TQP's Disputes Concerning Denning are Without Merit ..................................... 42

5. *The Asserted Claims Are Obvious as a Matter of Law Under 35 U.S.C. § 103* ........... 45

   a. RC4 Alone Renders the Asserted Claims Obvious................................................. 47

   b. Denning Alone Renders the Asserted Claims Obvious ......................................... 48

   c. Combinations of RC4, Lotus Notes with RC4, and Denning Render the Asserted Claims Obvious.................................................................................. 50

C. NO REASONABLE JURY COULD HAVE FOUND NEWEGG LIABLE FOR THE $2.3 MILLION DAMAGES VERDICT ......................................................................................................... 51

   1. *Legal Background* ..................................................................................................... 51

   2. *TQP Did Not Provide Legally Viable Evidence to Support Its Damages Claim* .......... 52

      a. The RSA Licenses Are Not Comparable to the '730 Patent ................................. 53

      b. Dr. Becker's Royalty Tranches Were Arbitrarily Selected and Find No Support in the Record .......................................................................................................... 56

   3. *TQP's Position is Undermined by Compelling Evidence* ........................................... 58

III. CONCLUSION ....................................................................................................................... 60

# TABLE OF AUTHORITIES

**Cases**

*ACCO Brands, Inc. v. ABA Locks Mfr. Co.*,
  501 F.3d 1307 (Fed. Cir. 2007).................................................................. 14, 15, 17, 19

*Advanced Display Sys., Inc. v. Kent State Univ.*,
  212 F.3d 1272 (Fed. Cir. 2000)......................................................................... 36, 42

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
  692 F.3d 1301 (Fed. Cir. 2012)......................................................................... 11, 20

*Amgen, Inc. v. Chugai Pharmaceutical Co.*,
  927 F.2d 1200 (Fed. Cir. 1991)............................................................................... 22

*Apotex USA Inc. v. Merck & Co., Inc.*,
  254 F.3d 1031 (Fed. Cir. 2001)......................................................................... 25, 29

*Atlas Powder Co. v. IRECO Inc.*,
  190 F.3d 1342 Fed. Cir. 1999).......................................................................... 36, 42

*Bellows v. Amoco Oil Co.*,
  118 F.3d 268 (5th Cir. 1997) .................................................................................... 2

*BMC Resources, Inc. v. Paymentech, LP*,
  498 F.3d 1373 (Fed. Cir. 2007)......................................................................... 10, 11

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) .................................................................................................. 3

*Carella v. Starlight Archery*,
  804 F.2d 135 (Fed. Cir. 1986) ............................................................................... 31

*Commil USA, LLC v. Cisco Sys.*,
  720 F.3d 1361 (Fed. Cir. 2013)......................................................................... 20, 21

*Connell v. Sears, Roebuck & Co.*,
  722 F.2d 1542 (Fed. Cir. 1983)............................................................................... 49

*D.L. Auld Co. v. Chroma Graphics Corp.*,
  714 F.2d 1144, 1150 (Fed. Cir. 1983)................................................................... 34

*DataTreasury Corp. v. Wells Fargo & Co.*,
  2:06-CV-72 DF, 2010 WL 5140807 (E.D. Tex. Sept. 27, 2010) ................... 34, 35, 36

*Del Mar Eng. Labs v. United States*,
    524 F.2d 1178 (Ct. Cl. 1975) ........................................................................................ 26

*Dow Chemical Co. v. Astro-Valcour, Inc.*,
    267 F.3d 1334 (Fed. Cir. 2001) .............................................................................. 26, 29

*Dunlop Holdings Ltd. v. Ram Golf Corp.*,
    524 F.2d 33 (7th Cir. 1975) .................................................................. 26, 28, 29, 30

*E.I. du Pont de Nemours & Co.*,
    849 F.2d at 1437 (Fed. Cir. 1988) .......................................................................... 26, 28

*Egbert v. Lippmann*,
    104 U.S. 333 (1881) ..................................................................................................... 31

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
    192 F.3d 973 (Fed. Cir. 1999) ........................................................................................ 4

*Emtel, Inc. v. Lipidlabs, Inc.*,
    583 F. Supp. 2d 811 (S.D. Tex. 2008) ....................................................................... 11

*Enzo Biochem, Inc. v. Gen-Probe, Inc.*,
    424 F.3d 1276 (Fed. Cir. 2005) .................................................................................. 34

*Eolas Technologies Inc. v. Microsoft Corp.*,
    399 F.3d 1325, 1333 (Fed. Cir. 2005) ......................................................... 25, 29, 32

*Ericsson v. D-Link*,
    Case No. 6:10-cv-473, 2013 U.S. Dist. LEXIS 110585 (E.D. Tex. Aug. 6, 2013) .................... 20

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
    575 F.3d 1312 (Fed. Cir. 2009) ..................................................................................... 4

*Flex-Rest, LLC v. Steelcase, Inc.*,
    455 F.3d 1351 (Fed. Cir. 2006) ............................................................................. 29, 30

*Fox Group v. Cree, Inc.*,
    700 F. 3d 1300 (Fed. Cir. 2012) ................................................................................. 26

*Friction Div. Prods., Inc. v. E.I. DuPont de Nemours & Co.*,
    658 F. Supp. 998 (D. Del. 1987) ................................................................... 26, 28, 31

*Fujitsu Ltd. v. Netgear, Inc.*,
    620 F.3d 1321 (Fed. Cir. 2010) ....................................................................... 16, 17, 19

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
   318 F. Supp. 1116 (1970) ..................................................................... 52

*Global Patent Holdings, LLC v. Panthers BRHC LLC*,
   586 F. Supp. 2d 1331 (S.D. Fla. 2008).................................................11

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   131 S. Ct. 2060 (2011)....................................................................... 20

*Graham v. John Deere Co.*,
   383 U.S. 1 (1966) ............................................................................... 46

*Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Corp.*,
   340 U.S. 147 (1950) ...................................................................... 46, 47

*In re Arkley*,
   455 F.2d 586 (CCPA 1972) ................................................................ 42

*In re Kollar*,
   286 F.3d 1326 (Fed. Cir. 2002)........................................................... 34

*Integra Life Sciences v. Merck*,
   331 F.3d 860 (Fed. Cir. 2003) ............................................................ 59

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
   424 F.3d 1374 (Fed. Cir. 2005)............................................... 31, 33, 34

*Iovate HealthSciences, Inc. v. Vio-Engineered Supplements & Nutrition, Inc.*,
   586 F.3d 1376, 1381(Fed. Cir. 2009)................................................... 3

*IP Innovation L.L.C. v. Red Hat, Inc.*,
   705 F. Supp. 2d 687 (E.D. Tex. 2010) ................................................ 55

*KSR Int'l Co v. Teleflex Inc.*,
   550 U.S. 398 (2007) ...................................................................... 46, 49

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) ................................... 51, 52, 53, 55

*LifeScan Scot. Ltd. v. Shasta Techs., LLC*,
   734 F.3d 1361 (Fed. Cir. 2013) ...........................................................17

*Lockwood v. American Airlines, Inc.*,
   107 F.3d 1565 (Fed. Cir. 1997)................................................ 31, 32, 33

*Lucent Technologies, Inc. v. Gateway, Inc.*,
 580 F.3d 1301 (Fed. Cir. 2009) .................................................................... 53, 55, 56

*Mahurkar v. C.R. Bard, Inc.*,
 79 F.3d 1572 (Fed. Cir. 1996) ................................................................................. 22

*Minton v. National Ass'n of Securities Dealers, Inc.*,
 336 F.3d 1373 (Fed. Cir. 2003) ............................................................................... 34

*Mirror Worlds, LLC v. Apple, Inc.*,
 692 F.3d 1351 (Fed. Cir. 2012) ............................................................................... 17

*Muniauction, Inc. v. Thomson Corp.*,
 532 F.3d 1318 (Fed. Cir. 2008) ............................................................... 10, 11, 12, 22

*Netscape Communications Corp. v. Konrad*,
 295 F.3d 1315 (Fed. Cir. 2002) ......................................................................... 31, 32

*Nobelpharma Ab v. Implant Innovations*,
 141 F.3d 1059 (Fed. Cir. 1998) ............................................................................... 22

*Oiness v. Walgreen Co.*,
 88 F.3d 1025 (Fed. Cir. 1996) ................................................................................. 51

*Palmer* and *Gillman v. Stern*,
 114 F.2d 28 (2d Cir. 1940) ...................................................................................... 28

*Palmer v. Dudzik*,
 481 F.2d 1377 (C.C.P.A. 1973) ............................................................................... 28

*Phillip M. Adams & Assoc., LLC v. Dell Computer Corp.*,
 519 Fed. Appx. 998 (Fed. Cir. 2013) ....................................................................... 14

*ResQNet.com, Inc. v. Lansa, Inc.*,
 594 F.3d 860 (Fed. Cir. 2010) ......................................................................... passim

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*,
 264 F.3d 1344 (Fed. Cir. 2001) ............................................................................... 22

*Schering Corp. v. Geneva Pharms., Inc.*,
 339 F.3d 1373 (Fed. Cir. 2003) ............................................................................... 36

*Servo Corp. v. General Elec. Co.*,
 337 F.2d 716 (4th Cir. 1964) ................................................................................... 48

*Superior Fireplace Co. v. Majestic Prods. Co.*,
   270 F.3d 1358 (Fed. Cir. 2001) ................................................................ 10

*TQP Development, LLC v. Merrill Lynch & Co., Inc., et al.*,
   Case No. 2:08-cv-00471 (E.D. Tex. July 18, 2012) ......................... 34, 35

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) .............................. 51, 52, 55, 57

*Unisplay, S.A. v. American Electronic Sign Co., Inc.*,
   69 F.3d 512 (Fed. Cir. 1995) ................................................................. 52

*W. L. Gore & Assoc. v. Garlock, Inc.*,
   721 F.2d 1540 (Fed. Cir. 1983) ............................................................. 31

*Western Union v. MoneyGram Payment Sys.*, 626 F.3d 1361 (Fed. Cir. 2010) ...................... 22, 46

## Statutes

35 U.S.C. § 102 ............................................................................................2, 60

35 U.S.C. § 102(a) ......................................................................... passim

35 U.S.C. § 102(b) ......................................................................... passim

35 U.S.C. § 102(g) ......................................................................... passim

35 U.S.C. § 102(g)(2) ............................................................................ 22

35 U.S.C. § 103 .............................................................................45, 46, 60

35 U.S.C. § 271(a) ................................................................................ 14

## Other Authorities

38 AIPLA Q.J. 373, 390-391 ................................................................. 59

3A-10 Donald S. Chisum, *Chisum on Patents* § 10.08[1] .......................... 25

9A Wright & Miller, Federal Practice and Procedure, § 2254 ....................... 3

Defendant Newegg Inc. ("Newegg") respectfully moves this Court to grant Judgment as a Matter of Law ("JMOL") in its favor, pursuant to Federal Rule of Civil Procedure 50(b). At trial, Plaintiff TQP Development, LLC ("TQP") did not present legally sufficient evidence for a reasonable jury to find that Newegg directly infringed U.S. Patent No. 5,412,730 ("the '730 Patent"), that Newegg actively induced infringement, or that TQP was entitled to the damages awarded by the jury. At the same time, Newegg presented clear and convincing evidence, not legally rebutted by TQP, that the '730 Patent was invalid. Consequently, this Court should grant judgment as a matter of law in favor of Newegg as specified below.

One non-infringement JMOL ground particularly worthy of this Court's attention centers on the dispositive requirement in claim 1 of the '730 Patent that one block of encrypted data must be transmitted *before* the next block of data is encrypted in the transmitter—what the parties have referred to as the "have been sent" claim limitation. The Court recognized this important order-of-steps requirement during the claim construction process. TQP does not deny this requirement, and yet TQP not only failed to prove that Newegg transmits the first block of encrypted data before encryption of a second block of data, but conceded that the opposite is true—i.e. that Newegg encrypts multiple blocks of data before any transmission occurs.

TQP's unpersuasive response is that this order-of-steps requirement refers to encryption at the receiver rather than the transmitter. But the text of claim 1 expressly defines the "first sequence" of key values that are used to encrypt as a sequence of key values on the *transmitter* side. The second step of claim 1 explicitly states as much: "generating a *first sequence* of pseudo-random key values based on said seed value *at said transmitter*." Only the *second* sequence is at the *receiver* side. Thus, by the plain text of the claim, the "have been sent" requirement must apply to *both* the first sequence in the transmitter and the second sequence in the receiver: "a new

one of said key values *in said first and said second sequences* being produced each time a predetermined number of said blocks are transmitted [have been sent] over said link."   Although much in modern patent litigation is gray, this is a particularly black and white basis on which the infringement verdict should be discarded as a matter of law.

Likewise, a JMOL of invalidity is warranted.   TQP does not deny that the prior art asserted by Newegg would invalidate the claims-in-suit if it qualifies as prior art under Section 102.   The record provides a plethora of grounds for a JMOL of invalidity and many of them involve legal questions for the Court as to what activities qualify as prior art under Section 102.   As explained, RC4 and Lotus Notes with RC4 were not "secret" or "concealed" such that the prior art would not qualify under Section 102.   Judgment as a matter of law of invalidity in favor of Newegg is also warranted.

Finally, the jury's award of $2.3 million is unsupported and JMOL on damages is warranted.   TQP presented expert testimony on reasonable royalty damages relying on licenses having no comparability either in technology or economics to the patent-in-suit.   TQP's expert piled error upon error when he relied on a made-up royalty scheme involving tranches based on nothing at all in the record.   The lump sum licenses to the '730 Patent are the best and only real world evidence directly establishing a reasonable royalty—far less than what the jury awarded.

Although the jury found for TQP, the infringement and damages cases presented by TQP cannot survive the many shortcomings described herein, and no reasonable jury could have found for TQP on Newegg's invalidity case either.   Newegg's motion should be granted.

## I.  LEGAL STANDARD

Judgment as a matter of law is appropriate when "the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes that reasonable jurors could not arrive at a contrary verdict."  *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 273 (5th Cir. 1997).  "The

question is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury might *reasonably* find a verdict for that party." 9A Wright & Miller, Federal Practice and Procedure, § 2254[1].

Conclusory expert testimony is not substantial evidence. *See Iovate HealthSciences, Inc. v. Bio-Engineered Supplements & Nutrition, Inc.*, 586 F.3d 1376, 1381-82 (Fed. Cir. 2009) (applying Fifth Circuit law). Likewise, "when an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

## II. ARGUMENT

A.    NO REASONABLE JURY COULD HAVE FOUND INFRINGEMENT OR ACTIVE INDUCEMENT OF INFRINGEMENT

The Court should grant judgment as a matter of law on TQP's infringement case because TQP failed to present sufficient evidence to support an infringement verdict in at least four critical ways.  First, TQP failed to establish that Newegg's accused website satisfied all of the claim requirements; this motion focuses on three such limitations.  For example, TQP conspicuously failed to prove that Newegg's system satisfies a critical claim limitation requiring that "a new key value in the first and second sequence is used each time a predetermined number of blocks have been sent from the transmitter over the communications link."  Second, it is undisputed that Newegg's customers independently initiate and perform at least three steps of the claimed method. Since Newegg does not direct or control its customers to take those actions, Newegg cannot be liable for infringement.  Third, TQP failed to provide any actual infringement evidence from the relevant time period.  Its only technical evidence of how the accused sales transactions occurred

---

[1] Emphases are supplied unless specified to the contrary.

was from 2013, after the '730 Patent expired. TQP may not rely on such evidence to prove infringement during the damages period. Finally, TQP failed to prove that Newegg actively induced infringement by intending to cause infringement or acting with culpable intent. For any one of these reasons, the Court should grant Newegg's motion.

1.     *TQP Failed to Prove that Newegg's Accused Website Systems Satisfied All Claim Requirements*

It was TQP's burden at trial to prove that Newegg's website met all the claim requirements. The failure to establish that the accused product meets all limitations of the claim requires judgment as a matter of law. *See Exergen Corp. v. Wal-Mart Stores, Inc*., 575 F.3d 1312, 1321 (Fed. Cir. 2009); *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980-981 (Fed. Cir. 1999) (judgment as a matter of law of non-infringement is appropriate when no reasonable fact finder could determine "that the accused devices meet every limitation of the properly construed claims"). Here, TQP withdrew its doctrine of equivalents case. Thus, it was required to show that Newegg satisfied every limitation literally, but TQP failed to carry its burden of proof as a matter of law.

a.     TQP Failed To Prove The "Have Been Sent" Requirement

All the asserted claims require: "a new one of said key values in said first and said second sequences being produced each time a predetermined number of said blocks are transmitted over said link." PX-1, '730 Patent, at Claim 1. The Court construed this claim requirement to mean "a new key value in *the first* and second sequence *is used* each time a predetermined number of blocks *have been sent* from the transmitter over the communications link." Dkt. No. 226, at 22.

TQP's infringement theory is that a single byte of data is the "predetermined number of blocks." Trial Tr. Nov. 20, 2013 AM, at 12:24-13:5; 23:2-6 ("Q. What is the predetermined number of blocks in SSL and RC4? A. RC4 defines a predetermined number of blocks in one—as one, and it's the—it is that way within SSL or TLS as well."). Thus, the only legitimate reading of

this construction in this case is that a new key value must be used at the transmitter for encrypting the next block only *after* each prior encrypted block has already been transmitted over the link – *not before*. A block of data must be encrypted and sent over the communication link before the next block is encrypted. TQP failed to prove that Newegg's NetScalers met this requirement.

TQP's expert, Dr. Jaeger, did not address the "have been sent" requirement on direct examination—he merely conclusorily asserted that the claim element is generally satisfied. Trial Tr. Nov. 20, 2013 AM, at 17:25-18:21 ("Q. Does Newegg's use of SSL and RC4 meet all the requirements of Element 1(e)? A. I find that it does, yes."). Dr. Jaeger then confirmed on cross, using the following demonstrative from his direct examination, that the one-byte "block" in Newegg's system is *not* transmitted when the next key value is used by the transmitter:



Dr. Jaeger's Demonstratives, attached as Ex. A, at Slide 68.

> Q    [I]n this animation—you show that we've got one block, the green block, and two blocks—the second block, the blue block—block, they've been encrypted already, correct?

A     As is shown here, yes.
Q     And they've each been encrypted using a different key value, correct?
A     Block 1 was encrypted with a different key value than Block 2, yes.
Q     So Block 2, the blue block, is being encrypted using a new key value *before* Block 1 has been transmitted across the communication link, correct?
A     That's correct.

Trial Tr. Nov. 20, 2013 AM, at 130:11-23; *see also id* at 54:22-55:5 (admitting that multiple bytes are transmitted *en masse* in Newegg's accused system, not one at a time). TQP's expert thus openly acknowledged that, under his infringement theory, the new key value is used to encrypt the next byte *before* the previously encrypted block has been sent over the communication link. The Court's claim construction is not met by Newegg's accused system.

Newegg's technical expert, Dr. Stubblebine, confirmed non-infringement by examining the same demonstrative slide prepared by Dr. Jaeger shown above. Trial Tr. Nov. 21, 2013 PM, at 32:17-25 ("The Court's construction says that new key value in the first and second sequence is used each time a predetermined number of blocks have been sent from the transmitter over the communication link. And what Dr. Jaeger was accusing as that predetermined number is one block. And so one block has got to be sent before you use the next key to encrypt the next block, and that's not what's going on."). It is beyond any reasonable dispute that Newegg's system does not send an encrypted block over the communication link before the next key is used to encrypt. As a result, Newegg is entitled to a judgment of non-infringement as a matter of law.

TQP initially disputed *but ultimately conceded* that Newegg's reading of the claim language and the construction is correct. During the claim construction phase of this case Newegg proposed that the phrase "blocks are transmitted over said link" be interpreted to require that the "blocks have been sent from the transmitter over the communication link." Dkt. 226 [Claim Construction Order] at 18. Newegg's briefing clearly explained that the new key value at the transmitter must not be used until after the prior block already has been sent over the link. Dkt.

178, at 20 ("[U]se of the past tense here indicates that the invention does not switch to the next key value until *after* the predetermined number of data blocks have been transmitted.").

TQP initially opposed the inclusion of the phrase "have been sent." Dkt. 172, at 5-6. TQP's briefing on the issue was conclusory and unconvincing, essentially going no further than expressing its belief that the "have been sent" language was redundant and unnecessary. Dkt. 172, at 5-6. However at oral argument, TQP argued that "have been sent" should not be included in the construction because it supposedly changed to the past tense the requirement that the first block be sent when the next block is transmitted, making it "awkward." Markman Tr., Dkt. 212 at 51:15-20 ("the concern is this, it's changing the present tense, 'are transmitted,' to the past tense, 'have been sent.'"). Specifically, TQP contended: "[t]he key values in the first sequence are in the transmitter. Those values are being produced before the data is transmitted. So changing it to 'have been sent' seems awkward to us." *Id.* at 51:11-52:5. Despite this supposed disagreement, TQP characterized the difference between "are transmitted" and "have been sent" as "very close" and "a minor issue." *Id.* at 55:11-56:12. In fact, TQP's counsel ultimately conceded that its concerns were addressed by the Court's ultimate construction: "To the extent that the Court's construction is indicating that a new key value is used past tense each time a predetermined number of blocks have been sent from the transmitter over the communication link, I think that may be broad enough to address the concern that I've raised." *Id.*

In the subsequent Claim Construction Order, this Court rejected TQP's arguments and adopted a construction requiring that the "blocks have been sent from the transmitter" because "the claim explicitly refers to transmission, not to encryption or to some other step of preparing for transmission." Dkt. 226 at 21. TQP never objected to this construction. In sum, the parties already debated during claim construction whether the new key value had to be used at the

transmitter *after* the block had been sent. The Court found that it did and TQP, after initially raising apparently grammatical rather than substantive concerns, accepted the construction.

Nevertheless, at trial, TQP suddenly contended that the requirement of the new key value being used to encrypt a second block before the first encrypted block has been sent over the link supposedly did not relate to the new key value in the *transmitter*, but rather only the new key value on the *receiver* side. TQP argued that encryption at the transmitter was irrelevant because the two sequences of key values are identical and the claim step at issue appears in a paragraph describing the generation of the second sequence of key values at the receiver. Trial Tr. Nov. 25, 2013 PM, at 113:8-114:17. But again, at the claim construction hearing, TQP's counsel accepted the Court's construction and acknowledged in the context of this very claim construction issue that the "key values in the first sequence are in the *transmitter*." Markman Tr. at 51-52.

In its mid-trial attempt to sidestep the claim constructions and backpedal from its previous positions taken on the record, TQP first notes that this claim step starts with the language "generating a second sequence of pseudo-random key values based on said seed value at said receiver." TQP asserts that this means the relevant clause (whose construction is at issue) "said first and said second sequences being produced each time a predetermined number of said blocks are transmitted over said link" must only relate to the *receiver* side.

But TQP does not get a "do-over" on claim construction. The claim requirement at issue expressly refers to the "first sequence" of key values, which is the sequence on the *transmitter* side, as this Court previously held. This is because the second step of the claim requires the step of "generating a *first sequence* of pseudo-random key values based on said seed value *at said transmitter*." Only the *second* sequence is at the receiver side. Thus, by the plain text of the claim, the requirement that a new key value is used after the previously encrypted block "ha[s]

been sent" applies to *both* the first sequence in the transmitter and the second sequence in the receiver: "a new one of said key values *in said first and said second sequences* being produced each time a predetermined number of said blocks are transmitted over said link." The new key values are undeniably required to be used at *both* the transmitter and the receiver *after* a predetermined number of blocks *have been sent* over the communication link.

Because TQP's reading of the claim construction is inconsistent with a plain reading of the Court's construction and the claim, and it is undisputed that Newegg does not transmit a block of encrypted data before encryption of a new block of data, Newegg is entitled to a judgment as a matter of law that it does not infringe the '730 Patent.

> b.     TQP Failed to Prove the "Predetermined Number of Blocks" Requirement

The claim requires a "predetermined number of *blocks*." This claim language requires a plurality of blocks—a single block is insufficient to constitute the claimed "blocks." Yet TQP's trial position was that a single block can satisfy the "blocks" requirement. Trial Tr. Nov. 20, 2013 AM, at 23:2-6 ("Q. What is the predetermined number of blocks in SSL and RC4? A. RC4 defines a predetermined number of blocks in one—as one, and it's the—it is that way within SSL or TLS as well."). This distinction—between the one block asserted by TQP as satisfying the claim requirement and the multiple blocks actually required—is important because the patent describes the invention as involving the counting of *blocks* as a part of the allegedly inventive encryption scheme. '730 Patent, at Col. 3 and Fig. 1. A single block, in addition to being inconsistent with the plain meaning of the plural claim language, does not require counting and is thus inconsistent with the patent's teaching that the blocks need to be counted. *See* Claim Construction Order, Dkt. 226 at 30 (noting that "use of the plural term 'blocks' in Claim 1 of the '730 patent weighs in favor of finding that two or more blocks are required" and that "[n]othing in

the '730 Patent is contrary to such a natural reading."); *see Superior Fireplace Co. v. Majestic Prods. Co.*, 270 F.3d 1358, (Fed. Cir. 2001) (holding that the change from claim language of "rear walls" plural to "rear wall" singular constituted a substantial change in claim scope).

      c.      <u>TQP Failed to Prove the "Generating First/Second Sequence[s]" Requirements</u>

TQP failed to prove that, as required by all of the asserted claims, Newegg's system "generat[es] a first sequence of pseudo-random key values based on said seed value at said transmitter, each new key value in said sequence being produced at a time dependent upon a predetermined characteristic of the data being transmitted over said link." The key value must be *exclusively* based on the seed value according to the Court's construction. However, RC4 includes three (3) input variables to generate the sequences of key values. Trial Tr. Nov. 21, 2013 PM, at 29:23-30:21; Trial Tr. Nov. 22 AM, at 33:4-21. Dr. Jaeger, TQP's expert, only offered conclusory testimony to the effect that RC4 generates key values based on a seed value, and thus failed to rebut the reality that RC4 uses more than one input to generate a key value. Trial Tr. Nov. 20, 2013 AM, at 9:1-10:18. Thus, the first sequence of key values generated by RC4 is *not based exclusively* on the necessary single seed value. Using similar logic, the second sequence of key values, at the receiver side, is also not exclusively based on the seed value.

      2.      *There is No Evidence that Newegg Performed, or Controlled or Directed, All the Steps of the Claimed Method*

TQP's infringement theory is that Newegg and its customers combine to perform the patented method. Because Newegg does not direct or control its customers or their computers to perform any of the steps that Newegg does not directly perform, Newegg cannot be liable for infringement. *See BMC Resources, Inc. v. Paymentech, LP*, 498 F.3d 1373, 1380 (Fed. Cir. 2007) (setting forth the direction or control standard); *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1330 (Fed. Cir. 2008) (reversing denial of a motion for judgment as a matter of law of no

infringement because the evidence was insufficient to support a finding of direction or control). TQP failed to—and indeed, cannot—meet the direct or control standard, or any other legal standard to prove Newegg's liability for divided infringement.

For a party to be held liable for direct patent infringement, "that party must commit all the acts necessary to infringe the patent, either personally or vicariously." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012) (*en banc*), *cert. granted*, 2014 U.S. LEXIS 11 (Jan. 10, 2014). Mere "arms-length cooperation" is insufficient to establish direct infringement where performance of the steps is divided. *Muniauction*, 532 F.3d at 1329 (citing *BMC*, 498 F.3d at 1371). Moreover, merely "control[ling] access to [the accused] system" and "instruct[ing] users on [the accused system's] use" is not enough to support a finding of direct infringement under the control or direction standard. *Muniauction*, 532 F.3d at 1330; *see also Emtel, Inc. v. Lipidlabs, Inc.*, 583 F. Supp. 2d 811, 834 (S.D. Tex. 2008); *Global Patent Holdings, LLC v. Panthers BRHC LLC*, 586 F. Supp. 2d 1331, 1335 (S.D. Fla. 2008), *aff'd*, 318 Fed. App'x 908 (Fed. Cir. 2009).

All asserted claims require two steps that are expressly performed at the "receiver":

> generating a second sequence of pseudo-random key values based on said seed value *at said receiver*, each new key value in said sequence being produced at a time dependent upon said predetermined characteristic of said data transmitted over said link such that said first and second sequences are identical to one another . . .

> decrypting the data sent over said link *at said receiver* in accordance with said second sequence.

'730 Patent, Claim 1. TQP's expert admitted that the "receiver" accused of performing these steps was Newegg's customers' Internet browsers—not Newegg or any of its instrumentalities. *See* Trial Tr. Nov. 20, 2013 AM, at 26:9-15. Newegg does not direct or control the performance of these steps. TQP argued that these two steps are performed by RC4 being used by the customer's

browsers.  Trial Tr. Nov. 20, 2013 AM, at 52:20-53:6.   TQP's expert conceded that, as part of the "SSL handshake" that initiates a secure connection between the customer's computer and Newegg's system, the *customer's* computer, at the customer's direction, must send a list of ciphers to Newegg, and any one on the customer's list that is supported by Newegg's NetScalers can be used.  *Id.* at 99:12-100:18.   Newegg and the customer cannot agree on and use any encryption cipher, let alone RC4, if it is not on the list initially provided by the customer's computer.  *Id.* at 101:8-102:14. TQP's expert admitted that any customer has the ability to unilaterally change, at any time, the browser settings on the customer's computer to include or not include RC4 on that cipher list.  *Id.*

TQP did not prove that Newegg directs or controls its customers' online behavior in any way, much less with the level of direction or control of a "mastermind."  *Muniauction*, 532 F.3d at 1329 (When the performance of method steps is divided, "the claim is directly infringed only if one party exercises 'control or direction' over the entire process such that every step is attributable to the controlling party, i.e., the 'mastermind.'").  The customer, not Newegg, exclusively controls whether RC4 is used.

Separate and apart from the failure to prove that Newegg directs or controls its customers with respect to the use of RC4, TQP also did not prove that Newegg directs or controls its customers' use of the SSL handshake protocol with RC4, which TQP and its expert alleged satisfies the "providing a seed value" step.  Trial Tr. Nov. 19, 2013 PM, at 150:2-20, 151:7-23; Trial Tr. Nov. 20, 2013 AM, at 5:11-6:6; 9:10-13, 93:10-21.  TQP's expert Dr. Jaeger admitted that Newegg's *customers* must initiate the SSL handshake or a secure transaction, beginning with the provision of a seed.  Trial Tr. Nov. 20, 2013 AM at 91:9-23; *see also* Trial Tr. Nov. 19, 2013 PM, at 140:12-24.  Specifically, the SSL handshake is initiated when a secure URL is entered or a

secure link is clicked by the customer, whereby "the ClientHello message [is] sent from the customer's computer." Trial Tr. Nov. 20, 2013 AM, at 94:1-4. This ClientHello message is the only affirmative action taken by Newegg or its customers that causes the SSL handshake, and thus the provision of a seed, to occur. Trial Tr. Nov. 20, 2013 AM, at 93:10:-94:14; Trial Tr. Nov. 21, 2013 PM, at 39:15-42:18. Thus, Newegg does not direct and control this claim requirement of "providing a seed" because Newegg's customers are in exclusive control over whether the ClientHello message is sent. Trial Tr. Nov. 21, 2013 PM, at 39:15-42:18.

Because TQP failed to prove that Newegg directs or controls whether its customers actually used RC4 or provided a seed by initiating an SSL handshake, TQP failed to establish infringement.

3. *TQP Presented No Evidence of Even a Single Instance of Direct Infringement During the Patent Term*

While TQP alleged that the use of the SSL security protocol with the RC4 encryption cipher jointly by Newegg's Citrix NetScalers and Newegg's customers' computers infringes the asserted claims of the patent, TQP presented no evidence of even a single transaction using RC4 during the patent term, and presented no evidence as to how Newegg's NetScalers actually operated during the accused transactions. Trial Tr. Nov. 19, 2013 PM, at 127:23-128:9. The only evidence of the use of SSL with RC4 that TQP offered was for transactions that took place in 2013, long after the '730 patent's May 2012 expiration. *See, e.g.,* Trial Tr. Nov. 20, 2013 AM, at 41:20-24. No reasonable jury could find that any infringement occurred on this record.

As this Court observed at the October 21, 2013 Pretrial Hearing, "as far as relevance goes, if we're at the close of the Plaintiff's case and the only evidence they have in that SSL and RC4 have been used is evidence from outside the period, then that sounds like that would be insufficient and a JMOL could be granted . . . . I just heard from Mr. Kroeger that they [TQP] have what they believe is evidence that will tie this back to the actual time period. You know, if they don't,

they're in trouble." Oct. 23, 2013 Pretrial Tr., at 136-37. TQP did not bridge the gap at trial as promised, and judgment as a matter of law of non-infringement is warranted.

      a.     <u>TQP Failed to Prove That Newegg Or Its Customers Actually Used RC4 During the Patent Term</u>

There can be no liability for any accused acts that occurred outside the patent term. 35 U.S.C. § 271(a) (infringement can only occur "during the term of the patent"); *see Phillip M. Adams & Assoc., LLC v. Dell Computer Corp.*, 519 Fed. Appx. 998, 1004 (Fed. Cir. 2013) (reversing denial of Defendant's JMOL of non-infringement, holding that "evidence of the IFDC.exe program is limited to the 2000 time period, over six years before [the lawsuit was filed] . . . . Accordingly, the IFDC.exe evidence cannot form the basis for the jury verdict of infringement."). Absent evidence showing actual use of the accused method during the damages period or, alternatively, evidence that Newegg's systems necessarily performed the accused method during the patent term, Newegg cannot be liable for any accused sales transactions. *See ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007).

In *ACCO Brands*, the patent-in-suit covered a locking system that required the accused device to be used in a specific manner, referred to at trial as the "Dornfeld method." *Id.* at 1310-11. Just as in this case, where transactions could use either the allegedly infringing RC4 encryption algorithm or a different non-infringing algorithm, in *ACCO Brands* the accused product could be used in the infringing Dornfeld method or in a non-infringing "press-to-lock method." *Id.* Although the jury found infringement based on expert testimony that the infringing mode was the "natural and intuitive" way to operate the device, the Federal Circuit reversed because there was no evidence that the accused locks were *actually* used, other than by the patentee's expert, in the infringing Dornfeld method. *Id.* at 1312. Although the accused infringer had provided instructions describing the infringing manner of use, the Federal Circuit determined

that this evidence was insufficient because direct infringement can only be proven by evidence of "specific instances of direct infringement" or proof that infringement "necessarily" occurred. *Id*. at 1312-13. The jury's infringement finding was therefore reversed because the patentee failed to prove either "specific instances of direct infringement or that the accused device necessarily infringes the patent in suit." *Id.*

As in *ACCO Brands*, the record in the present case "contain no evidence of actual users having operated the [accused system] in an infringing manner." *Id.* Here, TQP has not offered evidence of *any* specific instances of Newegg's direct or actual infringement during the patent term. Although TQP presented testimony that RC4 was used in certain sales transactions, TQP's expert admitted that all of that data was taken from transactions in 2013, well after the '730 patent expired. Trial Tr. Nov. 20, 2013 AM, at 104:14-20 (Jaeger) ("Q. You showed us a demonstrative about 95 percent of Newegg transactions using RC4. Do you recall that? A. Yes, I do. Q. That was based upon data that was collected only after the patent expired, correct? A. That's right.")). In fact, TQP did not present evidence of a single *actual* use of RC4 in connection with Newegg's website or that a single actual Newegg customer used RC4 during the patent term. *See id.* at 104:3-9. Despite TQP's belief that the SSL and RC4 functionality allegedly covered by the '730 Patent were "widely in use, and it was . . . greatly assisting or enabling Internet commerce— Internet commerce in the sense of payment," TQP did not present the jury with proof of even one instance of RC4 being used among the more than 68 million sales transactions it accused of infringement. Trial Tr. Nov. 19, 2013 PM, at 55:10-18; Trial Tr. Nov. 20, 2013 PM, at 64:22-65:2.

Nor did TQP present sufficient evidence to establish that infringement "necessarily" occurred. *ACCO Brands*, 501 F.3d at 1312-13. TQP agrees that Newegg's encrypted sales transactions can be performed in any number of non-infringing ways by, for example, using

encryption ciphers other than RC4. Trial Tr. Nov. 20, 2013 AM, at 117:16-18 ("Q. So the Citrix NetScaler could be used in non-infringing fashion? A. It could, yes."). Even if Newegg's system, during the patent term, was configured to allow encryption using multiple ciphers, including the RC4 cipher, TQP has not proven that RC4 was *necessarily* used in any transaction, much less the consistent 95% quantum being alleged. Encrypted transactions can use alternative ciphers such as 3DES and AES, and the selection of the cipher is dictated by the customer's browser, which can have RC4 disabled or otherwise unincluded. *See id.* at 117:7-15 ("Q. So it is possible that Newegg could modify the configuration of their Citrix NetScalers? A. Yes, it is. Q. Could they modify their Citrix NetScalers so that they don't use RC4? A. They could do that, yes."). Such optionality of RC4 proves that infringement did not necessarily occur and cannot lawfully be assumed. *See Fujitsu Ltd. v. Netgear, Inc.*, 620 F.3d 1321, 1327-28 (Fed. Cir. 2010).

TQP's witnesses contended at trial that Newegg must have used RC4 during the damages period because its NetScalers were always in the default configuration, and the 2013 data showing RC4 usage was also with the default settings. But TQP introduced no evidence of what the default settings were at any time during the damages period, despite evidence that Newegg has had three different NetScaler models over the years and has updated those NetScalers periodically with new software. Trial Tr. Nov. 20, 2013 AM, at 112:5-8; *id.* at 77:17-78:7 (Q. I understand it's been the default, but do you know what the default setting has been for all those NetScalers from 2004 to the present? A. No, I—I don't think I do."). Thus, TQP's expert simply assumed that the default settings must have been the same and admitted that he did not actually know. *Id.* at 75:21-79:6. Even if Newegg used the NetScaler default settings during the damages period and those settings included RC4 somewhere in the list, TQP has provided no evidence that Newegg's customers had RC4 enabled on their browsers during the damages period such that RC4 would have been used.

Similarly, had Newegg's customers all enabled RC4 on their browsers, although the Citrix NetScaler Manual refers to a list of supported ciphers nowhere does it indicate that such list is in a set order of priority or placement such that RC4 would have been automatically selected. PX 181-442. The NetScaler manual provides no proof that RC4 was actually or necessarily used. *See Mirror Worlds, LLC v. Apple, Inc.*, 692 F.3d 1351, 1358-62 (Fed. Cir. 2012) ("[E]xcerpts from user manuals as evidence of underlying direct infringement by third parties of products that can be used in a non-infringing manner are by themselves insufficient to show the predicate acts necessary for inducement of infringement.").

At most, TQP's evidence establishes that Newegg's systems may have been capable of using the RC4 cipher. However, under *ACCO Brands*, TQP was required to prove that Newegg's NetScalers were *necessarily* used and designed to be so used in an infringing manner, not just that they were *capable* of being used in such a manner. *ACCO Brands*, 501 F.3d at 1313 ("Because the accused device can be used at any given time in a noninfringing manner, the accused device does not necessarily infringe the [patent-in-suit]."); s*ee also Fujitsu*, 620 F.3d at 1329 (holding that mere capability of infringing use is not sufficient to establish infringement). Infringement of a method claim requires proof that the method was actually performed, and TQP introduced no proof that the method, using RC4, was ever performed during the patent term. *LifeScan Scot. Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1382 (Fed. Cir. 2013).

      b.      <u>TQP Failed to Prove How SSL was Implemented on the Accused NetScalers During the Patent Term</u>

TQP accused the use of SSL in combination with RC4 as infringing. SSL is a protocol set out in specification, not an operable code, and therefore the implementation and operation of SSL can differ greatly depending on how it is coded. Trial Tr. Nov. 20, 2013 AM, at 76:7-13 ("Yeah, there's – there's no requirement that the code be produced, only that the code adhere to the

specification."); Trial Tr. Nov. 21, 2013 PM, at 27:4-28:14. The mere use of SSL in general does not establish how a particular SSL implementation actually works.

TQP has not offered evidence to establish how Newegg's NetScalers actually implemented SSL during the damages period. Dr. Jaeger, TQP's infringement expert, admitted that he never examined Newegg's systems or any documentation specific to Newegg's NetScalers. Trial Tr. Nov. 20, 2013 AM, at 76:14-16-82:18-24. He also conceded that he has no idea how SSL was implemented in Newegg's purchased NetScalers as they were operated while the patent was still in force. *Id*. at 82:7-15. The only analysis of Newegg's systems that Dr. Jaeger performed was through a third-party website called Wireshark, and he only performed that analysis in 2013 *after* the patent had expired. *Id*. at 102:21-104:13. Wireshark does not reveal or provide the code running on the Citrix Netscalers used by Newegg. *Id*. at 103:11-20.

Dr. Jaeger testified that Newegg's NetScalers have all run an open source version of SSL called Open SSL, and his testimony was directed entirely to opining how Open SSL would satisfy the claim requirements. Trial Tr. Nov. 20, 2013 AM, at 75:14-25. But there is no evidence that the NetScalers were programmed with Open SSL at any time during the damages period. *Id.* Dr. Jaeger admitted that he did not test or examine the NetScalers used by Newegg during the patent term, and in fact, has never even seen them or the source code that runs on them. *Id.* at 76:14-16 ("Q. You've never seen the actual code that's operating on the NetScalers used by Newegg, correct? A. I have not seen the specific programs, no."); *id.* at 79:21-24.

Despite TQP's burden to prove infringement by a preponderance of the evidence, TQP's expert Dr. Jaeger conceded on cross that he "can't tell you if its more than 50 percent" likely that Newegg's NetScalers ran Open SSL as opposed to some other implementation of SSL. Trial Tr. Nov. 20, 2013 AM, at 81:11-82:15. By contrast, Dr. Stubblebine explained why it was highly

unlikely that a company like Citrix would use generic Open SSL code for its highly specialized devices (Trial Tr. Nov. 21, 2013 PM, at 27:4-29:16), and the jury heard uncontroverted evidence that the implementation of SSL that was actually used on Newegg's NetScalers affected the manner that the NetScalers operated for purposes of the claims—particularly in terms of whether the sequences of key values are based exclusively on a seed. Trial Tr. Nov. 21, 2013 PM, at 27:16-30:21. Compliance with a standard—in this case, the SSL/TLS specification—alone does not supplant the need for proof of how the accused system actually worked as compared to the claimed method. *See Fujitsu*, 620 F.3d at 1327-28 ("[A]n industry standard does not provide the level of specificity required to establish that practicing that standard would always result in infringement. . . . [I]t is not sufficient for the patent owner to establish infringement by arguing that the product admittedly practices the standard, therefore it infringes."). This dearth of evidence about how Newegg's NetScalers actually worked prevents reasonable jurors from finding any infringement, including of course the quantum claimed by TQP. *See ACCO Brands*, 501 F.3d at 1313.

Because TQP has failed to establish that any performance of the patented method occurred during the patent term, and thus no infringement occurred, it necessarily follows that Newegg cannot be liable for active inducement of infringement. TQP's "[h]ypothetical instances of direct infringement are insufficient," and the jury verdict of infringement thus cannot stand. *ACCO Brands,* 501 F.3d at 1313.

4.    *TQP Failed to Present Sufficient Evidence that Newegg is Liable for Active Inducement of Infringement*

Finally, TQP failed to prove that Newegg intended to cause any infringement, and so Newegg cannot be liable for active inducement of infringement. To show active inducement, TQP was required to establish, during the damages period, that: (1) Newegg knew of the '730 patent; (2) Newegg performed some of the steps of the asserted claim; (3) Newegg induced its customers to

perform any remaining steps of that claim; and (4) Newegg's customers in fact performed such steps. *Akamai*, 692 F.3d at 1318. A finding of inducement requires both knowledge of the existence of the patent and knowledge that the [collective performance of the steps of the asserted claim] constitute[s] patent infringement." *Commil USA, LLC v. Cisco Sys.*, 720 F.3d 1361, 1367 (Fed. Cir. 2013); *see also Akamai*, 692 F.3d at 1309. "The knowledge requirement … may be satisfied by showing actual knowledge or willful blindness." *Commil*, 720 F.3d at 1366. "A party is willfully blind if it believed there was a high probability that the acts constituted patent infringement … and took deliberate actions to avoid learning of the infringement." *Ericsson v. D-Link*, Case No. 6:10-cv-473, 2013 U.S. Dist. LEXIS 110585, *34 (E.D. Tex. Aug. 6, 2013) (*quoting Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068, 2070 (2011)). Merely being made aware of a patent and being accused of infringement, however, does not suffice to show the requisite culpable state of mind.

TQP presented no evidence at all, much less legally sufficient evidence, to show Newegg possessed the requisite state of mind for active inducement. No Newegg witnesses, no Newegg documents, and no Newegg admissions show that Newegg intended to cause infringement or otherwise acted with the requisite culpability. Newegg possesses and has possessed a good faith belief that the '730 Patent is not infringed and is invalid as shown by the quality of its trial positions. Newegg's robust defenses of invalidity and non-infringement show that Newegg's conduct cannot possibly amount to willful blindness. Newegg's own corporate representative at trial provided uncontroverted testimony that Newegg does not believe it infringed any valid claim of TQP's, which is why Newegg decided to take this case through trial and not settle. Trial Tr. Nov. 21, 2013 AM, at 16:9-18:2. Thus, there can be no active inducement. *Commil,* 720 F.3d at

1367-68.  Accordingly, Newegg is entitled to judgment as a matter of law that there has been no active inducement of infringement by Newegg.

B.     NO REASONABLE JURY COULD HAVE FOUND THE ASSERTED CLAIMS VALID OVER THE PRIOR ART OF RECORD

Judgment as a matter of law on Newegg's invalidity claims is warranted for numerous reasons.  This is a somewhat unusual invalidity case because TQP conceded at trial that "the combination of RC4 and Lotus Notes meets all of the elements" of the asserted claims.  Trial Tr. Nov. 25, 2013 AM, at 60:16-25[2].  TQP only disputed whether RC4 and Lotus Notes incorporating RC4 qualified as prior art.  *See, e.g., id.* at 60:16-25; 62:3-14.  TQP's main dispute with the prior art is that it could not qualify because it was kept secret.  But this misapprehends the law and facts.  Newegg presented conclusive evidence that the '730 Patent is invalid in light of (1) RC4 alone; (2) RC4 incorporated into Lotus Notes; and (3) a 1982 textbook by Dr. Dorothy Denning titled "Cryptography and Data Security" ("Denning").

First, there is no dispute that Dr. Ron Rivest invented RC4, and that RC4 and/or RC4 with Lotus Notes met all the elements of the asserted claims.  Newegg proved that Dr. Rivest did not abandon, suppress or conceal his invention, which predated the '730 Patent.  TQP's reasons for disputing that there was no abandonment, suppression or concealment fail as a matter of law, and the patent is invalid under 35 U.S.C. § 102(g).  Second, Dr. Rivest and his colleagues also publicly demonstrated and disseminated RC4 with Lotus Notes, and such demonstrations and disseminations created public knowledge and use that invalidates the asserted claims under 35 U.S.C. § 102(a) and/or (b).  Third, along with the prior invention and public use were offers for sale of RC4 and Lotus Notes incorporating RC4, invalidating the '730 Patent under section 102(b).

---

[2] Newegg's expert, Dr. Whitfield Diffie, examined each requirement of the asserted claims and testified specifically how RC4 and/or Lotus Notes met each of these limitations, Trial Tr. Nov. 22, 2013 AM; Trial Tr. Nov. 21, 2013 PM.

Fourth, the Denning textbook anticipates the claims of the '730 Patent. Finally, even if there is no anticipation under any of the aforementioned sections, the patent is obvious either in light of RC4, Lotus Notes with RC4, Denning, or combinations thereof.

The strong and unrebutted evidence of invalidity as described in this motion is not evidence that the jury is at liberty to disbelieve, and thus invalidity is warranted as a matter of law. *Nobelpharma Ab v. Implant Innovations*, 141 F.3d 1059, 1065 (Fed. Cir. 1998); *see also Muniauction*, 532 F.3d at 1330 (reversing a denial of a motion for a judgment as a matter of law of invalidity and holding asserted claims obvious as a matter of law); *Western Union v. MoneyGram Payment Sys.*, 626 F.3d 1361, 1374 (Fed. Cir. 2010) (same).

1. *The Prior Inventions of RC4 and Lotus Notes Including RC4 Invalidate the Asserted Claims Under 35 U.S.C. § 102(g)*

A patent claim is invalid under 35 U.S.C. § 102(g) if the invention defined by that claim was invented by another person in the United States before it was invented by the patentee, and that other person did not abandon, suppress or conceal the invention. *See, e.g., Amgen, Inc. v. Chugai Pharmaceutical Co.*, 927 F.2d 1200, 1205 (Fed. Cir. 1991). A prior invention by another can anticipate a claimed invention under 102(g)(2) if it was conceived and reduced to practice prior to the filing date of the patent. *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001). The "priority of invention 'goes to the first party to reduce the invention to practice unless the other party can show that it was the first to conceive the invention and that it exercised reasonable diligence in later reducing the invention to practice.'" *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1577 (Fed. Cir. 1996). Here, there is no dispute that the invention of the '730 Patent was conceived and reduced to practice by another prior to the filing date of that patent. And under the correct law, the true inventors of the technology at issue in this case did not abandon, suppress, or conceal their invention.

a.     RSA Invented The Claimed Subject Matter Of The '730 Patent First

Michael Jones did not invent the RC4 algorithm that is accused in this case of infringing. Trial Tr., Nov. 19, 2013 PM, at 6:8-12. Dr. Ron Rivest, an employee of RSA Data Security, invented the RC4 encryption algorithm. Trial Tr., Nov. 21, 2013 AM, at 135:21-24. Newegg's expert, Dr. Whitfield Diffie, examined each requirement of the asserted claims and testified specifically how RC4 and/or Lotus Notes met each of these limitations. *See, e.g.,* Trial Tr. Nov. 22, 2013 PM, at 55:20-61:22. Further, TQP conceded at trial that "the combination of RC4 and Lotus Notes meets all of the elements" of the asserted claims. Trial Tr. Nov. 25, 2013 AM, at 60:16-25. The asserted claims are invalid as a matter of law because Mr. Rivest invented the claimed subject matter before Mr. Jones' filing of the '730 Patent application. Further, dependent claims 3, 6, 9, in addition to claim 1, were invented by Mr. Eldridge and Dr. Ron Rivest of RSA Data Security, Inc. before Mr. Jones.[3] There is also no factual dispute regarding this prior invention, and thus all asserted claims of the '730 Patent are invalid as a matter of law if they were reduced to practice prior to the invention date of the '730 Patent and not abandoned, suppressed, or concealed.

RC4 alone was indisputably ready for patenting before the filing date of the '730 Patent. Dkt. 590 at 4 ("the Court finds that collateral estoppel applies with respect to (1) that the identified prior art RC4 algorithm was 'ready for patenting' to the date of October 6, 1988"). Not only did the Court previously hold that RC4 was ready for patenting prior to the critical date, but Newegg also

---

[3] Although TQP admits that Lotus Notes using RC4 meets each and every requirement of the asserted claims, Newegg notes that Messrs. Ozzie and Eldridge provided unrebutted testimony that Lotus Notes sent encrypted messages from a transmitter to a receiver, associated different seed values or RC4 keys with different receivers at different locations, and that Notes contained error control information prior to the critical date of the '730 Patent. *See, e.g.,* Trial Tr., Nov. 21, 2013 A.M., 89:5-90:7, 90:10-91:3, 105:4-21; Trial Tr. Nov. 21, 2013 P.M., 126:20-127:18, 127:20-129:20, 129:21-130:2; DX-10-6.

proved RC4 was ready for patenting prior to October 6, 1988. *See, e.g.,* DX 2; DX3; DX7; DX8; DX9; Trial Tr. Nov. 21, 2013 AM, at 76:21-77:4.

Additionally, TQP failed to rebut the overwhelming evidence that Lotus Notes with RC4 was reduced to practice prior to the October 6, 1989 invention date of the '730 Patent. Mr. Alan Eldridge requested in Fall 1987 that Dr. Rivest provide him with a link encryption algorithm to incorporate into the Notes software product. Trial Tr. Nov. 21, 2013 AM, at 76:1-20. Within a number of weeks, and no later than January 1988, Dr. Rivest delivered RC4 to Mr. Eldridge. Trial Tr. Nov. 21, 2013 AM, at 77:1-78:3. Raymond Ozzie confirmed that Mr. Rivest at RSA did, in fact, deliver the RC4 software module to Iris. *See, e.g.,* Trial Tr., Nov. 21, 2013 PM, at 111:16-112:20; 148:6-149:14; DX-148. Mr. Eldridge testified that he incorporated RC4 into the Lotus Notes product no later than February 1988. Trial Tr. Nov. 21, 2013 AM, at 80:3-17, 97:15-100:14. He testified that it took him no longer than three weeks to integrate RC4 into Lotus Notes, and more likely three days. Trial Tr., Nov. 21, 2013 AM, at 79:10-23. Ray Ozzie confirmed that RC4 was incorporated into Lotus Notes during the same time frame, and at the very latest in May 1988 – one and a half years earlier than the filing date of the '730 Patent. Trial Tr. Nov. 21, 2013 PM, at 114:5-18. DX8 and DX9 further show that RC4 was incorporated into the Notes product by February of 1988, consistent with Mr. Eldridge's testimony. Trial Tr. Nov. 21, 2013 AM, at 91:6-94:7; 96:4-100:14. Mr. Eldridge also testified that DX7 was a version of the RC4 source code that included the same version of the algorithm he incorporated into Lotus Notes. Trial Tr. Nov. 21, 2013 AM, at 78:4-20, 123:20-24. Moreover, DX10 is an April 1988 email message from Darryl Rubin of Microsoft describing the "very fast" "channel encryption" feature (*see* DX10-4), which Mr. Eldridge testified was RC4. Trial Tr. Nov. 21, 2013 AM, at 87:7-89:7. Also, in preparation for bringing Lotus Notes to market with RC4, Dr. Rivest disclosed the RC4 algorithm to the NSA

to secure an export license in a letter dated April 4, 1988. DX-2, DX-3; Trial Tr. Nov. 21, 2013 PM, at 149:15-160:11.

The above evidence was entirely unrebutted. It is undisputed that RC4 was in the code base. Trial Tr. Nov. 21, 2013 PM, at 134:6-17 ("[C]ertainly [the RC4 link encryption feature] was in the code base" of the demo program.). No reasonable jury could dispute that Lotus Notes including RC4 anticipates the asserted claims under 102(g). Thus the only issue is whether Lotus Notes including RC4 was abandoned, suppressed or concealed.

> b.  RSA Did Not Abandon, Suppress, Or Conceal RC4, and Iris Associates Did Not Abandon Suppress or Conceal Lotus Notes With RC4

Abandonment, suppression, or concealment is a question of law. *Apotex USA Inc. v. Merck & Co., Inc.*, 254 F.3d 1031, 1036 (Fed. Cir. 2001) ("Whether suppression or concealment has occurred is a question of law, which we review *de novo*."). "The three words—'abandon,' 'suppress,' and 'conceal—are perhaps misleading in suggesting that there are three separate and independent possibilities. In fact, the three words reflect a unitary concept, focusing on the failure of the person who was the first to reduce the subject matter to practice to either apply for a patent or commercialize the invention or both." 3A-10 Donald S. Chisum, *Chisum on Patents* § 10.08[1].

There are two situations that implicate the concept of abandonment, suppression, or concealment: 1) when a prior inventor, intending to indefinitely and exclusively apply the invention for his own profit, actively conceals the invention from public, and 2) when abandonment, suppression, or concealment can be inferred based upon an unreasonable delay in publicly disclosing the invention. *Eolas Technologies Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1333 (Fed. Cir. 2005) (citations omitted). TQP has argued only that RC4 and Lotus Notes with RC4 were actively concealed.

But there can be no active concealment if the prior inventor takes affirmative steps to make the invention publicly known. *Friction Div. Prods., Inc. v. E.I. DuPont de Nemours & Co.*, 658 F. Supp. 998, 1014 (D. Del. 1987) (citing *Del Mar Eng. Labs v. United States*, 524 F.2d 1178, 1185 (Ct. Cl. 1975) and *Dunlop Holdings Ltd. v. Ram Golf Corp.*, 524 F.2d 33, 37 (7th Cir. 1975)). The prior inventor need not divulge the "innards" of the invention to the public—public use of the invention, without disclosing the details of it, is sufficient to negate any intent to abandon, suppress, or conceal. *Id.*

Likewise, engaging in activities designed to bring about public or commercial use of the invention is also sufficient to negate any intent to abandon, suppress or conceal. *Id.*; *see also Fox Group v. Cree, Inc.*, 700 F. 3d 1300, 1306 (Fed. Cir. 2012) ("Commercialization has been relied upon as another way to prove public disclosure" under 102(g) even without revealing all the details of the invention); *Dow Chemical Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334, 1343 (Fed. Cir. 2001) (explaining that a period of delay does not constitute abandonment, suppression, or concealment if the prior inventor was engaged in reasonable efforts to bring the invention to market). Merely because a prior inventor keeps the inner workings of an invention a trade secret does not mean that she has abandoned, suppressed, or concealed the invention. *E.I. du Pont de Nemours & Co.*, 849 F.2d at 1437 n.5 (Fed. Cir. 1988) ("Because work is 'secret' does not necessarily mean that it has been 'abandoned, suppressed or concealed.'").

After incorporating RC4 into Notes, Mr. Eldridge testified that Iris and Lotus continually tested the product with RC4 every two weeks or so running the latest program code as development progressed, starting no later than early April 1988. Trial Tr., Nov. 21, 2013 AM, at 80:18-82:19. Mr. Ozzie testified that he demonstrated the Notes product, including RC4, to Microsoft. DX10-1, DX10-6; Trial Tr., Nov. 21, 2013 PM, 146:13-147:14. Lotus shipped Version

1 of the Notes product in December 1989. Trial Tr., Nov. 21, 2013 AM, 81:15-18. Messrs. Ozzie and Eldridge both testified that Lotus Notes was subject to significant efforts to commercialize the product. *See, e.g.,* Trial Tr., Nov. 21, 2013 AM, at 86:16-18; Trial Tr., Nov. 21, 2013 PM, at 141:6-143:11; 157:19-158:1. Mr. Ozzie testified that he provided multiple copies of Lotus Notes with RC4 to third party application partners, including Microsoft and Reuters. Trial Tr. Nov. 21, 2013 PM, at 119:13-122:9; 141:6-143:3. Dr. Rivest and Mr. James Bidzos both testified that RC4 standing alone was commercialized as a product named BSAFE. *See, e.g.,* Trial Tr., Nov. 22, 2013 AM, at 12:17-13:5; 45:13-46:2; 52:23-53:21.

The evidence of record clearly and indisputably shows that Mr. Eldridge and Dr. Rivest conceived of, and reduced to practice, a working version of the Notes product with RC4 no later than February 1988. RC4 and/or Lotus Notes with RC4 was never abandoned, suppressed or concealed because both products were subject to significant efforts of commercialization regardless of whether certain immaterial details of it were nonpublic or "trade secret," although RC4 and the RC4 feature of Lotus Notes were not trade secrets. *See* Trial Tr. Nov. 21, 2013 PM, at 142:13-18 ("QUESTION: Speaking generally, in terms of the demos and marketing, et cetera, of Lotus Notes in -- leading up to the commercial release, was the existence of the RC4 link encryption feature something that was confidential or proprietary? ANSWER: No."); Trial Tr. Nov. 21, 2013 AM, at 83:16-85:7. The evidence of record clearly and indisputably shows that Dr. Rivest and RSA diligently worked to publicize and commercialize RC4, and the Notes product with RC4 was heavily commercialized by Messrs. Ozzie and Eldridge, including by giving copies of Lotus Notes to Microsoft and Reuters, among others, under no obligation of confidentiality. Trial Tr. Nov. 21, 2013 AM, at 84:7-87:6; Trial Tr. Nov. 21, 2013 PM, at 118:15-119:6; 119:13-122:9; 142:19-143:3. Messrs. Ozzie and Eldridge both discussed the RC4 features of Notes with

third parties without any obligations of confidentiality. *See, e.g.,* Trial Tr. Nov. 21, 2013 AM, at 86:19-87:6; Trial Tr. Nov. 21, 2013 PM, at 126:8-11. Lotus Notes was even the subject of trade journal and periodical articles. DX4, DX25.

It is true that in some instances "suppression or concealment is [not] negated merely because a secret use of the invention has been commercial." *Palmer v. Dudzik*, 481 F.2d 1377, 1386 (CCPA 1973). But those cases involve secret uses of machine or process inventions, the benefits of which were never accessible to the public, not a publicly available product embodying the claimed invention, as with Lotus Notes and RC4. *See Dunlop*, 524 F.2d at 37 (distinguishing *Palmer* and *Gillman v. Stern*, 114 F.2d 28, 31 (2d Cir. 1940), involving secret use of a machine from a "non-informing" public use where "even though there may be no explicit disclosure of the inventive concept" the article embodying the invention was freely accessible to the public.); *see also E.I. du Pont*, 849 F.2d at 1437 ("Nor does § 102(g) contain a 'known in the art' requirement apart from the requirement of no abandonment, suppression or concealment").

The facts of *Dunlop* are very similar to the facts in this case. In *Dunlop*, the patented invention was a golf ball with a particular coating. *Dunlop*, 524 F.2d at 34. The prior inventor had reduced the invention to practice before the patentee, gave friends and potential customers the coated golf balls, and eventually sold several thousand of them. *Id.* He never publicly disclosed the formula of the coating, and, for this reason, the patentee argued that the prior invention was suppressed or concealed. *Id.* But the court held that the secret nature of the formula did not amount to suppression or concealment because the golf balls were in wide public use, such that the public obtained the *benefits* of the invention. *Id.* at 36-37. Such "non-informing" public use of the invention "forecloses a finding of suppression or concealment." *Id.* at 37; *see also Friction*, 658 F. Supp. at 1014 (dismissing an "invalid" argument that a proprietary process not disclosed to the

public was abandoned, suppressed, or concealed was "since the *process* itself does not have to be disclosed to the public in order to avoid a finding of abandonment, suppression or concealment of the invention. Only the benefits of the inventor's work need reach the public.") (citing *Dunlop*).

Like the golf balls of *Dunlop*, Lotus Notes with RC4 was distributed *without any obligations of confidentiality* to potential customers including Microsoft and Reuters. Trial Tr. Nov. 21, 2013 PM, at 121:13-122:9; 142:19-143:3.; *see also Eolas*, 399 F.3d at 1333 (holding that the demonstration of a prior invention software product to two Sun Microsystems engineers was sufficient to negate a finding that the prior invention was intentionally withheld from the public or that it was unreasonably delayed from public disclosure). Dr. Diffie testified that Microsoft was sophisticated enough to understand not only the high level aspects of Lotus Notes (as is all that is legally required), but also the inner workings of the Notes product, including the RC4 feature. The email from Darryl Rubin to Ray Ozzie confirms as much. DX10. Lotus Notes with RC4 was also demonstrated publicly without any obligation of confidentiality, Nov. 21, 2013 PM, at 118:15-119:6, and was ultimately the subject of a commercial release in December 1989. *See, e.g., Dow Chemical Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334, 43-44 (Fed. Cir. 2001) (finding no abandonment, suppression, or concealment based on reasonable efforts to commercialize and a public disclosure occurring after the priority date of the asserted patent); *Flex-Rest, LLC v. Steelcase, Inc.*, 455 F.3d 1351 1359-60 (Fed. Cir. 2006) (same). These facts were unrebutted at trial, and TQP bore the burden of production on this issue. *Apotex*, 254 F.3d at 1037 ("[O]nce a challenger of a patent has proven by clear and convincing evidence that 'the invention was made in this country by another inventor,' 35 U.S.C. § 102(g), the burden of production shifts to the patentee to produce evidence sufficient to create a genuine issue of material fact as to whether the prior inventor has suppressed or concealed the invention."). The unrestricted distribution,

demonstration, and commercial release of Lotus Notes provided the public with the benefits of the invention, even if it did not have access to the inner workings (although many third parties did). *See Dunlop*, 524 F.2d at 37 ("[E]ven though there may be no explicit disclosure of the inventive concept, when the article itself is freely accessible to the public at large, it is fair to presume that its secret will be uncovered by potential competitors.").

This case is also analogous to *Flex-Rest, LLC v. Steelcase, Inc.*, wherein the Federal Circuit held a secret device was not abandoned, suppressed, or concealed even though it was not publicly disclosed until after the invention date of the asserted patent. 455 F.3d 1351, 1359-60 (Fed. Cir. 2006). There, the alleged infringer kept its prior invention secret until it was publicly disclosed at trade show in June 1991, after the priority date of the asserted patent (February 1, 1991). *Id.* at 1358. During the period preceding the June 1991 trade show, the prior invention was subject to reasonable efforts to commercialize the invention. *Id.* at 1359. The patentee argued that because the invention was kept secret, it was intentionally suppressed. *Id.* But the Federal Circuit held that because an invention "was kept secret during [the relevant] time is not, by itself indicative of intentional suppression or concealment." *Id.* at 1359. Thus, in view of the efforts to bring the invention to market, the Federal Circuit held that there was no evidence to support an inference of suppression or concealment. *Id.* at 1360.

Even assuming for the sake of argument that RC4 was in fact a trade secret, and that the Lotus Notes technology was considered confidential pursuant to the Lotus-Iris Development Agreement, DX4, those facts alone are insufficient as a matter of law to support an inference of abandonment, suppression, or concealment. Significant testing and commercial activity surrounded the development of Lotus Notes until the commercial release of the product, including the numerous unrestricted public distributions and demonstrations, as explained above. Those

activities and the commercial release itself conferred the benefits of the Lotus Notes RC4 features to the public. Those disclosures were sufficient to convey even the details of those features to sophisticated members of the public, *e.g.*, Microsoft. Likewise, RC4 was embodied in the BSAFE product, which RSA heavily marketed, thereby conferring the benefit of RC4 alone to the public.

Thus, as a matter of law, the prior inventions of RC4 and the Lotus Notes product including RC4 invalidate the asserted claims of the '730 patent under § 102(g).

2. *The Prior Public Knowledge or Use of RC4 or Lotus Notes with RC4 Invalidate the Asserted Claims Under 35 U.S.C. §§ 102(a)/(b)*

A patent claim is invalid under 35 U.S.C. § 102(a) if the claimed subject matter was publicly known or used in the United States by someone other than the inventor before the patent applicant invented it. "The statutory language 'known or used by others in this country' . . . means knowledge or use which is accessible to the public." *Carella v. Starlight Archery,* 804 F.2d 135, 139 (Fed. Cir. 1986). "Whether a patent is invalid for a public use or sale is a question of law based on underlying facts." *Netscape Communications Corp. v. Konrad*, 295 F.3d 1315, 1320 (Fed. Cir. 2002) (citations omitted).

Making the invention publicly known requires only that the public enjoy the benefits of a publicly used invention. *Friction*, 658 F. Supp. at 1014. For a prior use of the invention to be public it must be either a) publicly accessible or b) constitute commercial exploitation of the invention. *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1381 (Fed. Cir. 2005) (citing *Egbert v. Lippmann*, 104 U.S. 333, 336 (1881)). Use or knowledge is accessible to the public if it occurs without any limitation or restriction of secrecy. *Id.; see also W. L. Gore & Assoc. v. Garlock, Inc.,* 721 F.2d 1540 (Fed. Cir. 1983). Public use or knowledge of the high-level aspects of a claimed invention are sufficient to place those claimed features in the public's possession under § 102(a). *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1570 (Fed. Cir. 1997).

Similarly, the public need not have access to the inner workings of the prior art use or knowledge for it to be prior art under §102(a). *Id.*

The most glaring instance of public use is the unrebutted evidence that Mr. Ozzie distributed copies of Lotus Notes with RC4 to third parties under no obligations of confidentiality. Trial Tr. Nov. 21, 2013 PM, at 118:15-122:9; 142:19-143:3; *see also Netscape*, 295 F.3d at 1320 ("Public use includes any use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor.") (citations omitted). Microsoft and Reuters were among those parties receiving copies. *Id.* at 119:13-122:9; 142:19-143:3. The Rubin email confirms that Microsoft had a copy of Notes in its possession and was well versed in its features nearly 6 months before the critical date of the '730 Patent. DX10. As a matter of law, this disclosure alone is a public use invaliding the asserted claims of the '730 Patent. *See Eolas*, 399 F.3d at 1334-35 (holding that a third-party inventor's demonstration of prior art software to two Sun Microsystem employees without confidentiality agreements was a public use under 35 U.S.C. § 102(b) as a matter of law).

Additionally, RC4 and Lotus Notes invalidate as public uses under §§ 102(a) and (b) for other reasons. Dr. Ron Rivest testified that he wrote the RC4 code in 1987. Trial Tr. Nov. 22, 2013 AM, at 15:2-10. He also testified that he delivered RC4 to Iris as a software product, *id.* at 13:13-18, pursuant to the agreement between RSA Data Security and Lotus. *Id.* at 12:10-13:21. He noted further that RC4 was marketed as part of a software product called BSAFE. *Id.* at 12:22-13:5. Dr. Rivest also testified that he disclosed RC4 to the NSA in April 1988 for the purpose of obtaining export permission. *Id.*; DX3. Mr. Alan Eldridge testified that RC4 was incorporated into the Lotus Notes product, and he and Mr. Ozzie testified that Lotus Notes was the subject of significant commercial exploitation, as explained above. *See, e.g.,* Trial Tr. Nov. 21, 2013 AM, at

84:7-87:6; Trial Tr. Nov. 21, 2013 PM, at 118:15-119:6; 119:13-122:9; 142:19-143:3. Also, as noted above, Lotus Notes was subject to significant public distribution and demonstration without any obligations of secrecy. *Id.* RC4 was also included in two commercial products that were heavily marketed (BSAFE and Lotus Notes). Because RC4 and Lotus Notes was subject to significant commercial exploitation, such use was a public use. *Invitrogen*, 424 F.3d at 1381.

TQP has provided no evidence to rebut these facts. Its only counterpoint is to contend that the RC4 and Lotus Notes source code was a trade secret or otherwise kept confidential from the public. But this is irrelevant because the public need not have access to the details of the prior art system, such as its source code, for it to constitute an invalidating public use. *See Lockwood*, 107 F.3d at 1570. RC4 and Lotus Notes were capable of performing and did, in fact, perform steps that are claimed methods of the '730 Patent. The patent claims do not recite any particular implementation of encryption or decryption—they only require "encrypting" and "decrypting," so proving invalidity cannot hinge upon whether the specific detailed code of the encryption algorithm was made known to the public. '730 Patent, Claim 1. In fact, TQP agrees that the code-level details of the encryption algorithm implementation need not be known to fully compare a system to the claims, as TQP never attempted to introduce any source code in its effort to show that Newegg's website infringed. Trial Tr. Nov. 20, 2013 AM, at 76:14-16 (Dr. Jaeger admitting that he never even saw any of the source code running on the accused NetScalers). As Mr. Eldridge testified, with RSA's encryption products like RC4, "[t]he algorithms were public, but the implementations were a trade secret" and Mr. Eldridge had an agreement with RSA that he was "the only one [at Iris] that would be allowed to see the source code" implementation. Trial Tr. Nov. 21, 2013 AM, at 83:16-23. The requisite aspects of RC4 were undisputedly public.

Accordingly, RC4 and Lotus Notes with RC4 invalidate the asserted claims of the '730 Patent as a matter of law because they were in public use under 35 U.S.C. §§ 102(a) and (b) well before the filing date of the '730 Patent.

3.      *The Prior Offers for Sale and Sale of RC4 and Lotus Notes Incorporating RC4 Invalidate the Asserted Claims Under 35 U.S.C. § 102(b)*

"[The on-sale] bar under 35 U.S.C. § 102(b) arises where, before the critical date, the invention is [on sale] and ready for patenting." *Invitrogen*, 424 F.3d at 1379. RC4, as delivered by RSA to Lotus and the National Security Agency, was indisputably ready for patenting before the patent's critical date, October 6, 1988. *See supra* Part II.B.1.

A license to software constitutes a sale when a usable software product is contemplated or provided pursuant to that license. *In re Kollar*, 286 F.3d 1326, 1321 n.3 (Fed. Cir. 2002); *Minton v. National Ass'n of Securities Dealers, Inc.*, 336 F.3d 1373, 1377-79 (Fed. Cir. 2003). Similarly, a license to "know how" or technology can constitute a sale if software incorporating that "know how" or technology is also delivered to the licensee. *Id.* The sale of a product before the critical date can anticipate method claims when the product, if used in its intended manner, performs the claimed method. *See TQP Development, LLC v. Merrill Lynch & Co., Inc., et al.*, Case No. 2:08-cv-00471, Dkt. 562 at 2, 5-8 (E.D. Tex. July 18, 2012) (citations omitted); *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276 (Fed. Cir. 2005). The sale does not need to have actually generated profit or revenue, or have even been an actual sale. 35 U.S.C. § 102(b). *See also D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1150 (Fed. Cir. 1983) ("That no sale was actually made to International Crest is irrelevant. An offer to sell is sufficient under the policy animating the statute, which proscribes not a sale, but a placing 'on sale.'").

Moreover, *public accessibility* of a third party sale or offer for sale is *irrelevant* under § 102(b). *DataTreasury Corp. v. Wells Fargo & Co.*, 2:06-CV-72 DF, 2010 WL 5140807, at *3

(E.D. Tex. Sept. 27, 2010) ("This Court thus does not find a sound basis for departing from the general rule of *In re Caveney* and *In re Epstein* that *public accessibility* of a third party sale or offer for sale *is irrelevant* under § 102(b)."). The sale of a product need not be public to qualify as an invalidating sale. *Id.*; *TQP Development, LLC*, Case No. 2:08-cv-00471, Dkt. 562 at 2; *cf. In re Caveney*, 761 F.2d 671, 675 (Fed. Cir. 1985) (noting an exception to the general rule that a sale of the invention made by another before the critical date is invalidating where the sale encompasses an unpatented product made by a secret patented process).

RC4 was the subject of a commercial sale or offer for sale since Ron Rivest invented RC4 and delivered the source code to Iris, where Alan Eldridge incorporated it into the Notes product. DX17; Trial. Tr. Nov. 21, 2013 AM, at 77:16-79:5; Trial Tr. Nov. 22, 2013 AM, at 13:15-21; 45:13-23. This occurred no later than January of 1988 when Mr. Eldridge received RC4 from RSA. *Id.* Mr. Eldridge incorporated RC4 into Lotus Notes by February of 1988. Trial. Tr. Nov. 21, 2013 AM, at 80:3-17. There was also a sale of the Lotus Notes product from Iris to Lotus pursuant to the March 1988 agreement, which is clear that source code had been purchased in January 1988. DX4; Trial Tr., Nov. 21, 2013 PM, at 115:23-116:21. And Mr. Ozzie confirmed that Lotus bought the Notes source code from Iris, and that that source code contained RC4. Trial Tr. Nov. 21, 2013 PM, at 115:16-118:3. Moreover, Ray Ozzie testified that Lotus Notes including RC4 was publicly distributed to "application partners" without any agreement of confidentiality. Trial Tr. Nov. 21, 2013 AM, at 84:7:87:6; Trial Tr. Nov. 21, 2013 PM, at 118:15-119:6; 119:13-122:9; 142:19-143:3. Also, RC4 was marketed in the software product BSAFE. *See, e.g.,* Trial Tr., Nov. 22, 2013 AM, at 12:17-13:5; 45:13-46:2; 52:23-53:21. Mr. Ozzie also testified that he demonstrated Lotus Notes including RC4 to Microsoft. Nov. 21, 2013 PM, at 118:15-119:6. Moreover, it is irrelevant that RC4 and/or Lotus Notes may have been secret or confidential. *See*

*DataTreasury Corp.*, 2010 WL 5140807 at *3 (noting "that *public accessibility* of a third party sale or offer for sale *is irrelevant* under § 102(b)").

Thus, as a matter of law, RC4 and Lotus Notes including RC4 was the subject of invalidating commercial sales/offers for sale between RSA and Lotus Development Corporation, and Iris Associates and Lotus Development Corporation, respectively. *See, e.g.,* Trial Tr. Nov. 21, 2013 AM; Trial Tr. Nov. 21, 2013 PM; Trial Tr. Nov. 22, 2013 AM; Trial Tr. Nov. 22, 2013 PM; DX2, DX3, DX4, DX7, DX8, DX 9, DX10, DX17; DX12. These were sales of software products that performed the steps of the asserted claims – not just a license to know how. Thus, these sales anticipate the asserted claims under 35 U.S.C. § 102(b), as a matter of law.

4. *The Asserted Claims Are Invalid Over the 1982 Denning Textbook, a Prior Printed Publication, Under 35 U.S.C. § 102(a)/(b)*

A patent claim is invalid under 35 U.S.C. § 102(a)/(b) when a single prior art reference discloses every claim limitation. *Atlas Powder Co. v. IRECO Inc.*, 190 F.3d 1342, 1346 (Fed. Cir. 1999). Invalidity by anticipation in a printed publication "requires that the four corners of a single, prior art document describe every element of the claimed invention." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). However, "a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).

As a matter of law, the '730 Patent is anticipated by the 1982 Denning textbook either as a 35 U.S.C. § 102(a) and/or § 102(b) prior printed publication. DX103. Denning was not reviewed by the Patent Office during prosecution or reexamination. Trial Tr. Nov. 22, 2013 AM, at 133:19-23.

Dr. Diffie explained to the jury that, when interpreted as broadly as TQP, the '730 patent simply claims a conventional stream cipher system, and would be invalid over such a system. Trial Tr. Nov. 22, 2013 AM, at 132:10-17 (agreeing that "the Jones patent [would] be invalid over a synchronous stream cipher"); *see also id*, at 120:12-21; Trial Tr. Nov. 22, 2013 PM, at 89:24-90:20; Trial Tr. Nov. 22, 2013 AM, at 130:23-131:16; DX-123.

Dr. Diffie explained, uncontroverted, how stream ciphers have been around since the 1500s but became more prominent around World War I. Trial Tr. Nov. 22, 2013 AM, at 123:14-125:6. Stream ciphers break the data up into blocks and encrypt each block in a way that depends upon where it is in the stream. *Id.* Dr. Diffie provided many historical examples that, just like the '730 Patent, use a pseudo-random number generator to accomplish this, such as the mechanical U.S. SIGABA, Swiss NEMA, and German Enigma rotor machines from World War II. *Id.* Dr. Diffie walked the jury through each asserted claim to show how stream cipher systems, as described in Denning's introductory textbook from 1982, DX-103, invalidate the claims. *Id.* at 132:21-144:21; Trial Tr. Nov. 22, 2013 PM, at 11:8-23:12; DX-103-138, -149 to -153, -108.

The figure of Dr. Denning's book, DX-103-153, matches Fig. 1 of the patent exactly (save for the "block counter" which TQP contends is not a limitation of the claims, Trial Tr. Nov. 20, 2013 AM, at 12-14). Below, Denning's stream cipher is compared to how TQP's expert, Dr. Jaeger, described the invention of the '730 Patent to the jury:



FIGURE 3.3 Synchronous stream cipher.

DX 103-153.

Dr. Jaeger's Demonstratives, attached as Ex. A, at Slide 10. Denning undoubtedly anticipates the asserted claims of the '730 Patent.

a. <u>Denning Anticipates All Asserted Claims of the '730 Patent</u>

Dr. Diffie walked the jury though the stream cipher systems described in Denning, showing how Fig. 3.3 reproduced above (DX103-153) and the accompanying text clearly anticipates each

element of independent claim 1 and dependent claims 6, 8, and 9 of the '730 patent. Dr. Diffie

showed that Denning disclosed all the following limitations:

- The preamble. *See*, *e.g.,* DX103-149 ("A stream cipher breaks the message $M$ into

  successive characters or bits $m_1$, $m_2$, . . . , and enciphers each $m_i$ with the $i$th element $k_i$ of a

  key stream $K = k_1 k_2$"); Trial Tr. Nov. 22, 2013 PM, at 13:13-16 ("Pages 138 and 139 [DX-

  103-152, -153] of Professor Denning's book teach what is in the preamble."); *id.* at 12:18-

  13:2. ("I believe it's clear in the diagram we were looking at, 3.3, they had chose a

  transmitter. She calls it a sender and a receiver and blocks in encrypted form flowing across

  a link between the two.").

- The "providing a seed value" limitation. *See, e.g.,* DX103-153; DX103-152 ("The starting

  stage of the key generator is initialized by a 'seed' $I_0$. Fig. 3.3 illustrates."); Trial Tr. Nov.

  22, 2013 AM, at 138:2-5 ("The $I_0$, usually often called a key, but in this case, we're calling

  it a seed. And Professor Denning calls it a seed on the previous page where she explains

  this diagram."); *see also id.* at 140:9-12, 141:14-18 ("the key generator is initialized by the

  seed [$I_0$]. . . . There are no other inputs to it.").

- The "generating a first sequence" limitation. *See, e.g.,* DX103-152; DX103-185 ("In

  Section 3.2 we discussed methods for generating pseudo-random key streams for stream

  encryption. The streams were generated from a seed $I_0$ . . . ."); Trial Tr. Nov. 22, 2013

  AM, at 137:23-138:1 ("The key generator there is what we are calling a pseudo-random

  number generator. In text a little below this diagram, pseudo-random number generator is

  discussed and in context of key generator."); *id.* at 139:11-17, 141:14-18, Trial Tr. Nov. 22,

  2013 PM, at 14:12-14, 15:3-6, 15:9-15 (describing how the key generator produces key

  values from an input and timing standpoint).

- The "encrypting" limitation. *See, e.g.,* Trial Tr. Nov. 22, 2013 AM, at 138:8-11 ("[T]he process at the bottom [of Fig. 3.3, DX 103-152, -153] labeled encipher and over there decipher are the XOR operation that Dr. Jaeger discussed earlier in this trial."); *see also id.* at 143:8-144:4, Trial Tr. Nov. 22, 2013 PM, at 16:6-9 (discussing how Denning discloses encrypting).

- The "generating a second sequence" limitation. *See, e.g.,* Trial Tr. Nov. 22, 2013 PM, at 17:13-21 ("So on the right side of the diagram, you see the key generator. The key generator is initialized by the seed, and the key generator produces a new key value for each block transmitted over the link. And such—it shows that such said first and second sequences are identical because the key generators are identical, and the seed values are identical, and the key values depend exclusively on the seed value."); *see also id.* at 14:12-14, 15:3-6, 18:12-15; Trial Tr. Nov. 22, 2013 AM, at 137:23-138:1, 141:14-18 (discussion of how the key generator produces and uses key values from an input and timing standpoint).

- The "decrypting" limitation. *See, e.g.,* Trial Tr. Nov. 23, 2013 PM, at 19:1-7 ("On the lower right side of the diagram [Fig. 3.3, DX 103-159] as we saw this morning, there is a— an encryption operation. It is an XOR operation identical to the encryption operation on the left side. And as each block is received, it is decrypted, making use of one of the key values produce by the key generator on the right side."); *see also id.* at 143:8-144:4.

- The seeding of and communication with multiple remote locations limitations of dependent claims 6 and 8. *See, e.g.,* Trial Tr. Nov. 23, 2013 PM, at 21:7-17 (explaining that "roughly each [of claims 6 and 8] speaks of associating a seed value or key value with a number of different entities with which you wish to communicate. And that is precisely what Dr.

Denning is showing in [Fig. 3.26 of Denning].");  *see also id.* at 20:20-24 (further

explaining Denning Figure 3.26); Figure 3.26 of Denning (DX 103-187,-188):

FIGURE 3.26  Centralized key distribution protocol.

- The "adding error control" limitation of dependent claim 9.  *See, e.g.,* DX103-151

  (explaining that "if errors are propagated by the decryption algorithm, applying error

  detecting codes before encryption (and after decryption—see Figure 3.2) provides a

  mechanism for authenticity"); DX103-152 ("Error correcting codes must be applied after

  encryption (because of the error propagation by the decryption algorithm), but can be used

  with error detecting codes (applied before encryption) for authentication."); Trial Tr. Nov.

  22, 2013 PM, at 22:14-21 ("[T]here is a discussion of two distinct ways of applying error

  control mechanisms. One is error detection, which she describes as being applied before

  encryption and after decryption. And the other is error correction codes, which are

  described somewhere in there, which must be applied after encryption and before

  decryption."); Fig. 3.2 of Denning (DX 103-151):



FIGURE 3.2  Encryption used with error detecting codes.

Thus, as shown above, every single element of claims 1, 6, 8 and 9 are disclosed in the Denning book. Claims 1, 6, 8 and 9 are therefore anticipated by Denning. *Atlas Powder*, 190 F.3d at 1346; *Advanced Display*, 212 F.3d at 1282.

b.   TQP's Disputes Concerning Denning are Without Merit

TQP contends that Denning describes several examples—which TQP deems "different systems"—that are unrelated and therefore cannot be "combined" to anticipate. *See, e.g.,* Trial Tr. Nov. 25, 2013 AM, at 25:18-26:12; Trial Tr. Nov. 25, 2013 PM, at 80:19-23 ("[T]his book right here (indicating) does not describe a single system that meets every one of the elements of this claim. It's only by mixing and matching from different parts of this book that he was able to pull this together."). Denning is a single publication. It is one book. Denning was also a textbook intended to teach a collection of encryption knowledge to college students as part of a class. Trial Tr. Nov. 22, 2013 AM, at 133:9-13 ("Q Okay. Who was the audience for this book? A Students of cryptography. Professor Denning used it in her classes at Purdue at the time, and it was well-known as a text and reference in the cryptographic community.").

TQP's only complaint is that Dr. Diffie cited to more than one section of the Denning book. But Dr. Diffie was not cherry picking unrelated pages from Denning, as TQP argued. The pages Dr. Diffie described for the jury were explicitly and directly related, and very clearly directed those skilled in the art how to build a system to perform a method as arranged in the claim using those related teachings. *See In re Arkley*, 455 F.2d 586, 587 (CCPA 1972) ("[T]he reference must clearly and unequivocally disclose the claimed [invention] or direct those skilled in the art to the [invention] without any need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference.").

Dr. Diffie explained how Claim 1, as asserted, generally describes a conventional stream cipher system. He directed the jury to descriptions related to stream ciphers in Chapter 3 [DX103-149 to -204], and more specifically, Sections 3.1 and 3.2 entitled "Block and Stream Ciphers" and "Synchronous Stream Ciphers" [DX103-149 to -153]. He then explained how Claims 6 and 8 relate to generic key distribution techniques. He directed the jury to Section 3.7.4, entitled "Distribution of Session Keys" [DX103-187 to -188], which clearly and relatedly explains how in such a conventional encryption system in which "two users which to communicate in a network *using conventional encryption*, they *must* share a secret key" and then describes a protocol for distributing these keys from a central facility. (DX-103-187). Dr. Diffie also explained how Claim 9 related to error control, and directed the jury to Section 3.2, which described how to apply error control mechanisms to stream ciphers (in which "transmission errors cannot be ignored"). DX-103-151 to -152. Every single one of these disclosures was expressly related and Dr. Diffie testified how they taught one skilled in the art to build the claimed invention of the '730 Patent.

TQP also argues that in Denning the key values are not based "exclusively on the seed," as the Court's constructions require. Trial Tr. Nov. 25, 2013 AM, at 8:16-9:6. Specifically, TQP's expert Dr. Rhyne testified that the Denning goes on from the "general" Fig. 3.3 "and shows three appropriate different ways that you can implement a key generator to generate[] the stream." Trial Tr. Nov. 25, 2013 AM, at 8:22-25. Dr. Rhyne pointed to two of those "appropriate" ways one "might build" a pseudorandom number generator—the output block feedback mode and the counter mode—and argued that those forms of pseudorandom number generation require inputs beyond the seed $I_0$. Trial Tr. Nov. 25, 2013 AM, at 9:7-10:8; *id.* at 13:12-19 (arguing that the output feedback mode requires a seed and a key as inputs); *id.* at 15:2-12 (arguing that the counter mode requires a seed and an encryption key as inputs). As to the third form of "appropriate"

pseudorandom number generators, the linear feedback shift register, Dr. Rhyne did not testify that this method lacks an exclusive input of a seed, Trial Tr. Nov. 25, 2013 AM, at 17:4-22, because this method does, in fact, teach a pseudorandom number stream "based exclusively on" the seed value $I_0$. *See, e.g.,* DX103-55 (showing [Fig. 3.6] and describing a linear shift register). Thus, there is no dispute that Denning discloses this requirement.

However, Dr. Diffie explained that his opinion that Denning teaches the use of a pseudorandom number generator with an exclusive seed input does not depend on which pseudorandom number implementation is used (e.g., counter mode, output feedback mode). Trial Tr. Nov. 22, 2013 PM, at 19:8-11. The general operation of stream ciphers, as depicted in Denning Fig. 3.3, was described in detail above, showed only a single input—the seed $I_0$. Even if TQP is correct that two of the three "appropriate" ways one "might build" a pseudorandom number generator are not based exclusively on a seed value, that does nothing to take away from the fact that the general disclosure of how stream ciphers with pseudorandom number generators work in Denning shows an exclusive input of a seed. DX 103-152, -153 (suggesting, immediately before and after Fig. 3.3, the use of pseudo-random number generators). The specific implementations harped on by Dr. Rhyne are merely "example[s]" (DX103-139)—they are not the sole or exclusive forms of pseudorandom number generators that Denning teaches to a person of ordinary skill in the art. Indeed, Mr. Jones did not invent pseudorandom number generators—they are described in the "Background of the Invention" section of the '730 Patent as receiving seed values. PX1, at Col. 1. Rather, Mr. Jones merely employed existing pseudorandom number generators and had them receive a seed. Trial Tr. Nov. 19, 2013 AM, at 126:24-127:17. The claims require no more than a sequence of key values that are pseudorandom, and Mr. Jones defined a pseudorandom number generator as no more than the following: "A pseudo-random number generator is a—an algorithm

that you input a—a value to, a number. And what it does is it outputs a series of numbers or keys that appear to be random, but they're really not. They—they actually are deterministic, so that's why they call it pseudo-random." Trial Tr. Nov. 19, 2013 AM, at 127:25-128:6.

Moreover, the linear feedback shift register implementation of the pseudorandom number generator does, in fact, teach key values based "exclusively on" the seed value $I_0$, as noted above. *See* DX103-55, at Fig. 3.6. Thus, there is no serious dispute as to whether Denning teaches this claim requirement. Dr. Rhyne's only argument distinguishing the linear feedback shift register from the asserted claims is that "[i]t only deals with bits, which are not blocks." Trial Tr. Nov. 25, 2013 AM, at 17:4-22. But Denning specifies that stream ciphers, in general, break messages into bits or *characters*, DX103-149, consistent with the Court's definition of "block." *See* Dkt. 226 [Claim Construction Order] at 39 ("The Court . . . construes "block" to mean "a group of bits, such as a *character*, word, or other unit of data."). As a result, Denning clearly teaches that a stream cipher utilizing a linear shift register can utilize blocks, as opposed to bits[4].

Accordingly, there is no reasonable dispute that Denning teaches a stream cipher including each and every requirement of the asserted claims.

5. *The Asserted Claims Are Obvious as a Matter of Law Under 35 U.S.C. § 103*

Newegg has demonstrated numerous ways that the asserted claims are anticipated by the prior art, which the jury could not ignore and which the Court should adopt, as a matter of law. But even if the Court determines that one element is missing from a prior art reference, the Court can find the missing element either obvious in light of common knowledge and common sense, or the Court can combine two references to find obviousness.

---

[4] In the event Denning does not expressly teach a stream cipher encrypting "blocks" of data, such a feature clearly would have been inherent or obvious since Denning speaks generally to the fact that stream ciphers were known to use "characters," *i.e.*, "blocks." *See infra* Part II.B.5.b.

A claim is invalid as obvious when the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious to one of ordinary skill in the art at the time the invention was made. 35 U.S.C. § 103. "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). The "ultimate judgment" of obviousness is a legal determination based on underlying facts. *Id.* at 17; *Western Union Co. v. MoneyGram Payment Sys.*, 626 F.3d 1361, 1369 (Fed. Cir. 2010). "Where [] the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claims is apparent in light of these factors, summary judgment is appropriate." *KSR Int'l Co v. Teleflex Inc.*, 550 U.S. 398, 427 (2007).

"[A] patent for a combination which only unites old elements with no change in their respective functions … obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This is a principal reason for declining to allow patents for what is obvious." *See id.* at 415-16 (internal citations omitted), (citing *Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Corp.*, 340 U.S. 147, 152-53 (1950)). Courts should take an "expansive and flexible" approach in determining obviousness, taking into account "the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* at 415-18. "If a person of ordinary skill in the art can implement a predictable variation [of the prior art], § 103 likely bars its patentability." *Id.* at 417. "[A]ny need or problem known in the field of

endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 420.

a.     RC4 Alone Renders the Asserted Claims Obvious

As noted above, uncontroverted evidence was presented to the jury showing that any claim requirement not expressly met by RC4 was inherent. Not only were those allegedly missing features of RC4 inherent, though—they were also obvious to be used with or included in the RC4 algorithm because the algorithm was intended to be and only could be used with those features. Mr. Ozzie, Mr. Eldridge, and Dr. Rivest all testified that it would have been very simple for a person of ordinary skill in the art to implement the algorithm into a system having "transmitter," "receiver," "communication link," and the "providing a seed value." Trial Tr. Nov. 21, 2013 AM, at 79:10-23; Trial Tr. Nov. 21, 2013 PM, at 112:2-15; Trial Tr. Nov. 22, 2013 AM, at 31:16-32:5; 33:22-35:3. RC4 would be useless otherwise. Mr. Eldridge testified that his motivation to request RC4 at the time from Dr. Rivest was to find a faster algorithm that generated a pseudo-random sequence of numbers for the link encryption function of Lotus Notes—a system having those allegedly missing features. Trial Tr. Nov. 21, 2013 AM, at 73:7-75:25; 77:5-15; 79:6-9. Specifically, Mr. Eldridge had the idea for RC4, including "generat[ing] a long sequence of numbers" as the encryption keys, despite the fact that he was not a cryptographer and had just "done some reading." Trial Tr. Nov. 21, 2013 AM, at 74:2-75:25

The link encryption function in Lotus Notes was already operating with another algorithm (RC2), so incorporating RC4 into Lotus Notes and thus combining RC4 with the allegedly missing features was a simple task. *Id.* at 79:10-17. Mr. Eldridge had even written code to seed the link encryption algorithm, which eventually would be RC4. *Id.* at 91:6-92:4. Dr. Rivest created RC4 very quickly after Mr. Eldridge requested it, and Mr. Eldridge quickly and easily was able to

implement it into Lotus Notes. Trial Tr. Nov. 21, 2013 AM, at 77:16-78:3; 79:10-23. Dr. Diffie explained that looking at the code would make it obvious to use RC4 with a sender and a receiver "because encrypting things between senders or transmitters and receivers was the basic thing you did with cryptography for most of its history." Trial Tr. Nov. 22, 2013 AM, at 100:23-101:10.

Thus, for a person of ordinary skill in the art (or even for a person like Mr. Eldridge of less than ordinary skill in the art), it would have been obvious to create RC4 and use it in the environment and manner claimed by the '730 Patent. Further, Mr. Eldridge and Mr. Ozzie both testified that Lotus Notes included the features of dependent claims 6, 8, and 9 of the asserted claims. Trial Tr. Nov. 21, 2013 AM, at 90:8-91:5; 105:4-21; Trial Tr. Nov. 21, 2013 PM, at 129:12-20. All of the asserted claims are therefore obvious as a matter of law over RC4.

### b. Denning Alone Renders the Asserted Claims Obvious

The asserted claims of the '730 Patent are also invalid as obvious over Denning alone. Denning is a textbook, and a person of ordinary skill in the art would have looked to Denning to implement the method of claims 1, 6, 8, and 9 of the '730 Patent. Trial Tr. Nov. 22, 2013 AM, at 133:9-13 ("Q. Who was the audience for this book? A. Students of cryptography. Professor Denning used it in her classes at Purdue at the time, and it was well-known as a text and reference in the cryptographic community."). Moreover, even if RC4 and/or Lotus is not relied upon as prior art, the evidence thereof still constitutes evidence of obviousness and level of ordinary skill. *See Servo Corp. v. General Elec. Co.*, 337 F.2d 716, 720 (4th Cir. 1964).

Here, Mr. Eldridge testified that he was motivated to implement a faster algorithm that generated a sequence of pseudorandom numbers for network encryption, s*ee supra* Part II.B.5.a, that it was very simple to implement RC4 into Lotus Notes, and that it took him no more than three weeks (and probably more like three days) to implement RC4 into Lotus Notes. Trial Tr. Nov. 21, 2013 AM, at 79:10-23. Messrs. Rivest and Ozzie confirmed as much. *See supra* Part II.B.5.a. Mr.

Eldridge had the idea for RC4, including "generat[ing] a long sequence of numbers" as the encryption keys, despite the fact that he was not a cryptographer and had just "done some reading." Trial Tr. Nov. 21, 2013 AM, at 74:2-75:25. Thus, for a person of ordinary skill in the art (or even for a person like Mr. Eldridge of less than ordinary skill in the art), it would have been obvious to combine any of the teachings of Denning with any other teachings of Denning or to provide any features of the claimed invention allegedly not disclosed by Denning, such as generating sequences of pseudo-random key values based exclusively on a seed value.

TQP dismisses Denning for disclosing multiple encryption system embodiments. Even if the different portions of the textbook should be considered separate embodiments, a person skilled in the art would have found it obvious to combine those embodiments to create the subject matter of claims 1, 6, 8, and 9 as discussed above. Courts should take an "expansive and flexible" approach in determining obviousness, taking into account "the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR Int'l Co v. Teleflex Inc.*, 550 U.S. 398, 415-18 (2007). "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 416. Dr. Diffie correctly explained that "the standards for anticipation seem to me to be more severe than those for obviousness. I would certainly also think that Denning makes [the invention] obvious." Trial Tr. Nov. 22, 2013 PM, at 80:1-4; *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983) ("[A]nticipation is the epitome of obviousness.").

For example, in Denning, the linear feedback shift register stream cipher implementation teaches key values based "exclusively on" the seed value $I_0$, as noted above. *See* DX103-55, at Fig. 3.6. Thus, to the extent this feature is not taught with respect to other stream cipher implementations disclosed in Denning, *see* DX103-152-DX103-158, it would have been obvious

to include key values based "exclusively on the seed" with those other implementations in view of the linear feedback shift register. Moreover, Dr. Rhyne's only argument distinguishing the linear feedback shift register from the asserted claims is that "[i]t only deals with bits, which are not blocks." Trial Tr. Nov. 25, 2013 AM, at 17:4-22. But Denning specifies that stream ciphers, in general, break messages into bits *or characters*, DX103-149, consistent with the Court's definition of "block." *See* Dkt. 226 [Claim Construction Order] at 39 ("The Court . . . construes "block" to mean "a group of bits, such as a *character*, word, or other unit of data."). Thus, to the extent Denning does not expressly teach the linear shift register stream cipher implementation as encrypting "blocks" of data, such a feature clearly would have been obvious since Denning speaks generally to the fact that stream ciphers were known to use "characters."

The asserted claims are invalid as obvious as a matter of law over Denning.

c.     <u>Combinations of RC4, Lotus Notes with RC4, and Denning Render the Asserted Claims Obvious</u>

Finally, the asserted claims of the '730 Patent are also invalid as obvious over RC4 and Denning together. Denning teaches the limitations TQP asserts are missing, and teaches the limitations of the asserted dependent claims. DX103; *see supra* Part II.B.4. Since Denning is a textbook, a person of ordinary skill in the art would have looked to Denning to implement the method of claims 1, 6, 8, and 9 of the '730 Patent, including providing different seed values to different receivers and error control. DX103; Trial Tr. Nov. 22, 2013 AM, at 133:9-13. Moreover, Mr. Ozzie, Mr. Eldridge, and Dr. Rivest all testified that it would have been very simple for a person of ordinary skill in the art to implement the algorithm into a system having these features, like Lotus Notes. *See supra* Part II.B.5.a. Accordingly, the asserted claims are obvious as a matter of law over RC4 and Denning.

Dependent claims 6, 8, and 9 would have been obvious over Lotus Notes in view of Denning since Denning is a text book that teaches associating different seed values at different receivers and error control. DX103; *see supra* Part II.B.4. Mr. Eldridge also testified that Lotus Notes had error control and provided different seed values to different receivers. *See supra* Part II.B.5.a. Thus, claims 6, 8 and 9 are invalid as obvious over Lotus Notes and Denning.

C.     NO REASONABLE JURY COULD HAVE FOUND NEWEGG LIABLE FOR THE $2.3 MILLION DAMAGES VERDICT

Newegg is also entitled to judgment as a matter of law on damages. TQP's expert's reasonable royalty evidence is based on licenses with no technological or economic comparability to the '730 Patent. Moreover, TQP's expert's methodology was arbitrary and unsupported by any record evidence. Without such unreliable evidence and methodology, the remaining evidence supports that the proper royalty in this case should have been an amount much lower than that awarded by the jury.

1.     *Legal Background*

The patent owner bears the burden of proving and a reasonable royalty damages award. *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1029 (Fed. Cir. 1996). Royalty rates that are "arbitrary" and "unrelated to the facts of the case" are "unreliable" and "irrelevant" as a matter of law. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315, 1318 (Fed. Cir. 2011). "[A] reasonable royalty analysis requires a court to hypothesize, not to speculate." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).

"Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79-80 (Fed. Cir. 2012) (citations omitted). While licenses other than

those to the patent-in-suit are potentially relevant, the Federal Circuit "insist[s] that the 'licenses relied upon by the patentee in proving damages [be] *sufficiently comparable to the hypothetical license at issue in the suit.*'" *Id*. The bar for technical and economic comparability of licenses is quite high. "[A]lleging a loose or vague comparability between different technologies or licenses does not suffice." *Id.* Requiring the underlying technologies to be comparable ensures that experts only "consider licenses that are commensurate with what the Defendant has appropriated. If not, a prevailing Plaintiff would be free to inflate the reasonable royalty analysis with conveniently selected licenses without an economic or other link to the technology in question." *ResQNet*, 594 F.3d at 872. Ultimately, "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." *Uniloc*, 632 F.3d at 1317. "[T]he trial court must carefully tie proof of damages to the claimed invention's footprint in the market place." *ResQNet*, 594 F.3d at 869.

### 2. *TQP Did Not Provide Legally Viable Evidence to Support Its Damages Claim*

Analysis of a reasonable royalty must be determined in accordance with a hypothetical negotiation framework between the patentee and the accused infringer at the time of first accused infringement. *See Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120-22 (1970), aff'd, 446 F.2d 295 (1971); *see also Unisplay, S.A. v. American Electronic Sign Co., Inc.*, 69 F.3d 512, 518 (Fed. Cir. 1995). Here, TQP's expert, Dr. Stephen Becker, concluded that Newegg and TQP's predecessor, Telequip, would have agreed to a royalty of $0.25 per accused sales transaction, with damages totaling $5.1 million. Trial Tr. Nov. 20, 2013 PM, at 37:1-24. As demonstrated below, the record does not support Dr. Becker's opinion. Specifically, Dr. Becker's starting point for damages consists entirely of four licenses to a patent fundamentally different from the patent-in-suit, involving economic circumstances and parties who are entirely

different from those of the hypothetical negotiation in this case. Additionally, Dr. Becker's royalty structure is completely arbitrary—it finds no support in any license or other evidence in the record, and is improper under current damages case law.

a.        The RSA Licenses Are Not Comparable to the '730 Patent

For his starting point, Dr. Becker uses arbitrarily selected third-party licenses that supposedly involve technology comparable to the '730 Patent. Trial Tr. Nov. 20, 2013 PM, at 43:8-44:3; 44:3-18; 76:5-18. These licenses were granted by RSA Technologies for its United States Patent No. 4,405,829 (the "'829 Patent" or "RSA Patent"). Trial Tr. Nov. 20, 2013 PM, at 76:5-18; PX-99; PX-100; PX-102; PX-103. Dr. Becker contends that the parties would have used the four RSA licenses to the '829 Patent as the start point in setting a royalty, despite that these licenses indisputably neither involve the '730 Patent nor any of the parties in this case or even parties similarly situated to those in this case. Trial Tr. Nov. 20, 2013 PM at 76:1-77:3, 127:14-21.

Dr. Jaeger, TQP's technical expert, contended that the '829 Patent was technically comparable to the '730 Patent because both patents involve providing secure communication between a transmitter and receiver using encryption keys. Trial Tr. Nov. 20, 2013 AM, at 43:24-44:3. Dr. Jaeger admitted that he performed no claim-by-claim comparison between the RSA and TQP patents to determine their differences in scope. *Id.* at 44:9-12. His bases for asserting comparability are true of virtually any possible encrypted communications. *See Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1328-1329 (Fed. Cir. 2009) (rejecting "superficial" and "scant" comparability of licenses to "PC-related patents" "as if personal computer kinship imparts enough comparability"); *LaserDynamics*, 694 F.3d at 79 ("[A]lleging a loose or vague comparability between different technologies . . . does not suffice.").

Both Dr. Jaeger and Dr. Becker agree, however, that the '829 RSA Patent has been widely praised as a breakthrough technology and is considered a foundational invention for communications security. Trial Tr. Nov. 20, 2013 PM, at 106:2-6; 128:1-14. Neither is aware of any similar praise for the '730 TQP Patent. *Id.* And they agree that the '829 Patent is far broader than the '730 Patent, encompassing features not covered by the '730 Patent like digital signatures, party identification, party authentication, and public key/asymmetric encryption. *Id.*

Economically, the differences between the RSA licenses and the hypothetical negotiation are worlds apart. The RSA licenses were entered into by licensees in entirely different lines of business than Newegg's, and the licenses encompassed vastly different and broader rights than would be granted to Newegg under the '730 Patent. Trial Tr. Trial Tr. Nov. 20, 2013 PM, at 76:5-18; 118:13-119:13; PX-99; PX-100; PX-102; PX-103. As Dr. Becker concedes, when the RSA licenses were granted, RSA was "in the security technology business" and focused on licensing its technology to original equipment manufacturers. *Id.* The RSA licenses granted permission to make and sell various hardware products that performed the encryption functions of the RSA Patent. *Id.* The licensees were competitors in the same technology and commercial space as RSA.

Here, Newegg is not a manufacturer but an online retailer alleged to be a mere user of the '730 Patent's technology, and it is not accused of making and selling any product that performs the encryption method covered by the '730 Patent. Trial Tr. Nov. 20, 2013 PM, at 119:9-120:7. The $0.25 RSA royalty was paid to manufacture and sell a security token, which is a small piece of hardware, like a fob, that case be used to gain access to secure areas of building. Trial Tr. Nov. 20, 2013 PM, at 76:5-18; 118:13-119:13; PX-99; PX-100; PX-102; PX-103. Newegg does not manufacture, sell, or even use tokens in its sales transactions, but according to Dr. Becker paying $0.25 to make and sell a token is essentially the same as paying $0.25 per online sales transaction.

The hypothetical license to Newegg would have been granted in 2004 when the Internet and online shopping were far more established commercial fixtures, whereas the RSA licenses were granted between 1996 and 1998 when the state of the Internet and online security were markedly different, with online shopping just beginning to emerge.  PX-99, -100, -102, -103.  Dr. Becker acknowledged that neither Newegg nor Telequip would have had access to these licenses in a 2004 hypothetical negotiation.  Trial Tr. Nov. 20, 2013 PM, at 117:6-118:12.

Dr. Becker ignores all of these economic and technological distinctions and simply deems the licenses comparable, falling far short of proving comparability such that the licenses could be relied upon to prove a reasonable royalty.  *LaserDynamics*, 694 F.3d at 79 ("[A]lleging a loose or vague comparability between different . . . licenses does not suffice."); *Lucent*, 580 F.3d at 1328 (rejecting reliance on license "directed to a vastly different situation").  TQP has not made the requisite showing of a "basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." *Uniloc*, 632 F.3d at 1317.

Parties attempting to use comparable licenses must account for "the technological and economic differences between them."  *See id.* at 1317; *IP Innovation L.L.C. v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 690-691 (E.D. Tex. 2010).  Here, Dr. Becker offers no such accounting for the numerous technical and economic differences between the RSA licenses to the '829 Patent and the hypothetical negotiation between Newegg and Telequip involving the '730 Patent.

This case is strikingly similar to *ResQNet*, where ResQNet's damages expert relied on several "re-bundling" licenses to ResQNet's software products and testified that the licenses were "based on the technology described in the patents-in-suit" or at least "analogous" to the patented technology.  *ResQNet*, 594 F.3d at 870-71.  The Federal Circuit rejected this flimsy connection to the patents-in-suit, noting that "none of these licenses even mentioned the patents in suit or showed

any other discernible link to the claimed technology." *Id.* at 870. Thus, the Federal Circuit concluded that "[t]he rebundling licenses simply have *no place in this case*." *Id.* at 871. Relying on unrelated licenses, particularly to the exclusion of two actual licenses to the patents-in-suit in the record, was a fatal misstep for the expert in *ResQNet*. Even though the relevant licenses were settlements, they were the "most reliable" in the record. *Id.* at 872. The Federal Circuit instructed the district court to "not rely on unrelated licenses to increase the reasonable royalty rate above rates more clearly linked to the economic demand for the claimed technology." *Id.* at 872-73.

Dr. Becker also presumes that a reasonable royalty must be a running royalty despite the fact that all of TQP's settlement licenses with online retailers contain lump sum payments that are small fractions of his $5.1 million opinion. *See* DX247; PX61; DX246 (licenses for lump sums ranging from $25,000 to $500,000); DX43; PX42; PX517; Trial Tr. Nov. 23, 2013 PM, at 103:8-25. Like ResQNet's expert, Dr. Becker simply latched on to the unrelated RSA licenses to the exclusion of far more reliable licenses "clearly linked to the economic demand for the claimed technology" to improperly inflate the ultimate dollar amount of his calculations.

The RSA licenses are "radically different from the hypothetical agreement under consideration." *Lucent,* 580 F.3d at 1327. Like the rejected rebundling licenses in *ResQNet*, the RSA licenses "simply have no place in this case." 594 F.3d at 871, 877. TQP's contentions that the '829 and '730 Patents were technically comparable, and that the RSA licenses are economically comparable, fails to support any verdict for its $5.1 million damages claim.

      b.      <u>Dr. Becker's Royalty Tranches Were Arbitrarily Selected and Find No Support in the Record</u>

Dr. Becker opined that a reasonable royalty in this case would be a running royalty paid per sales transaction in the form of five tranches with a volume discount. Trial Tr. Nov. 20, 2013 PM, at 152:2-15. Dr. Becker could not offer any historical basis for using tranches in the first place,

and Dr. Becker offered no good reason for setting his tranches at 1 million, 5 million, 25 million, and 100 million uses, nor is there any justification given for the particular discounted rate as one enters the next highest tranche. Trial Tr. Nov. 20, 2013 PM, at 145:25-146:6. Dr. Becker freely admits that there is not a single license in this case that follows the royalty structure conjured by Dr. Becker. *Id.* Thus, Dr. Becker's royalty structure is arbitrary and completely disconnected to the facts of this case, and cannot support a jury verdict based in any way on his $5.1 million damages calculation. *Uniloc*, 632 F.3d at 1315, 1318.

Dr. Becker's royalty structure is based only on the $0.25 per token royalty from the RSA licenses as a supposed "starting point," discussed above, his "judgment," and two other data points: (1) an unscientific conversion from a per token royalty to a per use royalty; and (2) the fact that, in 2013, after the '730 Patent had expired and more than a decade after the date of the hypothetical negotiation, RSA was selling software tokens to third parties at a volume discount. *See, e.g.,* Trial Tr. Nov. 20, 2013 PM, at 76:1-86:22; 151:25-155-19. These data points bear no reasonable connection to the hypothetical negotiation at issue, however.

First, Dr. Becker concedes that the RSA per unit royalties for security tokens is not the same as a per *use* royalty because those tokens can be used an unlimited number of times. Trial Tr. Nov. 20, 2013 PM, at 123:15-124:24; PX99; PX100; PX102; PX103. There is no evidence anybody ever licensed the RSA patent on a per transaction or per use basis, however.

Second, considering the applicability of the $0.25 per token royalty, Dr. Becker makes the unremarkable observation that the more one uses each token, the less one effectively pays per use. *Id.* From here, Dr. Becker concludes, without explanation or citation to evidence, that "the parties in this case would have been aware of this fact and would have agreed to a volume discount schedule that provided for rapidly declining marginal rates per transaction as annual volume

increased." Trial Tr. Nov. 20, 2013 PM, at 82:14-83:16. There is no evidence of any volume discounts or tranches in the RSA licenses or any other licenses in this case whatsoever. As with the conversion from per-token to per-use, Dr. Becker just made it up.

The record does not support TQP's $5.1 million claim or the jury's $2.3 million verdict.

3.      *TQP's Position is Undermined by Compelling Evidence*

Other record evidence also precludes TQP's damages position as a matter of law. For example, in contrast to Dr. Becker's mere assumption that Telequip and Newegg would have agreed to a running royalty form of a license, Newegg's corporate representative, Lee Cheng, testified that Newegg would have only taken a lump sum. Nov. 21, 2013 AM, at 19:10-20:19. Because of Telequip's lack of licensing policy, its not practicing or licensing the patent, and both parties' desire to avoid audits and usage reports, the only reasonable form of a license would be Newegg's preferred lump sum. Nov. 21, 2013 AM, at 19:10-20:19. Other evidence, discussed below, also supports the use of a low-value lump sum in this case.

First, in the past four years, TQP has entered into multiple licenses with various online retailers that contained rights to either the '730 Patent or the '730 and '637 Patents together. Trial Tr. Nov. 19, 2013 PM, at 69:23-70:3. In exchange for the rights granted under these licenses, the online retailers paid lump-sums indicative of reasonable royalty as to Newegg being much less than $500,000. *See, e.g.* DX247; PX61; DX246 (Settlement licenses to the '730 patent for lump sums ranging from $25,000 to $500,000); DX517; PX42; PX43; Trial Tr. Nov. 23, 2013 PM, at 103:8-25; Trial Tr. Nov. 21, 2103 AM, at 27:20-24. However, to the extent that these licenses also included rights to TQP's '637 Patent, a downward adjustment would apply.

Second, TQP and Amazon entered into a lump sum license agreement for the '730 Patent. Trial Tr. Nov. 19, 2013 PM, at 88:13-89:4; DX247. Under this license, Amazon received a

nonexclusive, worldwide license to the '730 patent in exchange for a lump sum payment of $500,000. *Id.* Amazon and Newegg are direct competitors in the e-commerce market as the top two online-only retail market. Trial Tr. Nov. 21, 2013 AM, at 14:17-21; 27:20-24. However, Amazon is approximately thirty times larger than Newegg in terms of revenue scale. The lump-sum amount of $500,000 adjusted downward based on the relative market shares of Amazon and Newegg yields an implied value that is a small fraction of what Amazon paid to TQP.

Third, in 2008, the '730 Patent and a related patent were purchased by TQP for $750,000. Trial Tr. Nov. 19, 2013, at 53:21-25. The value of a patent for sale can be one of the most informative pieces of evidence in determining the value of a patent. *See Integra Life Sciences v. Merck*, 331 F.3d 860, 871 (Fed. Cir. 2003) (noting that a license fee for the patent should consider the price of acquisition of the patent). "A jury should consider the valuation of the infringed asset at the time of its acquisition when assessing alleged damages caused by infringement of that asset." Michael R. Annis & Brad L. Pursel, *Intellectual Property Valuation Under U.S. GAAP and the Impact on Intellectual Property Litigation*, 38 AIPLA Q.J. 373, 390-391. The $750,000 price paid for the '730 Patent and the '637 Patent is thus a meaningful data point for determining a reasonable royalty rate for the '730 Patent.

Fourth, Newegg paid about $265,000 for its accused NetScalers from the January 2004 hypothetical negotiation date through the May 2012 expiration of the '730 Patent—a fraction of TQP's damages claim and the jury verdict. Trial Tr. Nov. 21, 2013 AM, at 23:2-14. If TQP's infringement theory is correct, this data point is telling of "the claimed invention's footprint in the market place." *ResQNet*, 594 F.3d at 869.

Finally, Newegg presented evidence that it could have, in 2004, changed the configurations of its NetScalers to eliminate the use of RC4 at virtually zero cost and relied exclusively on other non-infringing alternative ciphers like 3DES or AES.  Trial Tr. Nov. 21, 2013 PM, at 50:21-52:9. The change is akin to a flip of a switch.  Newegg's ability to avoid infringement confirms that Newegg had options at the hypothetical negotiation and would not agree to pay anything unreasonable or substantially different from its expectations (i.e., lump sum, fair price) in light of the value of the '730 Patent.  Nov. 21, 2013 AM, at 19:10-20:19.

## III.   CONCLUSION

For the foregoing reasons, Newegg is entitled to judgment as a matter of law that the asserted claims of '730 Patent are not infringed, that Newegg does not actively induce infringement of the '730 Patent, that the asserted claims are invalid under 35 U.S.C. § 102 and/or § 103, and that the damages verdict of $2.3 million is unsupportable and must be remitted.

Dated: February 17, 2014          Respectfully submitted,

By: /s/ Daniel H. Brean
Kent E. Baldauf, Jr.
James J. Bosco, Jr.
Daniel H. Brean
Anthony W. Brooks
**THE WEBB LAW FIRM**
One Gateway Center
420 Ft. Duquesne Boulevard, Suite 1200
Pittsburgh, PA 15222
Tel: (412) 471-8815
Fax: (412) 471-4094
kbaldaufjr@webblaw.com
jbosco@webblaw.com
dbrean@webblaw.com
abrooks@webblaw.com

Alan Albright
**BRACEWELL & GUILIANI**
111 Congress Avenue
Suite 2300
Austin, TX 78701-4061
Tel: (512) 494-3620
Fax: (512) 479-3920
alan.albright@bgllp.com

Edward R. Reines
**WEIL, GOTSHAL & MANGES LL**P
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: (650) 802 3000
Fax: (650) 802 3100
edward.reines@weil.com

Trey Yarbrough (Texas Bar No. 22133500)
Debra E. Gunter (Texas Bar No. 24012752)
**YARBROUGH WILCOX GUNTER PLLC**
100 E. Ferguson St., Ste. 1015
Tyler, Texas 75702
Tel: (903) 595-3111
Fax: (903) 595-0191
trey@yw-lawfirm.com

*Counsel for Newegg Inc.*

### **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was served on February 17, 2014 upon all counsel of record via the Court's ECF system.

/s/ Daniel H. Brean
*Counsel for Newegg Inc.*