**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

TQP DEVELOPMENT, LLC,

         Plaintiff,

    v.

1-800-FLOWERS.COM, INC., et al.,

         Defendants.

C.A. No. 2:11-cv-248-JRG-RSP

**PLAINTIFF TQP DEVELOPMENT, LLC'S OPPOSITION TO DEFENDANT
NEWEGG INC.'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW**

**Table of Contents**

Page

I.    INTRODUCTION ...................................................................................1

II.    LEGAL STANDARD..............................................................................1

III.    SUFFICIENT EVIDENCE SUPPORTS THE JURY'S FINDING
CONCERNING INFRINGEMENT AND ACTIVE INDUCEMENT..............................2

    A.    There Was More Than Sufficient Evidence to Support the Jury's Finding
that Newegg's Accused Websites Satisfied all Claim Requirements.....................2

        1.    TQP Presented More Than Sufficient Evidence that the "Have
Been Sent" Claim Construction was Met. ....................................................2

        2.    TQP Presented More Than Sufficient Evidence From Which the
Jury Could Find the "Predetermined Number of Blocks"
Limitation Satisfied.....................................................................................8

        3.    TQP Presented More Than Sufficient Evidence that Newegg
Infringed the "Generating First/Second Sequence Requirements."...........10

    B.    The Evidence Demonstrates that Newegg Performed, Directed, or
Controlled All Steps of the Patented Method. ......................................................11

        1.    Dr. Jaeger's Testimony, SSL/TLS Specifications, and Newegg's
Own Testimony Provided More Than Sufficient Evidence
Demonstrating Direction and Control.......................................................11

            a.    Newegg Directs and Controls Use of SSL or TLS......................11

            b.    Newegg Directs Selection of RC4.............................................12

        2.    Newegg Focuses on Actions That Are Not Claimed by the
Patented Method. ......................................................................................14

    C.    TQP Presented More Than Sufficient Evidence of Direct Infringement..............17

        1.    TQP Presented More Than Sufficient Evidence to the Jury That
RC4 Was Used by Newegg During the Damages Period. .........................17

        2.    TQP Presented More Than Sufficient Evidence to the Jury
Concerning How SSL Was Implemented on the Accused
NetScalers. ...............................................................................................20

    D.    TQP Presented More Than Sufficient Evidence at Trial Demonstrating
that Newegg Is Liable for Inducement..................................................................21

IV.    MORE THAN SUFFICIENT EVIDENCE SUPPORTS THE JURY'S
DECISION THAT THE '730 PATENT WAS VALID OVER THE PRIOR ART..........22

## Table of Contents

Page

A. More Than Substantial Evidence Supports the Jury's Finding that the '730 patent Is Not Invalid Under 35 U.S.C. § 102(g). ...................................................22

1. Newegg Failed to Show that the RC4 Algorithm Meets All Claim Limitations Such that It Could Be Prior Art under Section 102(g). ..........23

2. More Than Substantial Evidence Shows that Lotus Notes in Combination with RC4 Was Abandoned, Suppressed or Concealed...................................................................................................25

B. More Than Substantial Evidence Supports the Jury's Finding That RC4 And Lotus Notes With RC4 Do Not Invalidate the '730 patent Under 35 U.S.C. § 102(a) or (b). .........................................................................28

1. Newegg Has Failed to Show that RC4 Meets All Claim Limitations or That it Was in Public Use Prior to the Critical Date. .........28

2. More Than Substantial Evidence Shows that Lotus Notes Utilizing RC4 Was Not in Public Use Prior to the Critical Date. ............................29

C. Newegg Has Not Met Its Burden to Prove that RC4 and/or Lotus Notes Were On Sale Under Section 102(b) by Clear and Convincing Evidence. ..........30

1. RC4 Was Not Subject to a Public Sale or Commercial Offer for Sale Prior to the Critical Date. ....................................................31

2. The "Development and License Agreement" Was a Development and License of Technology Agreement, Not the Sale of a Product, and the RC4 Algorithm Is Not "On-Sale" Prior Art Within the Meaning of 35 U.S.C. § 102(b)..................................................................32

3. The "Development and License Agreement" Was Not an Offer to Perform the Patent Process for Consideration. ...........................................35

4. RC4 Combined with Lotus Notes Was Not the Subject of a Public Sale or Commercial Offer for Sale. ...........................................................36

D. Newegg Fails to Meet its Burden of Showing by Clear and Convincing Evidence that Denning Invalidates the '730 patent Under 35 U.S.C. § 102(a)/(b). ........................................................................................38

1. There Was Sufficient Evidence From Which The Jury Could Find that Figure 3.3 of Denning Was Not Enabling. .........................................38

2. Denning Does Not Anticipate the Asserted Claims of the '730 Patent Because It Fails to Disclose All Elements Combined in the Same Way as in the Recited Claims. .......................................................39

## Table of Contents

**Page**

| | | | |
|---|---|---|---|
| | 3. | The More Specific Examples of Stream Ciphers From Denning Also Fail to Anticipate the Asserted Claims of the '730 patent. | 41 |
| E. | | Newegg Failed To Present Clear and Convincing Evidence that the Asserted Claims Are Obvious. | 42 |
| | 1. | RC4 Cannot Render the Asserted Claims Obvious. | 43 |
| | 2. | Denning Does Not Render the Asserted Claims Obvious. | 44 |
| | 3. | Combinations of RC4, Lotus Notes, and Denning Also Do Not Render the Claims Obvious. | 45 |
| | 4. | Newegg Ignores the Record Evidence of Secondary Considerations of Non-Obviousness | 46 |
| V. | | SUFFICIENT EVIDENCE SUPPORTS THE JURY'S DAMAGES AWARD | 46 |
| A. | | The Jury's Damages Verdict Is Reasonable And Supported By Substantial Evidence | 46 |
| B. | | The Jury Was Entitled To Rely On Dr. Becker's Damages Opinions. | 50 |
| | 1. | This Court has rejected Newegg's arguments challenging Dr. Becker's opinions multiple times | 50 |
| | 2. | The RSA licenses are sufficiently comparable. | 51 |
| | 3. | Dr. Becker's opinion on the royalty rate is consistent with Federal Circuit precedent and based on the evidence. | 53 |
| | 4. | Dr. Becker's opinion on the royalty base is consistent with Federal Circuit precedent and based on the evidence. | 56 |
| C. | | The Evidence Cited In Newegg's Motion Does Not Support Judgment As A Matter Of Law | 57 |

<u>**Table of Authorities**</u>

**Page**

**Cases**

*ACCO Brands, Inc. v. ABA Locks Mfr. Co.*
    501 F.3d 1307 (Fed. Cir. 2007)...............................................................18, 19

*Advanceme Inc. v. RapidPay, LLC*
    509 F. Supp. 2d 593 (E.D. Tex. 2007)............................................................22

*Akamai Techs., Inc. v. Limelight Networks, Inc.*
    692 F.3d 1301 (Fed. Cir. 2012)...............................................................16, 21

*Alco Standard Corp v. Tenn. Valley Auth.*
    808 F.2d 1490 (Fed. Cir. 1986)......................................................................17

*Anthony v. Chevron USA, Inc.*
    284 F.3d 578 (5th Cir. 2002) ...........................................................................1

*Apotex USA, Inc. v. Merck & Co.*
    254 F.3d 1031, 1037-1038 (Fed. Cir. 2001) ............................................23, 27

*Bell Communications Research v. Vitalink Communications Corp.*
    55 F.3d 615 (Fed. Cir. 1995)..........................................................................20

*BMC Res., Inc. v. Paymentech, L.P.*
    498 F.3d 1373 (Fed. Cir. 2007)......................................................................15

*Brooktree Corp. v. Advanced Micro Devices, Inc.*
    977 F.2d 1555 (Fed. Cir. 1992)......................................................................58

*Connell v. Sears, Roebuck & Co.*
    722 F.2d 1542 (Fed. Cir. 1983)......................................................................40

*Conoco, Inc. v. Energy & Environmental International, L.C.*
    460 F.3d 1349  (Fed. Cir. 2006)........................................................................3

*Dey L.P. v. Sunovion Pharms., Inc.*
    715 F.3d 1351, n.4 (Fed. Cir. 2013)...............................................................29

*Dow Chem. Co. v. Mee Indus., Inc.*
    341 F.3d 1370 (Fed. Cir. 2003)......................................................................47

*Dow Chem. Co. v. United States*
    226 F.3d 1334 (Fed. Cir. 2000)........................................................................3

*Dresser-Rand Co. v. Virtual Automation Inc.*
    361 F.3d 831 (5th Cir. 2004) ...........................................................................2

## Table of Authorities

**Page**

*DSU Med. Corp. v. JMS Co.*
471 F.3d 1293 (Fed. Cir. 2006) (en banc) ....................................................... 21

*Dunlop Holdings Ltd. v. Ram Golf Corp.*
524 F.2d 33 (7th Cir. 1975) ..................................................................... 27, 30

*Emtel, Inc. v. LipidLabs, Inc.*
583 F. Supp. 2d 811 (S.D. Tex. 2008) ........................................................ 14, 16

*Energy Transp. Group, Inc. v. William Demant Holding A/S*
697 F.3d 1342 (Fed. Cir. 2012) ....................................................................... 46

*Envirotech Corp. v. Westech Engineering, Inc.*
904 F.2d 1571 (Fed. Cir. 1990) ....................................................................... 35

*Eurand, Inc. v. Mylan Pharms, Inc.*
676 F.3d 1063 (Fed. Cir. 2012) .............................................................. 43, 44, 46

*Finjan, Inc. v. Secure Computing Corp.*
626 F.3d 1197 (Fed. Cir. 2010) .................................................................. 50, 57

*Flex-Rest, LLC v. Steelcase, Inc.*
455 F.3d 1351, 1359 (Fed. Cir. 2006) ......................................................... 27, 28

*Fromson v. Western Litho Plate & Supply Co.*
853 F.2d 1568 (Fed. Cir. 1988) ....................................................................... 56

*Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.*
394 F.3d 1368 (Fed. Cir. 2005) ....................................................................... 50

*Fujitsu Ltd. v. Netgear Inc.* 620 F.3d 1321 (Fed. Cir. 2010) ................................. 19, 20

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*
318 F. Supp. 1116 (S.D.N.Y. 1970) ........................................................... passim

*Gillman v. Stern*
114 F.2d 28 (2d Cir. 1940) .............................................................................. 30

*Global Patent Holdings, LLC v. Panthers BRHC LLC*
586 F. Supp. 1331 (S.D. Fla. 2008) ........................................................ 13, 14, 16

*Hiltgen v. Sumrall*
47 F.3d 695 (5th Cir. 1995) .............................................................................. 2

*In re Kollar*
286 F.3d 1326 (Fed. Cir. 2002) .............................................................. 32, 33, 34, 35

*Kimberly-Clark Corp. v. Johnson & Johnson*
745 F.2d 1437 (Fed. Cir. 1984) ....................................................................... 24

iii

## Table of Authorities

**Page**

*Kumho Tire Co. v. Carmichael*
119 S. Ct. 1167 (U.S. 1999) ............................................................ 55

*LaserDynamics, Inc. v. Quanta Computer, Inc.*
694 F.3d 51 (Fed. Cir. 2012) ........................................................... 58

*Lemelson v. United States*
752 F.2d 1538 (Fed. Cir. 1985) ....................................................... 10

*Lodsys, LLC v. Brother In'l Corp.*
2013 U.S. Dist. LEXIS 85614 at *56-*58 (E.D. Tex. June 14, 2013) .............. 8

*Lucent Techs, Inc. v. Gateway, Inc.*
580 F.3d 1301 (Fed Cir 2009) ............................................... 17, 53, 58

*Michalic v. Cleveland Tankers, Inc.*
364 U.S. 325 (1960) ........................................................................ 17

*Microsoft Corp. v. i4i Ltd.*
131 S. Ct. 2238 (2011) ............................................................... passim

*Minn. Mining & Mfg. Co. v. Chemque, Inc.*
303 F.3d 1294  (Fed. Cir. 2002) ...................................................... 38

*Minton v. National Association of Securities Dealers, Inc.*
336  F.3d  1373  (Fed.  Cir. 2003) ................................................... 32

*Moleculon Research Corp v. CBS, Inc.*
793 F.2d 1261 (Fed. Cir. 1986) .................................................. 17, 32

*Monsanto Co. v. Ralph*
382 F.3d 1374 (Fed. Cir. 2004) ....................................................... 49

*Muniauction, Inc. v. Thomson Corp.*
532 F.3d 1318 (Fed. Cir. 2008) ....................................................... 16

*Net MoneyIn, Inc. v. Verisign, Inc.*
545 F.3d 1359 (Fed. Cir. 2008) .................................................. 40, 42

*Novo Nordisk Pharm., Inc. v. Bio-Tech. Gen. Corp.*
424 F.3d 1347 (Fed. Cir. 2005) ....................................................... 38

*Oak Industries, Inc. v. Zenith Electronics Corp.*
726 F. Supp. 1525  (N.D. Ill. Nov. 8, 1989) ................................... 27

*Oddzon Prods., Inc. v. Just Toys, Inc.*
122 F.3d 1396 (Fed. Cir. 1997) .................................................. 25, 29

## Table of Authorities

**Page**

*Palmer v. Dudzik*
481 F.2d 1377 (CCPA 1973) ................................................................. 25

*Paper Converting Mach. Co. v. Magna-Graphics Corp.*
745 F.2d 11 (Fed. Cir. 1984) ................................................................. 20

*Pfaff v. Well Elecs., Inc.*
525 U.S. 55 (1998) ..................................................................... 30, 31

*Reeves v. Sanderson Plumbing Prods., Inc.*
530 U.S. 133 (2000) ........................................................... 2, 23, 28, 31

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*
289 U.S. 689 (U.S. 1933) .................................................................. 56

*Spectralytics, Inc. v. Cordis Corp.*
649 F.3d 1336 (Fed. Cir. 2011) .................................................... 46, 49, 60

*State Contracting & Engineering Corp. v. Condotte Am., Inc.*
346 F.3d 1057 (Fed. Cir. 2003) .................................................... 50, 51, 55

*State Indus., Inc. v. Mor-Flo Indus., Inc.*
883 F.2d 1573 (Fed. Cir. 1989) ............................................................ 55

*Summit Tech., Inc. v. Nidek Co.*
363 F.3d 1219 (Fed. Cir. 2004) ............................................................. 2

*Symbol Techs., Inc. v. Opticon, Inc.*
935 F.2d 1569 (Fed. Cir. 1991) ........................................................... 10

*Tec Air, Inc. v. Denso Manufacturing Michigan Inc.*
192 F.3d 1353 (Fed. Cir. 1999) ........................................................... 31

*Titanium Metals Corp. of Am. v. Banner*
778 F.2d 775 (Fed. Cir. 1985) ............................................................ 52

*TopPharm, Inc. v. Ranbaxy Pharms., Inc.*
336 F.3d 1322 (Fed. Cir. 2003) ........................................................... 37

*Uniloc USA, Inc. v. Microsoft Corp.*
632 F.3d 1292 (Fed. Cir. 2011) ........................................................ 3, 39

*United States v. Frazier*
387 F.3d 1244 (11th Cir. 2004) ........................................................... 55

*Warner-Lambert Co. v. Teva Pharms. USA, Inc.*
2004 U.S. Dist. LEXIS 12915, 59 (D.N.J. June 29, 2004) ............................... 24

<u>**Table of Authorities**</u>

<u>**Page**</u>

*Woodland Trust, v. Flowertree Nursery, Inc.*
    *148 F.3d 1368 (Fed. Cir. 1998)* ..................................................................................... 29

**Statutes**

35 U.S.C. § 101 ...................................................................................................................... 52

35 U.S.C.§ 102 ............................................................................................................... 42, 52

35 U.S.C. § 102(a) ....................................................................................................... 28, 29, 38

35 U.S.C. § 102(b) ............................................................................................................ passim

35 U.S.C. § 102(g) ............................................................................................................ passim

**Rules**

Fed R.Evid.705 ...................................................................................................................... 55

Fed. R. Evid. 703 ................................................................................................................... 55

## I.    INTRODUCTION[1]

In order to prevail in its Motion for Judgment as a Matter of Law, Newegg must show that there was no legally sufficient basis for the jury to find in TQP's favor.  All that is necessary to oppose a motion for JMOL is to "establish a conflict in substantial evidence." *See Anthony v. Chevron USA, Inc.,* 284 F.3d 578, 583 (5th Cir. 2002).   "If there is substantial evidence of such quality and weight that reasonable and fair-minded jurors might reach a different conclusion," then judgment as a matter of law is not appropriate. *Id.*  Newegg's motion identifies no issue for which there is insufficient evidence for the jury's finding.  Instead, Newegg takes a scattershot approach contending that the jury got everything wrong and that Newegg should have prevailed on every single argument presented at trial—in essence, Newegg's motion is premised on the improper notion that the jury's verdict is entitled to absolutely no weight.

Throughout its motion, Newegg primarily relies only on the evidence it presented at trial, and ignores the evidence and argument to the contrary. For example, Newegg simply ignores the testimony proving that the generating first/second sequence requirements" was met.  Likewise, in arguing that a reasonable jury would find that the Denning textbook anticipates and/or renders obvious the asserted claims, Newegg ignores the substantial testimony from TQP's expert that this text was not enabling.

Newegg's remaining arguments fair no better.  Sufficient evidence exists from which a jury could find in TQP's favor with regard to infringement and damages.  Likewise, there was a sufficient basis from which a jury could find that Newegg did not meet its burden of proving invalidity by clear and convincing evidence.  Newegg's motion should be denied on all grounds.

## II.    LEGAL STANDARD

A motion for JMOL is a procedural issue not unique to patent law; thus, such motions are reviewed under the law of the regional circuit. *Summit Tech., Inc. v. Nidek Co.,* 363 F.3d 1219,

---

[1] The cited portions of the trial transcript are attached hereto as Exhibit 1.  The relevant pages of the referenced Plaintiff's exhibits ("PX") are attached hereto as Exhibit 2.  The relevant pages the referenced Defendant's exhibits ("DX") are attached hereto as Exhibit 3.

1223 (Fed. Cir. 2004). In the Fifth Circuit, JMOL may only be granted if "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Hiltgen v. Sumrall,* 47 F.3d 695, 700 (5th Cir. 1995) (internal citation omitted). In ruling on a motion for JMOL, the court reviews all the evidence in the record and must draw all reasonable inferences in favor of the nonmoving party. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150-51 (2000). Further, the court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *Id.* The court grants "great deference to a jury's verdict" and it should be overturned "only if, when viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion." *Dresser-Rand Co. v. Virtual Automation Inc.,* 361 F.3d 831, 838 (5th Cir. 2004).

## III.    SUFFICIENT EVIDENCE SUPPORTS THE JURY'S FINDING CONCERNING INFRINGEMENT AND ACTIVE INDUCEMENT

### A.    There Was More Than Sufficient Evidence to Support the Jury's Finding that Newegg's Accused Websites Satisfied all Claim Requirements.

#### 1.    TQP Presented More Than Sufficient Evidence that the "Have Been Sent" Claim Construction was Met.

As this Court has repeatedly recognized, Newegg's argument regarding the "Have Been Sent" limitation (Dkt. No. 436 at 4-9) concerns which of the parties' experts properly applied the claim construction at issue.[2] Specifically, when Newegg raised this issue at trial, the Court noted that this was a jury issue and that Newegg's attorneys "were free to cross-examine [TQP's expert] on it," but otherwise denied the requested relief of a curative jury instruction. Nov. 20,

---

[2] Judge Bryson, sitting by designation, recently issued a different claim construction for this term in *TQP Development, LLC v. Intuit, Inc.*, Case. No. 2:12-CV-180. Specifically, he found that: "The term 'produced,' as used in that [term] means 'generated' or 'supplied.' The phrase 'are transmitted' means 'are being transmitted' with respect to the transmitter and 'have been transmitted' with respect to the receiver." 2:12-CV-180, Dkt. 152 at 15-16. This construction is fully consistent with the Court's construction in this case. Further, the evidence introduced at trial shows that both constructions are met by Newegg's systems. *See* 2:12-CV-180, Dkt. No. 162 at 9-10.

2013 AM Trial Tr. at 121:2-3.  When the same issue arose later in the trial, the Court was even more explicit that any dispute concerning how its claim constructions were applied was a factual issue and a credibility determination for the jury:

> All right counsel.  The Court understands that different experts may have a different reading of the Court's claim construction language.  That doesn't mean that I'm going to reopen the claim construction language or serve as a mediator between the experts and tell the jury who's right and who's wrong.
> You both have expert witnesses.  And if you – if your witnesses can explain why the other one's explanation is faulty, that's what this trial is about.  The jury will evaluate the witness's credibility and make a determination.

Nov. 21, 2013 PM Trial Tr. at 35:10-21.

The Court's decision that the jury was required to resolve the dispute by evaluating the credibility of the competing experts is in keeping with the great weight of Federal Circuit authority.[3]  Indeed, the Federal Circuit has repeatedly recognized that "it is decidedly the jury's role to evaluate the weight to be given to the testimony of dueling qualified experts.  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1306 (Fed. Cir. 2011) (reversing District Court's decision to grant a JMOL overturning a jury verdict finding infringement); *Dow Chem. Co. v. United States*, 226 F.3d 1334, 1338 (Fed. Cir. 2000) (stating that the issue of "comparing the properly construed claims to the device [or process] accused of infringing" is a "factual determination"); *Conoco, Inc. v. Energy & Environmental International, L.C.*, 460 F.3d 1349, 1362-63 (Fed. Cir. 2006) (noting that the district court determined that *Conoco's* witnesses were more credible than EEI's on the "application of the facts to [the court's] construction" of the terms in question).

In this regard, there is no dispute that TQP provided competent expert testimony concerning how the limitation was met.  For instance, TQP's expert, Dr. Jaeger, presented the

---

[3] Defendants Intuit, Inc. and The Hertz Corporation moved for summary judgment on this exact issue based on this same testimony.  During the hearing, defendants asserted, without authority, that it was error to submit the application of this construction to the jury.  Ex. 4 at 100:21- 101:1.  Judge Bryson, sitting by designation, stated he did not find it erroneous to submit this to the jury and that he "probably would have done the same thing" if he were faced with a dispute over a claim construction during trial.  *Id.* at 101:2-102:11.

following slide to the jury:



Dr. Jaeger then provided the following testimony as to how this limitation (referred to as claim

element 1[e]) was met:

> Q    Okay.  So let's look at the Court's construction of the last part of Element
> 1(e).  How does Newegg's use of SSL and RC4 meet this?
> A    Well, my understanding of this construction is it's stating that -- that a new
> key value in the first and second sequence is used each time predetermined
> number of blocks have been sent from --from the transmitter -- you can't see it all
> -- over the communication link.
>    . . . .
> Now, we're -- we're using symmetric key cryptography here so the key value has
> to be the same; we've restricted the sequences to be the same; but we also must
> ensure that encryption on a particular block is done with the same key value as
> decryption.
>
> At this point, we're at claim Element 1(e) requiring that a new key value -- the
> same key value, one value -- in the first and second sequences is used. So it has to
> be -- it's already -- it's already been used in the first sequence, but we're requiring

4

that the same key value be used in both sequences at this point in Claim Element 1(e).

So let me show you how I -- how I envision this -- how I think about this.  So we have the key values in the sequence.  We're producing key value based on the predetermined characteristic in the transmitter.

This key value encrypts a block of ciphertext.  The next key value will be used to -- to   encrypt the next block of ciphertext.  These are transmitted. So -- so the -- the same new key value has to be used in -- in both the first and second sequence for the decryption to come off properly.  If you use different key value, you're not going to decrypt the data.

 So here, when the block arrives, the same new key value is used also in the second sequence.  So you have to use the same key value to decrypt the data so that the -- the invention works.

Nov. 20, 2013 AM Trial Tr. at 20:12-22:9.  This testimony alone stands as sufficient evidence from which a jury could find in TQP's favor, as it did.[4]

Further, Newegg's contention that the Court's construction requires use of a new key value tied to the moment of transmission is belied by the specification and would exclude multiple preferred embodiments.  The limitation at issue— "a new one of said key values in said first and said second sequences being produced each time a predetermined number of said blocks are transmitted over said link" —was added to the claim during the prosecution history to clarify that the "predetermined condition" upon which the key values are produced is a predetermined number of blocks transmitted over the link and not merely a generic predetermined condition of the data.  *Intuit*, Dkt. No. 122-4 at 2-3.  *See also Barclays* Order at 17-18 (describing the effect of the amendment).  This amendment during the prosecution history belies the notion that there is a temporal limitation between use of a new key value and transmission, because in the preferred embodiments the key value at the transmitter is changed based on an advance signal sent by the

---

[4] Though Newegg makes much of the arguments presented in the Claim Construction Briefs and at the hearing (Dkt. 436 at 6-7), the fact remains that the Court's Claim Construction Order focuses on the receiver using a new key value after transmission—and not the transmitter—when construing this term. *See* Dkt. No. 226 at 18-22.  In any event, issues that arose during the *Markman* hearing are irrelevant to this Motion as they were not presented to the jury.  Instead, the only issue is present here is whether TQP presented sufficient evidence to satisfy the claim construction as provided to the jury—which it did through Dr. Jaeger's testimony.

block counter when it reaches a predetermined interval number *before transmission*:

> A block counter 21 monitors the stream of data from the source 15 and generates an 'advance signal' each time the data meets a predetermined condition. Advantageously, the block counter 21 may simply count the number of bytes (characters), words or blocks of data being transmitted, compare the current count with a predetermined 37 interval number' and produce an advance signal each time the current count reaches the interval number (at which time the current count is reset to 0).

'730 patent at 3:16-25.  In response to the advance signal, the pseudo-random number generator changes its output to the next key value:

> The generator 23 responds to each advance signal from block counter 21 by changing its output to the next successive encryption key value.  Thus, for example the combination of counter 21 and generator 23 operate to change the encryption key each time total number of bytes transmitted is an exact multiple of the predetermined interval number.

'730 patent at 3:33-35.  Accordingly, the key values must change at precisely the same time relative to the data stream to accurately encrypt and decrypt the data:

> Block counter 29 performs the identical function as that performed by the counter 21 at the transmitting station 11 and hence supplies advance signals to the generator 27 *at precisely the same times (relative to the data stream)* that counter 21 advances generator 23.  Each time the current count reaches the interval number, the pseudo-random number generator 27 is advanced.  Since the internal makeup of the random number generator 27 is identical to that of generator 23, and since it is supplied with the same seed value, and since block counter 29 is supplied with the same interval number value as that supplied to block counter 21, *exactly the same sequence of keys will be supplied to the random number generators 23 and 27, and the keys will change at precisely the same time (relative to the data stream) to accurately decipher the transmitted data*.

 '730 patent 3:64-4:12.

The fact that the specification shows the advance signal sent to the transmitter prior to transmission is further demonstrated by Figures 1 and 4 to the '730 patent.  Both figures provide that the block counter will send its signal to the pseudo-random number generator *prior to transmission*.  There is no description of a signal to advance keys being fed back to the transmitter only after data transmission.  Accordingly, Newegg's contention that use of new key values is tied to the timing of data transmission finds no support in the specification.

Instead, the specification confirms, as the Court found in *Barclays*, that the claim "only requires that each new key be 'produced' at a specific time relative to the data . . . .  That is, the

claim requires that each key is used at precisely the right time relative to the data." *Barclays Order*, at 17-18.  The specification thus teaches that the key values in the transmitter and receiver change at the same time ***relative to the transmitted data stream***:  "exactly the same sequence of keys will be supplied to the random number generators 23 and 27, and the keys will change at precisely the same time (relative to the data stream) to accurately decipher the transmitted data." '730 patent at 4:8-12.  *See also id.* at 3:64-4:1.  In other words, this limitation assures that the same key value used to encrypt the data is also used to decrypt the data.  Indeed, the specification expressly describes an embodiment in which the encryptor buffers new keys temporarily:

> The block counter 21 need not supply advance signals on boundaries between encryption units, nor does the generator 23 need to provide new key values precisely on encryption unit boundaries.  Instead, the encryptor 17 may buffer the new keys temporarily, using it for the first time on the next successive encryption unit of data.

'730 patent at 3:50-56.  This is entirely consistent with (1) the requirement that the key values change at the same time relative to the data stream, and entirely inconsistent with Newegg's purported requirement of changing keys only after the blocks are transmitted; and (2) Dr. Jaeger's testimony that "the same new key value is used also in the second sequence.  So you have to use the same key value to decrypt the data so that the -- the invention works."  Nov. 20, 2013 P.M. Trial Tr. at 20:12-22:9.

TQP's proper application of the construction is also confirmed by the Court's recent denial of Defendants Intuit and Hertz's Motion for Summary Judgment in a related case.  Case No. 2:12-cv-180, Dkt. No. 152.  In that case, the defendants moved for summary judgment based only on Dr. Jaeger's testimony from the Newegg trial, and made the argument presented here, that this testimony failed to meet the limitation because it required a block to be transmitted before a new key value was used.  In denying the motion, the Court ruled "the interpretation of the claim that the defendants advocate would be at odds with a large portion of the specification" and that "if the claim language were interpreted to require that the new key value in the transmitter be produced only after a predetermined number of blocks has actually been

transmitted through the communication link, ***that would describe an entirely different system from the one described and depicted in the specification***." *Id.* at 14-15 (emphasis added).  The Court's previous analysis of this issue is still correct. Clearly, if this Court can conclude that this evidence and argument did not mandate summary judgment, the same evidence cannot demonstrate that a jury was required to find in Newegg's favor.

In sum, there was more than sufficient evidence upon which the jury could conclude that the patent contained no requirement tying use of a new key value to the fact of transmission as Newegg asserts.  Accordingly, there is no basis to enter judgment as a matter of law.

## 2. TQP Presented More Than Sufficient Evidence From Which the Jury Could Find the "Predetermined Number of Blocks" Limitation Satisfied.

Newegg next makes an argument that it failed to make in claim construction[5]—that the claim language of a "predetermined number of blocks" "requires a plurality of blocks—a single block is insufficient to constitute the blocks."  Dkt. No. 436 at 9.  Putting aside the issue of waiver based on Newegg's failure to raise this issue at the proper time, the mere fact that the claim language refers to a number of "blocks" does not preclude the use of a single block to practice the methods.  As this Court has noted, "[w]hether a singular form of a term in a claim precludes the plural, ***or vice versa***, frequently depends on how a term is used in context, as well as what the specification discloses."  *Lodsys, LLC v. Brother In'l Corp.*, 2013 U.S. Dist. LEXIS 85614 at *56-*58 (E.D. Tex. June 14, 2013) (Gilstrap, J.) (emphasis added).

In that regard, nothing in the claim language or specification precludes the "predetermined number of blocks" from being one (i.e. a single block).  Newegg's argument that the patent requires a block counter and thus requires more than one block (Dkt. No. 436 at 9)—seeks to import limitations from one embodiment into the claims.  This is improper under basic principles of claims construction.  Further, the counting of blocks is not a limitation of the claims.   Indeed, the specification discloses an embodiment where the number of blocks

---

[5] During claim construction, Newegg argued only that the term "block" should be construed as a "fixed length segment of data."  Dkt. No. 226 at 36-37.

counted—or "interval number"—"may itself be a changing value generated by a random number generator." '730 patent 1:47-53. If the predetermined number of blocks may be pseudo-random, this leads to the conclusion that the occasional use of "one block" as the interval number was in fact indicated, or at the very least not excluded, by the specification.

This Court has several times rejected the argument Newegg makes here that, simply because the specification makes reference to a block counter, the predetermined number of blocks is precluded from being a single block because the block counter would be irrelevant in that situation.[6] Dkt. No. 436 at 9. For example, in the Court's most recent claim construction order in *TQP Development, LLC v. Intuit, Inc.*, 2:12-cv-180, and *TQP Development, LLC v. Chrysler Group LLC*, 2:13-cv-219, the Court rejected the identical argument as follows:

> To the extent that the defendants contend that a block counter would not be necessary to count a single byte, and that a single byte therefore does not constitute a block of data, that argument is unconvincing. A block counter is not recited in the claims. Instead, block counters are discussed in the specification as a mechanism for determining when the predetermined number of blocks has been reached for purposes of changing the key value in the encryption system. ***The fact that counter would not be necessary in the case in which the interval is one block/byte (because counting to one does not require a "counter"), does not mean that the "predetermined number" of blocks interval cannot be one or the block of data must be more than one byte.***

*TQP Development, LLC v. Intuit Inc.*, 2:12-cv-180 at 4-5. *See also TQP Development, LLC. v. Wells Fargo & Co.,* Case No. 2:12-CV-61 (Dkt. No. 187 at 29-31) (rejecting the identical construction and holding "the claim invention depends upon the transmitter and receiver counting blocks in the same manner, but nothing in the '730 patent requires that the blocks must be . . . of any particular length").

In sum, Newegg argues that a reasonable jury could only find what this Court has twice rejected—that the limitations require more than one block. The argument should be rejected.

---

[6] Newegg misleadingly cites to the Court's claim construction Order concerning the phrase "sequence of blocks in encrypted form" (Dkt. No. 436 at 9), where the Court construed the phrase to require more than one block be encrypted. Dkt. No. 226 at 30. The Court's Order did not construe "block" or "predetermined number of blocks."

The jury heard the competing experts' testimony on this limitation and decided which expert was more credible. This finding by the jury should not be disturbed.

### 3. TQP Presented More Than Sufficient Evidence that Newegg Infringed the "Generating First/Second Sequence Requirements."

With regard to the "generating first/second sequence" requirements, Newegg does not contend that TQP failed to present evidence that these limitations were met. Instead, Newegg complains only that TQP's testimony on this topic was "conclusory." Dkt. No. 436 at 10. While TQP disagrees with Newegg's characterization, even if it is correct, this is not a sufficient basis to set aside a jury verdict.

In order to show literal infringement, TQP was required to "show the presence of every element . . . in the accused device." *See Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985). Meeting this burden does not require an expert to explain the "factual foundation" for his testimony that the patent is infringed. *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1576 (Fed. Cir. 1991). Indeed "summary" testimony concerning the basis for an expert's opinion is sufficient. *Id.* "The responsibility for challenging the factual underpinnings of [expert] testimony [falls] squarely on [defendants] during cross-examination." *Id.*

TQP more than met its burden through Dr. Jaeger's testimony. He testified that it was his opinion that "Newegg's use of SSL with RC4 met the requirement of generating a sequence pseudo-random key values based exclusively on the seed value." Nov. 20, 2013 A.M. Trial Tr. at 9:1-9. He explained that the "seed value in Newegg's systems" was "the server write key." *Id.* at 9:10-13. He explained that the "server write key value" was "the only value that's used in producing the key values in RC4." *Id.* at 9:14-19. He further explained that his opinion was based on both "his experience with RC4" and the deposition testimony of Dr. Ron Rivest, the creator of RC4. *Id.* at 9:20-10:5. He finally noted that although some "implementations of RC4 use other parameters besides the seed value," RC4 generated the pseudo-random key values based "exclusively on [] the seed value" and that the sequence of pseudo-random numbers was "not based on any of those parameters." *Id.* at 10:6-18. In other words, the sequence of pseudo-

random key values was "not based on any of those [other] parameters" that some implementations of RC4 used as inputs. *Id.*

Newegg fails to identify how any of this testimony is "conclusory." Indeed, Newegg failed to cross-examine Dr. Jaeger concerning his testimony regarding this limitation. Thus, to the extent Dr. Jaeger's opinion was missing certain "factual foundation," Newegg failed to challenge it at trial. This testimony thus stands as sufficient evidence from which a reasonable jury could find that the claim limitation was met. The mere fact that Newegg's expert had a contrary opinion is no basis to disrupt the jury's verdict.

**B.     The Evidence Demonstrates that Newegg Performed, Directed, or Controlled All Steps of the Patented Method.**

**1.     Dr. Jaeger's Testimony, SSL/TLS Specifications, and Newegg's Own Testimony Provided More Than Sufficient Evidence Demonstrating Direction and Control.**

Despite Newegg's contentions to the contrary, TQP presented more than sufficient evidence from which a reasonable jury could find that Newegg directed and controlled every step of the patented method. Specifically, Dr. Jaeger provided testimony that the patented method was performed by Newegg's websites' use of the SSL/TLS encryption protocols and the RC4 cipher. His testimony confirms that Newegg directed and controlled both (1) the use of SSL or TLS and (2) the selection of the RC4 cipher.[7] In addition, the SSL/TLS specifications, as well as the testimony Newegg's own VP of IT, supported the jury's findings. Nov. 19, 2013 PM Trial Tr. 129:16-131:4; 135:9-136:10; 139:7-23; Nov. 20, 2013 PM Trial Tr. at 14:15-24; 15:3-7 and 11-16.

**a.     Newegg Directs and Controls Use of SSL or TLS.**

TQP provided sufficient evidence that Newegg directed and controlled the use of SSL or TLS (collectively referred to as "SSL"). For instance, the evidence establishes that Newegg

---

[7] In addition, testimony was provided that Newegg's systems create a Session ID that enables Newegg to track customers' sessions and ensure that if the customer resumes a session, the customer will continue to use the cipher suite that was earlier selected. Nov. 19, 2013 PM Trial Tr. 135:9-136:10. In this way, Newegg directed and controlled any additional customer sessions.

administers its own security and that its Netscaler devices provide the security-related functions for Newegg such as SSL off-loading.   Nov. 21, 2013 PM Trial Tr. 67:5-7 and 11-14. The evidence demonstrated that Newegg, as opposed to its customers, decided to make their website use HTTPS such that a secure communication protocol must be implemented to contact the website. Nov. 21, 2013 PM Trial Tr. 64:16-21; Nov. 19, 2013 PM Trial Tr. 135:9-136:10.  The evidence further established that SSL or TLS are the secure communication protocols that must be used to contact Newegg's accused websites. Nov. 19, 2013 PM Trial Tr. 127:23-128:5; Nov. 20, 2013 PM Trial Tr. 15:20-16:1. Specifically, Newegg used SSL Version 3 and TLS Version 1 during the infringing period. Nov. 21, 2013 PM Trial Tr. 78:10-14.

### b.      Newegg Directs Selection of RC4.

Evidence was also presented at trial sufficient to establish that Newegg directs or controls a customer's computer to use SSL with RC4. Nov. 19, 2013 PM Trial Tr. at 144:14-16. Newegg's HTTPS infringing webpages were designed by Newegg to require use of SSL Version 3 and TLS Version 1 protocol handshake used by Newegg (*Id.* at 129:16-25-133:5). It is the Newegg SSL server that selects the cipher suite. *Id.* at 129:16-131:4; 135:9-136:10; 139:7-23; PX 133-22; PX134-35.  The default setting of the NetScaler performs the patented method of the '730 patent by encrypting data using the Secure Sockets Layer ("SSL") in combination with the RC4 encryption cipher. *Id.*; Nov. 20, 2013 AM Trial Tr. at 116:15-23; 117:21-23.

Further, ample evidence was provided at trial that Newegg always utilized these default settings.  For instance, Newegg's Vice President of IT, Albert Chong, testified that (i) Newegg obtained its Citrix NetScalers with a default setting mandating RC4 cipher selection and (ii) Newegg never changed this default cipher selection. Nov. 20, 2013 PM Trial Tr. at 17:14-21. Mr. Chong also testified that the accused websites all used the RC4 for encryption. Nov. 20, 2013 PM Trial Tr. at 14:15-24; 15:3-7 and 11-16.  Further, Newegg's NetScaler devices had the same configuration at trial when that they did when they were first installed in 2004. Nov 20,

2013 AM Trial Tr. at 41:20-42:11; Nov. 20, 2013 PM Trial Tr. at 6:14-19, 17:8-13.[8]

More than sufficient evidence was presented at trial that Newegg's "NetScalers are the device that selects what the Ciphersuite [*i.e.*, RC4] will be."  Nov. 19, 2013 PM Trial Tr. at 135:19-24. *See also id.* 139:7-142:20.  Indeed, even Newegg's expert Dr. Stubblebine agreed that the selection of the cipher does not occur until Newegg's servers respond to the client computer with a "server hello message," which identifies the "single cipher suite selected by the server." Nov. 21, 2013 PM Trial Tr. at 79:12-80:25.

Newegg's reliance upon *Global Patent Holdings, LLC v. Panthers BRHC LLC,* 586 F. Supp. 1331 (S.D. Fla. 2008) to claim that it does not direct and control the selection of RC4 because the client must initiate contact and supply a list of supported cipher suites is misplaced. In *Global Patent Holdings*, the court rejected the plaintiff's claim that the defendant directed users to perform the step of identifying a query . . . and inputting said query" by providing them with Javascript programs that "allow[ed] the process to begin." *Global Patent Holdings,* 586 F. Supp. at 1335. Nothing in the decision indicates that the Javascript programs caused users to "identify a query. . . and input[] said query," and hence, could be said to have directed and controlled the users' performance of that step. *Id.*

In contrast to *Global Patent Holdings*, the evidence showed that Newegg's host servers determine that the RC4 encryption algorithm will be used along with SSL to transmit encrypted data to the client computer for decryption. Newegg selects the encryption cipher, and by doing so, causes its clients to perform the steps of providing a seed value, generating a sequence of key values, and decrypting the data. Newegg's host servers instruct the client computer to perform these method steps, and the client computer (unlike a human in a non-automated process) must obey these instructions. Nov. 19, 2013 PM Trial Tr. at 135:15-24.  Moreover, there are no acts relevant to the claims of the '730 patent that need to be taken by users of Newegg's accused

---

[8] Lee Cheng, Newegg's Chief Legal Officer, testified that Newegg could have avoided using the '730 patent's claimed technology by simply changing the default settings, though he admitted that Newegg never did so. Nov. 21, 2013 AM Trial Tr. at 31:21-32:22.

websites; hence, whether a Newegg customer is an agent of Newegg is not at issue in the context of the claims asserted in this case.  Unlike in *Global Patent Holdings*, the steps of the '730 patent start after the customer's computer seeks to access the infringing Newegg websites, which were designed by Newegg to require the use of SSL/TLS.  Thereafter, the steps of the '730 patent are directed and controlled by Newegg.  Nov. 19, 2013 PM, Trial Tr.  at 139:7-20; 140:25-142:20.

Newegg's reliance upon *Emtel, Inc. v. LipidLabs, Inc.*, 583 F. Supp. 2d 811 (S.D. Tex. 2008) fails for similar reasons. First, *Emtel* involved a motion for summary judgment of non-infringement, and was not a motion for judgment as a matter of law based upon trial testimony. *Id*. at 840. Moreover, in *Emtel* the court rejected the plaintiff's claim that the defendant directed the delivery of medical services through videoconferencing because the defendants were not involved at all in how the physicians performed the claimed steps of diagnosing or treating a patient. *Id*. at 838 ("In the present case, the movants are not involved at all in how the physicians diagnose, instruct in treatment, or aid in treatment of, a patient. The physicians, not the movants, perform and control these steps of the claimed method."). Here Newegg selects the encryption cipher, and, by doing so, causes its clients to perform the steps of providing a seed value, generating a sequence of key values, and decrypting the data.

## 2.    Newegg Focuses on Actions That Are Not Claimed by the Patented Method.

Newegg attempts misdirection by arguing that it does not direct or control steps that are not included in the '730 patent. For example, Newegg argues that it does not control the method steps performed by the client computer because customers are free to visit or not visit Newegg's website. JMOL at 15. Newegg argues that the customer must enter the URL for Newegg's websites to initiate the SSL handshake, and that Newegg does not control the customer's decision to access its websites. *Id*. However, the fact that the client initiates the process by, for example, clicking on a link is not an element of the claims of the '730 patent. Nov. 21, 2013 PM Trial Tr. at 60:11-14. Visiting a Newegg website is not a method step claimed by the '730 patent and hence not relevant to the issue of direction and control. *See SiRF Tech. Inc. v. ITC*, 601 F.3d.

14

1319, 1331 (Fed. Cir. 2010) ("Appellants' argument misreads the claim limitations. There exists no method step in any of the disputed claims that requires [the claim limitations described by Appellants]. . . Appellants, in essence, ask us to read such limitations into the claims. We decline to do so."). The method steps actually claimed by the '730 patent (*e.g.,* providing seed values, generating key values, and encrypting/decrypting data) are performed by the client computer automatically when Newegg's NetScalers determine that the RC4 encryption algorithm will be used. There are no discretionary acts of Newegg's customers that need to be controlled because the client computer's performance of claimed method steps is compelled by Newegg's NetScalers.

Similarly, Newegg argues that TQP did not demonstrate the direction or control required for joint infringement because the client's computer provides the initial list of supported encryption algorithms to the host server pursuant to the SSL/TLS protocol, and any customer has the ability to unilaterally change their browser settings to include RC4 on the cipher list. Dkt. No. 436 at 15. However, providing a list of supported encryption algorithms is also not a method step claimed by '730 patent. *See SiRF Tech.*, 601 F.3d at 1331. Moreover, the argument that the customer has the ability to unilaterally change its browser settings to include RC4 on the cipher list or not, Dkt. No. 436  at 12, is irrelevant. TQP is not accusing those connections that do not use RC4.

More generally, the authorities that Newegg relies upon to support its contention that TQP has not established joint infringement are all distinguishable because control over the discretionary conduct of others was required to meet the method claims at issue in these cases. *See BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1376, 1382 (Fed. Cir. 2007) (affirming district court's summary judgment ruling that the plaintiff had failed to come forward with evidence showing that the defendant controlled the discretionary acts of debit networks and financial institutions required by the claimed method steps, such as "determining, during the session, whether sufficient available credit or funds exist in an account associated with the payment number to complete the transaction."); *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d

15

1318, 1322, 1329-30 (Fed. Cir. 2008) (finding that the defendant did not control the discretionary acts of bidders required by the claimed method steps, such as "inputting data associated with at least one bid for at least one fixed income financial instrument into said bidder's computer via said input device."); *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1306-07, 1318-19 (Fed. Cir. 2012), *cert. granted,* 2014 U.S. LEXIS 11 (Jan. 10, 2014) (reversing summary judgment ruling against McKesson based on discretionary acts of patients and healthcare providers and remanding to district court to litigate inducement; affirming district's ruling that *Akamai* failed to establish control over the discretionary acts of content providers and remanding to district court to litigate inducement); *Emtel*, 583 F. Supp. 2d at 815-16, 839-40 (granting summary judgment in favor of defendants because defendants did not control the discretionary acts of physicians required by the method claims, such as "diagnosing a medical condition" and "providing instructions via video-conferencing system . . . to said first medical caregiver to . . . treat said first caregiver"); *Global Patent Holdings, LLC v. Panthers BRHC LLC*, 586 F. Supp. 2d 1331, 1335 (S.D. Fla. 2008) (finding that the defendant did not control the discretionary act of "identifying a query … and inputting said query" required of a customer).

As set forth above, sufficient evidence was presented to the jury that it was Newegg's NetScaler devices that select the encryption cipher, and by doing so, causes Newegg's clients to perform the steps of providing a seed value, generating a sequence of key values, and decrypting the data. Nov. 19, 2013 PM Trial Tr. at 135:19-24. *See also id.* 139:7-142:20. Newegg's NetScalers instruct the client computer to perform these method steps, and the client computer (unlike a human in a non-automated process) must obey these instructions. Nov. 19, 2013 PM Trial Tr. at 135:15-24.  The jury heard all of this evidence, and Newegg's evidence to the contrary, and judged TQP to be more credible as to whether Newegg directed and controlled its customers in performing these limitations of the claims.  These findings are proper and should not be disturbed.

**C.     TQP Presented More Than Sufficient Evidence of Direct Infringement.**

**1.     TQP Presented More Than Sufficient Evidence to the Jury That RC4 Was Used by Newegg During the Damages Period.**

Newegg next claims that TQP failed to meet its burden of showing a "single transaction using RC4 during the patent term" and "[t]he only evidence of the use of SSL with RC4 that TQP offered was for transactions that took place in 2013, long after the '730 patent's May 2012 expiration."  (Dkt. No. 436 at 13).  In other words, Newegg argues that, while there can be no dispute that it used RC4 with SSL to some degree during the relevant period, and because it did not maintain records of the extent of its infringing activity, or failed to retain whatever records may have been created, and did not seek such records until after the damages period had expired, TQP is foreclosed from pursuing damages against Newegg.[9]  This is not the law.

Instead, "[i]t is hornbook law that direct evidence of a fact is not necessary. Circumstantial evidence is not only sufficient, 'but may also be more certain, satisfying and persuasive than direct evidence.'" *See Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261 (Fed. Cir. 1986) (quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960)).  The mere fact that "evidence of infringement is circumstantial [] does not make it any less credible or persuasive." *Alco Standard Corp v. Tenn. Valley Auth.*, 808 F.2d 1490, 1503 (Fed. Cir. 1986); *Lucent Techs, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318  (Fed Cir 2009) (finding instruction manuals along with expert testimony sufficient to show direct infringement).  The evidence introduced at trial established, at least circumstantially, that Newegg infringed during the damages period.

---

[9]  The evidence established that Newegg could have maintained metrics on the number of encrypted communications using the infringing technology.  Newegg could, in fact, have maintained such records after it was sued and before the patent expired. Nov. 21, 2013 AM Trial Tr. at 36:19-37:5 (Lee Cheng explaining that Newegg can and has tracked usage data). Instead, Newegg waited until 2013, two years after TQP brought this action and well after the patent expired, to undertake the simple test to determine which encryption ciphers were in use until 2013. Nov. 21, 2013 AM Trial Tr. at 36:19-37:11.

At trial, Dr. Jaeger relied in part on evidence produced by Newegg showing that 92%-95% of its secured transactions used SSL with the RC4 cipher. Nov. 20, 2013 AM Trial Tr. at 48:20-49:12. In addition, Dr. Jaeger performed his own tests on the websites using Wireshark which similarly confirmed the usage of SSL with RC4. Nov. 19, 2013 PM Trial Tr. at 1 139:7-142:20; Nov. 20, 2013 AM Trial Tr. at 37:14-42:11. While this evidence is from after the expiration of the patent, it undisputed that Newegg's systems always operated in this same manner. Nov. 20, 2013 PM Trial Tr. at 31:21-32:22; Nov. 21, 2013 AM Trial Tr. at 31:21-32:22. During trial evidence was introduced that Newegg purchased its NetScalers from Citrix from as early as 2003 or 2004. Nov. 20, 2013 PM Trial Tr. at 7:22-23.  Further, the evidence is undisputed that Newegg's NetScalers were always in the default setting which called for the use of RC4, and Newegg continued to use these settings until well after the patent expired. Nov. 20, 2013 PM Trial Tr. at 31:21-32:22; Nov. 21, 2013 AM Trial Tr. at 31:21-32:22.   The jury also received evidence that RC4 usage likely declined over time, supporting the inference that a website using RC4 in 2013 was likely to have used it to a greater extent earlier on. Nov. 20, 2013 PM Trial Tr. at 54:15-56:4 (Dr. Becker explaining that alternative ciphers were not commercially available throughout the relevant period).[10]

Because the default settings did not change, data regarding the website from Spring and Summer 2013 is at least circumstantial evidence illustrating how the system worked during the infringing period, and more than sufficient to meet TQP's burden of establishing direct infringement. The jury could thus find that the data derived by Dr. Jaeger in 2013 was representative of the RC4 transactions during the infringing period. *Id.* at 41:20-42:11.

*ACCO Brands, Inc. v. ABA Locks Mfr. Co*., 501 F.3d 1307 (Fed. Cir. 2007), upon which Newegg relies, is distinguishable from the facts of this case. ACCO's patents were directed to

---

[10] Thus, Newegg's failure to collect data during the infringement period worked to its benefit, as the infringing cipher (RC4) was more commonly used during the infringement period than in 2013. Accordingly, the available data at trial likely underestimated Newegg's infringement.

two locking systems that inhibited the theft of equipment such as personal computers—a key lock and a combo lock. *Id*. at 1310. Evidence demonstrated that the key lock could be used in one of two ways, only one of which infringed. *Id*. The defendants' customers could have used the key locks in either way, but there was no evidence that Belkin's customers actually used the key lock in an infringing manner or that Belkin encouraged any of its customers to do so. 501 F.3d at 1312.  Instead, Belkin instructed its customers to use the noninfringing press-to-lock method to operate the lock. *Id*. at 1312. Therefore, the fact that the key lock was "capable of being used in an infringing fashion" was insufficient to support a finding of infringement. *Id*. at 1313.

Here, unlike the situation in *ACCO Brands,* there was evidence that throughout the period of 2004 through 2012, Newegg's host servers were configured to use RC4 as the default encryption cipher. Nov. 20, 2013 PM Trial Tr. at 7:22-23; Nov. 20, 2013 AM Trial Tr. 41:20-42:11. Testimony from Newegg's own employee, Albert Chong, confirmed that Newegg never changed the default settings. Nov. 20, 2013 PM Trial Tr. at 17:14-21.  This, coupled with the evidence of significant RC4 usage after expiration of the patent, was more than sufficient to show infringement prior to expiration, especially since RC4 usage overall was declining.

Newegg's reliance on *Fujitsu Ltd. v. Netgear Inc*., 620 F.3d 1321 (Fed. Cir. 2010), is similarly misplaced. The plaintiff in that case asserted patents that claimed an aspect of wireless communications technologies. *Id*. at 1325.  The district court relied upon a standard rather than the accused products in assessing infringement. The Federal Circuit held that a district court may rely on an industry standard in analyzing infringement, provided that the accused product operates in accordance with the standard. *Id*. at 1327. However, where the industry standard does not provide the level of specificity required to establish that practicing that standard would always result in infringement, it is not sufficient for the patent owner to establish infringement by arguing that the product practices the standard. *Id*. at 1327-1328.  In that case the district court held that the accused fragmentation standard was optional, rather than a requirement, and thus someone could comply with the standard without infringing the patent. *Id*. at 1329, 1331.

19

Unlike the situation in *Fujitsu*, the evidence shows that Newegg's systems selected the RC4 encryption cipher by default. Nov. 19, 2013 PM Trial Tr. at 142:17-20; 144:14-16. The testimony of Newegg's Lee Cheng confirmed that throughout the period of its use of NetScalers, Newegg never changed the default settings of its accused websites that required the RC4 encryption algorithm in combination with SSL/TLS. Nov. 21, 2013 AM Trial Tr. at 31:21-25. Regardless of the NetScaler models purchased by Newegg over the years, there is no evidence that the default encryption ciphers settings were ever other than RC4.

The fact that there are in existence non-accused encryption algorithms that may be used to connect to Newegg's accused websites is irrelevant because it is fundamental to patent law that "an accused product that sometimes, but not always, embodies a claimed method nonetheless infringes." *Bell Communications Research v. Vitalink Communications Corp.*, 55 F.3d 615, 623 (Fed. Cir. 1995) (citing *Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 20 (Fed. Cir. 1984).  Further, the evidence showed that such alternatives were used only a small fraction of the time, and that RC4 was used for well over 90% of secure sessions. Nov. 20, 2013 AM Trial Tr. at 48:20-49:12.

### 2. TQP Presented More Than Sufficient Evidence to the Jury Concerning How SSL Was Implemented on the Accused NetScalers.

Newegg's claim that TQP failed to provide sufficient evidence concerning the implementation of SSL on the Newegg's NetScalers is also without basis.  Newegg challenges Dr. Jaeger's testimony as to whether Newegg's NetScalers have all run an open source version of SSL during the damages period. Dkt. 436 at 18. Newegg ignores Dr. Jaeger's actual testimony, which quoted the interrogatory response provided by Newegg that states "Newegg uses the standardized implementation of the SSL and TLS protocols in its NetScalers." Nov. 20, 2013 AM Trial Tr. at 127:1-7.   As Dr. Jaeger explained, such standard implementation means that Newegg's deployment satisfies the requirements of the SSL and TLS protocol standards. *Id*. at 127:9-11.  Dr. Jaeger's uncontroverted testimony demonstrated that Newegg's NetScalers used SSL operating according to published standards, which he excepted and described as meeting

elements of the claims. Nov. 19, 2013 PM Trial Tr. at 129:16-25-133:5; Nov. 20, 2013 AM Trial Tr. at 82:25-83:5. Based on this testimony, the jury was correct to find that Newegg's NetScalers met the requirements of the '730 patent.

In an attempt to undermine Dr. Jaeger, Newegg's expert, Dr. Stuart Stubblebine, offered confusing testimony which in no way contradicted Newegg's own discovery response and witness testimony that it used SSL in an industry standard manner that met the limitations of the patent-in-suit. *See* Nov. 21, 2013 PM Trial Tr. at 26:17-29:16.  The jury was entitled to credit Dr. Jaeger's explanation over the testimoiny of Dr. Stubblebine in this regard.

> **D.     TQP   Presented   More   Than   Sufficient   Evidence   at   Trial Demonstrating that Newegg Is Liable for Inducement.**

Newegg claims it is entitled to judgment as a matter of law that there was no induced infringement because TQP failed to present substantial evidence that Newegg either possessed the specific intent to encourage another's infringement or knew the induced acts constituted patent infringement. JMOL at 20. A defendant can be held liable for inducing infringement if it can be shown that (1) it knew of the plaintiff's patent, (2) it induced the performance of the steps of the method claimed in the patent, and (3) those steps were performed. *Akamai Techs., Inc. v. Limelight Networks, Inc.,* 692 F.3d 1301, 1318 (Fed. Cir. 2012), *cert. dismissed*, 133 S. Ct. 1520, 185 L. Ed. 2d 569 (2013) and *cert. dismissed*, 133 S. Ct. 1521, 185 L. Ed. 2d 570 (2013). The Federal Circuit has further explained the test: "[I]nducement requires that the alleged infringer knowingly   induced   infringement   and   possessed   specific   intent   to   encourage   another's infringement." *Akamai*, 692 F.3d at 1308 (alteration in original) (quoting *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc)).

Newegg provides no authority that its purported good faith belief in the noninfringement and invalidity of the '730 patent and "the quality of its trial positions" preclude it from being liable for inducement.  Dkt. No. 436 at 20.  In any event, the only evidence of any good faith on behalf of Newegg would have come from Lee Cheng—the only party witness put on by Newegg. He testified that Newegg "was not terribly qualified to evaluate the technical merits of a patent,"

Nov. 21, 2013 AM Trial Tr. at 17:16-17, that he did not know if Newegg's systems were practicing the technology of the patent, *id.* at 26:25-27:8, that he had not even "read [the patent] carefully," *id.* at 32:23-33:16, and that Newegg could have stopped using RC4 after being sued and chose not to, *id.* at 31:21-32:22. In light of this testimony, the jury was free to reject Newegg's argument that its defenses were grounded in good faith.

Further, there is sufficient evidence in the record that Newegg was aware of the '730 patent and the infringing nature of its website at least by the time TQP filed its complaint. Nov. 21, 2013 AM Trial Tr. at 15:19-22. The jury could reasonably rely on testimony showing Newegg took no steps to change its host servers default settings, even after it was aware that its customers would be accessing its websites and those websites defaulted to the use of SSL/TLS with RC4 so as to infringe the '730 patent. Nov. 21, 2013 AM Trial Tr. at 31:21-32:22. Again, TQP offered evidence that use of SSL with RC4 was necessarily used by Newegg's NetScalers as confirmed by Newegg's own Mr. Chong. Nov. 20, 2013 PM Trial Tr. at 6:12-18:19.

Accordingly, Newegg knew or should have known that having customers access its website would result in infringement of the '730 patent. *Advanceme Inc. v. RapidPay, LLC*, 509 F. Supp. 2d 593, 607 (E.D. Tex. 2007), *aff'd*, 277 Fed. Appx. 1023 (Fed Cir. 2008) ("The requisite showing of intent is a 'showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringement.' Courts have construed this to mean actual or constructive knowledge of the patent.").

## IV.   MORE THAN SUFFICIENT EVIDENCE SUPPORTS THE JURY'S DECISION THAT THE '730 PATENT WAS VALID OVER THE PRIOR ART.

### A.   More Than Substantial Evidence Supports the Jury's Finding that the '730 patent Is Not Invalid Under 35 U.S.C. § 102(g).

Under 102(g), "the ultimate burden of persuasion remains with the party challenging the validity of the patent…. Once the patentee has satisfied its burden of production, the party alleging invalidity under 102(g) must rebut any alleged suppression or concealment with clear and convincing evidence to the contrary." *Apotex USA, Inc. v. Merck & Co.*, 254 F.3d 1031,

1037-1038 (Fed. Cir. 2001). As the Court has already indicated, TQP met its burden of production showing that RC4 and Lotus Notes with RC4 were suppressed or concealed prior to the '730 patent's critical date and therefore JMOL regarding suppression or concealment is inappropriate. *See* Nov. 25, 2013 PM Trial Tr. at 73:13-14 (The Court: "that's clearly, in the Court's view, a disputed question of fact."). Newegg's renewed motion for judgment as a matter of law with respect to RC4 and Lotus Notes incorporating RC4 largely cuts and pastes from its pre-verdict Rule 50(a) motion, upon which it declined to present oral argument at trial as it was not "worth the investment of time." *See* Nov. 25, 2013 AM Trial Tr. at 77:10-11. Nothing has changed. Newegg's renewed motion should be denied as Newegg has still failed to meet its burden to show that no reasonable jury could have found that the '730 patent is not invalid under § 102(g).

### 1.   Newegg Failed to Show that the RC4 Algorithm Meets All Claim Limitations Such that It Could Be Prior Art under Section 102(g).

TQP presented more than substantial evidence and expert testimony that RC4 alone cannot be prior art under Section 102(g) both because it does not meet all of the limitations of the '730 patent claims and because, even if it did, RC4 was abandoned, suppressed or concealed. With regard to the preliminary question, whether RC4 meets the relevant claim limitations, Newegg conflates RC4 with RC4 as used in Lotus Notes to falsely imply that TQP agrees that RC4 alone meets all limitations. In fact, TQP presented credible expert testimony from Dr. Rhyne that RC4 alone fails the very first elements of claim 1—disclosing a transmitter and receiver and providing a seed—and as a result the remaining limitations cannot be met. *See* Nov. 25, 2013 AM Trial Tr. at 32:19-33:17; *see also TQP v. Merrill Lynch & Co., Inc.*, Case No. 2:08-cv-471-WCB, at *3 (E.D. Tex. July 18, 2012) ("the evidence does not show that the RC4 algorithm either generates or provides the key to the encryption engine."). Newegg claims only that the jury must have believed Newegg's expert Dr. Diffie instead, even though he was throughly impeached. (Dkt. 436 at 23.)  Competing expert testimony is insufficient to overturn the jury's verdict, and Newegg points to no other evidence. *See Reeves v. Sanderson Plumbing*

*Prods.*, 530 U.S. 133, 137 (2000) (In ruling on a Rule 50 motion, the court must "draw[] all reasonable inferences in favor of the nonmoving party, but making no credibility determinations or weighing any evidence.")

Further, even if Newegg presented clear and convincing evidence that all of the required claim elements were met by RC4, which it did not, substantial evidence establishes that RC4 was abandoned, suppressed or concealed and therefore does not qualify as a prior invention under 35 U.S.C. § 102(g). *See, e.g.*, *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1446 (Fed. Cir. 1984) (holding that prior art must be "already available to the public" and that "secret prior art" cannot invalidate a patent under § 102(g)); *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 2004 U.S. Dist. LEXIS 12915, at *59 (D.N.J. June 29, 2004) (finding a prior inventor suppressed and concealed the invention where it was kept as a trade secret). The jury was entitled to find, consistent with the facts, that RC4 was suppressed and concealed as a trade secret. *See, e.g.*, DX168-2; Nov. 21, 2013 AM Trial Tr. at 111:6-14 ("RSA security has never officially released the algorithm."). Testimony at trial confirmed that the RC4 algorithm was held as a trade secret by RSA until the mid 1990s, and that it was not publicly available before then. *See* Nov. 22, 2013 AM Trial Tr. at 19:16-20:5; 38:12-39:15 ("Q. Okay. Was RC4 held as a trade secret by RSA? A. It was for a while, yes….Q. So in the mid – in the mid-1990s, ARC4 became available – it was publicly available … and before ARC4 was available, certainly, RC4 wasn't publicly available. A. Not to my knowledge."); *id.* at 38:12-14 ("Q. Was RC4 held as a trade secret by RSA? A. It was for a while, yes."). Newegg's technical expert, Dr. Stubblebine, also confirmed at trial that RC4 was a trade secret. *See* Nov. 21, 2013 PM Trial Tr. at 90:9-17 ("Q: And to your knowledge, Dr. Rivest never filed a patent on RC4, correct? Instead, he kept it secret, right? A: I'm -- I'm not aware of a patent being filed. Q: Okay. And it was kept a trade secret until some hacker cracked the code and posted it to a website called Cipherpunks in 1994, correct? A: Yes."). Newegg has not pointed to any facts that would suggest RC4 itself was available to the public prior to the patent's critical date and its motion should be denied.

**2.     More Than Substantial Evidence Shows that Lotus Notes in Combination with RC4 Was Abandoned, Suppressed or Concealed.**

In order to override the jury's verdict, Newegg must show, among other things, that no reasonable jury could have failed to find by clear and convincing evidence that Lotus Notes incorporating RC4 was available to the public prior to October 6, 1989 such that the public could "gain[] knowledge of the invention which will insure its preservation in the public domain." *Palmer v. Dudzik*, 481 F.2d 1377, 1387 (CCPA 1973) (finding suppression or concealment despite some efforts to commercialize the invention). "When the possessor of secret prior art (art that has been abandoned, suppressed or concealed) that predates the critical date is faced with a later-filed patent, the later-filed patent should not be invalidated in the face of this 'prior' art, which has not been available to the public." *Oddzon Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1402 (Fed. Cir. 1997). Newegg has failed to meet its burden.

It is undisputed that Lotus Notes alone, without utilizing RC4, does not meet the claim limitations of the '730 patent. Thus, the relevant "invention" that must have been publicly understood is Lotus Notes utilizing RC4. Substantial evidence shows that Lotus Notes with RC4 functionality was suppressed or concealed from public knowledge prior to the critical date. Lotus Notes was first sold to the public in December 1989. *See* Nov. 21, 2013 PM at 115:20-22 (Ozzie Testimony) ("Q. And when did that first commercial release take place? A. December 7th, 1989."). Prior to that time, it was maintained and developed in strict confidence, especially with respect to RC4, Dr. Rivest's trade secret. *See* DX4-15 (Mar. 31, 1988 Agreement between Iris and Lotus requiring confidentiality); DX12-12 (Dec. 7, 1984 Agreement between Iris and Lotus requiring confidentiality); DX17-5 (July 29, 1986 Development and License Agreement between RSA and Lotus, requiring that its proprietary source code be kept confidential); DX55 (non-disclosure agreement between RSA and Iris); DX34 (agreement to keep Lotus and RC4 confidential between Iris, Lotus and Ozzie). By the plain terms of the agreements governing the product's development, all relevant persons were contractually prohibited from disclosing the operation of RC4 and Lotus Notes. And in fact, the evidence establishes that these agreements

were honored and the operation of RC4 and Lotus Notes was never disclosed prior to the critical date. As explained above, RC4 was, and remained, a trade secret until 1994 and in the few public demonstrations of the product prior to its release, the RC4 component of Lotus Notes was disabled, meaning that the "invention" was never publicly displayed. *See* Nov. 25, 2013 AM at 42:15-43:15; Nov. 21, 2013 PM at 138:16-22 (Q. Do you recall if you had the opportunity to demonstrate [the RC4] functionality at Lotus Week? A. I almost certainly did not demonstrate it because….we would have had it turned off."); *id*. at 139:9-11 ("Q. do you recall if the RC4 link encryption feature would have been turned on for the demonstration you would have done for Mr. Gates? A. Almost certainly not."). Newegg's attempt to sidestep the overwhelming evidence that the public did not, and could not, know of the invention prior to the critical date by casting certain alleged uses of Lotus Notes as "non-informing public uses" is unavailing. Calling them "numerous unrestricted public distributions," Newegg makes only two specific arguments that they allege demonstrate that the public received any benefit of the invention prior to December 1989: (1) that the Lotus Notes product with RC4 was tested internally by one employee, Mr. Eldridge; and (2) the Lotus Notes product with RC4 was allegedly demonstrated to Microsoft and/or Reuters before being publicly released. Dkt. No. 436 at 26-27.  Neither argument stands up to scrutiny.

Internal testing by Mr. Eldridge does not constitute public use, since by definition it is internal and non-public. No evidence was presented that anyone outside of RSA, not even Mr. Eldridge, had ever read the RC4 code prior to its being reverse engineered in the mid-1990's. *See* Nov. 21, 2013 AM Trial Tr. at 114:3-9. Likewise, the alleged demonstrations of Lotus Notes to Microsoft and/or Reuters are insufficient. Contrary to Newegg's repeated assertions that no confidentiality obligations were present, Mr. Eldridge admits that he would not have disclosed RSA's trade secret to Microsoft and that his conversations with them were only high level due to the fact that he was bound by a non-disclosure agreement with RSA. *Id*. at 118:20-119:5. Mr. Eldridge further admits that Lotus Notes was kept confidential for marketing reasons and Lotus only disclosed fragments of information about the product before its launch in December 1989.

26

*Id*. at 120:4-15. The RC4 product was in fact so secret that Mr. Eldridge was restricted from coding in cryptography for 20 years after being exposed to it. *Id*. at 115:9-116:16. As to Reuters, its beta-testing was allegedly done as a potential "application partner," not a competitor, and to the extent the testing included the use of RC4, non-disclosure agreements would have restricted public disclosure of the invention. *See id*. at 119:21-25 ("Q. All the beta testers would be subject to non-disclosure confidentiality agreements; isn't that right? A. Well, with respect to how Notes operated, yes."). Even assuming that no NDA was in place, nothing about the alleged limited internal beta-tests of Lotus Notes suggests that the *public* ever had access to the invention. Unlike the public use in *Dunlop Holdings Ltd. v. Ram Golf Corp.*, 524 F.2d 33 (7th Cir. 1975), where over 12,000 golf balls were sold to the public, the alleged distribution here was limited to one or two copies of the software that were provided subject to confidentiality restrictions and never turned over to the public. *See Oak Industries, Inc. v. Zenith Electronics Corp.*, 726 F. Supp. 1525, 1535-1536 (N.D. Ill. Nov. 8, 1989) (distinguishing *Dunlop* and finding that short-term testing of a product does not "rise[] to the level of public use or benefit necessary to defeat an allegation of concealment under § 102(g)").

Newegg's reliance on *Flex-Rest, LLC v. Steelcase, Inc.,* 455 F.3d 1351, 1359 (Fed. Cir. 2006) similarly does not compel reversing the jury's determination of disputed factual issues. In *Flex-Rest*, unlike here, the patentee put forward no evidence to support a claim of intentional concealment other than an earlier-inventor's seven-month delay before filing a patent *application* showed intent to conceal. Accordingly, the Federal Circuit found that the trial court did not err in excluding any jury instruction on intentional concealment. *Id*. *Flex-Rest* does not, as Newegg claims, stand for the proposition that efforts to commercialize a product before public disclosure automatically negate other evidence of concealment, only that efforts to commercialize may negate *a total lack of evidence* of concealment, *i.e.*, where the patentee has failed to meet its burden of production to create a genuine issue of material fact regarding suppression or concealment. *Id.* at 1358 ("Flex-Rest did not make out a prima facie case of suppression"); *see also Apotex,* 254 F.3d at 1038-1039. By contrast, overwhelming evidence shows that the Lotus

27

Notes product was intentionally concealed prior to its public release in December 1989. In fact, the Court here has already found that TQP met its burden of production on this issue and that concealment is "clearly, in the Court's view, a disputed question of fact." Nov. 25, 2013 AM Trial Tr. at 73:13-14. *Flex-Rest* cannot override the jury's acceptance of the more than substantial evidence showing concealment.

None of Newegg's purported disclosures of Lotus Notes with RC4 are clear and convincing evidence that the confidentiality provisions governing the product development and trade secret status of RC4 were violated, or that any individual not legally bound to secrecy regarding its functionality, let alone the public at large, had access to the patented method or received any of its benefits before Mr. Jones filed his patent application on October 6, 1989. As a result, Newegg's motion should be denied.

**B.**   **More Than Substantial Evidence Supports the Jury's Finding That RC4 And Lotus Notes With RC4 Do Not Invalidate the '730 patent Under 35 U.S.C. § 102(a) or (b).**

**1.**   **Newegg Has Failed to Show that RC4 Meets All Claim Limitations or That it Was in Public Use Prior to the Critical Date.**

Like its 102(g) prior invention theories, Newegg's 102(a) and (b) prior use theories cannot stand absent a preliminary finding that all claim limitations are met by RC4. Newegg presented no evidence that would compel a jury to make such a finding over TQP's countervailing evidence and therefore its prior use arguments with respect to RC4 must fail. *See Reeves*, 530 U.S. at 137 (In ruling on a Rule 50 motion, the Court must "draw[] all reasonable inferences in favor of the nonmoving party, but making no credibility determinations or weighing any evidence."). Additionally, Newegg's motion should fail as it addresses only Lotus Notes with RC4, and offers no evidence that would show that RC4 itself was independently in public use at any point prior to the critical date. No such evidence exists—RC4 was kept a trade secret until well after the critical date. *See* Section IV.A.2, *supra*.

### 2. More Than Substantial Evidence Shows that Lotus Notes Utilizing RC4 Was Not in Public Use Prior to the Critical Date.

Newegg's argument that Lotus Notes with RC4 was in public use under § 102(a) and (b) similarly fails under Federal Circuit law and the Court's instructions for several reasons, most importantly because the Lotus Notes system incorporating RC4 is third-party alleged prior art and the public never had access to the invention prior to the critical date. *See* Nov. 25, 2013 AM Trial Tr. at 43:6-21. In *Woodland Trust*, the Federal Circuit, in reversing a judgment of invalidity based on sections 102(a) and 102(b), held that "when an asserted prior use is not that of the applicant, section 102(b) is not a bar when that prior use or knowledge is not available to the public." *Woodland Trust, v. Flowertree Nursery, Inc., 148 F.3d 1368, 1370 (Fed. Cir. 1998)* (third party secret commercial activity, more than one year before the patent application of another, is not a § 102(b) bar). Recently, the Federal Circuit in *Dey L.P. v. Sunovion Pharms., Inc.*, 715 F.3d 1351 (Fed. Cir. 2013) confirmed that "secret commercialization" by a third party is not public use, "even if it might have resulted in forfeiture were the third party the one filing for the patent." *Id.* at 1359 n.4. Such third-party secret use does not invalidate another's patent since the law is designed to encourage and reward disclosure of inventions, not to penalize an inventor for failing to uncover hidden prior uses by others. *See Oddzon Prods,* 122 F.3d at 1402. ("[P]rior, but non-public, inventors yield to later inventors who utilize the patent system.").

Moreover, because it is undisputed that Lotus Notes alone does not meet the limitations of the '730 patent claims, and Newegg has no evidence that Lotus Notes was ever shown to the public in a form which permitted public identification or understanding of RC4 relative to the asserted claims, Newegg has failed to establish public use of an invalidating technology under either Section 102(a) or (b). Newegg points to the same alleged "commercial exploitation" of Lotus Notes that it did in its attempt to show prior invention.[11] These arguments fail for the same reasons. Neither Mr. Eldridge's confidential implementation of RC4, nor the alleged high-level

---

[11] Newegg's assertion of "significant public distribution" is wholly unsupported in the record. None of its purported evidence of RC4 alone being commercialized is relevant, since RC4 alone does not meet the limitations of the '730 patent claims.

discussions with Microsoft provide any benefit of the invention to the public. To provide a benefit, the details of the machine or process must be ascertainable by inspection or analysis of the product that is sold or publicly displayed. *Gillman v. Stern*, 114 F.2d 28 (2d Cir. 1940); *Dunlop*, 524 F.2d at 36-7. Further, as described above, Newegg has not offered clear and convincing evidence that Lotus Notes with RC4 enabled was in widespread public use prior to December 1989.

Newegg's claim that all of the facts described above evidencing careful and deliberate concealment of the encryption features of Lotus Notes (*i.e.*, the "invention") from the public are irrelevant to determining public use misses the mark. Dkt. No. 436 at 30-31. As Newegg admits by arguing to the Court that various other ciphers are non-infringing alternatives to the patented method, the invention of the '730 patent does not cover everything that "encrypts" and "decrypts" data. Contrary to Newegg's attempt to overgeneralize, the specifics of how the invention encrypts, transmits and decrypts data are the "requisite aspects" of the invention and were not in public use or voluntarily disclosed before the critical date. *See* Nov. 25, 2013 AM Trial Tr. at 43:6-21 (Rhyne Testimony). Newegg's reliance on Mr. Eldridge's testimony for this disingenuous argument is misleading and against the weight of the evidence that RC4, not Mr. Eldridge's implementation of it in Lotus Notes, was the trade secret. *See* Section IV.A.2, *supra*. Newegg has failed to show by clear and convincing evidence that Lotus Notes with RC4 was in public use prior to December 1989 and its motion should be denied.

### C. Newegg Has Not Met Its Burden to Prove that RC4 and/or Lotus Notes Were On Sale Under Section 102(b) by Clear and Convincing Evidence.

To successfully prove an on-sale bar to patentability under §102(b), Newegg must show by clear and convincing evidence: (1) that a product embodying the invention was the subject of a commercial sale or offer to sell prior to the critical date; and (2) that the invention was "ready for patenting" prior to the critical date. *Pfaff v. Well Elecs., Inc.,* 525 U.S. 55, 67 (1998). In order to meet the first prong of *Pfaff*, Newegg must show by clear and convincing evidence that the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have

rendered the claimed invention obvious by its addition to the prior art. *Tec Air, Inc. v. Denso Manufacturing Michigan Inc*., 192 F.3d 1353, 1358 (Fed. Cir. 1999). Further, Newegg must show that a qualifying sale was either by the patentee or not done in secret. *W.L. Gore & Assocs., Inc. v. Garlock, Inc.* 721 F.2d 1540, 1550 (Fed. Cir. 1983). As described above, Newegg failed to present clear and convincing evidence that RC4 alone is a "product embodying the invention," and thus it could not be prior art even if sold. Moreover, even assuming that RC4 itself meets that threshold test, more than substantial evidence supports the jury's finding that neither RC4 nor Lotus Notes with RC4 were the subject of invalidating sales.

### 1.     RC4 Was Not Subject to a Public Sale or Commercial Offer for Sale Prior to the Critical Date.

Again, Newegg has failed to establish by clear and convincing evidence that RC4 alone meets the limitations of the '730 patent. As a result, any alleged sale of RC4 prior to the critical date is irrelevant to a determination of prior art and Newegg's motion with respect to RC4 should be denied on this ground alone. *See Reeves*, 530 U.S. at 137; *TQP v. Merrill Lynch*, Case No. 2:08-cv-471-WCB, at *3 (E.D. Tex. July 18, 2012) (denying summary judgment in part because "the evidence does not show that the RC4 algorithm either generates or provides the key to the encryption engine."). Because RC4 does not practice all of the elements of the claim of the '730 patent, Newegg fails by definition to meet the *Pfaff* test for on-sale bar. Newegg fails to meet the first prong because it has failed to show that that a product embodying the invention was on-sale prior to the critical date. Furthermore, Newegg has failed to meet the second prong because it has failed to show that the product on sale was ready for patenting. *See Pfaff*, 525 U.S. at 67. Newegg's Motion with respect to RC4 must therefore be denied.

Nonetheless, even assuming that RC4 itself practices the patented method, it cannot be prior art under Section 102(b) based on the alleged sale between RSA and Iris, as Newegg claims. The "Development and License Agreement," upon which Newegg relies as an alleged on-sale event, involves RC2, a prior and non-accused cipher, not RC4. RC4 had not yet been invented at the time of the alleged sale. Further, the document Newegg alleges constitutes an

invalidating sale was an agreement to develop and license technology, not for the sale of a product within the meaning of §102(b). Thus, even if the "Development and License Agreement" refers to the RC4 algorithm (which it does not), the alleged license cannot be invalidating prior art as a matter of law.

> **2.      The "Development and License Agreement" Was a Development and License of Technology Agreement, Not the Sale of a Product, and the RC4 Algorithm Is Not "On-Sale" Prior Art Within the Meaning of 35 U.S.C. § 102(b).**

The Federal Circuit has held that a license or sale of know-how or technology, as distinct from a sale of the invention itself, is not within the scope of the on-sale bar. *In re Kollar*, 286 F.3d 1326, 1333-34 (Fed. Cir. 2002) (holding that neither the transfer of know-how regarding a claimed process nor that of a written description of a process qualifies as a "sale" within the meaning of § 102(b)); *Moleculon Research Corp v. CBS, Inc.*, 793 F.2d 1261, 1267 (Fed. Cir. 1986) (holding that "an assignment or sale of the rights in the invention and potential patent rights is not a sale of 'the invention' within the meaning of section 102(b)")[12].

In *Kollar*, the Federal Circuit reversed the Board of Patent Appeals and Interferences's conclusion that the examiner properly rejected the claims at issue under the on-sale bar. 286 F.3d at 1334. The purported on-sale event was an agreement between two entities to share technology and coordinate research efforts with the ultimate goal of building a plant to implement the claimed process. *Id.* at 1328-29. Pursuant to the agreement, the inventor sold the "right to commercialize" the invention, and the "necessary technical information to utilize that invention." *Id.* Kollar, the inventor, admitted that he reduced the invention to practice before the agreement, so the only issue was whether the agreement was a sale triggering the on-sale bar. *Id.* at 1329. The Federal Circuit held that the agreement was not a sale under Section 102(b).

---

[12] Newegg cites to *Minton v. National Association of Securities Dealers, Inc.*, 336 F.3d 1373 (Fed. Cir. 2003) for the proposition that "a license to software constitutes a sale when a usable product is contemplated or provided pursuant to that license." Dkt. 436 at 34. *Minton* is distinguishable from the situation here and in *Kollar* as the *Minton* transaction involved a fully operational computer program implementing the claimed method and Minton conveyed his program and system with a warranty of workability. *Minton*, 336 F.3d at 1375, 1378.

As this Court has previously recognized, the facts here are very similar to those in *Kollar*. *See TQP v. Merrill Lynch*, Case No. 2:08-cv-471-WCB, *7 (E.D. Tex. July 18, 2012) (denying summary judgment that RC4 was on sale prior to the critical date in part because the "facts are similar to those of *In re Kollar*."). Here, RSA and Lotus entered into a "Development and License Agreement." *See* DX17. The agreement describes Lotus as "designing, developing, producing and marketing software ***products***" (future products to be developed by Lotus, such as Lotus Notes, that would incorporate RSA's technology), and in contrast, describes RSA as "designing and developing encryption software" (an encryption algorithm that Lotus intended to later incorporate into its future products). *Id.* at 1. Analogous to the agreement in *Kollar*, the agreement here involved developing technology with the ultimate goal of creating the Lotus Notes product. Moreover, the agreement here called for a joint-development arrangement in which that product was to be co-owned by Lotus and Iris. *See* DX-17. "Merely granting a license to an invention [to allow the licensee to commercialize the product] does not trigger the on-sale bar of § 102(b)." *TQP v. Merrill Lynch*, Case No. 2:08-cv-471-WCB, *7 (E.D. Tex. July 18, 2012) (*quoting In re Kollar*, 286 F.3d 1326, 1330-1331 (Fed. Cir. 2002)).

Substantial evidence establishes that the transaction was merely a license of technology, and not a sale of a product. For example, Alan Eldridge of Iris Associates, which worked as a "subcontractor" for Lotus, testified and confirmed that RC4 was licensed to Lotus and was not Iris's property to sell. *See*, Nov. 21, 2013 AM Trial Tr. at 112:1-6 ("Q The licensing relationship for RC4 was, in fact, between Lotus and RSA, not Iris, correct? A: Correct. Q: And the RC4 code was not Iris's code to sell or offer to sell, correct? A: Correct").

Mr. Ray Ozzie, who also worked for Iris, confirmed that the RC4 algorithm was RSA's "intellectual property." *See* Nov. 21, 2013 PM Trial Tr. at 158:22-159:10 ("Q. It is accurate that you didn't do any work at all on the actual source code module that implemented R -- the RC4 algorithm itself, correct? A. I did not touch at all personally RSA intellectual property. I probably did from time to time touch the surrounding modules that implemented the algorithms of how it was called, but since security is not my core competency, it – those modifications would

probably have been environmental in nature, language related. You know, we'd switch from one compiler to another, so you'd have to change -- you know, add if statements.").

Additional testimony of Dr. Rivest of RSA further establishes that the transaction was merely a license of technology, and not a sale of a product. Dr. Rivest testified that the RC4 algorithm was not sold, but rather licensed. Nov. 22, 2013 AM Trial Tr. at 37:22-38:2. He also explained that RSA provided "ideas" or know-how, which Lotus implemented in their own form. When asked about the RC4 code Newegg asserts is evidence of the purported "product" sold, he explained that RSA was providing exemplary encryption code only:

> Q. This isn't like a Lotus Notes product . . . something you'd ship off to a customer?
>
> A. No. . . . In fact, they probably took whatever code we provided them and reimplemented it all to their style and taste, so this is quite likely — this code per se was probably not a code embedded anywhere in Lotus. They took these ideas and reimplemented them in mathematical equivalent form but codewise different. That would be my expectation of what actually happened. I never saw their code.

*Id*. at 35:9-36:3. Similarly, Dr. Rivest described the Agreement as one in which RSA developed algorithmic encryption techniques, and Lotus would later implement that technology in its own way into its Notes product. *Id*. at 12:17-21 ("Q. What technology of yours was incorporated in Lotus Notes? … A. We supplied some algorithmic encryption techniques in the form both of documentation and in terms of software."). Indeed, Dr. Rivest repeatedly referred to the RC4 algorithm as "technology" or his code as a "demonstration" that was "educational." *Id*. at 33:25-34:6. "This is not a final product. This is not something that someone would buy."). All the evidence, from the title of the "Development and License Agreement" to the testimony of Dr. Rivest describing the Agreement, consistently supports the conclusion that the Agreement was for developing and licensing technology and not an on-sale event.

The conclusion that the "Development and License Agreement" is not an on-sale event is fully consistent with the policies underlying the on-sale bar as discussed in *Kollar*, such as whether the purported sale benefits the inventor or whether the sale is by an unrelated third party.

*Kollar*, 286 F.3d at 1334. As the *Kollar* court explained, "the grant of a license in and of itself does not enable the public to justifiably believe that an invention is freely available because a license discloses the invention only to the licensee, usually (as in this case) with an accompanying confidentiality obligation, and does not involve an embodiment of the invention that is publicly available." *Id.* That is precisely the situation here. RSA allegedly only disclosed the algorithm—confidentially—to Lotus and kept the algorithm a trade secret. In addition, this situation does not disturb the policy of discouraging removal of inventions from the public domain that the public reasonably has come to believe are freely available (*see Envirotech Corp. v. Westech Engineering, Inc.*, 904 F.2d 1571, 1574 (Fed. Cir. 1990)) because RSA was keeping the RC4 algorithm as a trade secret and not allowing it to become publicly available. Also, the conclusion that RSA's trade secret algorithm was not invalidating prior art supports the policy of favoring the prompt and widespread disclosure of inventions. *See id.*

### 3. The "Development and License Agreement" Was Not an Offer to Perform the Patent Process for Consideration.

In addition, the Development and License Agreement was not an offer for sale of the invention because the claims of the '730 patent are all method claims and the Development and License Agreement is not an offer to perform the claimed process for consideration. A process is not sold in the same sense as is a tangible item. As the Federal Circuit explained in *Kollar*:

> "Know-how" describing what the process consists of and how the process should be carried out may be sold in the sense that the buyer acquires knowledge of the process and obtains the freedom to carry it out pursuant to the terms of the transaction. However, such a transaction is not a "sale" of the invention within the meaning of *§ 102(b)* because the process has not been carried out or performed as a result of the transaction.

*Kollar*, 286 F.3d at 1332. Just as in *Kollar*, the '730 patent claims a process. Thus, the rationale articulated in *Kollar* applies with full force to the situation here.

Here, there is no evidence that the process claimed by the '730 patent was performed for consideration. Any testing of the RC4 cipher that Dr. Rivest may have performed was simply part of the development process, and there is no evidence that Dr. Rivest performed all aspects of

the claimed process in his testing. Accordingly, the Development and License Agreement is not a sale of the invention that triggers the on-sale bar.

**4.      RC4 Combined with Lotus Notes Was Not the Subject of a Public Sale or Commercial Offer for Sale.**

Newegg has also failed to proffer clear and convincing evidence that Lotus Notes with RC4 met either prong of the 102(b) on-sale test. As evidence of a sale, Newegg points only to a January 6, 1988 agreement between Iris and Lotus, which purportedly transferred the Lotus Notes source code. *See* Nov. 22, 2013 PM Trial Tr. at 45:4-19; DX4. This agreement, however, is not an exhibit in this trial and it exists nowhere in the record. In any case, Newegg's characterization of this missing document as constituting a sale or offer for sale is contrary to the evidence. It is undisputed that Lotus Notes alone does not practice all steps of the '730 patent and that it could not be prior art at least until the RC4 algorithm was integrated. Thus, the alleged January 1988 sale could not have been a sale of the *invention* since it is also undisputed that, as of the date Newegg claims Lotus Notes with RC4 was sold, RC4 had not yet been implemented into the Notes product. *See* Nov. 21, 2013 AM Trial Tr. at 80:5-9. Iris was not even in possession of RC4 as of January 1988 such that it could sell it to Lotus. *See* Nov. 21, 2013 PM Trial Tr. at 111:21-112:4 (Mr. Ozzie explaining that initial versions of Lotus Notes developed in January and February 1988 contained RC2, not RC4). Accordingly, no contracts between Iris and Lotus mention any transfer of RC4 and the only evidence in the record of Lotus Notes including RC4 being sold to anyone establishes that such a sale took place in December 1989, when the product was released. *See* Nov. 21, 2013 PM Trial Tr. at 115:20-22 (Ozzie Testimony) ("Q. And when did that first commercial release take place? A. December 7th, 1989."). Newegg's expert, Dr. Diffie, merely opined at trial that as of February 1988, one month after the alleged sale, Lotus Notes had "reached a set of—a state in which it *could be*—it *could* then be demonstrated to people, delivered to potential customers." *See* Nov. 22, 2013 PM Trial Tr. at 47:4-17 (emphasis added). At best, Dr. Diffie's testimony supports the idea that Lotus Notes with RC4 was ready for patenting by Lotus *after* the alleged sale to Lotus was complete, not that Lotus ever sold the

invention to anyone else prior to December 1989.

Finally, the sale that Newegg claims occurred between Iris, the developer of Lotus Notes, and Lotus prior to the product's public release cannot be a sale under Section 102(b) because: (a) neither Iris nor Lotus was the patentee; and (b) any such agreement between them would have been secret and therefore outside of the on-sale bar. The Federal Circuit in *W.L. Gore,* applying Section 102(b) to an alleged sale between third parties of a product that did not disclose the patented process, and which occurred subject to confidentiality agreements, explained:

> If Budd [who was not the patentee] offered and sold anything, it was only tape, not whatever process was used in producing it. Neither party contends, and there was no evidence, that the public could learn the claimed process by examining the tape. If Budd and Cropper [also not the patentee] commercialized the tape, that could result in a forfeiture of a patent granted them for their process on an application filed by them more than a year later. [citations omitted] There is no reason or statutory basis however, on which [the third parties'] secret commercialization of a process, if established, could be held a bar to the grant of a patent to Gore on that process.

> Early public disclosure is a linchpin of the patent system. As between a prior inventor who benefits from a process by selling its product but suppresses, conceals, or otherwise keeps the process from the public, and a later inventor who promptly files a patent application from which the public will gain a disclosure of the process, the law favors the latter.

721 F.2d at 1550. In other words, even if Newegg is correct that a sale occurred between Iris and Lotus on January 7, 1988, such a sale would only invalidate the right of Iris and Lotus to patent the invention after January 7, 1989. As in *W.L. Gore*, there is no evidence that the public could learn the patented process of the '730 patent through the development of Lotus Notes prior to October 7, 1988. Neither Lotus nor Iris disclosed Lotus Notes with RC4 operating such that the public could access its patented method until the product was shipped in December 1989. That Mr. Eldridge and other insider employees of Lotus may have known the process is irrelevant to the application of Section 102(b). Newegg's theory therefore fails as a matter of law. *See TopPharm, Inc. v. Ranbaxy Pharms., Inc.*, 336 F.3d 1322, 1327 (Fed. Cir. 2003).

**D.     Newegg Fails to Meet its Burden of Showing by Clear and Convincing Evidence that Denning Invalidates the '730 patent Under 35 U.S.C. § 102(a)/(b).**

**1.     There Was Sufficient Evidence From Which The Jury Could Find that Figure 3.3 of Denning Was Not Enabling.**

As this Court instructed the Jury, in order to be anticipatory "[e]ach and every claim limitation must expressly be present or implied to a person having ordinary skill in the art of the technology of the invention so that looking at that piece of prior art, that person could make or use or practice that invention." Nov. 25, 2013 PM Trial Tr. at 44:3-8.  In other words, "[i]n order to anticipate, a prior art disclosure must also be enabling." *Novo Nordisk Pharm., Inc. v. Bio-Tech. Gen. Corp.*, 424 F.3d 1347, 1355 (Fed. Cir. 2005).  The burden of proving that a reference is enabling lies with the party seeking to invalidate the patent.  *See Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1305-08 (Fed. Cir. 2002) (finding insufficient evidence to support jury's verdict of invalidity where, among other failings, the patent challenger did not put forth evidence that the reference was enabled).

Newegg asserts that Figure 3.3 of small portions of the accompanying text of Denning, anticipates claim 1 of the '730 patent.  However, Newegg's invalidity expert Dr. Diffie, never provided any evidence that this disclosure was enabling. Newegg's failure to carry its burden in this regard is alone grounds to deny Newegg's JMOL.

However, not only did Newegg fail to present evidence concerning enablement, TQP presented substantial evidence to the contrary from which the jury could find that the Figure 3.3 of the Denning text was not enabling.  Specifically, Dr. Rhyne testified as follows:

Q.  Now, do you recall Dr. Diffie's testimony that two pages of [the Denning] book invalidated the '730 patent.
A.  Yes, I heard that here in the trial.
Q.  Do you agree with that testimony?
A.  I do not.
Q.  Any why not?
A.  Well, the only two pages he alluded to were pages 138 and 139, and on those two pages, the only specific description of a synchronous stream cipher system is a very general diagram.  I believe it's Figure 3.3 that's at the top of Page 139.
        And I do not believe that that figure alone or anything else on those two pages would inform someone that you had a system that performed all the steps of that Claim 1 of the '730 patent or any of the other dependent claims.

Nov. 25, 2013 AM Trial Tr. at 6:4-14.

Dr. Rhyne continued to explain that "looking only at this figure [3.3] or even the few other sentences that [Dr. Diffie] cited to on the opposite page, there's no way to tell one of skill in the art . . . what's going on in these two key generators.  There's just—there's just a white box with a label." *Id.* at 7:10-16.  Dr. Rhyne would go on to say that "it makes a great deal of difference as to whether or not a system like this, a synchronous stream cipher system, meets all the limitations of that claim, which are very specific.  And if you don't know what's going on in the key generator, and there's nothing about that here in this figure, then you don't have any information about how—how this system would or would not meet Claim 1." *Id.* at 7:17-24. Dr. Rhyne also noted that "one skilled in the art" could not have "built a system that performed the method of Claim 1 using just Figure 3.3" because "[t]hey wouldn't know what to put inside the key generator white boxes to know whether or not, when they got through building it, it met Claim 1 or not." *Id.* at 21:15-21.  *See also id.* at 64:5-65:19 (affirming during cross-examination that "one skilled in the art" would not be able to determine that the "key generator in Denning represents a pseudo-random number generator" based solely on Figure 3.3).

Dr. Rhyne's testimony stands unrebutted. But even if the Court finds that Dr. Diffie provided testimony concerning enablement, TQP clearly provided sufficient evidence to the contrary.  *See, e.g.*, *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1306 (Fed. Cir. 2011) ("[i]t is decidedly the jury's role to evaluate the weight to be given to the testimony of dueling qualified experts").  Here, the jury clearly found Dr. Rhyne's testimony that Denning was not enabling more credible than any such testimony by Dr. Diffie.  Accordingly, Newegg has failed to demonstrate that it is entitled to JMOL on this basis.

### 2. Denning Does Not Anticipate the Asserted Claims of the '730 Patent Because It Fails to Disclose All Elements Combined in the Same Way as in the Recited Claims.

Newegg's arguments that Denning anticipates the asserted claims fails for the additional reason that it is only by mixing elements from different and unrelated systems that it is able to argue that all of the limitations of claim 1 are met.  Newegg's repeated assertions it can mix and

match elements from various different portions of Denning because it "is a single publication" and "one book" misstates the law.  The fact that every element of a claimed invention must be within "the four corners of a single publication" is not the "whole story."  *Net MoneyIn, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008).  Instead, in order to be anticipatory a reference "must not only disclose all elements of the claim within the four corners of the document, but must also disclose those elements 'arranged as in the claim.'"  *Id.* (quoting *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983)).  The "arranged as in the claim" requirement "refers to the need for an anticipatory reference to ***show all of the limitations of the claims arranged or combined in the same was as recited in the claims***, not merely in a particular order."  *Id.* at 1370 (emphasis added).  Thus, in *Net MoneyIn*, the Federal Circuit reversed a district court's decision that found a patent claim anticipated by combining separate parts of two different protocols disclosed in the same reference to find all of the limitations met.  *Id.* at 1371.  The Federal Circuit made this decision even though the differences "were only slight."  *Id.*

As in *Net MoneyIn*, Newegg attempted to show the limitations of the dependent claims were met by combining different systems described in Denning.  Specifically, Dr. Diffie combined Figure 3.3 with Figure 3.26, found almost 30 pages later in the book, to attempt to show that the limitations of claim 6 and 8 were met.  Dkt. No. 436 at 40.  Likewise, Dr. Diffie relied on a discussion of error correction on pages 151 and 152 to show claim 9 was met, even though this discussion preceded Figure 3.3 by seven pages and there is nothing Denning tying the two systems together or showing them combined as in the claims.  *Id.* at 41.

Indeed, Dr. Diffie admitted that Figure 3.3 and the accompanying text describe "one thing"—one system—and that there were "lots of systems described in the Denning book."  Nov. 22, 2013 PM Trial Tr. at 80:25-81:7.  However, Dr. Diffie and Newegg were unable to point to "one system" in Denning that discloses all of the limitations of Claims 6, 8, or 9 as combined in the claims.  It was only by improperly combining Figure 3.3 with other, different systems, that Newegg contends all of the limitations are met.  For this additional reason, Newegg failed to

present any clear and convincing evidence that the dependent claims were anticipated.

### 3.    The More Specific Examples of Stream Ciphers From Denning Also Fail to Anticipate the Asserted Claims of the '730 patent.

Newegg's discussion concerning the stream ciphers from Denning that one could actually build from the text (but which did not meet certain limitations of the patent) is similarly confused.  Dkt. 436 at 42-45.  The synchronous stream ciphers at issue are the output block feedback mode, counter mode, and linear feed back shift register.  (Dkt. No. 436 at 43.) Newegg presented no evidence concerning these modes at trial.  Indeed, Dr. Diffie confirmed that his opinion did "not at all" concern these modes.  Nov. 22, 2013, PM Trial Tr. at 19:8-11.

Instead, the only evidence presented to the jury concerning these three synchronous stream ciphers came from Dr. Rhyne.  Dr. Rhyne noted that Denning referred to these as "appropriate different ways that you can implement a key generator to generate[] the stream." Nov. 25, 2013 AM Trial Tr. at 8:16-25.  Dr. Rhyne discussed these methods of implementing a key generator in support of his opinion that Figure 3.3 was not enabling, and did not contain all of the limitations of claim 1.  *Id.*

Dr. Rhyne's testimony concerning these three systems showed only that they were missing at least one limitation of the claim 1.  Specifically, Dr. Rhyne testified that (1) both the output feedback and counter modes did not meet the element 1(c) because they generated pseudo-random numbers based on two inputs and did not meet the Court's construction requiring the numbers to be generated based "exclusively on a seed;" and (2) that the linear feedback shift register did not meet elements (1)(a) and (1)(g) of claim 1 because it encrypted on a bit basis, not blocks as required by the claims.  Nov. 25, 2013 AM Trial Tr. at 19:23-20:20.

Dr. Rhyne presented *absolutely no testimony* that any limitation of Claim 1 was met by any feature of any of the three systems; he only testified that certain limitations were absent. Likewise, Newegg presented no such testimony or evidence.  Thus, Newegg's contention that "there is no dispute" that Denning's discussion of linear feedback shift "teach a pseudorandom number stream 'based exclusively on' the seed value" (Dkt. No. 436 at 44) finds absolutely no

support in the record.  Newegg instead points only to the absence of such evidence.  *Id.* ("Dr. Rhyne did not testify that [the linear feedback shift register] lacks an exclusive input of a seed."). Establishing whether linear feedback shift registers met any limitations of the claim was Newegg's burden to prove by clear and convincing evidence.  Newegg cannot use a lack of testimony to fill in a gap and create evidence where none exists.

Even if Newegg had established that linear feedback shift registers met every other limitation, its claim that, because Denning states that "stream ciphers, in general, break messages into bits or characters," Denning "clearly teaches that a stream cipher utilizing a linear shift register can utilize blocks" (Dkt. 436 at 45) has no record support and does not establish anticipation. There is no evidence in the record of a linear feedback shift register that encrypts blocks.  Newegg's attempt to mix and match Denning's discussion of "general stream ciphers" with the linear feedback shift register mode to show anticipation is inappropriate under *Net MoneyIn*, discussed above.  *Net MoneyIn*, 545 F.3d at 1371 ("unless a reference discloses . . . not only all of the limitations claimed but also all of the limitations . . . combined in the same way recited in the claim, it  . . . cannot anticipate under 35 U.S.C.§ 102").

In sum, Newegg has failed to show that it met its burden of showing anticipation by Denning by clear and convincing evidence at trial, let alone that a reasonable jury could only conclude that the patent was invalid in light of Denning.  Newegg's motion should be denied.

### E.     Newegg Failed To Present Clear and Convincing Evidence that the Asserted Claims Are Obvious.

At trial, Newegg had the burden to show by clear and convincing evidence that the asserted claims were obvious over the prior art.  *Microsoft Corp. v. i4i Ltd.* 131 S. Ct. 2238, 2242 (2011).  Newegg's burden is even higher here—it must show that "a reasonable jury would not have a legally sufficient evidentiary basis" to find for TQP on the issue of obviousness.   In other words, Newegg must show that reasonable jury could only conclude that there was clear and convincing evidence of obviousness.  Newegg did not meet its burden at trial and cannot meet its burden to overturn the verdict on obviousness grounds.

Although the obviousness inquiry should be "expansive and flexible" as Newegg contends (Dkt. No. 436 at 46), "[g]enerally, a party seeking to invalidate a patent as obvious must  demonstrate by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so." *Eurand, Inc. v. Mylan Pharms, Inc.*, 676 F.3d 1063, 1070-71 (Fed. Cir. 2012) (internal quotations omitted).

At trial, Newegg did not present *any evidence* concerning whether a skilled artisan (1) would have been motivated to combine any of their prior art references; or (2) whether that artisan would have had a reasonable chance of success from doing so.  Indeed, other than with respect to whether it would be obvious to use RC4 with a transmitter and receiver (Nov. 22, 2013 AM Trial Tr. at 100:23-101:10; Nov. 23, 2013 PM Trial Tr. at 94:23-95:4), and a stray comment from its invalidity expert during cross-examination (Nov. 22, 2013 PM Trial Tr. at 79:20-80:4), *Newegg presented no argument to the jury concerning obviousness* in any form.

Faced with the void of any record evidence or testimony supporting its obviousness arguments, Newegg takes a scattershot approach of arguing, without any real analysis, that obviousness should be found by a combination of any of RC4 alone, Denning alone, and unspecified combinations of RC4, Lotus Notes, and Denning. In essence, Newegg is asking the Court to find that reasonable jury would find by clear and convincing evidence that one skilled in the art would view the asserted claims as obvious when the jury was presented with no argument or testimony in that regard. Newegg's argument untenable. There is no evidence in the record that would require a reasonable jury to find that the asserted claims are obvious.

### 1.      RC4 Cannot Render the Asserted Claims Obvious.

Newegg's contention that any "missing features of RC4" were inherent or "were also obvious to be used with or included in the RC4 algorithm" misses the point.  As discussed above in Section IV.A.2, RC4 is not invalidating prior art as it was suppressed and concealed until well after the priority date of the '730 patent.  Accordingly, the issue of whether or not it would have

been obvious to include any missing elements of the RC4 algorithm is simply irrelevant.

### 2.      Denning Does Not Render the Asserted Claims Obvious.

The Federal Circuit has held that where "a defendant urges an obviousness finding by 'merely throw[ing] metaphorical darts at a board'" in hopes of arriving at a successful result, but "'the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful,'" courts should reject "'hindsight claims of obviousness.'" *Eurand, Inc. v. Mylan Pharms, Inc.*, 676 F.3d 1063, 1070-71 (Fed. Cir. 2012).   Newegg's arguments that Denning renders the patent claims obvious can be characterized as nothing but throwing such "metaphorical darts at a board" and hoping something sticks.   Instead of pointing to specific portions of Denning that Newegg contends invalidate the patent, it baldly asserts "it would have been obvious to combine any of the teachings of Denning with any of the other teachings of Denning or to provide any features of the claimed inventions allegedly not disclosed by Denning." Dkt. No. 436 at 49.

Again, Newegg presented no evidence to the jury concerning obviousness with regard to Denning.   Although Dr. Diffie did provide an off-handed comment that he "would certainly . . . think that Denning makes it obvious," he provided no analysis in that regard. Nov. 22, 2013 PM Trial Tr. at 80:4.   Indeed, Dr. Diffie confirmed that he "was testifying about anticipation," not obviousness, when providing his invalidity opinion.   Nov. 22, 2013 PM Trial Tr. at 80:5-7.

Although Newegg claims that "any of the teachings" of Denning can be combined to render the claims of the '730 patent obvious, the only example Newegg relies on is the "Linear Feedback Shift Register."   (Dkt. 436 at 49.)   Contrary to Newegg's assertion, there is no evidence in the record that the Linear Feedback Shift Register contains any of the elements of any of the claims of the '730 patent.   Indeed, Dr. Diffie testified that his opinion did "not at all" rely upon "linear feedback [shift] register[s]." Nov. 22, 2013 PM Trial Tr. at 19:8-11.

Instead, the only evidence in the record concerning Linear Feedback Shift Registers is from Dr. Rhyne, who testified that Linear Feedback Shift Registers did not meet two limitations of claim 1. Nov. 25, 2013 AM Trial Tr. at 17:4-22.   Specifically, Dr. Rhyne testified that a

Linear Feedback Shift Registers would not meet the preamble's requirement of "transmitting data comprising a sequence of blocks in encrypted form," and the requirement of limitation 1(g) of producing a new key value in said first and second sequence "each time a predetermined number of said blocks are transmitted over said link." *Id.*   Dr. Rhyne did not, contrary to Newegg's assertions, provide any testimony that any other limitation of the '730 patent were met by the Linear Feedback Shift Registers, and there is no other testimony of this fact in the record.

Newegg failed to present the jury with clear and convincing evidence that Denning rendered the '730 patent obvious.  Having failed to meet their burden at trial, Newegg now provides no basis to set aside that verdict and render a JMOL.

### 3.   Combinations of RC4, Lotus Notes, and Denning Also Do Not Render the Claims Obvious.

Newegg raises yet another argument not mentioned at trial that (1) RC4 and Denning, or (2) Lotus Notes and Denning, render the claims obvious.  Again, Newegg makes no attempt to specify which teachings of Denning should be combined with which aspects of RC4 or Lotus Notes to render the claims obvious.  Also, Newegg again presents no evidence or argument that one of skill in the art would be motivated to do so or would expect success from such combinations.  Further, RC4 and Lotus Notes are not invalidating prior art as discussed *supra*, and thus cannot be used to invalidate the patent.

To the extent Newegg is asserting that one skilled in the art would be motivated to combine the stream cipher techniques taught by Denning with the RC4 cipher, this is belied by the text of Denning itself.  Directly below Figure 3.3, the text notes that "[e]ven a good pseudo-random number generator is not always suitable for key generation."  DX103-153. Accordingly, Denning teaches away from using pseudo-random number generators, such as RC4. Nov. 25, 2013 AM Trial Tr. at 64:5-10 (Dr. Rhyne testifying that Denning "teaches against using a pseudo-random sequence generator, . . .but she does describe one, even though she recommends not using it.").

4.    **Newegg Ignores the Record Evidence of Secondary Considerations of Non-Obviousness.**

Newegg's motion also ignores the fact that in determining obviousness, "objective consideration of nonobviousness must also be considered." *Eurand, Inc.*, 676 F.3d at 1070-71. In this regard, TQP presented evidence concerning the commercial success of the '730 patent as "over a hundred licenses have been assigned by companies like Amazon, companies like Microsoft, eBay, and even IBM who owns Lotus Notes." Nov. 25, 2013 AM Trial Tr. at 46:9-47:2.  Accordingly, a reasonable jury would have been able to consider the evidence of these licenses and find that Newegg had not met its burden of establishing obviousness.

## V.    SUFFICIENT EVIDENCE SUPPORTS THE JURY'S DAMAGES AWARD

To set aside the jury's damages award, Newegg "must show that the award is, in view of all the evidence, … so outrageously high … as to be unsupportable as an estimation of a reasonable royalty." *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1345 (Fed. Cir. 2011). This Court must determine whether the verdict is supported by substantial evidence, "while keeping in mind that a reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'" *Id.*  The award must be upheld "unless 'grossly excessive or monstrous,' clearly not supported by the evidence, or based only on speculation or guesswork." *Energy Transp. Group, Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1356 (Fed. Cir. 2012).  Newegg is unable to meet this heavy burden.

A.    **The Jury's Damages Verdict Is Reasonable And Supported By Substantial Evidence.**

TQP's damages expert, Dr. Stephen L. Becker, is a professional economist and owner and director of the economic and financial analysis firm Applied Economics Consulting Group, Inc.  Nov. 20, 2013 PM Trial Tr. at 31:17-21, 32:3-6.  Dr. Becker has a Bachelor's of Science in electrical engineering and computer science, an MBA in finance, and a Ph.D. in public policy with a focus on econometrics.  *Id.* at 33:9-24.  Dr. Becker has approximately 20 years of experience in economic and financial analysis, and has served as an expert on economic matters in over 50 over those cases concerning patents.  *Id.* at 32:15-25.  Dr. Becker is also a member of

multiple associations that deal specifically with intellectual property licenses.  *Id.* 36:1-10. Newegg does not dispute that Dr. Becker is qualified to provide expert testimony on patent damages in this case.  *Id.* at 36:11-16.

Dr. Becker testified at trial that he relied on the widely-accepted *Georgia-Pacific* factors in order to determine a reasonable royalty adequate to compensate TQP for Newegg's infringement of the '730 patent.[13]  *Id.* at 38:20-40:7.  Dr. Becker ultimately concluded that the parties to the hypothetical negotiations would have agreed to a tiered running royalty structure based on the number of orders (transactions) made through Newegg's accused websites during the relevant damages period of May 6, 2005 through May 2, 2012. *Id.* at 37:4-12, 44:6-45:21, 59:18-61:22.  Dr. Becker opined that a running royalty structure is more appropriate than a lump-sum payment because a running royalty more accurately reflects the extent of use, and because comparable licenses in the same industry use a running royalty.  *Id.*

In determining the appropriate royalty rate, Dr. Becker focused primarily on *Georgia-Pacific* factors 1, 2, and 12.  *Id.* at 65:5-21.  Under factor 1 (royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty), Dr. Becker reviewed the existing licenses to the '730 patent, but found them to be of limited relevance because all were entered into as settlements of litigation without admission of liability, and because most were black-box lump-sum settlements from which it was not possible to derive a running royalty based on the accused infringer's extent of use.  *Id.* at 65:22-73:21, 167:7-11. Indeed, as Dr. Becker testified, many of the TQP licenses, including the Amazon license cited in Newegg's motion (DX 247), include provisions expressly stating that the consideration amount does *not* represent a reasonable royalty for the alleged infringement.[14]  Nov. 20, 2013 PM Trial

---

[13] *See Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1382 (Fed. Cir. 2003) (endorsing the factors set out in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) for determining a reasonable royalty).

[14] The settlement agreement between TQP and Amazon provides: "The parties agree this is a litigation settlement and no representation is made that the foregoing consideration represents a reasonable royalty for the infringement alleged in the Litigation." DX 247 at 5.  Most of the other settlement and license agreements to the '730 patent include similar provisions.

Tr. at 68:10-69:24, 70:14-71:21; DX 246 at 1, DX 247 at 5.

Under factor 2 (rates paid by the licensee for the use of other patents comparable to the patent in suit), Dr. Becker reviewed Newegg's licenses produced in this case, but found them to be irrelevant because all were entered into as settlements of litigation, and concerned technology unrelated to invention of the '730 patent.  Nov. 20, 2013 PM Trial Tr. at 73:22-75:7.

Under factor 12 (the portion of the profit or selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions), Dr. Becker focused on four license agreements entered into by RSA Data Security, Inc. ("RSA") to license its patented public key encryption technology to manufacturers of security tokens.  *Id.* at 75:13-77:7.  Dr. Becker testified that the RSA licenses are particularly relevant to the hypothetical negotiations in this case because (1) they predate the hypothetical negotiations, (2) according to TQP's technical expert Dr. Jaeger, the technology licensed in the RSA licenses is comparable to the invention of the '730 patent, (3) both the RSA licenses and the hypothetical negotiations involve a non-exclusive license to a single patent, and (4) the $0.25 per security-token royalty in the RSA licenses is tied specifically to the element of the system that generates the encryption keys, rendering those parts of the licenses even more comparable.  Nov. 20, 2013 PM Trial Tr. at 76:1-18, 77:8-79:12, 160:5-22.

Dr. Becker further testified that, while the RSA licenses' $0.25 royalty rate was an appropriate starting point, this per-token rate would need to be adjusted in order to account for the fact that, unlike the software-based key management method of the '730 patent, the RSA security tokens are pieces of hardware that can be reused multiple times, as well the fact that Newegg is a large online retailer with high volumes of transactions per year.  *Id.* at 80:20-83:15.  Dr. Becker explained that the effective per-transaction rate for a customer that makes only one transaction per year with a given security token would be $0.25.  But if that same customer makes 10 transactions, the effective royalty rate would decline to $0.025 per transaction, and further down to $0.0025 per transaction for 100 transactions.  *Id.* at 81:18-82:13.  Dr. Becker opined that the parties to the hypothetical negotiations would have adopted a tiered structure that

started at the $0.25 rate in the RSA licenses and discounted rapidly in order to account for Newegg's high transaction volumes.  *Id.* at 82:14-83:16.  The end result is $5,104,588 in total royalties for Newegg's approximately 68 million infringing orders, making the overall effective royalty rate $0.07 per infringing transaction.  *Id.* at 83:17-86:21, 108:17-109:4.

Significantly, Newegg failed to offer any expert testimony to rebut Dr. Becker's opinions.  Newegg's counsel merely suggested in closing argument that the $5.1 million figure testified to by Dr. Becker was too high in light of the settlement amounts paid by other parties.  Nov. 25, 2013 PM Trial Tr. at 104:25-105:9.  However, at no time during the trial did Newegg offer any evidence regarding calculation or the ultimate amount of any damages award.[15]

Federal Circuit precedent dictates that a jury's damages verdict should not be disturbed if it is within the range of damages testified to by the parties' experts.  *Spectralytics*, 649 F.3d at 1347 (holding that "the jury's choice of a 5–percent royalty was not 'outrageously high' in view of the expert testimony that 20–percent was reasonable and appropriate"; "The jury was entitled to choose a damages award within the amounts advocated by the opposing parties.").  The jury's damages verdict of $2.3 million—less than half the amount testified to by Dr. Becker—is well within this range, and Newegg's motion for JMOL should thus be denied.  Indeed, the Federal Circuit routinely rejects accused infringers' challenges to damages verdicts where, as here, the amount awarded is less than the amount calculated by the patentee's expert, and especially where the accused infringer, like Newegg, failed to present competing expert testimony.  *See, e.g.*, *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1383 (Fed. Cir. 2004) (upholding jury verdict where the patentee's damages expert presented evidence based on the *Georgia-Pacific* factors, the jury awarded patentee 80% of the damages its expert testified to, and the infringer failed to present an

---

[15] Newegg's concurrently filed motion for a new trial seeks remittitur of the damage award to $50,000.  According to Newegg, Amazon is "at least ten times larger than Newegg," therefore Newegg's damages should be 1/10th of the $500,000 settlement amount paid by Amazon, or $50,000.  D.I. 437 at 14-15.  This argument is meritless and should be rejected for the reasons discussed herein and in TQP's opposition to Newegg's motion for new trial.  For purposes of this motion, however, TQP will assume that Newegg's requested damages amount is $50,000.

expert witness in rebuttal); *State Contracting & Engineering Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1072 (Fed. Cir. 2003) ("We cannot say that the jury's award, which was, in turn, substantially smaller than the amount calculated by [the patentee's damages expert], was grossly excessive or clearly unsupported by the evidence, especially in light of the contractors' failure to present competing expert testimony as to a reasonable royalty."); *see also Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005) ("the jury is not bound to accept a rate proffered by one party's expert but rather may choose an intermediate royalty rate"); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212 (Fed. Cir. 2010).

**B.      The Jury Was Entitled To Rely On Dr. Becker's Damages Opinions.**

**1.      This Court has rejected Newegg's arguments challenging Dr. Becker's opinions multiple times.**

Newegg, having failed to present *any* evidence at trial to rebut Dr. Becker's testimony, now seeks to overturn the jury's damages verdict by arguing (for the fourth time in this case) that the RSA licenses relied upon by Dr. Becker are not sufficiently comparable, and that the royalty structure selected by Dr. Becker is "arbitrary."   These arguments challenging the reliability of Dr. Becker's opinions are merely a recasting of the arguments asserted in Newegg's *Daubert* motion, which was squarely *denied* by this Court.  The Court held:

> While the per-transaction royalty used by Dr. Becker is not the same as the one set forth in the RSA licenses, that does not make it inappropriate.…  Dr. Becker has explained the reasoning behind his damages theory. Whether his specific methodology and the reasoning are persuasive is a question for the jury.

> Distilled to their essence, Defendants' disagreements are with Dr. Becker's conclusions, not his methodology.  More is needed to bar expert testimony under Rule 702 and *Daubert*.  **Dr. Becker has tied his theory to the facts of the case by presenting a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue under the sanctioned *Georgia-Pacific* framework**. Dr. Becker's testimony regarding his model of the hypothetical negotiation combined with his methodological explanation of how he applied this model to the relevant facts satisfies Rule 702 and *Daubert*.

Dkt. No. 382 at 4-5 (emphasis added).

Newegg reasserted the same meritless arguments in a subsequent motion in limine and

again in its pre-verdict motion for JMOL on damages, both of which were summarily denied by this Court.[16]  As set forth below, Newegg's present motion remains meritless.  Newegg is unable to show that Dr. Becker's testimony was "so seriously flawed that it may not be used as evidentiary support for the jury verdict."  *Condotte Am.*, 346 F.3d at 1072.

## 2.      The RSA licenses are sufficiently comparable.

As set forth above, Dr. Becker found the RSA licenses to be relevant under factor 12 of the *Georgia-Pacific* analysis because they predate the hypothetical negotiations, the technology covered by the RSA patent is comparable to that of the '730 patent, the RSA licenses like the hypothetical negotiations involve a non-exclusive license to a single patent, and because the RSA licenses use a running royalty tied specifically to the element of the system that generates the encryption keys.  Nov. 20, 2013 PM Trial Tr. at 76:1-18, 77:8-79:12, 157:16-160:22.  Dr. Becker's conclusion that the RSA patent (the '829 patent) and the '730 patent are sufficiently comparable was based on his discussions with Dr. Jaeger, TQP's technical expert.  Nov. 20, 2013 PM Trial Tr. at 76:11-18, 158:1 (Q: So why did you rely on Dr. Jaeger's opinion about the technical comparability of the '829 patent and the '730 patent?  A: I looked to Dr. Jaeger for that opinion because he's the one who has the technical capability to do that.  He's the one who's qualified to do it.).  Consistent with his expert report, Dr. Jaeger testified at trial that the RSA patent is technologically comparable to the '730 patent because "both systems provide secure communication between the transmitter and receiver, and they also provide methods for determining how keys … are produced in order to … to provide this secure communication."  Nov. 20, 2013 AM Trial Tr. at 43:8-14, 43:22-44:3.  Dr. Jaeger also testified that he discussed his opinions concerning comparability with Dr. Becker.  *Id.* at 44:4-8.

Newegg, in attempting to undermine Dr. Jaeger's opinion, first suggests that Dr. Jaeger erred because he purportedly did not perform a "claim-by-claim comparison" of the RSA and

---

[16] A similar challenge to Dr. Becker's opinions was also rejected by Federal Circuit Judge Bryson, sitting by designation in *TQP Development, LLC v. Merrill Lynch & Co., Inc. et al.*, C.A. No. 2:08-cv-471-WCB (E.D. Tex.).

'730 patents to determine the differences in scope. Dkt. No. 436 at 53. This is inaccurate. Dr. Jaeger testified that while he did not did not review each and every element of the '730 patent and see if it was found in the '829 patent (which of course would be a futile exercise), he indeed "looked at the elements to look for comparability." Nov. 20, 2013 AM Trial Tr. at 44:9-18. Dr. Jaeger further testified that he did find differences between the two patents, but that they were nonetheless comparable because they both "provide methods for determining how keys are produced to solve this overlapping problem related to secure communication." *Id.* at 44:22-45:9.

Newegg's vague, unsubstantiated assertions that the RSA patent has been "widely praised" and is "far broader" than the '730 patent (Motion at 54) are equally unavailing. As testified to by Dr. Becker, the number of awards received by a patent bears little if any relevance to the hypothetical negotiations analysis. Nov. 20, 2013 PM Trial Tr. at 161:2-23 (Q: In your experience, in a negotiation for a license, is the primary concern of the party seeking a license to a patent how many awards it's won? A: No.); *see also id.* at 158:6-13. The value of a particular patent, and the *right to use* the technology covered by such patent, is relative. A highly praised patent has no value to someone who does not use the technology patented therein, while a potential licensee planning to extensively use patented technology must pay irrespective of whether that technology has been well-publicized. Indeed, the evidence shows that the technology covered by the '730 patent would be highly valuable to Newegg in a hypothetical negotiation given that Newegg would go on to use said technology for at least 95% of the transactions on its websites. *Id.* at 59:16-64:5, 165:18-166:6.

The fact that the RSA and '730 patents are not identical in scope also does not render the RSA licenses non-comparable, as two different validly-issued patents inherently cannot cover identical technologies. *See* 35 U.S.C. §§ 101, 102; *Titanium Metals Corp. of Am. v. Banner*, 778 F.2d 775, 780 (Fed. Cir. 1985). Again, as testified to by Dr. Jaeger, the patents are sufficiently comparable because both provide methods for determining how keys are produced in order to improve secure communication between a transmitter and a receiver. Nov. 20, 2013 AM Trial Tr. at 43:8-14, 43:22-44:3, 44:22-45:9. The mere fact that Newegg disagrees with Dr. Jaeger's

opinion, the reliability of which is undisputed, is irrelevant. Furthermore, the differences in implementation of the '730 patent and the RSA patent were thoroughly addressed and accounted for in Dr. Becker's analysis of *Georgia-Pacific* factors 9, 10, and 13, which encompass the benefits of the patented technology and any commercially acceptable non-infringing alternatives. Nov. 20, 2013 PM Trial Tr. at 48:6-59:15, 164:20-166:6; PX 45, PX 51, PX 56.

Finally, Newegg's conclusory assertions regarding the purported economic differences between the RSA licenses and the hypothetical negotiations in this case also do not render the RSA licenses non-comparable. Federal Circuit precedent establishes that the particular circumstances under which a comparative license is entered into need not be identical so long as "some basis for comparison" exists in the evidence. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1330 (Fed. Cir. 2009); *see also ResQNet.com, Inc. v. Lansa, Inc.* 594 F.3d 860, 879 (Fed. Cir. 2010) ("[I]t is not necessary that the identical situation existed in past transactions, for the trier of fact to determine the value of the injury.")). Dr. Becker sufficiently explained the reasons why he found the RSA licenses to be comparable, and, as discussed below, he reasonably accounted for the differences in the technologies and the parties' economic circumstances. The mere fact that Newegg disagrees with Dr. Becker's opinions or the conclusions reached by the jury is simply not a legitimate basis to overturn the jury's verdict.

### 3. Dr. Becker's opinion on the royalty rate is consistent with Federal Circuit precedent and based on the evidence.

In determining the appropriate royalty rate to apply, Dr. Becker properly accounted for the difference between a license to manufacturers to make a physical token controlling access to a computer network, as in the RSA licenses, and the hypothetical licenses in this case providing for easy secure access to Newegg's websites supporting millions of sessions per year.

Q: Now, would this per-token rate [in the RSA licenses] be a reasonable royalty in this case?

A [by Dr. Becker]: Well, what we've got to recognize is that the tokens that are being talked about in these RSA licenses are – they're essentially reusable. You get a – you get one of these things, and you can use it over and over again.

So we've got to do something to take into account the fact that with the software-based key management that the '730 talks about, we've got orders.

And one particular customer could make multiple orders, and so there needs to be some adjustment to go from this sort of per-token world into a per-order world.

Q:  And have you made that adjustment?

A:  Yes.

Nov. 20, 2013 PM Trial Tr. at 80:20-82:16.

Dr. Becker explained that the effective per-use or per-transaction rate for the RSA security tokens would decrease rapidly as of the number of transactions increased. *Id.* at 81:18-82:13.  Dr. Becker also looked at how the parties to the hypothetical negotiations would structure a license that provides a reasonable royalty while accounting for Newegg's high transaction volumes.  In light of these considerations, Dr. Becker ultimately concluded that the parties to the hypothetical negotiations would have adopted a tiered structure that started at a $0.25 rate per transaction, but steeply discounted as volume rose.

A:  I've decided and – and reached the opinion that there was one additional adjustment that would be reasonable to make in this case.

Q:  And what adjustment is that?

A:  Well, as we saw in an earlier slide, Newegg is a very large online retailer, and so I thought that it would be reasonable that Newegg would ask for some sort of volume discount, not just the obvious discount that comes from using a token multiple times, but a volume discount scheduled to reflect the fact that they would be licensing a very large number of orders.

And so what I did is took this declining scale but laid on top of it an additional volume-based discount that provided a schedule of royalties where for under a million orders, you'd be at 25 cents.   From a million to 5 million orders, you'd be at 10 cents an order – per order; from 5 million to 25 million, a penny; 25 million to a hundred million, at a half a penny, and then over a hundred million a tenth of a penny.

And that gives the effect of both a volume discount for Newegg just having lots and lots of customers placing lots of orders, and this almost mathematical certainty that if you use a token 10 times, 15 you're going to be at 2½ cents instead of 25 cents.

So this combines those two effects.

*Id.* at 82:16-83:16.

Newegg's contention that the royalty structure adopted by Dr. Becker is arbitrary is without merit.  As discussed above, Dr. Becker's based his opinions on his analysis of the *Georgia-Pacific* factors and the facts in evidence, including, *inter alia*, the '730 patent itself, Dr. Jaeger's analysis and opinions, comparable licenses including the RSA licenses, "Newegg and industry documents related to the importance of encryption and online security," "depositions of Newegg employees," "transaction data" produced by Newegg, and "TQP documents and testimony from TQP witnesses."  *Id.* at 37:25-39:2.  The mere fact that Dr. Becker did not apply a specific formula and used his judgment to determine the particular tranches and volume-discounts does not render his opinions invalid.  As recognized by the Federal Circuit, calculating damages is "not an exact science."  *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1576 (Fed. Cir. 1989).  "[A]ny  reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'"  *ResQNet.com, Inc.*, 594 F.3d at 880-81.  As a qualified expert, Dr. Becker was entitled to rely on his experience and expertise to determine the form of royalty that the parties would have adopted to account for the specific circumstance of very high volumes in the base. *See United States v. Frazier*, 387 F.3d 1244, 1298 (11th Cir. 2004) ("[E]xperts of all kinds tie observations to conclusions through the use of 'general truths derived from…specialized experience, …and 'no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.'") (quoting *Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167, 1178 (U.S. 1999)).

Dr. Becker's knowledge gained from his experience and expertise that a tranched rate structure is a common and appropriate practice in the relevant industries is a sufficient basis in itself for that opinion.  But in fact Dr. Becker identified exemplars of this practice in his expert report, including, *inter alia*, 2013 sales data for RSA's security tokens.  D.I. 304-1 at ¶¶ 172-73.  The fact that this data was not admitted into evidence at trial is inconsequential. *See* Fed. R. Evid. 703, 705; *Condotte Am.*, 346 F.3d at 1072 (damages expert's testimony on reasonable royalty addressing the *Georgia-Pacific* factors, though "in abbreviated fashion," sufficient to

support jury's damages verdict).   Furthermore, that the RSA sales data post-dates the hypothetical negotiations, does not, as Newegg suggests, make it irrelevant.   Instead, facts known after the date of the hypothetical negotiations may properly be considered in calculating a reasonable royalty.   *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988) (calculating a reasonable royalty "permits and often requires a court to look to events and facts that occurred [after the date of the hypothetical negotiations] and that could not have been known to or predicted by the hypothesized negotiator").

Contrary to Newegg's assertion, this case is nothing like *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010).   The Federal Circuit in *ResQNet* rejected the expert's reliance on certain "re-bundling licenses" to drive up the royalty rate because they were "not consistent at all" the other licenses in the record that had a much lower royalty rate, and the expert offered "little or no evidence of a link between the re-bundling licenses and the claimed invention."   *Id.* at 870.   In direct contrast with *ResQNet*, Dr. Becker explained precisely why he found the RSA licenses to be relevant to the hypothetical negotiations.   Moreover, the reasonableness of the $0.25 starting rate derived by Dr. Becker is confirmed by the fact that all of the licenses to the '730 that incorporate a running royalty use a rate of $0.25 per transaction. PX 59 at 5, PX 60 at 24, PX 61 at 2.   In fact, the overall effective rate yielded by Dr. Becker's calculations is only $0.07 per infringing transaction—far less than the $0.25 rates in the RSA and TQP agreements.   Nov. 20, 2013 PM Trial Tr. at 83:17-86:21, 108:17-109:4.

### 4. Dr. Becker's opinion on the royalty base is consistent with Federal Circuit precedent and based on the evidence.

Federal Circuit precedent dictates that the royalty base – the measure of the extent of infringement – must reasonably reflect the claimed infringement.   *ResQNet.com, Inc.*, 594 F.3d at 869.   Consistent with this principle, Dr. Becker made clear that his opinions are based on the understanding that the parties to the hypothetical negotiations would have agreed to a royalty that reflects the extent of Newegg's infringing use.   Nov. 20, 2013 PM Trial Tr. at 44:6-45:11.   Dr. Becker reasonably calculated a royalty base based on the evidence provided by Newegg

regarding the number of transactions made on the accused websites, each of which represents an encrypted session, and apportioned the royalty base to include only the transactions that utilized the infringing technology.  *Id.* at 60:4-65:2, 83:17-85:17.

Not only is the number of transactions directly tied to the extent of Newegg's infringement, but it also maps closely to the economic value of the patented invention to Newegg.  As Dr. Becker testified, the invention of the '730 patent provides an efficient method for strong encryption that does not excessively burden server resources.  Newegg, "the second largest online-only retailer in the U.S.," used this invention to support encrypted transactions from which it earns revenues.  *Id.* at 48:8-53:1, 56:7-57:7; PX 45, PX 51, PX 56.

Newegg's assertion that "there is no evidence anybody ever licensed the RSA patent on a per transaction or per use basis" (Motion at 65) must be rejected.  As an initial matter, this argument improperly conflates the issues of calculating the royalty rate and calculating the royalty base.  The sole inquiry upon determination of the latter is whether the chosen base (number of transactions) reasonably reflects the extent of Newegg's infringement, which Newegg does not dispute.  Moreover, as noted above, a per transaction rate is consistent with the prior licenses of the '730 patent that include a running royalty, all of which are based on the number of transactions or sessions.  None use a "per user" or "per token" rate.  PX 59 at 5, PX 60 at 24, PX 61 at 2; Nov. 19, 2013 PM Trial Tr. at 62:20-68:4.

## C. The Evidence Cited In Newegg's Motion Does Not Support Judgment As A Matter Of Law.

Newegg's assertion that "[o]ther record evidence also precludes TQP's damages position as a matter of law" (Motion at 58) is incorrect.  To the extent that any of the record evidence conflicts with Dr. Becker's opinions, the jury, as the finder of fact, was entitled to weigh all the evidence and "decide for itself what to accept or reject."  *Finjan*, 626 F.3d at 1212.  "In setting damages, the jury's function is to weigh contradictory evidence, to judge the credibility of the witnesses, and to resolve factual disputes."  *Id.*  "[N]either the trial court upon motion for judgment n.o.v. nor the appellate court may substitute its choice of result for that of the jury."

*Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1580–81 (Fed. Cir. 1992).

In any case, the evidence cited in Newegg's motion does not support judgment as a matter of law.  Newegg first asserts that its corporate representative Lee Cheng testified that "Newegg would only have taken a lump sum."  Motion at 58.  This is false.  At best, Mr. Cheng's testimony shows that, as a general matter, Newegg "almost always" licenses patents on a lump-sum basis.  Nov. 21, 2013 AM Trial Tr. at 19:10-20:19.  However, Newegg's general licensing practices are irrelevant to the hypothetical negotiations at issue in this case.  Indeed, immediately upon hearing such testimony the Court *sua sponte* called a bench conference and put an end to this line of questioning.  *Id.* at 20:20-21:2 ("THE COURT: I have a real problem seeing the relevance of this.  I mean, you're just going through all kinds of general generic business model stuff.  We need to get on to the facts in dispute at this case.").  Newegg failed to provide any other evidence in support of its contention that the parties to the hypothetical negotiations would have adopted a lump-sum royalty.

Newegg's reliance on certain agreements entered into by TQP to license the '730 patent (DX 246, DX 247, and PX 61) is also misplaced.  As discussed above, all of these agreements were entered into as settlements of litigation in which validity and infringement were still in dispute.  Therefore, the settlement amounts paid under these agreements bear little if any relevance to the hypothetical negotiations analysis, which assumes that the patent is valid and infringed.  *Lucent Techs.*, 580 F.3d at 1325; *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012) ("The propriety of using prior settlement agreements to prove the amount of a reasonable royalty is questionable. … The notion that license fees that are tainted by the coercive environment of patent litigation are unsuitable to prove a reasonable royalty is a logical extension of *Georgia–Pacific*. . . .").

Moreover, two of the TQP settlement agreements relied upon by Newegg include provisions expressly stating that consideration paid does *not* represent a reasonable royalty for the licensees' infringement. As highlighted for the jury during the trial (Nov. 19, 2013 PM Trial Tr. at 103:13-104:20), the settlement agreement between TQP and Amazon provides:

> The parties agree this is a litigation settlement and no representation is made that the foregoing consideration represents a reasonable royalty for the infringement alleged in the Litigation.

DX247-1.

The settlement agreement between TQP and Alticor Inc. provides:

> [T]he Parties agree that this Agreement has not been negotiated under the "Hypothetical Negotiation" standard and this settlement does not represent a reasonable royalty, but rather this settlement is an agreement between the Parties to resolve a commercial dispute without either Party having the benefit of information that would be required to establish a reasonable royalty in the context of the "Hypothetical Negotiation" standard . . . .

DX246-1.

Newegg simply ignores this evidence.  Newegg's bald assertion that the "Amazon is approximately thirty time larger than Newegg," and that the $500,000 payment from the Amazon settlement agreement should be adjusted downward based on Newegg's relative market share (Dkt. No. 436 at 59) is devoid of any legal or factual support. Newegg did not present any evidence at trial to suggest that the total size of Amazon played any role in the determination of the amount of the settlement with Amazon, or that its total size was indicative of the extent of its infringement.  In fact, the only evidence at trial was that TQP had no evidence of the extent of Amazon's infringement at the time of the settlement.  Nov. 19, 2013 PM Trial Tr. at 103:5-12.

Contrary to Newegg's assertion, TQP's agreement with Micro Electronics, Inc. (PX 61) also does not conflict with Dr. Becker's opinion, but actually supports it.  In addition to the lump sum payment of $25,000, the agreement provides for a running royalty of $0.25 per "internet sales transaction" for all *future* infringing use of the patented technology.  PX 61 at 2; Nov. 19, 2013 PM Trial Tr. at 64:10-65:12.  This agreement thus supports the reasonableness of Dr. Becker's conclusion that the parties to the hypothetical negotiations would have agreed to a running royalty starting at a rate of $0.25 per transaction.  *See* Nov. 20, 2013 PM Trial Tr. at 167:12-22 (Q: In a hypothetical negotiation, is the rate being negotiated for past use or for going-forward use?  A: It's all going forward.).

The fact that TQP purchased the '730 patent for $750,000 in 2008 also does not support Newegg's motion for judgment as a matter of law.  In fact, the Federal Circuit rejected a nearly

identical argument in *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336 (Fed. Cir. 2011).   In *Spectralytics*, the jury awarded the patentee a 5% royalty on defendants' $447 million in infringing sales where the patentee's damages expert testified that a 20% royalty would be appropriate.   The defendants moved for judgment as a matter of law, arguing that the patentee placed a low value on its invention because 7 years prior it sold its assets for $4 million plus 25% of any infringement damages recovered.   The Federal Circuit affirmed the denial of defendants' motion, holding:   "We agree with the district court that this circumstance does not render a 5-percent royalty unreasonable. … [T]he weight to be given to this aspect was a task for the jury, and a reasonable jury could have chosen to give very little weight to this evidence." *Id.* at 1347..

In this case, the only fact evidence before the jury was the testimony of TQP's principle Erich Spangenberg, who negotiated the patent purchase in question.   Mr. Spangenberg testified that TQP believed the '730 patent to be worth "a lot more" than the purchase price.   Nov. 19, 2013 PM Trial Tr. at 55:19-56:1.   Moreover, the $750,000 cash payment was only one component of the consideration for the '730 patent.   The second, "most important" component was a license back to the seller allowing it to continue to practice the '730 patent. *Id.* at 53:21-54:5; PX 13 at 11-13.   The jury was entitled to weigh this unrebutted testimony.

Finally, Newegg's reliance on the fact that Newegg paid $260,000 for its NetScalers must also be rejected.   Newegg's NetScalers are not accused products in this case.   As explained by Dr. Becker, the '730 patent covers a *method* for encryption which does not require any particular type of hardware of software.   Nov. 20, 2013 PM Trial Tr. at 161:24-163:7.   Therefore, the price Newegg paid for the NetScalers used to implement the patented method (among other tasks) bears no relevance to the reasonable royalty analysis.   And even if it were relevant, the jury was entitled to give little weight to this evidence.

Dated:  March 18, 2014

Respectfully submitted,

**TQP DEVELOPMENT, LLC**

By: /s/ *Marc A. Fenster*
Marc A. Fenster, CA Bar No. 181067
E-mail: mfenster@raklaw.com
Adam S. Hoffman, CA Bar No. 218740
E-mail: ahoffman@raklaw.com
Alexander C. Giza, CA Bar No. 212327
E-mail: agiza@raklaw.com
Paul A. Kroeger, CA Bar No. 229074
Email: pkroeger@raklaw.com
Judith L. Meadow, CA Bar No. 089665
Email: jmeadow@raklaw.com
Michael T. Boardman, CA Bar No. 279153
Email: mboardman@raklaw.com
Benjamin T. Wang, CA Bar No. 228712
Email: bwang@raklaw.com
**RUSS AUGUST & KABAT**
12424 Wilshire Boulevard, 12th Floor
Los Angeles, CA  90025
Telephone:     310/826-7474
Facsimile:     310/826-6991

Andrew W. Spangler, TX Bar No. 24041960
E-mail: spangler@spanglerlawpc.com
**SPANGLER LAW P.C.**
208 N. Green Street, Suite 300
Longview, Texas 75601
Telephone:     903/753-9300
Facsimile:     903/553-0403

**Attorneys for Plaintiff**
**TQP DEVELOPMENT, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the counsel of record who are deemed to have consented to electronic service are being served on March 18, 2014, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail, facsimile transmission and/or first class mail on this same date.


<i>/s/ Marc A. Fenster</i><br>Marc A. Fenster