**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| TQP DEVELOPMENT, LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 2:11-cv-00248 |
| | § | |
| 1-800-FLOWERS, INC., et al., | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Newegg's Motion for Judgment based on the Defense of

Laches (Dkt. No. 432). Plaintiff TQP Development, LLC ("TQP") brought suit against

Defendant Newegg Inc. ("Newegg") alleging infringement of United States Patent No. 5,412,730

("the '730 Patent"). The Court conducted a jury trial in November 2013, on the issues of

infringement and invalidity. Pursuant to the Court's Order on the parties' Motions *in Limine*,

evidence relevant only to Newegg's equitable defenses was not presented to the jury. (*See* Dkt.

No. 387.)

On December 20, 2013, the Court informed the parties that it intended to resolve

Newegg's equitable defenses by briefing, and that the parties were entitled to present additional

evidence beyond those already presented at the jury trial. The parties subsequently submitted

their post-trial briefing on the issue of laches. (*See* Dkt. Nos. 432, 433, 434, 435.) The Court

having considered the same now makes and enters the following findings of fact and conclusions

of law relating to Newegg's assertion of the defense of laches:

## I. FINDINGS OF FACT

### a. TQP's Predecessors in Interest

1. The '730 Patent, titled "Encrypted Data Transmission System Employing Means for Randomly Altering the Encryption Keys," was invented by Michael Jones, and assigned to Telequip Corp. ("Telequip") – originally a coin dispenser company which employed Mr. Jones at the time – on May 2, 1995.  (PX001; Trial Tr. Nov. 19, 2013 PM at 31:8-10 (Jones).)

2. Mr. Jones was first inspired to work on data encryption when he read an article in Scientific American in the 1970s.  (Trial Tr. Nov. 19, 2013 PM at 21:8-18 (Jones).)  After receiving the '730 Patent in 1995, Mr. Jones attended conferences and lectures on information security, where he started identifying people whom Telequip could hire to help grow and expand in this area.  (*Id.* at 112:20-113:8.)

3. Mr. Jones then created the "Secure Coprocessor Division" within Telequip to implement the patented technology disclosed in the '730 Patent.  (Trial. Tr. Nov. 19, 2013 AM at 109:13-16 (Jones).)  Despite an initial disagreement as to the feasibility of the patented invention, Mr. Jones and his colleagues eventually came up with a product called the "hotline modem." (*Id.* at 110:22-25.)   Telequip sold only thirty units of the hotline modem before it ended production, due to lack of demand.  (*Id.* at 111:5-19.)  The hotline modem was never used with the World Wide Web.  (Trial Tr. Nov. 19, 2013 PM at 29:2-5 (Jones).)

4. In the mid 1990's, while Mr. Jones was still employed with Telequip, he became familiar with RC4 – an encryption algorithm, and SSL – a secured communication protocol.  (Trial Tr. Nov. 19, 2013 PM at 18:16-19:8 (Jones).)   Mr. Jones implemented a product called "smart token" around that time with an early version of SSL, which he later admitted that might have infringed the '730 Patent.  (*Id.* at 19:9-20:1.)  Despite his familiarity with both SSL and RC4, Mr. Jones testified that he lacked the legal skill to know whether a particular

technology would infringe the '730 Patent.  (*Id.* at 27:14-28:16.)  Neither Telequip nor Mr. Jones did any investigation or analysis as to whether SSL or RC4 infringed the '730 Patent. (*Id.* at 20:2-5.)

5. Though briefly toying with the idea of licensing its patent portfolio in the 1990's, Telequip never made a serious attempt at licensing nor considered filing any lawsuit against businesses or individuals using SSL.  (Trial Tr. Nov. 19, 2013 PM at 21:2-7; 32:14-34:3 (Jones).)  Mr. Jones explained that Telequip was then focusing on developing products, and lacked the skills to perform any internal patent infringement analysis.  (*Id.* at 20:6-20; 21:2-7.)

6. Despite owning three encryption related patents and two or three patents relating to coin dispensing, Telequip did not have an intellectual property licensing policy.   (Dkt. No. 433, Ex. 4, June 5, 2013 Deposition Tr. of Paul Stump ("Stump Depo.") at 17:11-13.)

7. Mr. Jones retired from Telequip in 1997, but stayed involved as a director and a significant shareholder.  (Trial. Tr. Nov. 19, 2013 AM at 118:6-9 (Jones).)  Around this same time, he started an electronic commerce website, which enabled consumers to buy goods over the internet.  (Trial Tr. Nov. 19, 2013 PM at 11:20-12:1 (Jones).)

8. In 1997, Telequip shut down the Secure Coprocessor Division and started focusing on its coin dispensing business.  (Stump Depo. at 17:23-18:6; Trial Tr. Nov. 19, 2013 at 117:14-24 (Jones).)  In 2006, Telequip and its assets (including the '730 Patent) were acquired by Crane Co. ("Crane") – a company active in the fields of aerospace and fluid handling.   (Trial Tr. Nov. 19, 2013 AM at 118:13-15 (Jones); Trial Tr. Nov. 10, 2013 PM at 52:21-24 (Spangenberg).)  Telequip had made no attempt to revive the Secure Coprocessor Division prior to Crane's acquisition.   (Stump Depo. at 19:21-20:1.)   At the time of Crane's acquisition, a hundred percent of Telequip's revenue came from its coin dispensing business.

(Trial Tr. Nov. 19, 2013 PM at 31:18-21 (Jones).)

      **b.   TQP**

9.   TQP subsequently purchased the '730 Patent from Crane in 2008.   (Trial Tr. Nov. 19, 2013 PM at 52:19-53:1 (Spangenberg).)

10.   Prior to the purchase, Mr. Spangenberg, owner of TQP, invested about $1.2 to $1.3 million in analyzing the '730 patent, which ultimately led him to make the purchase based on a belief that the '730 Patent "was greatly assisting or enabling Internet commerce."  (*Id.* at 55:10-18.)

11.   Beginning in 2008, TQP started filing a series of patent infringement lawsuits against various entities such as banks, online retailers, and online service providers, based on the alleged infringement of the '730 Patent.  *See, e.g.*, Case No. 2:08-cv-00471 (filed December 15, 2008 against Merrill Lynch & Co. et al.); Case No. 2:09-cv-00088 (filed March 25, 2009 against Amazon.com, Inc. et al); Case No. 2: 09-cv-00279 (filed September 16, 2009 against Ticketmaster Entertainment, Inc., Apple, eBay, Half.com et al); Case No. 2: 10-cv-00446 (filed October 20, 2010 against Dell Inc. et al.).   According to PACER records, after TQP acquired the '730 Patent in 2008 and before it sued Newegg in 2011, TQP filed such suits against at least 107 defendants.  (*See* Dkt. No. 433-7, Declaration of Erich Spangenberg ("Spangenberg Decl.") ¶ 5.)  In the year 2009 alone, TQP's settlement income exceeded $8 million.  (PX0042.)  Mr. Spangenberg and two or three employees of his company were in charge of overseeing TQP's litigation as well as its licensing business.  (*Id.*)

12.   TQP relied on "marketing documents and white papers" it obtained from the internet, open source code, and scholarly papers to preliminarily identify alleged infringers.  (Trial. Tr. Nov. 19, 2013 PM at 79:23-80:7 (Spangenberg).)

13.   TQP filed the instant case against Newegg on May 6, 2011.   TQP accuses Newegg of

infringing the '730 Patent starting as early as January 2004.  (Trial Tr. Nov. 20, 2013 PM at 54:13-14 (Becker).)

14. Mr. Eric Spangenberg, the sole owner and employee of TQP, became aware of Newegg's existence as an online retailer sometime after 2008.  (Trial Tr. Nov. 19, 2013 PM at 50:7-10 (Spangenberg); Spangenberg Decl. ¶ 4.)  In July, 2009, Newegg was sued by SFA Systems, LLC, another entity owned and operated by Mr. Spangenberg.  (*See SFA Systems, LLC v. 1-800-Flowers, Inc. et al.*, Case No. 6:09-cv-00340 (July 28, 2009 E.D. Tex.).)

15. The accused infringing instrumentality in this case is Secure Sockets Layer ("SSL") and/or Transport Layer Security ("TLS") protocol in combination with an encryption algorithm called RC4, which was implemented by a product called NetScalers.  (*See, e.g.*, Trial Tr. Nov. 20, 2013 AM at 116:15-23 (Jaeger).)  Neither SSL nor RC4 alone infringes the '730 Patent.  (Trial Tr. Nov. 19, 2013 PM at 128:10-16 (Jaeger).)  Before suing Newegg, TQP had sued other SSL users.  (Trial. Tr. Nov. 19, 2013 PM at 97:17-20 (Spangenberg).)  In its prior lawsuits against other Internet retailers such as Amazon, TQP had informed those retailers that they were being sued for using the combination of SSL and RC4.  (*Id.* at 99:14-23.)

16. TQP's technical expert Dr. Alan Jaeger testified that, in forming an opinion about Newegg's infringement, he found it unnecessary to examine the source code of NetScalers.  (Trial Tr. Nov. 20, 2013 AM at 116:15-23 (Jaeger).)  This is because SSL and RC4 are "standardized," such that any system using SSL and RC4 would operate the same way with respect to TQP's asserted claims.  (*Id.* at 119:17-120:5.)  Dr. Jaeger instead relied on publically available SSL and RC4 documentation and screen shots of an internet browser connected to Newegg's website to identify the accused infringing use of SSL and RC4.  (Trial Tr. Nov. 19, 2013 PM at 130:18-134:1; 139:7-142:20 (Jaeger); Trial Tr. Nov. 20, 2013 AM at 102:21-104:20

(Jaeger); PX127; PX133; PX134.)

17. There was no communication between TQP and Newegg before TQP filed the instant case. (*Id.* at 98:13-15.)  TQP explained that it elected not to first contact a targeted company before filing suit because it did not want to be sued (in a declaratory judgment action) in Southern California.  (*Id.* at 100:20-101:7; 101:19-22.)

18. The '730 Patent underwent an *Ex Parte* reexamination from December 27, 2010 to September 20, 2011, when the patentability of the original claims 1-2 was confirmed and eight new claims were added.

        **c.  Newegg**

19. Newegg launched its internet retail website www.newegg.com in 2001.  (Trial Tr. Nov. 21, 2013 AM at 11:17-19 (Cheng).)  By August 2007, it had grown into a "billion-dollar specialty site" with six million registered customers.  (*See* PX0049.)

20. In 2004, Newegg began using NetScalers which it had purchased from Citrix Systems, Inc. ("Citrix").  (Trial Tr. Nov. 21, 2013 AM at 23:2-14 (Cheng).)  From 2004 till the time of the jury trial, Newegg had purchased six different models of NetScalers, the total cost of which approximated $260,000.  (*Id.*)

21. Newegg used NetScalers primarily as a load balancing device for its website, rather than for the encryption function.  (Trial Tr. Nov. 20, 2013 PM at 112:19-21 (Becker).)  NetScalers allows its users to select different types of encryption algorithms.  (Trial Tr. Nov. 20, 2013 PM at 6:12-7:5 (Chong).)  Newegg, however, made no change to the default setting which had been pre-selected by Citrix, i.e., setting RC4 as the default encryption algorithm.  (*Id.*; Trial Tr. Nov. 20, 2013 AM 117:21-23 (Jaeger).)  Prior to this case, Newegg had heard of RC4, but knew nothing about its technical details.  (Trial Tr. Nov. 20, 2013 PM at 6:12-7:5

(Chong).)

22. Since at least 2004, Newegg has consistently posted a "Privacy Policy" on its website, assuring its customers that their sensitive information is "encrypted and protected with the best encryption software currently available in the industry – SSL." (Trial Tr. Nov. 20, 2013 PM at 51:4-52:10 (Becker); PX0056 at 2.)

23. Newegg did not know of the existence of the '730 Patent until TQP filed the instant case in 2011. (Trial Tr. Nov. 21, 2013 AM at 15:19-22 (Cheng).) The '730 Patent expired on May 2, 2012 – about a year after the filing of this lawsuit.

24. The Citrix NetScalers could be used in a non-infringing fashion. (Trial Tr. Nov. 20, 2013 AM at 117:4-23 (Jaeger).) For example, infringement could be avoided if a user of the NetScalers switches the encryption algorithm from RC4 – the default setting – to other algorithms provided by NetScalers, such as AES or Triple DES ("3DES"). (Trial Tr. Nov. 21, 2013 PM at 45:5-14 (Stubblebine).)

25. While both parties agree that 3DES was available as an alternative encryption algorithm in 2004, they dispute whether the use of 3DES instead of RC4 would have reduced the efficiency of Newegg's website. (*See* Trial Tr. Nov. 21, 2013 PM at 50:21-52:9 (Stubblebine); Trial Tr. Nov. 20, 2013 PM at 55:12-56:4 (Becker).) AES, on the other hand, was not available on most browsers in 2004. (Trial Tr. Nov. 20, 2013 PM at 54:11-55:3 (Becker); Trial Tr. Nov. 21, 2013 PM at 51:10-11 (Stubblebine).) AES has since become a widely supported encryption algorithm. (Trial Tr. Nov. 20, 2013 PM at 55:2-3 (Becker).)

26. Between the time this suit was filed in May 2011 until the expiration of the '730 patent in May 2012, Newegg never changed the default setting on NetScalers and continued using RC4 as the encryption algorithm. (Trial Tr. Nov. 21, 2013 AM at 32:5-22 (Cheng).)

27. In his deposition taken on April 11, 2013, Newegg's General Counsel, Mr. Lee Cheng testified that Newegg was not aware of any non-infringing alternatives or design-arounds to the '730 Patent, and had not undertaken any efforts to identify non-infringing alternatives or design-arounds, as Newegg believed it did not infringe any valid claims.  (Dkt. No. 433, Ex.2, Apr. 11, 2013 Depo. Tr. of Lee Cheng ("Cheng Depo.") at 34:18-35:21. )  Mr. Cheng further testified that "it would be a waste of our money and time to [identify non-infringing alternatives and design-arounds]."  (Cheng Depo. at 35:5-6.)

28. In August 2013, Newegg performed a test on its website www.neweggflash.com, to demonstrate the capability of removing RC4 from the list of supported encryption ciphers. (*See* Dkt. No. 432 Ex. F.)  With RC4 disabled and AES implemented as the primary encryption cipher, the test did not incur any major impact on NetScalers or result in any customer complaints.  (*Id.*)

## II.  CONCLUSIONS OF LAW

### a.  Jurisdiction

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

2. This action arises under the Patent Laws of the United States, 35 U.S.C. § 1, et seq.

3. Accordingly, the Court must apply the precedents of the United States Court of Appeals for the Federal Circuit, which has jurisdiction over any appeal of this judgment.  28 U.S.C. § 1295(a).

### b.  Laches

#### i.  Applicable Law

4. The owner of a patent is not entitled to recover damages for acts that occurred before it filed

a lawsuit where: (1) the patentee delayed filing the lawsuit for an unreasonably long and inexcusable period of time, and (2) the alleged infringer has been or will be prejudiced in a significant way due to the patentee's delay in filing the lawsuit. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992) (en banc).

5. "A patentee cannot avoid the consequences of his laches by transferring the patent." *Eastman Kodak Co. v. Goodyear Tire, & Rubber Co.*, 114 F.3d 1547, 1559 (Fed.Cir.1997), *abrogated on other grounds by Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448 (Fed.Cir.1998). The actions and inactions of a prior rights holder are imputed to successive rights holders in the laches analysis. *Id.*

6. If a suit was delayed for six years, a rebuttable presumption arises that the delay was unreasonable and unjustified, and that material prejudice resulted. *Aukerman*, 960 F.2d at 1034-35. The patentee may eliminate this presumption by offering evidence to show that the delay was justified or that material prejudice did not result. *Id.* at 1038. Such evidence "must be sufficient to put the existence of a presumed fact into genuine dispute," even if it may ultimately be rejected as not persuasive. *Id.* Elimination of the presumption does not mean the patentee precludes the possibility of a laches defense. *Id.* Rather, it means that the presumption plays no part in the ultimate decision. *Id.*

7. The period of delay is measured from the time the patentee or his predecessor in interest "has actual or constructive knowledge of the defendant's potentially infringing activities." *Wanlass v. Gen. Ele. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998). The availability of delay based on construction knowledge "imposes on patentees the duty to police their rights." *Id.* at 1338. Circumstances giving rise to constructive knowledge include "pervasive, open and notorious activities" that a reasonable patentee would suspect were infringing, such as "sales,

marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities," if those activities "are sufficiently prevalent in the inventor's field of endeavor." *Id.*  If a patentee's ignorance of infringement is justifiable, however, constructive knowledge will not be imputed to him.  *Id.*

8. In assessing whether the patentee delayed filing suit for an unreasonable and inexcusable length of time, a court must consider and weigh any justification offered by the patentee for its delay.  *Aukerman*, 960 F.2d at 1033.  Excuses which have been recognized include, but are not limited to, other litigation; negotiation with the accused; possibly poverty and illness under limited circumstances; and dispute over ownership of the patent.  *Id.*

9. Material prejudice may be economic or evidentiary.  *Aukerman*, 960 F.2d at 1043. Evidentiary prejudice "may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *Aukerman*, 960 F.2d at 1033 (citations omitted).

10. "Economic prejudice may arise where a defendant will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit."  *Id.* at 1033.  Such damages or monetary losses are not merely those attributable to a finding of infringement, because otherwise economic prejudice would arise in every suit.  *Id.*  The court must look for "a *change* in the economic position of the alleged infringer during the period of delay."  *Id.*  Economic prejudice is particularly likely to arise, where "an infringer, if he had had notice, could have switched to a noninfringing product."  *Id.*

11. At all times, the defendant bears the ultimate burden of persuasion of the defense of laches.

*Aukerman*, 960 F.2d at 1038.  It must prove delay and prejudice by a preponderance of the evidence.  *Id.* at 1045.

12. Finally, the establishment of the factors of undue delay and prejudice, whether by actual proof or by the presumption, "does not mandate recognition of a laches defense in every case."  *Aukerman*, 960 F.2d at 1036.  "Laches remains an equitable judgment of the trial court in light of all the circumstances."  *Id.*

        *ii.  The Court concludes that Newegg has failed to establish a presumption of laches*

13. Based on the findings of fact and applicable legal standards discussed above, the Court finds that Defendant Newegg has failed to establish a presumption of laches.

14. Newegg claims that Telequip – TQP's predecessor in interest – had constructive knowledge of Newegg's infringement since at least 2004, because Newegg's website has since then "touted using the SSL and encryption functionality."

15. The Court notes from the outset that, since 1997, Telequip ceased to be active in the encrypted data transmission industry.  *See Fedders*, 145 F.3d at 1464 (considering whether a patentee was active in the industry in determining whether to impute constructive knowledge to the patentee).  In that year, with Mr. Jones' retirement, Telequip shut down the Secure Coprocessor Division that Mr. Jones had created and instead focused on its coin dispensing business.  Findings of Fact ¶ 8.  By 2006 when Crane acquired Telequip, a hundred percent of Telequip's revenue came from the coin dispensing business.  *Id.*

16. Telequip, however, "could not simply ignore any and all evidence of potentially infringing activity," even if it was not still active in the industry.  *Fedders*, 145 F.3d at 1466.  Indeed, Telequip was not completely out of expertise in the area of encrypted data transmission.  Mr. Jones, inventor of the '730 Patent, stayed involved as a director and a significant shareholder

after his retirement from Telequip in 1997.  *Id.* ¶ 7.  Prior to his retirement, Mr. Jones had

been active in the area of secured data transmission – he read magazines and attended

lectures and conferences on this subject.  *Id.* ¶ 2.  In the mid 1990's, around the time that the

'730 Patent was issued, Mr. Jones "became familiar" with both SSL and RC4, the

combination of which is accused of infringing the '730 Patent in this case.  *Id.* ¶ 4.  Mr.

Jones' intimate knowledge with SSL enabled him to implement a product with an early

version of the protocol.  *Id.*  While he may have lacked the skill to conduct an infringement

analysis in a legal sense, Mr. Jones' familiarity with SSL, RC4 as well as the '730 Patent

should have reasonably led him, and ultimately Telequip, to suspect that the combination of

SSL and RC4 would infringe the '730 Patent.

17. On the other hand, since 2004, Newegg's website consistently posted a Privacy Policy

assuring its customers that their sensitive information is "encrypted and protected with the

best encryption software currently available in the industry – SSL."  *Id.* ¶ 22.  Newegg

contends that such public statement on its website constitutes "pervasive, open and notorious

activities" that Telequip would reasonably suspect infringing.  *See Gen. Ele.*, 148 F.3d at

1337.  The Court disagrees.

18. There is no dispute that SSL – a widely-used communication protocol – does not itself

infringe the '730 Patent.  *Id.* ¶ 15.  Also undisputed is the fact that the use of SSL and an

encryption algorithm does not always infringe the '730 Patent.  *See id.* ¶ 24 (SSL combined

with 3DES does not infringe the '730 Patent).  Indeed, it is the *combination* of SSL with a

specific encryption algorithm, i.e., RC4, that has been accused of infringing.  *Id.* ¶ 15.  While

Newegg did openly advertise the use of SSL in combination with *some* encryption algorithm,

it never specified the SSL/RC4 combination, the only infringing combination identified in

this case.  *Id.* ¶ 22.  To a reasonable patentee, Newegg's website would have been no different from a vast number of other websites which used SSL together with *some* encryption algorithm.  Without an open statement specifying the use of both SSL and RC4 on Newegg's website, Telequip would have no more reason to believe that Newegg was infringing its patent than any other website using SSL.  *See Fedders*, 145 F.3d at 1465 (finding the patentee had no reason to believe an alleged infringer's product infringed when advertisement of the accused product failed to disclose the specific characteristics of the patented technology).  To find out which websites were using SSL and RC4 specifically, Telequip and Mr. Jones would then have to test all websites using SSL, at a time when the former was trying to revive its struggling coin dispensing business and the later was focusing on his electronic commerce startup.  *See* Findings of Fact ¶¶ 7, 8.  The Court finds it unreasonable to charge Telequip or Mr. Jones, both with limited resources in 2004 and both inactive in the secured data transmission field, with a duty to police the entire SSL-based Internet sector.  Newegg's open use of SSL and some unspecified encryption algorithm was insufficient to lead Telequip or Mr. Jones to suspect that the Newegg website was infringing. *See Fedders*, 145 F.3d at 1466.  Therefore, Newegg has failed to show that Telequip or Mr. Jones should have known Newegg's alleged infringement since 2004.  The presumption of laches does not apply in this case.

> iii.  *The Court concludes that Newegg has proved by a preponderance of the evidence that TQP's delay in bringing suit was unreasonable*

19. Based on the findings of fact and applicable legal standards discussed above, the Court finds that Defendant Newegg has proved by a preponderance of the evidence that TQP's delay in bringing suit was unreasonable.

20. TQP purchased the '730 Patent from Crane in 2008.[1]  Findings of Fact ¶ 9.  Prior to the purchase, Mr. Spangenberg, owner of TQP, invested substantial amounts of money in analyzing the patent, which led to his conclusion that the '730 Patent "was greatly assisting or enabling Internet commerce." *Id.* ¶ 10.  Soon after the purchase, well equipped with the information obtained from such extensive analysis, TQP started filing series of patent infringement lawsuits against various entities, including online retailers who were in the same competitive space as Newegg.  *Id.* ¶ 11.  Mr. Spangenberg became aware of the existence of Newegg sometime between 2008 and July 2009.  *Id.* ¶ 14.  TQP, however, did not sue Newegg until May 2011; nor did it give Newegg notice of other TQP lawsuits or its intention to enforce the '730 against Newegg, prior to filing suit.  *Id.* ¶ 17.

21. The Court finds that TQP had at least constructive knowledge of Newegg's potential infringement between late 2008 and early 2009, when Mr. Spangenberg first became aware of Newegg's existence.  Since the acquisition of the '730 Patent in 2008, TQP took it upon itself to police the entire Internet targeting specifically SSL users.  *See id.* ¶ 15.  Unlike its predecessor in interest who lacked the means and resources to examine whether a particular website used the SSL/RC4 combination, a substantial part of TQP's business was to identify just such websites.  *See id.* ¶¶ 12, 15.  Its expertise in identifying potential infringers has been well demonstrated by the more than a hundred defendants that it sued between 2008 and 2011.  *See id.* ¶ 11.  On the other hand, Newegg, which by 2008 had grown into a prominent billion-dollar e-commerce website, openly advertised its use of the SSL protocol.  *See id.* ¶ 22.  Such open advertisement should have led TQP to reasonably suspect early on that Newegg's website was infringing.  A comparatively simple test, which collects certain

---

[1] Newegg has proffered no evidence or argument regarding Crane's delay in bringing patent infringement suits based on the '730 Patent.

communication data via a client computer connected to Newegg's website, would have revealed that the website was using SSL and RC4.  *See* ¶ 21.  In other words, at the time Mr. Spangenberg learned of Newegg's existence, TQP was actively engaged in identifying potential infringers among SSL users and was well equipped to do so.  Newegg's open use of SSL was "sufficiently prevalent" in TQP's "field of endeavor" such that constructive knowledge of Newegg's infringement should be imputed to TQP.  *See Gen. Ele.*, 148 F.3d at 1338.

22. Further, the Court finds that TQP's more than two-year delay in bringing suit against Newegg should not be excused by reason of TQP's other litigation.   The existence of other litigation does not automatically excuse delay in bringing suit against subsequent accused infringers.  *See Am. Home Prods. v. Lockwood Mfg. Co.*, 483 F.2d 1120, 1123 (6th Cir. 1973); *cf. Hall v. Aqua Green Mfg. Inc.*, 93 F.3d 1548, 1554 (Fed. Cir. 1996) (holding that patentee's delay in bringing later lawsuits not excused by his involvement in an earlier litigation).  Rather, the rational for "the other litigation" excuse focuses on the fact that patent litigation is "unusually complex, lengthy and expensive."  *Am. Home Prods.*, 483 F.2d at 1122-23.  Therefore, it is often inequitable to require the patent owner to sue all infringers at the same time.

23. Unlike a traditional patent owner, however, since 2008 TQP has been filing patent infringement claims against hundreds of defendants simultaneously or in quick succession, and yet it still managed to stay highly profitable.  Findings of Fact ¶ 11.  TQP operated with a cost-effective litigation model under which it sued a large number of entities based on substantially the same accused infringing instrumentality, i.e., the combined use of SSL and RC4.  *See e.g.*, *id.* ¶ 15.  Indeed, TQP's technical expert admitted that, in forming an opinion

about Newegg's infringement in this case, he found it unnecessary to examine the source code of the accused infringing product NetScalers, because SSL and RC4 are "standardized." *Id.* ¶ 16.   Given TQP's high profitability and the relatively low cost for it to file a patent infringement claim, the Court finds that TQP had both the means and the expertise to sue Newegg at an earlier time.[2]   Rather, TQP made a calculated, strategic decision to proceed with certain lawsuits while delaying others.   The rationale for applying "the other litigation" excuse is therefore substantially diminished in this case.   *See Am. Home Prods.*, 483 F.2d at 1122-23.

24. Moreover, during the more than two-year delay in bringing suit against Newegg, TQP never informed Newegg about its other litigation or its intention to enforce the '730 Patent against Newegg.   While there can be "no rigid requirement in judging a laches defense that such notice must be given," a patentee's failure to give prior notice should not be automatically excused.   *See Aukerman*, 960 F.2d at 1039.   The Court need to weigh "the overall equities" on a case by case basis to determine whether appropriate notice should have been sent earlier. *See Hall*, 93 F.3d at 1554.

25.  In this case, Newegg claims, and TQP does not dispute, that it did not know of TQP or its related litigations prior to being sued in 2011.   Findings of Fact, ¶ 23.   On the other hand, Mr. Spangenberg became aware of the existence of Newegg since as early as the end of 2008 or early 2009.   *Id.* ¶ 14.   TQP initiated no contact with Newegg whatsoever during the ensuing two years before filing the instant case.   *Id.* ¶ 17.   The sole explanation TQP offered for its

---

[2] TQP makes much of the fact that Mr. Spangenberg, being the owner and only employee of TQP, was already heavily burdened with other litigations.  However, it is not that TQP could not afford to hire more employees.  As noted above, the evidence shows that TQP was highly profitable between 2008-2011.  Findings of Fact, ¶ 11. Keeping Mr. Spangenberg as the sole employee was TQP's business decision, most likely to lower cost and maximize profit.  TQP cannot reap the benefit of operating a highly profitable one-man shop while crying lack of resources at the same time.

inaction was that it did not want to be dragged into a declaratory judgment action filed in a remote forum.  *Id.*  Equipped with both the expertise and resources in identifying potential infringers among SSL users, TQP was in the best position to notify uninformed companies such as Newegg that a patent infringement suit was on its way.  Yet again, it made a strategic decision to keep Newegg in the dark for at least two years in order to retain its own choice of forum, disregarding the possibility that Newegg might be prejudiced by the delay and complete lack of notice.  On balance, the Court finds that the "overall equities" under such circumstance weigh in Newegg's favor.  *See Hall*, 93 F.3d at 1554.  TQP should have, at the minimum, notified Newegg of its other pending litigation and its intention to enforce the '703 Patent against Newegg well before filing suit in 2011.  Its failure to bring suit at an earlier time or to initiate any pre-suit contact with Newegg renders its two-year delay in bringing suit unreasonable.

26. Finally, the Court finds that TQP's delay in bringing suit should not be excused by the reexamination of the '730 Patent.  The '730 Patent underwent reexamination from December 2010 to September 2011.  Findings of Fact, ¶ 18.  The reexamination, however, did not stop TQP from suing Newegg in May 2011, precisely in the middle of the reexamination proceeding.  Given that TQP filed suit against Newegg (and other co-defendants in this case) despite uncertainty of the reexamination proceeding, the proceeding cannot excuse TQP's delay in bringing suit.

> iv.  *The Court concludes that Newegg has not proved by a preponderance of the evidence that it has suffered material evidentiary prejudice because of TQP's delay*

27. Based on the findings of fact and applicable legal standards discussed above, the Court finds that Defendant Newegg has not proved by a preponderance of the evidence that it suffered material evidentiary prejudice because of TQP's delay.

28. Newegg claims that TQP and its predecessor in interest's delay in filing suit prevented Newegg from obtaining information not ordinarily made or kept by Newegg, such as NetScalers' default encryption setting from 2005-2012 as well as NetScalers' specific implementation of SSL.  As noted above, the Court finds that TQP's delay in bringing suit, but not that of its predecessor in interest, was unreasonable.  Accordingly, the Court will focus on the evidentiary prejudice Newegg allegedly suffered between 2008 and 2011, i.e., the period of delay caused by TQP's inaction.

29.  Evidentiary prejudice may arise "by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *Aukerman*, 960 F.2d at 1033.  Here, Newegg allegedly suffered evidentiary prejudice because of "its inability to know, retroactively" whether RC4 was the default encryption cipher used on NetScalers or what version of SSL was running on NetScalers during 2008-2012.  Newegg takes issue with TQP's assumption that since the default encryption ciphers in 2013 include RC4 those settings must have included RC4 between 2008-2012.  (*See* Trial Tr. Nov. 20, 2013 AM at 77:24-78:3 (Jaeger).)  Newegg also complains about TQP's use of Open SSL code in proving infringement, claiming that a company like Citrix would unlikely have used generic Open SSL code for its "highly specialized" device, i.e., the NetScalers.

30. The Court acknowledges that Newegg, who purchased NetScalers from Citrix and adopted Citrix's default settings wholesale, generally keeps no record of NetScalers' specific settings. *See* Findings of Fact, ¶ 21.  However, this is no proof that such information was lost or became unavailable because of TQP's delay in bringing suit.  Newegg never explains why,

with reasonable diligence, it could not have discovered NetScalers' default encryption setting and SSL version from Citrix – the very company who made and sold NetScalers to Newegg. *See id.* ¶ 20.  Indeed, no evidence suggests that Newegg even attempted to discover such information from Citrix.  Nor did Newegg provide any fact witnesses at trial with technical knowledge of NetScalers, despite acknowledging that certain Newegg engineers were involved in implementing NetScalers into the rest of Newegg's system.  (*See* Trial Tr. Nov. 21, 2013 AM at 28:5-30:5 (Cheng).)  The alleged "loss of record" therefore is a direct result of Newegg's own decision not to pursue further discovery from Citrix or its own engineers, rather than TQP's delay in bringing suit.

31. Newegg further alleges that it has suffered evidentiary prejudice because it did not maintain the data showing the extent of actual RC4 usage between 2008 and 2012, and thus could not rebut TQP's expert's use of a flat 95% rate.  TQP's expert used the flat 95% rate for RC4 usage throughout the infringement period (2005-2013), based on the 2013 data Newegg had produced in this case.  (*See* Trial Tr. Nov. 20, 2013 PM at 62:1-64:21 (Becker).)  Newegg argues that, had TQP sued it earlier, Newegg would have been able to record the actual RC4 usage prior to 2013, which might have been lower than 95%.

32.  Newegg's assumption that the pre-2013 RC4 usage was lower than 95% finds no support in the record.  At trial, both TQP and Newegg's experts testified that AES, one of the two identified non-infringing alternatives to RC4, was unavailable on most browsers in 2004. (*See* Trial Tr. Nov. 20, 2013 PM at 54:21-55:3 (Becker); Trial Tr. Nov. 21, 2013 PM at 51:14-21 (Stubblebine) ("[I]f Newegg had been approached back in 2004…it could have used Tripple DES.  *And then as AES came along,* it could put AES as the first option…") (emphasis added).)  Both experts further agree that since 2004, AES has become more

popular and is in fact widely supported today.   (*See id.*)   Put differently, in 2004 most customers had no other choice but to use RC4 as the encryption algorithm on their web browsers; however, as AES came along and became more popular, the reliance on RC4 has accordingly diminished.   This evidence suggests that RC4 usage likely has been declining since 2004.   Therefore, the pre-2013 RC4 usage likely was higher than the 95% rate of 2013. Contrary to Newegg's allegation, TQP's use of a flat 95% rate for the years 2005-2012 likely *underestimates* the actual RC4 usage, thereby benefiting rather than prejudicing Newegg.

33. In sum, the Court finds that Newegg has failed to prove by a preponderance of the evidence that TQP's delay in bringing suit has caused material evidentiary prejudice to Newegg.

> *v.   The Court concludes that Newegg has not proved by a preponderance of the evidence that it has suffered material economic prejudice because of TQP's delay*

34. Based on the findings of fact and applicable legal standards discussed above, the Court finds that Defendant Newegg has not proved by a preponderance of the evidence that it has suffered material economic prejudice because of TQP's delay.   As noted above, the Court will focus on the economic prejudice Newegg allegedly suffered between 2008 and 2011, i.e., the period of delay caused by TQP's inaction.

35. Newegg argues that, had TQP brought suit against it earlier, it would have changed the encryption settings of its NetScalers to a non-infringing alternative during the patent term, or even declined to renew its license for NetScalers altogether.   The Court, however, is not convinced that such a result is probable.   After being sued by a first non-practicing entity in 2007, Newegg "formulated a policy to not automatically settle frivolous lawsuits and to defend such lawsuits vigorously so as not to invite more lawsuits."   (*See* Trial Tr. Nov. 21, 2013 AM at 17:12-18:13 (Cheng); Dkt. No. 434 at 6.)   Newegg appears to have considered TQP's claim as a "frivolous" one that it needed to defend "vigorously" since the outset of

this lawsuit.  For example, in a deposition taken on April 11, 2013 – almost two years after the filing of the instant case – Newegg's General Counsel Mr. Cheng testified that Newegg had not undertaken any efforts to identify non-infringing alternatives or design-arounds to the '730 Patent, as Newegg believed it did not infringe on any valid claims.  Findings of Fact, ¶ 27.  Mr. Cheng further testified that "it would be a waste of our money and time to [identify non-infringing alternatives and design-arounds]." [3]  *Id.*   Newegg provides no explanation why it would have considered TQP's claims less frivolous and thereby undertaken a serious effort to identify non-infringing alternatives, had such claims been brought at an earlier time.  Indeed, TQP acquired the '730 Patent in 2008, after Newegg had formulated its "non-settling and vigorous defense" policy.  Even assuming TQP had sued Newegg the moment it became the owner of the '730 Patent, the Court perceives no reason that such an earlier suit would have prompted Newegg to spend the time and money to identify or switch to any non-infringing alternatives.  Newegg has failed to demonstrate "a change in [its] economic position" that could have been avoided by an earlier suit.  Accordingly, the Court finds that Newegg has not suffered material economic prejudice because of TQP's delay in bringing suit.  *See Aukerman*, 960 F.2d at 1033.

## III. CONCLUSION

In sum, while the Court finds that TQP's delay in bringing suit was unreasonable, Newegg has failed to demonstrate that it suffered material evidentiary or economic prejudice because of TQP's delay.   Accordingly, the Court finds that Newegg has not proved by a preponderance of the evidence that TQP's recovery of damages should be limited by laches.  Judgment shall be entered in favor of TQP and against Newegg on the issue of laches, holding

---

[3] Instead of relying on its own investigation, Newegg performed the August 2013 test of replacing RC4 with AES "following TQP's instructions."  (*See* Findings of Fact ¶ 28; Dkt. No. 432 at 9.)

that such equitable defense does not limit or preclude recovery by TQP against Newegg in this

case.  (*See* Dkt. No. 432.)


    **So ORDERED and SIGNED this 7th day of August, 2014.**


RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE