**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**


| | | |
|---|---|---|
| TQP DEVELOPMENT, LLC | § | |
| | § | |
| v. | § | Case No. 2:11-CV-248-JRG |
| | § | |
| 1-800-FLOWERS.COM, INC., et al. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion for Judgment as a Matter of Law, limited to the issue of invalidity, filed by Defendant Newegg (Dkt. No. 436). The Court has already addressed the portion of Defendant's Motion dealing with infringement. *See* (Dkt. No. 461.) For the reasons set forth below, the portion of Newegg's motion concerning invalidity is **DENIED**.

## I.      Background

The Court held a jury trial in this case and the jury entered a verdict on November 25, 2013. At the time of trial, the asserted claims of U.S. Patent No. 5,412,730 ("'730 Patent")—the sole patent-in-suit—were Claims 1, 6, 8, and 9. The Jury returned a verdict that the asserted claims were not invalid; that the asserted claims were directly infringed and that Newegg had induced its customers to infringe; and that $ 2.3 MM was the "sum of money, if paid now in cash" which "would fairly and reasonably compensate TQP for its damages resulting from Newegg's infringement of the '730 Patent."[1] (Dkt. No. 407 ("Verdict").) Newegg asserts that, in the approximately 23 hours of testimony presented to the jury, that the jury did not have sufficient evidence for its findings.

Newegg levels three primary § 102 challenges. First, its principle argument is that TQP's patent is invalid under § 102(g) because it is invalidated by a third party's prior inventions—

---

[1] At trial TQP had asserted that it, if damages were awarded, the proper amount was $ 5.1 MM. Newegg did not present its own expert testimony on damages.

either (1) RC4 alone, or (2) Lotus Notes with RC4. The Court first addresses the assertion that RC4 alone anticipates the claimed invention. The Court then turns to whether or not Lotus Notes with RC4 anticipates the claimed invention. Given that the Court finds that there is substantial evidence to support the jury's verdict that neither RC4 alone nor Lotus Notes with RC4 anticipates the claimed invention, the Court denies Newegg's Motion under § 102.

The Court's finding under § 102 is intertwined with the Court's recent judgment as a matter of law ruling of no infringement. (Dkt. No. 461). Therefore, should the Federal Circuit disagree with the Court's finding of no infringement, the Court, in the alternative, addresses the parties arguments under § 102 and § 103. (*See* Dkt. No. 461).

Also, necessarily comingled with the Defendant's arguments under § 102(g), the Defendant argues that the third party's prior invention was in "public use" under § 102(a). The Court addresses the "public use" arguments after its discussion of § 102(g). The Defendant's next § 102 argument is that the prior invention was sold before the Plaintiff's patent's critical date, and thus, invalidates the patent under § 102(b). The Defendant finally argues that the Plaintiff's patent is invalidated by prior art in the form of a textbook. The Court addresses each argument in turn, but first addresses the factual background.

## II.    Applicable Law

Upon a party's renewed motion for judgment as a matter of law following a jury verdict, the Court asks whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." Fed. R. Civ. P. 50(b); *Am. Home Assur. Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually

lie." *Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). "A JMOL may only be granted when, 'viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion.'" *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) (quoting *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).

Under Fifth Circuit law, a court is to be "especially deferential" to a jury's verdict, and must not reverse the jury's findings unless they are not supported by substantial evidence. *Baisden v. I'm Ready Productions, Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). A motion for judgment as a matter of law must be denied "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Baisden* 393 F.3d at 498 (citation omitted). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion for judgment as a matter of law, a court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 451 (5th Cir. 2013) (citation omitted). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he

court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151 (citation omitted).

### III.    RC4 Cipher Alone as Not Anticipatory

First, the parties dispute (despite the Defendant's self-serving statement to the contrary[2]) whether the RC4 cipher alone anticipates the patented invention. (Pl.'s Resp. at 23, Dkt. No. 440). The Court finds that a reasonable jury could have concluded that the RC4 cipher was not anticipatory. Based on the evidence presented at trial, the jury could have concluded that RC4 alone lacks at least the elements requiring a transmitter and receiver and providing a seed. (11/25/13 AM Trial Tr. (Rhyne) 32:19–33:17); *see also TQP v. Merrill Lynch & Co., Inc.*, Case No. 2:08-cv-471, at *3 (E.D. Tex. July 18, 2012) (Bryson, J.) ("[T]he evidence does not show that the RC4 algorithm either generates or provides the key to the encryption engine."). The jury weighed the competing testimony of Newegg's expert, Dr. Diffie, and yet, decided that the patent was not invalid. The Court will not make credibility determinations or weigh the evidence, as those are functions for the jury. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 137 (2000).

### IV.    Lotus Notes with RC4 is Not Anticipatory

As the Court previously found, SSL plus RC4 does not infringe the '730 patent. *See* (Dkt. No. 461 (granting Newegg's JMOL of non-infringement). Defendant contends, however, that

---

[2] The Defendant's JMOL states: "First, there is no dispute that Dr. Ron Rivest invented RC4, and that RC4 and/or RC4 with Lotus Notes met all elements of the asserted claims." Def.'s JMOL at 21, Dkt. No. 436. Clearly, the Plaintiff disputes this aspect of the case, as it is one of the core questions of fact, and presented expert testimony on the issue. Using an ambiguous conjunction such as "and/or" in connection with an incorrect statement to the Court ("First, there is no dispute that . . . RC4 . . . met all elements of the asserted claims") is either a most inartfully drafted argument or a knowingly inaccurate statement, either of which puts Newegg outside the bounds of appropriate advocacy.

there is no substantive difference between Lotus Notes with RC4 and SSL with RC4 because they run the same services. Defendant's invalidity expert stated:

> Q And so the jury understands, because we did hear a lot yesterday about Notes, for purposes of your validity analysis, what is the difference between a combination of RC4 and SSL and a combination of RC4 and Lotus Notes?

> A It is my opinion that there is no substantive difference, that the services that Notes provide to RC4 are the same as the services that SSL provides to RC4.

11/22/13 PM Trial Tr. (Diffie) 24:17–25, Dkt. No. 419. In other words, based on the testimony of Defendant's expert, there is no difference between that which the Court found not to infringe (SSL with RC4) and that which Defendant seeks to find invalidating (Lotus Notes with RC4). Therefore, based on this testimony, it cannot be that SSL with RC4 does not infringe, but Notes with RC4 anticipates. *Peters v. Active Mfg. Co.*, 129 U.S. 530, 537, (1889) ("That which infringes, if later, would anticipate, if earlier."). The Court finds that Notes with RC4 does not invalidate the '730 patent because it does not anticipate the '730 patent. Therefore, Newegg's Motion for Judgment as a Matter of Law on Invalidity is **DENIED.**

## V. Alternative Analysis Showing No Anticipation

Nevertheless, and strictly in the alternative, the Court undertakes the task to understand how the jury found that Lotus Notes with RC4 (if it does anticipate) was not prior art. Some background here may be helpful. As an initial matter, the Court notes that the invention/priority date of the patent at issue, United States Patent No. 5,412,730 (the '730 patent), is October 6, 1989, *see* U.S. Patent No. 5,412,730, and the critical date for the patent is one year before the invention date (October 6, 1988). Neither of those dates is disputed. The following facts established at trial apply to the alleged third-party "prior invention" (Lotus Notes with RC4) under § 102(g) and are also largely undisputed.

Alan Eldridge was an engineer for a small engineering startup company called Iris Associates (hereinafter, Iris)—formed by Ray Ozzie in 1984. (11/21/13 AM Trial Tr. (Eldridge) 68:17–22, 71:6–7, Dkt. No. 416); (11/21/13 PM Trial Tr. (Ozzie) 100:17–20, Dkt. No. 417). After the events in question, Iris was purchased by Lotus Development, a software company (hereinafter, Lotus). (*Id.*) According to Eldridge, the relationship between Iris and Lotus during the relevant time period during which the relevant events occurred could be fairly represented as a contractor–subcontractor relationship. (11/21/13 AM Trial Tr. (Eldridge) 106:10–14).

As Eldridge testified, his job at Iris was to fulfill a software development agreement between Lotus and Iris whereby Iris would build a software program, called Lotus Notes, for Lotus. (11/21/13 AM Trial Tr. (Eldridge) 69:7, 106:17–18, Dkt. No. 416); (DX4). Eldridge also confirmed that Lotus contracted with Ron Rivest of RSA Data Securities (hereinafter, RSA) to supply the cryptographic software for specific routines that would be run on Lotus Notes. (11/21/13 AM Trial Tr. (Eldridge) 76:2–7). As Eldridge testified, this request was made to Rivest in the fall of 1987. (*Id.* 77:16–17). Rivest created the cipher known as RC4 and "license[d] to Lotus [this] software module[] for encryption and decryption, based on specifications provided by Lotus." (DX17-1). Per RSA's contract with Lotus, Rivest delivered RC4 to Eldridge at Iris around January 1988. (*Id.*); (11/21/13 AM Trial Tr. (Eldridge) 77:19–22); (DX7). Eldridge testified that he had "very good reason to believe" that the RC4 cipher was incorporated into Lotus Notes, thus reducing the allegedly prior invention to practice, by February 25, 1988. (11/21/13 AM Trial Tr. 80:8–9); *see* (DX9 (dated February 22, 2015)). The jury was presented with undisputed evidence that the source code underlying RC4 was delivered to Iris as "confidential and proprietary," an "unpublished work," and was "trade secret information of RSA Data Security." (DX7).

Eldridge then testified that Lotus Notes with RC4 was "field tested" in two ways: the alpha test and the beta test. (11/21/13 AM 80:20–82:5, Dkt. No. 416). As Eldridge testified:

> A Okay. There are two levels to field test. There is internal testing, and that would have been Iris testing it by having an Iris clients and servers talk to each other, and because we had a very close relationship with Lotus, notes was also running in Lotus, so they were also part of the alpha test.
>
> And every two weeks or so, we would take the latest software that was notes and bring it down to Lotus, and so Iris and Lotus were always running code that was two to three weeks old. And that -- and that was the alpha test.
>
> Now, the beta test, which is the phase where you talk to potential customers, is -- you don't update them as often. The product is generally more mature by that point. And we went through a -- I know it was a fairly -- because it was a complicated product and because it was a network product, the beta test cycle was fairly long. I could -- I know when it was over. I don't know when it began.
>
> Q When was it over, the beta testing?
>
> A Well, we -- we shipped Version 1 of Notes in December of '89, so it was before -- it was over before then.

(11/21/13 AM Trial Tr. (Eldridge) 80:18–81:18). In other words, Lotus Notes with RC4 was sold to the public as a commercial, finished product in December of 1989. (*Id.*)

The Defendant sought to lay out the events that occurred during the alpha and beta testing phases to show that the prior invention was not abandoned, compressed, or concealed. With respect to the alpha testing, Eldridge described it as follows:

> Q With respect to the alpha testing, you mentioned that was between Iris and Lotus, correct?
>
> A Within Iris -- Iris talking to itself, Lotus talking to itself and Lotus and Iris the – the clients and servers talking to each other.

(11/21/13 AM Trial. Tr. 80:22–81:1, Dkt. No. 416). Mr. Ozzie, founder of Iris, also testified about the alpha testing:

> Q Was it a regular practice during the development process to send copies of the code to Lotus?

> A   Yes, because the test group was -- were Lotus employees. Iris was just a development shop. And so all of the test, documentation and so on existed at Lotus. . . .  So they had under NDA, you know, copies of -- of -- of the source code.

(11/21/13 PM Trial Tr. (Ozzie) 117:12–23, Dkt. No. 417). Eldridge also testified that during this phase of internal testing between Lotus and Iris, Lotus Notes with RC4 was capable of sending encrypted messages using RC4 from a transmitter to a receiver by the middle of April 1988. (11/21/13 AM Trial Tr. (Eldridge) 90:8–20).

Eldridge also spoke about the beta testing phase of Lotus Notes with RC4 and testified to the following:

> Q   All the beta testers would be subject to non-disclosure confidentiality agreements; isn't that right?
>
> A   Well, with respect to how Notes operated, yes. That did not extend to anything about RC4.

(11/21/13 AM Trial Tr. (Eldridge) 119:21–25, Dkt. No. 416). During beta testing, Ozzie and Eldridge also testified that they demonstrated Notes with RC4 or otherwise spoke about Lotus Notes with RC4 with different application partners. For example, Eldridge testified:

> Q   When did you meet with Microsoft to discuss Notes and RC4?
>
> A   It was -- it would have been in March of '88. And at that point, RC4 was fully functional in Notes because I remember explaining the virtues of RC4 because I was attracted to the fact that it performs so well.

(11/21/13 AM Trial Tr. (Eldridge) 86:19–22, Dkt. No. 416). Ozzie also testified that

> A   Well, as is evident in – in the documents, Microsoft definitely had access to [Lotus Notes with RC4] as a side effect of a potential deal that we were structuring with them.
> IBM also had ready access to the product.
> I know that Microsoft was not under NDA. The one for IBM was more than likely under a blanket master agreement between the companies, you know, that covered non-disclosure among a lot of conversations.

(11/21/13 PM Trial Tr. (Ozzie Depo.) 121:21–122:6, Dkt. No. 417). Ozzie, however, went on to testify that the reason he knew that Microsoft was not under a non-disclosure agreement was because Ozzie himself demonstrated the Lotus Notes products to Bill Gates in a hotel room on a computer with the RC4 functionality turned off. (11/21/13 PM Trial Tr. (Ozzie) 123:21–124:6). For example, Ozzie testified:

> Q Given that the difference in context from the Lotus Week event, do you recall if the RC4 link encryption feature would have been turned on for the demonstration you would have done for Mr. Gates?
>
> A Almost certainly not. . . .

(11/21/13 PM Trial Tr. (Ozzie Depo.) 139:7–15, Dkt. No. 417). He also testified that he did not demonstrate the RC4 functionality at another claimed public dissemination:

> Q You testified this morning that the version of Lotus Notes that you used for the demo at Lotus Week in May of '88 included the RC4 link encryption feature that we discussed. Do you recall if you had the opportunity to demonstrate that functionality at Lotus Week?
>
> A I almost certainly did not demonstrate it because the product -- whenever you're demonstrating, you want the product to perform as well as it can possibly perform. So we would have had it turned off. . . .

(11/21/13 PM Trial Tr. (Ozzie Depo.) 138:12–22, Dkt. No. 416).

Furthermore, Eldridge testified that Iris (including himself and Ozzie) would have kept the RC4 code a trade secret due to the contractual obligations between Iris and RSA—the developer of the RC4 cipher. (11/21/13 AM Trial Tr. (Eldridge) 116:19–21; 118:24–119:2, Dkt. No. 416).

Thus, the following facts can be gleaned if viewed in a light most favorable to the jury's verdict: (1) The '730 patent's invention date is October 6, 1989; (2) Lotus Notes with RC4 was reduced to practice around February 1988; (3) The software that became Lotus Notes with RC4 was developed under a number of non-disclosure confidentiality agreements; (4) Lotus and Iris

ran internal tests of Lotus Notes with RC4 during the alpha testing phase in early 1988; (5) Ozzie and Eldridge demonstrated Lotus Notes with RC4 functionality turned off to various people including Mr. Gates; (6) Lotus Notes with RC4 was distributed to certain application partners and during beta testing that ended on December 7, 1989; (7) the beta testers were under nondisclosure agreements during the beta testing phase; (8) Lotus Notes with RC4 was commercially released and became publicly known on December 7, 1989.

## VI.    Section 102(g): The Prior Inventor Bar

An issued patent is presumed valid. 35 U.S.C. § 282; *Fox Grp., Inc. v. Cree, Inc.*, 700 F.3d 1300, 1304 (Fed. Cir. 2012). "Under § 102(g) a patent may be invalidated if 'the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it.'" *Fox Grp., Inc. v. Cree, Inc.*, 700 F.3d 1300, 1304 (Fed. Cir. 2012) (quoting 35 U.S.C. § 102(g)).

The Federal Circuit has established a burden-shifting framework for § 102(g). *Fox Grp., Inc.*, 700 F.3d at 1304. First, "a challenger of a patent must prove by clear and convincing evidence that the invention was made in this country by another inventor."[3] *Fox Grp., Inc.*, 700 F.3d at 1304 (internal quotation marks omitted) (citing *Apotex USA, Inc. v. Merck & Co., Inc.*, 254 F.3d 1031, 1035 (Fed. Cir. 2011)). "Then, the burden shifts to the patentee to produce evidence sufficient to create a genuine issue of material fact as to whether the prior inventor has suppressed or concealed the invention." *Fox Grp., Inc.*, 700 F.3d at 1304 (internal quotation marks omitted). "Finally, the burden shifts again to the challenger who must rebut any alleged

---

[3] Given that Lotus Notes with RC4 was reduced to practice before the '730 patent's invention date, there is no genuine dispute that Defendant has met their initial burden here. *See also TQP Dev., LLC v. Inuit Inc.*, Case No. 2:12-cv-180 at 10 (E.D. Tex. June 20, 2014) (Bryson, J.) (reviewing the trial record in the present case and reaching the same conclusion in the context of a summary judgment motion).

suppression or concealment with clear and convincing evidence to the contrary." *Id.* (internal quotation marks omitted).

The Federal Circuit has defined "two ways for [a Plaintiff] to produce evidence sufficient to create a genuine issue of material fact of abandonment, suppression, or concealment." *Fox Grp., Inc. v. Cree, Inc.*, 700 F.3d 1300, 1305 (Fed. Cir. 2012); *see also Dow Chem. Co. v. Astro–Valcour, Inc.*, 267 F.3d 1334 (Fed. Cir. 2001) ("Our case law distinguishes between two types of abandonment, suppression, or concealment."). The first would be to show that "an inventor **actively** abandon[ed], suppresse[d], or conceal[ed] his invention from the public." *Dow Chem. Co. v. Astro–Valcour, Inc.*, 267 F.3d 1334, 1342 (Fed. Cir. 2001) (emphasis added). "The second occurs when abandonment, suppression, or concealment may be **inferred based on upon the prior inventor's unreasonable delay** in making the invention publicly known." *Id.* (emphasis added).

Active or "[i]ntentional suppression refers to situations in which an inventor 'designedly, and with the view of applying it indefinitely and exclusively for his own profit, withholds his invention from the public.'" *Fujikawa v. Wattanasin*, 93 F.3d 1559, 1567 (Fed. Cir. 1996) (quoting *Kendall v. Winsor*, 62 U.S. (21 How.) 322, 328 (1858)).

Finally, "[e]ven though there is no explicit disclosure requirement in § 102(g), the spirit and policy of the patent laws encourage an inventor to take steps to ensure that the public has gained knowledge of the invention which will insure its preservation in the public domain or else run the risk of being dominated by the patent of another." *Apotex USA, Inc. v. Merck & Co., Inc.*, 254 F.3d 1031 (Fed. Cir. 2001); *OddzOn Products, Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1402 (Fed. Cir. 1997) ("Moreover, as between an earlier inventor who has not given the public the benefit of the invention, *e.g.,* because the invention has been abandoned without public

disclosure, suppressed, or concealed, and a subsequent inventor who obtains a patent, the policy of the law is for the subsequent inventor to prevail.").

### A. Parties' Arguments

Plaintiff presented evidence seeking to show that both (1) RC4 alone, and (2) Lotus Notes with RC4, do not qualify as prior art under § 102(g) because the inventions were abandoned, suppressed, or concealed. (Pl.'s Resp. at 24–25, Dkt. No. 440); (Def.'s JMOL at 21, Dkt. No. 436). The Plaintiff contends that Lotus Notes with RC4 was actively concealed from the time it was reduced to practice (February 1988) until the time the program as a whole was commercially released on December 7, 1989. (*Id.*) In the intervening time, the Plaintiff filed a patent application and established their priority date of October 6, 1989. (*Id.*) Based on the evidence concerning the RC4 trade secret, the web of nondisclosure agreements, the assertion of confidentiality provisions by the same, and the other evidence presented during trial, the Court finds that the Plaintiff provided sufficient evidence to raise a genuine issue of material fact as to whether the prior inventors actively concealed their invention and presented that theory and the applicable law to the jury.

Defendant agrees that TQP only argued for active concealment. (Def.'s JMOL at 25, Dkt. No. 436). Defendant then first argues that "there can be no active concealment if the prior inventor takes affirmative steps to make the invention publicly known." (*Id.* at 26). For Defendant's second argument, it believes that "engaging in activities designed to bring about public or commercial use of the invention is also sufficient to negate any intent to abandon, suppress or conceal." (*Id.*) In other words, the Defendant argues that steps toward commercialization—regardless of whether those steps were secret or not—between the time an

invention is reduced to practice and the time it is commercially available negate active concealment. Both arguments will be addressed in turn.

**B. Court's Analysis**

As an initial matter, the Court notes that this is not an interference proceeding. The Defendant did not invent the prior invention and does not use the prior invention. This case does not present the question of which of two inventors should get priority to the same invention. This case presents the question of whether Mike Jones, the inventor of the '730 patent who utilized the patent system to disclose his invention to the public and, in exchange, obtained a patent on his invention, should lose that patent because another inventor, around the same time period, made a similar invention but then kept that invention secret while attempting to later bring it to market. The jury heard substantial testimony about the third-party prior invention, the jury was instructed on the law, and the jury found that the facts did not support invalidation of the '730 patent. Given that the law supports the Plaintiff's arguments, and given that "[e]arly public disclosure is a linchpin of the patent system," the Court finds that the jury verdict should be upheld. *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983).

Turning now to the Defendant's first argument, the Court agrees that affirmative steps to make the invention publicly known would weigh against a finding of abandonment, suppression, and concealment. However, when viewed in a light most favorable to the jury's verdict, the evidence presented at trial does not show that the prior inventors took affirmative steps to make the invention publicly known during the relevant time period. Instead, the evidence on the record in this case establishes that the parties involved in the Lotus Notes with RC4 invention (and the RC4 alone invention) did the exact opposite: they took affirmative steps to ensure that the prior invention was <u>not</u> made publicly known (and was not disclosed) between the time it was reduced

to practice and the time it was sold to the public on December 7, 1989. *E.g.*, (DX4-15); (DX7); (DX12); (DX17); (DX55); (DX34); (11/21/13 AM Trial Tr. (Eldridge) 119:21–25); (11/21/13 PM (Ozzie) Trial Tr. 117:12–23).

Instead of taking affirmative steps to make the invention publicly known, Rivest, Iris, Lotus, Eldridge, and Ozzie entered into a web of nondisclosure agreements, confidentiality agreements, and noncompete agreements that covered all the parties involved and had no defined termination date. (DX4-15); (DX7); (DX12); (DX17); (DX55); (DX34). For example, the jury was presented with evidence that as early as 1984, Iris and Lotus had entered into a software development agreement requiring that Iris software projects, among other projects, remain confidential.[4] (DX12 at 1, 11–12). The jury was presented with evidence that this agreement required confidentiality of the "Software Technology," which was defined as "all general and specific knowledge, experience and information, including without limitation all inventions, trade secrets, know-how and improvements thereof." (DX12 at 2). These confidentiality provisions extended indefinitely past any termination date. (DX12 at 14). An agreement with nearly identical terms, and the same confidentiality provisions, was reaffirmed by the parties in March of 1988—just before any of the alleged public disclosures took place. (DX4). The jury was also presented with a similar agreement that was executed between RSA and Lotus, requiring that Lotus "maintain the Source Code received from RSA on a confidential basis with the same degree of care as used by Lotus in protecting the confidentiality of its own proprietary information." (DX17-5). Finally, Ozzie, Iris, and Lotus entered into an agreement whereby Ozzie agreed that Iris owned the source code to Lotus Notes and that Ozzie must "comply with the confidentially provisions" contained in the previous agreements between Iris and Lotus. (DX34).

---

[4] This contract even restricted the disclosure of information already within the public's knowledge "and readily accessible to [a] third party" if the "combination of [known] features" was not known. DX4.

Furthermore, evidence at trial established that RC4 was held as a trade secret, and to this day, "RSA security has never officially released the [RC4] algorithm." (DX168-2); (11/21/13 AM Trial Tr. (Eldridge) 111:6–14, Dkt. No. 416). Evidence from Newegg's expert, at trial, also established that RC4 was affirmatively held as a trade secret:

> Q Okay. And [RC4] was kept a trade secret until some hacker cracked the code and posted it to a website called Cipherpunks in 1994, correct?
>
> A (Stubblebine) Yes.

(11/21/13 PM Trial Tr. (Stubblebine) 90:14–17, Dkt. No. 417); (DX55 (nondisclosure agreement between RSA and Iris)); (DX7 (calling RC4 "trade secret information of RSA Data Security")).

The jury was also presented with evidence that Iris did not want to breach confidentiality provisions by making the invention publicly known. (11/21/13 AM Trial Tr. (Eldridge) 118:24–119:5, Dkt. No. 416). Furthermore, even if Iris and Lotus wanted to disclose the entirety of the Lotus Notes with RC4 product, both Ozzie and Eldridge—principals at those companies—were bound by non-disclosure agreements with Dr. Rivest and RSA.[5] (11/21/13 AM (Eldridge) 118:24–119:2); (DX55); (DX7). Neither Ozzie nor Eldridge testified to breaching any or all of these agreements.

Defendant's response to these concerns is that the prior inventor need not divulge the "innards" of the invention to the public to be public use.[6] (Def.'s JMOL at 26); *see Dey L.P. v. Sunovion Parm., Inc.*, 715 F.3d 1351, 1359 (Fed. Cir. 2013). To support their argument, Defendant cites to at 1987 district court case from the District of Delaware, *Friction Division*

---

[5] Eldridge testified that his non-disclosure agreement with Dr. Rivest was so strict that Eldridge was not allowed to get another job implementing code at the crypto layer for 20 years merely because he could have seen Dr. Rivest's code. (11/21/13 AM Trial Tr. (Eldridge) 115:12–20, Dkt. No. 416).

[6] The Court addresses the specific instances alleged to have constituted public use in the next section. The Court does agree that if there is a public use or disclosure, there is not suppression or concealment.

*Products., Inc. v. E.I. DuPont de Nemours & Co.*, 658 F. Supp. 998 1013–14 (D. Del. 1987) *aff'd*, 883 F.2d 1027 (Fed. Cir. 1989) (non-precedential decision). However, the Federal Circuit has not drawn the distinction relied on by the Defendant. *See TQP Dev., LLC v. Intuit Inc.*, Case No. 2:12-cv-180 at 12 (E.D. Tex. June 20, 2014) (Bryson, J.) ("The Federal Circuit, however, has not drawn that distinction. The circuit court has made clear that a finding of suppression and concealment requires evidence of the inventor's unreasonable delay in making the "the invention" publicly known. Where the "inner workings" are the essence of the invention, it is those "inner workings" that must not be suppressed or concealed . . . .") *citing Fox Grp., Inc. v. Cree, Inc.*, 700 F.3d 1300, 1305 (Fed. Cir. 2012). Ultimately, it was the Defendant's burden to prove by clear and convincing evidence to the jury that the patent was invalidated by the uses they described.[7] The jury heard and saw the Defendant's evidence. The jury heard and saw the Plaintiff's evidence. The jury then resolved the factual dispute in favor of the Plaintiff. Substantial evidence supports that verdict of no invalidity, and the Court will not supplant the jury's verdict in this circumstance.

Turning to the Defendant's second argument—that the concealment and suppression does not matter because the product was eventually sold—the Court believes that evidence showing commercialization does negate an *inference* of suppression or concealment based on unreasonable delay, but does not necessarily negate the actual evidence that the invention was ***actively*** suppressed or concealed during the relevant time period. The Federal Circuit has defined "two ways for [a Plaintiff] to produce evidence sufficient to create a genuine issue of material fact of abandonment, suppression, or concealment": active concealment and an inference of concealment drawn from an unreasonable delay. *Fox Grp., Inc. v. Cree, Inc.*, 700 F.3d 1300, 1305 (Fed. Cir. 2012); *see also Dow Chem. Co. v. Astro–Valcour, Inc.*, 267 F.3d 1334 (Fed. Cir.

---

[7] As noted earlier, the Court addresses each substantive, alleged "public use" in the next section.

2001) ("Our case law distinguishes between two types of abandonment, suppression, or concealment."). In the present case, Newegg agrees that the Plaintiff argued for active concealment, not an inference of concealment based on an unreasonable delay. (Def.'s JMOL at 25, Dkt. No. 436 ("TQP has argued only that RC4 and Lotus Notes with RC4 were actively concealed.")); *see Dow Chem. Co. v. Astro–Valcour, Inc.*, 267 F.3d 1334, 1342–44 (Fed. Cir. 2001) (noting this concealment case was "the latter type," involving an *inference*, and that evidence showing commercialization does not raise a genuine issue of material fact concerning abandonment, suppression, or concealment); *Apotex USA, Inc. v. Merck & Co., Inc.*, 254 F.3d 1031, 1039 (Fed. Cir. 2001) (noting this case was "the latter type," involving an *inference*, but noting that Plaintiff had raised a genuine issue of material fact showing concealment and then noting the various ways that the Defendant had made the benefits of its invention known the public before Plaintiff entered the market). Here, the Plaintiff presented evidence showing a web of confidentiality agreements, nondisclosure agreements, and trade secret designations that raised a genuine issue of material fact that the invention was *actively* suppressed or concealed before it was ultimately released to the public. In the intervening time, and independently, the '730 patent was filed and constructively reduced to practice.

Defendant does find some support in the case of *Flex–Rest, LLC v. Steelcase, Inc.*, 455 F.3d 1351 (Fed. Cir. 2006), for the proposition that efforts at commercialization can negate the intent element of active concealment. In that case, the Federal Circuit addressed the issue of active concealment. *Id.* at 1358. However, the court noted that "[t]he only evidence [Plaintiff] offers for this argument is the time taken to file the patent application for the [prior invention manufactured by the Defendant] and the fact that the device was kept secret during that time." *Id.* at 1358. The court went on to say that the "record demonstrates that after reduction to practice,

[Defendant] moved almost immediately towards both filing a patent application and commercially disclosing the [prior invention manufactured by the Defendant] at a trade show, actions which indicate an intent to make a public disclosure." *Id.* at 1359. "That the [prior invention] was kept secret during this [six-month time period] is not, by itself, indicative of intentional suppression or concealment." *Id.* at 1359. The court goes on to say that "[b]ecause [Plaintiff] did not offer any evidence indicating a designed intent to withhold the [prior invention] from the public, we conclude that there is not sufficient evidence to support a jury instruction regarding intentional suppression or concealment." *Id.*

The present controversy, however, relies on markedly different facts. First, the Plaintiff presented evidence that all parties involved in the Lotus Notes with RC4 invention intended to (and in fact did) keep key elements of the prior invention secret by action and legal design: confidentiality agreements, nondisclosure agreements, and trade secret designations. Thus, the Plaintiff <u>did</u> offer "evidence indicating a designed intent to withhold the [prior invention] from the public," removing this case from the purview of *Flex–Rest*. 455 F.3d 1351, 1359 (Fed. Cir. 2006). Second, the third-party inventors in the present case, in fact, had the opportunity to present the full Lotus Notes with RC4 invention at a trade show, but nevertheless declined to do so,[8] and also did not attempt to file a patent application. Thus, the "record demonstrates that after reduction to practice," the third-party inventors <u>did not</u> "move[] almost immediately towards both filing a patent application and commercially disclosing the [prior invention] at a trade show"—despite the explicit opportunity to do so. These actions fairly suggest an intent to not publicly disclose, further removing this case from the purview of *Flex–Rest*. *Id.* at 1359. Third,

---

[8] *See* 11/21/13 PM (Ozzie) 138:16–22, Dkt. No. 417 ("Q. Do you recall if you had the opportunity to demonstrate [the RC4] functionality at Lotus Week? A. I almost certainly did **not** demonstrate it because . . . we would have turned it off.") (emphasis added).

unlike the prior invention in *Flex–Rest*, the prior invention in this case was not made by the Defendant, but was made by an unrelated third party. Considering the totality of these distinguishing facts, the Court will not draw an inference of <u>no intent</u> to conceal; especially where a jury could have found a the myriad of facts suggesting exactly the opposite.

Here, when viewed in a light most favorable to the jury verdict, the third-party team of Iris, Lotus, and RSA deliberately chose to keep key, claimed aspects of the Lotus Notes with RC4 invention a trade secret, chose to keep the underlying Lotus Notes with RC4 invention confidential between the parties, chose to avoid disclosing the full functionality to the public, and chose to avoid disclosure through a patent application. Accordingly, the parties involved had confidentiality agreements in place with its employees, sub-contractors, and beta testers, to prevent public disclosure of the program. Therefore, these third parties cannot both elect to avoid the patent system and still invoke that system to erect a third-party § 102(g) bar (or a third-party public use bar) to an inventor who disclosed the invention for patenting. *See, e.g.*, *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1549–50 (Fed. Cir. 1983) ("There is no reason or statutory basis, however, on which [a third party prior inventor's] secret commercialization of a process, if established, could be held a bar to the grant of a patent to [patentee] on that process.").

The situation that occurred in this case favors the patentee who discloses his invention over the prior inventor who kept it secret:  "Even though there is no explicit disclosure requirement in § 102(g), the spirit and policy of the patent laws encourage an inventor to take steps to ensure that the public has gained knowledge of the invention which will insure its preservation in the public domain or else run the risk of being dominated by the patent of another." *Apotex USA, Inc. v. Merck & Co., Inc.*, 254 F.3d 1031 (Fed. Cir. 2001) (internal quotation marks omitted). Here, the invention was invented by Rivest in conjunction with

Eldridge. Through their designedly confidential process, they ran the risk of being dominated by the patent of another—the '730 patent. In this case, the decision to keep the prior invention suppressed gave rise to situation at hand. A reasonable jury so found, and there is substantial evidence to support the jury verdict.

**VII.     Section 102(a): Public Use or Knowledge Bar**

"If a device was 'known or used by others' in this country before the date of invention or if it was 'in public use' in this country more than one year before the date of application, it qualifies as prior art." *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1570 (Fed. Cir. 1997). "For a challenger to prove a patent claim invalid under § 102(b), the record must show by clear and convincing evidence that the claimed invention was in public use before the patent's critical date." *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1325 (Fed. Cir. 2009). "When the asserted basis of invalidity is prior public use, the party with the burden of proof must show that the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention." *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 737 (Fed. Cir. 2002).

Both comingled with the assertions concerning the § 102(g) bar, and set forth in a separate section of their brief, Defendant argues that there was an actual public use or public disclosure at (1) the beta testing stage and when the product was distributed to application partners; (2) the discussions/demonstrations of Lotus Notes with Microsoft; and (3) the demonstrations of Lotus Notes at Lotus Week. The Court notes that, in the right context, actual public use or disclosure would likely give rise to a § 102(g) bar as well. However, as set forth below, when the facts are viewed in the light most favorable to the jury's verdict, none of these

events gave rise to a public use disclosure, and the jury's verdict in this regard should be overturned.

*First*, Defendant argues that "[t]he most glaring instance of public use is the unrebutted evidence that Mr. Ozzie distributed copies of Lotus Notes with RC4 to third parties under no obligations of confidentiality." (Def.'s JMOL at 32). This evidence, however, was rebutted at trial. For example, Defendant notes that "Reuters were among those parties receiving copies" of Lotus Notes. (Def.'s JMOL at 27). At trial, Ozzie testified that Reuters "were more than likely under some kind of an [NDA] agreement with Lotus." (11/21/13 PM Trial Tr. (Ozzie) 142:23–143:3, Dkt. No. 417). Furthermore, the jury was shown evidence that Ozzie himself was under obligations of confidentiality not to disclose how the underlying RC4 functionality worked. (DX4 (requiring "all general and specific knowledge, experience and information, including without limitation all <u>inventions</u>, <u>trade secrets</u>, know-how and improvements thereof" to be kept confidential, signed by Ozzie) (emphasis added)); (DX34 (agreeing that Ozzie must "comply with the confidentially provisions" contained in the previous agreements between Iris and Lotus)); DX55 (agreement to keep RSA source code confidential and a trade secret). As another example, Eldridge spoke about the beta testing phase of Lotus Notes with RC4 and testified to the following:

> Q  All the beta testers would be subject to non-disclosure confidentiality agreements; isn't that right?
>
> A  Well, with respect to how [Lotus] Notes operated, yes. That did not extend to anything about RC4.

(11/21/13 AM Trial Tr. (Eldridge) 119:21–25, Dkt. No. 416). However, Eldridge also testified that due to his contractual agreement with RSA, he "did not disclose how [RC4] worked" to anybody either, including Microsoft and Reuters. (11/21/13 AM (Eldridge) 115:7–8). So while

Ozzie testified that Microsoft may have not been under the express obligations of a nondisclosure agreement itself, it is clear that the jury heard evidence that Eldridge and Ozzie could not have disclosed the entirety of the Lotus Notes with RC4 functionality to third parties without breaking confidential obligations they had with RSA and Lotus. There was also affirmative testimony that neither of them wanted to breach those obligations. (11/21/13 AM Trial Tr. (Eldridge) 119:24–120:2). Thus, the jury was free to take them at their word, weigh the evidence, judge credibility, and conclude that the Microsoft discussions were, in fact, "general high level" discussions that did not disclose all the elements of the '730 patent. (11/21/13 AM Trial Tr. (Eldridge) 117:22–118:7); *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 137 (2000).

*Second*, while Eldridge testified that these were just high level discussions with Microsoft, Ozzie testified that he demonstrated Lotus Notes to Mr. Gates in a hotel room. (11/21/13 PM Trial Tr. (Ozzie) 123:21–124:6, Dkt. No. 417). Ozzie, however, went on to testify that the RC4 functionality was turned off during that demonstration:

> Q Given that the difference in context from the Lotus Week event, do you recall if the RC4 link encryption feature would have been turned on for the demonstration you would have done for Mr. Gates?
>
> A Almost certainly not. . . .

(11/21/13 PM Trial Tr. (Ozzie) 139:7–11). In light of this evidence, a reasonable jury could have concluded that demonstrations and discussions of Lotus Notes *without* RC4 to Microsoft were insufficient to disclose all elements of the claimed invention in the '730 patent. *See Dey L.P. v. Sunovion Parm., Inc.*, 715 F.3d 1351, 1359 (Fed. Cir. 2013) (reversing summary judgment of invalidity under the public-use prong of § 102 because "a reasonable jury could conclude that if members of the public are not informed of, and cannot readily discern, the *claimed features* of

the invention in the allegedly invalidating prior art, the public has not been put in possession of those features" (emphasis added)); *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 738 (Fed. Cir. 2002) (faulting defendant for "not present[ing] an element-by-element comparison between the [prior inventor] and the asserted claims," and reversing the jury verdict of invalidity on that basis).

*Third*, the jury was presented with evidence that the RC4 functionality was turned off during demonstrations at Lotus Week as well. (11/21/13 PM (Ozzie) 138:16–22, Dkt. No. 417 ("Q. Do you recall if you had the opportunity to demonstrate [the RC4] functionality at Lotus Week? A. I almost certainly did not demonstrate it because . . . we would have turned it off.")). Again, demonstrating a product that is missing key elements from the '730 patent is not a public disclosure of all the elements of the '730 patent. *See Dey L.P. v. Sunovion Pharm., Inc.*, 715 F.3d 1351, 1359 (Fed. Cir. 2013). Thus, a reasonable jury could have concluded that public use of the Lotus Notes *without* RC4 program at Lotus Week was not enough to place the claimed features of the '730 patent in the public's possession.

Defendant's response to these concerns is that the prior inventor need not divulge the "innards" of the invention to the public to be public use. (Def.'s JMOL at 26); *see Dey L.P. v. Sunovion Parm., Inc.*, 715 F.3d 1351, 1359 (Fed. Cir. 2013). This argument largely mirrors their argument under § 102(g), *see supra*, and the Court rejects it for similar reasons. To support their argument, Defendant again cites *Friction Div. Prods., Inc. v. E.I. DuPont de Nemours & Co.*, 658 F. Supp. 998 1013–14 (D. Del. 1987) *aff'd*, 883 F.2d 1027 (Fed. Cir. 1989) (non-precedential decision). However, again, the Federal Circuit has not adopted the distinction relied on by the Defendant. *See TQP Development, LLC v. Intuit Inc.*, Case No. 2:12-cv-180 (E.D. Tex. June 20, 2014) (Bryson, J.). Furthermore, Defendant's citation to *Lockwood v. American*

*Airlines, Inc.*, 107 F.3d 1565, 1570 (Fed. Cir. 1997) is also unavailing. *Lockwood* held that the defendant's "public use of the high-level aspects of the [prior invention] was enough to place the *claimed* features of the [patent in question] in the public's possession." *Id.* at 1570 (emphasis in original). That principle is not inconsistent with the reasoning here. The distinction here is that there was enough evidence for a reasonable jury to find that the prior inventors high-level disclosure of the prior invention did not place the claimed features of the '730 in the public's possession because key *claimed* features were not displayed/disseminated/discussed. *Id.* Thus, the opposite conclusion—that the claimed features were not in public use before the critical date—was justified and supports the verdict. *See also TQP Development, LLC v. Intuit Inc.*, Case No. 2:12-cv-180, at 12 (E.D. Tex. June 20, 2014) (Bryson, J.) (reaching the same legal conclusion about *Lockwood* in the context of public use).

As noted earlier, the jury was presented with evidence that Iris, Lotus, Ozzie, and Eldridge were contractually bound to confidentiality with respect to the "Software Technology," which was defined as "all general and specific knowledge, experience and information, including without limitation all inventions, trade secrets, know-how and improvements thereof." (DX4-2). Defendant provided no testimony that these contractual obligations were breached, and the jury heard evidence that those bound by such obligations took them seriously. Defendant hand-waves over the details concerning what does and does not need to be disclosed in the prior invention to ensure that the public has access to all elements of the claimed invention; yet, this type of detail would be precisely the type of detail—especially in the face of confidentiality agreements to the contrary—that would have been needed meet the clear and convincing burden that the patent was invalid due to public disclosure or use. *See* (Def.'s JMOL at 33 (calling Plaintiff's arguments "irrelevant" because the source code does not need to be disclosed, but offering no explanation

for what would need to be disclosed and offering no explanation about whether those details would be covered by the executed confidentiality agreements)). The jury heard extensive evidence, was instructed on the law, was free to judge the credibility and weigh competing fact questions, and this jury found that these uses did not invalidate the patent. The Court will not substitute its judgment for that of the jury on these disputed issues of fact. Defendant has not met their burden by clear and convincing evidence.

## VIII.   Section 102(b): The "On-Sale" Bar

The "on-sale bar" rule is set forth in the portion of § 102(b) that provides that a person shall not be entitled to a patent if the invention was "on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). The Supreme Court in *Pfaff v. Wells Electronics, Inc.*, established a two-part test for determining when the on-sale bar of § 102(b) operates to invalidate a patent. 525 U.S. 55, 67–68 (1998). First, the product whose sale is claimed to be invalidating must have been "the subject of a commercial offer for sale" more than one year prior to the date of the patent application— otherwise known as the "critical date." *Id.* at 67.

Second, the invention embodied in the invalidating product must have been "ready for patenting" before the critical date. *Pfaff*, 525 U.S. at 67. A party can satisfy the second part of the *Pfaff* test with "proof of reduction to practice before the critical date." *Id.* at 67–68. Although an invention need not be ready for patenting before the commercial offer for sale, there can be no offer for sale of an invention "until such time as the invention is conceived." *August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1289 (Fed. Cir. 2011). In order for a patent claim to be anticipated under the on-sale bar, "each and every limitation" of the claim must be found "either

expressly or inherently in the device or process that was sold." *Minton v. Nat'l Ass'n of Sec. Dealers, Inc.*, 336 F.3d 1373, 1376 (Fed. Cir. 2003).

The Defendant asserts that the source code for the version of Lotus Notes that incorporated RC4 was sold by Iris to Lotus before the critical date. (Def.'s JMOL at 35, Dkt. No. 436). The Defendant also asserts that "Ron Rivest of RSA invented RC4" and then delivered that source code to Iris, who then incorporated RC4 into Lotus Notes and delivered Lotus Notes with RC4 to Lotus pursuant to a March 1988 agreement. (*Id.* at 35). Defendant argues that it "is clear" from the March 1988 that source code had been purchased in January 1988. (*Id.* at 35).

Plaintiff responds that Iris never had the right to sell RC4 source code, and that RC4 as implemented by Iris was actually separately licensed to Lotus through an agreement between RSA and Lotus, not Iris and Lotus. (Pl.'s Resp. at 33, Dkt. No. 440). Further, Plaintiff argues that the January 1988 sale, which Plaintiff believes Defendant lacks evidence for, could not have been a sale of the RC4 product with Lotus Notes because Eldridge testified that he did not incorporate RC4 into Lotus Notes until February 1988.

The parties do not substantively dispute that the critical date of the '730 patent is October 6, 1988. *See TQP Development, LLC v. Intuit Inc.*, Case No. 2:12-cv-180 at 4 (E.D. Tex. June 20, 2014) (Bryson, J.). The record is also clear that RC4 was not owned by Iris. Eldridge testified to this fact:

Q And the RC4 code was not Iris's code to sell or offer to sell, correct?

A Correct.

(11/21/13 AM Trial Tr. (Eldridge) 112:4–6, Dkt. No. 416). The record is also clear that Lotus obtained the right to use RC4 through a license with RSA, not a license with Iris:

Q The licensing relationship for RC4 was, in fact, between Lotus and RSA, not Iris, correct?

A Correct.

(11/21/13 AM Trial Tr. (Eldridge) 112:1–3, Dkt. No. 416). Furthermore, the Defendant has not shown that the source code allegedly "purchased" in January of 1988 contained the RC4 source code, as Eldridge testified that he did not implement the RC4 source code until February 1988. The jury found that the above facts established that there had not been a sale of an invalidating product. *See TQP Development, LLC v. Inuit Inc.*, Case No. 2:1 at 5 (Bryson, J.) (reviewing testimony from the present trial in the context of a summary judgment motion and noting that "[t]he record reveals that there is a genuine dispute of fact with regard to whether Notes with RC4 was the subject of a sale or offer for sale before the critical date."). The jury concluded, based on sufficient evidence, that there was no sale because Iris did not own the source code to RC4 and did not incorporate the source code to RC4 at the time the alleged sale took place. The Court will not overturn the jury verdict supported by this evidence.

## IX.     Anticipation Based on Denning Textbook

A.  The Parties' Arguments

TQP first argues that the small portion of the Denning Textbook that was shown to the jury is not enabling, and therefore, not anticipatory. (Pl.'s Resp. at 38, Dkt. No. 440). In support, TQP cites a lack of evidence on the part of Newegg to show that the textbook was enabling. (*Id.*) Further, TQP cites to the testimony of its validity expert—Dr. Rhyne—who testified that it was his belief that the figure and text provided to the jury would not "tell one of skill in the art . . . what's going on in these two key generators." (11/25/13 AM Trial Tr. (Rhyne) 7:10–16, Dkt. No. 420). Plaintiff argues that its expert did not agree with Newegg's experts on the point of whether the disclosure taught all of the limitations of the '730 patent. (*Id.* 7:5–8).

Newegg argues that its expert conclusively established that the Denning reference met all the elements of the asserted claims. (Def.'s JMOL at 38, Dkt. No. 436).

B. The Court's Analysis

"In order to anticipate, a prior art disclosure must also be enabling, such that one of ordinary skill in the art could practice the invention without undue experimentation." *Novo Nordisk Pharm., Inc. v. BioTech. Gen. Corp.*, 424 F.3d 1347, 1355 (Fed. Cir. 2005).

Here, the Plaintiff's expert testified that Denning reference did not teach one of ordinary skill in the art how the system would or would not meet Claim 1. (11/25/13 AM Trial Tr. (Rhyne) 7:17–24, Dkt. No. 420):

> Q Do you agree with Dr. Diffie's opinion that this Figure 3.3 teaches all of the limitations of the '730 patent?
>
> A I do not.
>
> Q And why not?
>
> A Well, you don't know -- looking only at this figure or even at the few other sentences that he cited to on the opposite page, there's no way to tell one of skill in the art or even me, even more of skill in the art, what's going on in these two key generators.
>     There's just – there's just a white box with a label.
>     And it makes a great deal of difference as to whether or not a system like this, a synchronous stream cipher system, meets all the limitations of that claim, which are very specific. And if you don't know what's going on in the key generator, and there's nothing about that here in this figure, then you don't have any information about how -- how this system would or would not meet Claim 1.

(11/25/15 AM Trial Tr. (Rhyne) 7:5–24). The Defendant had the burden to prove by the clear and convincing evidence that the patent was invalidated by the Denning reference. Yet, Defendant does not cite to any rebuttal testimony on this point. The jury weighed the credibility of the experts and found that the patent was not invalid due to the Denning reference. There is substantial evidence to support the jury's finding of no anticipation.

## X.      Obviousness

The Court, *supra*, found sufficient evidence to support the jury's verdict that RC4 alone does not anticipate the '730 patent because it was missing elements and it was suppressed or concealed before it was commercialized. Defendant argues that if RC4 alone does not anticipate the '730 patent, then RC4 alone renders the patent obviousness. However, following the line of reasoning discussed in substance above, the jury could have found that RC4 alone is not prior art for obviousness purposes because RC4 alone was a trade secret that was suppressed or concealed. Therefore, the Court will address the Defendant's argument that the Denning Textbook renders the '730 patent obvious. (Def.'s JMOL at 48, Dkt. No. 436).

### A.  Parties Arguments

Defendant argues that "Denning is a textbook, and a person of ordinary skill in the art would have looked to Denning to implement the method of claims 1, 6, 8, and 9 of the '730 Patent." (Def.'s JMOL at 48, Dkt. No. 436). Defendant argues that "Eldridge testified that he was motivated to implement a faster algorithm that generated a sequence of pseudorandom numbers for network encryption, that it was very simple to implement RC4 into Lotus Notes, and that it took him no more than three weeks" to do so. (Def.'s JMOL at 48).

Plaintiff responds that the Defendant has not pointed to any evidence actually presented to the jury that shows the claims of the '730 patent should be rendered obvious. (Pl.'s Resp. at 44, Dkt. No. 440). Besides an offhand remark from Diffe—who said he thought that "Denning makes it obvious"—the Plaintiff believes that Defendant presented no analysis to the jury. (*Id.*) Furthermore, Plaintiff alleges that it confirmed on cross examination of Diffe that he "was testifying about anticipation," not obviousness. (11/22/13 PM Trial Tr. (Diffe) 80:5–7).

B.  Court's Analysis

The Defendant has the burden to show by clear and convincing evidence that the asserted claims were obvious over the prior art. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011). To prevail on judgment as a matter of law, moreover, Defendant must show that no reasonable jury would have a legally sufficient evidentiary basis to find for the Plaintiff. Fed. R. Civ. P. 50. "Generally, a party seeking to invalidate a patent as obvious must demonstrate by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so.'' *In re Cyclobenzaprine Hydrochoride*, 676 F.3d 1063 (Fed. Cir. 2012) (internal quotation marks omitted).

The Court agrees with the Plaintiff. The jury found that Defendant failed to meet its burden of proving obviousness by clear and convincing evidence. The Plaintiff is correct that the record is devoid of any real analysis, much less analysis sufficient to meet the elevated burden needed to overcome the verdict, concerning obviousness with regard to the Denning Textbook. Defendant's expert confirmed that he was testifying about anticipation, (11/22/13 PM Trial Tr. (Diffe) 80:5–7), and the Defendant has provided no other citations to its expert's analysis of obviousness. The Court will not overturn the jury's finding based on this. To the extent Newegg raises other obviousness arguments in its Motion, the Court similarly finds a lack of sufficient proof that they were presented to the jury, or otherwise analyzed with the jury, at trial.

XI.     **Conclusion**

For the reasons set forth above, the Court finds that the jury's verdict of validity should stand and that Newegg's Motion for Judgment as a Matter of Law as it relates to invalidity should be and is hereby **DENIED**.

**So ORDERED and SIGNED this 17th day of August, 2015.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE