# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| TQP DEVELOPMENT, LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 2:11-CV-248-JRG |
| | § | |
| 1-800-FLOWERS.COM, INC., et al., | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Newegg, Inc.'s ("Newegg") Rule 50(b) Motion for Judgment as a Matter of Law, limited to the issue of damages ("Mot.", Dkt. No. 436). The Court has already addressed the portions of Defendant's Motion dealing with infringement (Dkt. No. 461) and invalidity (Dkt. No. 464). For the reasons set forth below, Newegg's Rule 50(b) Motion for Judgment as a Matter of Law is **DENIED** as to damages.

## I. BACKGROUND

The Court held a jury trial in this case, and the jury entered a verdict on November 25, 2013. At the time of trial, the asserted claims of U.S. Patent No. 5,412,730 ("the '730 Patent") were Claims 1, 6, 8, and 9. The '730 Patent, the sole patent-in-suit, involves the use of encryption keys to provide secure communications between a transmitter and receiver. The jury returned a verdict that the asserted claims were not invalid; the asserted claims were directly infringed; Newegg had induced its customers to infringe; and $2.3 million was the "sum of money if paid now in cash," which "would fairly and reasonably compensate TQP for its damages resulting from Newegg's infringement of the '730 Patent."[1] (Dkt. No. 407 ("Verdict").)

---

[1] TQP asserted at trial that, if damages were awarded, the proper amount of damages was $5.1 million. Newegg did not present its own expert testimony on damages.

1

Newegg asserts that, in the approximately 23 hours of testimony presented to the jury, the jury did not have sufficient evidence for its findings.

Newegg offers two main arguments in support of its contention that TQP did not present sufficient evidence to support the jury's damages award. First, Newegg argues that Dr. Stephen Becker, TQP's damages expert, calculated a reasonable royalty amount based on license agreements that were not comparable to the '730 Patent. Second, Newegg argues that Dr. Becker created a royalty structure using arbitrary methodology.[2] Additionally, Newegg asserts that remaining evidence precludes TQP's damages position as a matter of law.

The Court's finding with regard to damages is intertwined with the Court's judgment as a matter of law finding no infringement. (Dkt. No. 461.) Therefore, should the Federal Circuit disagree with the Court's finding of no infringement, the Court addresses the parties' arguments with regard to damages. Having reviewed the parties' briefing and the entire record, the Court is persuaded that TQP introduced substantial evidence that is more than adequate to support the jury's damages verdict.

## II. LEGAL STANDARD

**A. Applicable Law Regarding Rule 50**

Upon a party's renewed motion for judgment as a matter of law following a jury verdict, the Court asks whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." Fed. R. Civ. P. 50(b); *Am. Home Assur.*

---

[2] The Court notes that a significant portion of Newegg's arguments merely rephrase Newegg's previous *Daubert* challenges to Dr. Becker's opinions and testimony. *See* (Dkt. No. 382.) For example, Newegg states, "Thus, Dr. Becker's royalty structure is arbitrary and completely disconnected to the facts of this case…." (Mot. at 57.) The Federal Circuit recently discouraged such practice: "Under the guise of sufficiency of the evidence, [Defendant] questions the admissibility of [Plaintiff's] testimony and whether his damages model is properly tied to the facts of the case. Such questions should be resolved under the framework of the Federal Rules of Evidence and through a challenge under *Daubert*. . . ." *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013). However, after considering Newegg's arguments as a whole, the Court finds that they do not rise to the same level of impropriety as in *Versata* and thus addresses each argument.

*Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). "A JMOL may only be granted when, 'viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion.'" *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) (quoting *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).

Under Fifth Circuit law, a court is to be "especially deferential" to a jury's verdict, and must not reverse the jury's findings unless they are not supported by substantial evidence. *Baisden v. I'm Ready Productions, Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). A motion for judgment as a matter of law must be denied "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Baisden*, 393 F.3d at 498 (citation omitted). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion for judgment as a matter of law, a court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d

444, 451 (5th Cir. 2013) (citation omitted). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151 (citation omitted).

## B. Applicable Law Regarding Damages

Upon a showing of infringement, a patentee is entitled to an award of damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. However, "[t]he burden of proving damages falls on the patentee*." Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). There are two alternative categories of damages typically recovered in a patent case: the patentee's lost profits or the "reasonable royalty [the patentee] would have received through arms-length bargaining." *Id.* In this case, TQP sought to recover only the second category of damages, a reasonable royalty.

To determine an appropriate reasonable royalty, patentees (and courts) commonly employ the hypothetical negotiation, or "willing licensor-willing licensee" model. *Id.* at 1324–25. The hypothetical negotiation "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began," assuming that the patent is valid, enforceable, and infringed. *Id.*; *see also Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 n.13 (Fed. Cir. 1995) (en banc). Such a reasonable royalty analysis "necessarily involves an element of approximation and uncertainty." *Unisplay, S.A. v. Am. Elec.*

*Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995). However, the Court must ensure that a jury's damages award is supported by substantial evidence. *Id.* Generally, the Court should uphold a jury's damages award "unless 'grossly excessive or monstrous,' clearly not supported by the evidence, or based only on speculation or guesswork." *Energy Transp. Group, Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1356 (Fed. Cir. 2012).

### III. ANALYSIS

At trial, TQP presented its damages theory through the testimony of Dr. Becker. TQP calculated a royalty base by totaling the number of accused transactions completed using Newegg's websites during the relevant damages period of May 6, 2005 to May 2, 2014. (Dkt. No. 415 at 64:22–25, 65:1–2.) Such calculation amounted to 68.2 million orders. (*Id.* at 64:25.)

Additionally, TQP calculated a reasonable royalty rate using a tiered structure based on a volume discount schedule. (*Id.* at 37:13–19.) Specifically, Dr. Becker found four third-party license agreements granted by RSA Data Security, Inc. ("RSA") for U.S Patent No. 4,405,829 ("the RSA Patent") to be relevant and comparable to the hypothetical negotiation at issue in the present case. (*Id.* at 75:13–25, 76:1–10.) The RSA licenses granted permission to make, use and sell personal security tokens and charged a royalty of 25-cents per-token. (*Id.* at 78:8–10, 16–25; 79:1–2.) Dr. Becker used this 25-cents per-token-rate as a starting point for his damages analysis, converted it to a per-transaction (or per-use) rate, and then implemented a discounted rate structure to account for Newegg's large volume of customer orders. (*Id.* at 78:8–15, 83:2–5, 83:11–13.)

Applying this formula, Dr. Becker arrived at a damages amount of $5,101,588 in total royalties for the 68.2 million orders placed using the allegedly infringing technology. (*Id.* at

5

85:15–17.) The jury awarded $2.3 million in damages. Newegg now argues that no reasonable jury could have found Newegg liable for that amount.

**A. TQP's Reliance on the RSA Licenses Supports the Jury's Award**

Newegg argues that the RSA licenses serving as Dr. Becker's starting point for damages are not technologically similar to the '730 Patent or economically comparable to the current hypothetical negotiation. (Mot. at 52–53.) Newegg asserts that the RSA licenses do not involve the '730 Patent, any parties to the current case, or even any parties similarly situated. (*Id.* at 53.) More specifically, Newegg challenges the analysis performed by Dr. Ray Jaeger, TQP's technical expert, in which he concluded that the RSA Patent was technically comparable to the '730 Patent, contending that "[h]is bases for asserting comparability are true of virtually any possible encrypted communications." (*Id.* at 53.) Further, Newegg points to Dr. Becker and Dr. Jaeger's agreement that the RSA Patent was broader than the '730 Patent because it encompassed more features. (*Id.* at 54.)

Newegg also argues that its business model is not economically comparable to that of the RSA Patent licensees because, while the RSA licensees paid the 25-cents per-token royalty to manufacture and sell physical security tokens, Newegg is an online retailer accused of merely using the '730 Patent's encryption technology. (*Id.* at 54.) Finally, Newegg cites *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870–873, 877 (Fed. Cir. 2010), and asserts that TQP's lump sum settlement licenses with online retailers are more reliable indicators of the '730 Patent's economic value. (*Id.* at 55–56.)

TQP responds by arguing that Dr. Becker properly found the RSA licenses relevant through his reasoned analysis of *Georgia Pacific* factors 1, 2, and 12. ("Resp.", Dkt. No. 440, at 47, 51.) Dr. Becker found existing licenses to the '730 Patent to be of limited relevance because

6

all were entered into as settlement agreements without an admission of liability. (*Id.* at 47.) Similarly, Dr. Becker found Newegg's produced licenses to be irrelevant because all were entered into as settlements and concerned unrelated technology. (*Id.* at 48.) In contrast, Dr. Becker focused on the RSA licenses for multiple reasons, including Dr. Jaeger's opinion that the RSA Patent is technically comparable to the '730 Patent. (*Id.*) Further, TQP notes that the 25-cents per-token royalty in the RSA licenses "is tied specifically to the element of the system that generates the encryption keys, rendering those parts of the licenses even more comparable." (*Id.*) At trial, Dr. Jaeger testified as follows:

> QUESTION: In what way did you find the '730 patent and the '829 patents comparable?
>
> ANSWER: I found that both systems provide secure communication between the transmitter and receiver, and they also provide methods for determining how keys are—are produced in order to—to provide this secure communication.
>
> …
>
> QUESTION: Are there differences between the '730 and the '829 patents?
>
> ANSWER: Yes…there are significant differences. And the '829 patent is about public key crypto systems, and the '730 patent describes symmetric key crypto systems.
>
> QUESTION: Okay. But it's still your opinion that the two patents, the '730 and the '829, are comparable?
>
> ANSWER: They're comparable in that…the problems they solve overlap, and they both provide methods for determining how keys are produced to solve this overlapping problem related to secure communication.

(Dkt. No. 414 at 43:22–25, 44:1–3, 44:22–25, 45:1–9.) Dr. Jaeger also testified that he discussed his opinions with Dr. Becker. (*Id.* at 44:4–8.)

The Court finds that it was not necessary for Dr. Jaeger to present a claim-by-claim comparison of the '730 Patent and the RSA Patent to reach his conclusion that the two patents

7

were technically comparable. Dr. Becker was entitled to rely upon Dr. Jaeger's technical analysis when constructing his damages model and presenting it to the jury, and the jury was free to judge the credibility of both experts. Dr. Becker explained the reasoning behind his conclusions, and he accounted for the differences between the two patents when formulating his royalty structure. The Court concludes that "[s]ome basis for comparison" existed in the evidence presented to the jury. *Lucent Techs.*, 580 F.3d at 1330.

Moreover, Newegg's reliance on *ResQNet* is misplaced. In *ResQNet*, the Federal Circuit concluded that the plaintiff's damages expert impermissibly "inflated" his damages calculations by considering licenses that had no connection to the claimed invention. 594 F.3d at 870–71 ("Notably, none of these licenses even mentioned the patents in suit or showed any other discernible link to the claimed technology."). The Court is not persuaded that TQP selected the RSA licenses to "inflate" its damages calculations. Dr. Becker's analysis is fundamentally different from that rejected in *ResQNet*. Instead, as described above, Dr. Becker relied on Dr. Jaeger's technical analysis identifying the "discernable link to the claimed technology." *See id.*

Further, Dr. Becker analyzed a great number of potentially relevant licenses and distinguished those upon which he relied from those he did not find relevant to the hypothetical negotiation. Although it certainly could have, Newegg chose not to present expert testimony on damages to the jury to rebut Dr. Becker's conclusions. The Court finds that Dr. Becker's reliance on the RSA licenses and testimony as a whole was adequate to "tie proof of damages to the claimed invention's footprint in the market place" and support the jury's verdict. *See id.* at 869.

**B. Dr. Becker's Royalty Structure is Not Arbitrary**

Newegg next argues that Dr. Becker's royalty structure is arbitrary, asserting that "there is not a single license in this case that follows the royalty structure conjured by Dr. Becker." (Mot. at 57.) Newegg contends that Dr. Becker uses the 25-cents per-token royalty from the RSA licenses as a starting point and adds nothing more to the calculation than "his judgment" and two other data points with "no reasonable connection" to the case: (1) a conversion from a per-token to a per-use royalty; and (2) RSA's 2013 licensing practices. (*Id.*)

TQP responds by arguing that Dr. Becker's royalty structure accounts for the difference between a license to manufacture a physical token and the hypothetical license in this case providing for secure access to Newegg's websites. (Resp. at 53.) At trial, Dr. Becker testified that he made the necessary adjustments to transition from a "per-token world to a per-order world." (Dkt. No. 415 at 80:24–25, 81:1–16.) TQP further argues that Dr. Becker structured the hypothetical negotiation to allow for a reasonable royalty rate in light of Newegg's high transaction volumes. (Resp. at 54.) Dr. Becker testified as follows:

> ANSWER: Well, as we saw in an earlier slide, Newegg is a very large online retailer, and so I thought that it would be reasonable that Newegg would ask for some sort of volume discount, not just the obvious discount that comes from using a token multiple times, but a volume discount scheduled to reflect the fact that they would be licensing a very large number of orders.
>
> And so what I did is took this declining scale but laid on top of it an additional volume-based discount that provided a schedule of royalties where for under a million orders, you'd be at 25 cents. From a million to 5 million orders, you'd be at 10 cents an order— per order; from 5 million to 25 million, a penny; 25 million to a hundred million, at a half a penny, and then over a hundred million a tenth of a penny.

(Dkt. No. 415 at 82:20–25, 83:1–10.)

The Court is not persuaded by Newegg's post-verdict attack on TQP's damages theory. The fact that Dr. Becker's per-transaction royalty is not identical to the RSA licenses' per-token

9

royalty does not render Dr. Becker's theory inappropriate or arbitrary. As described above, Dr. Becker explained the reasoning behind his royalty structure and his rationale for each adjustment made. Newegg does not challenge Dr. Becker's expert qualifications, and Dr. Becker was entitled to rely on his expertise and judgment in determining a royalty structure. Additionally, Dr. Becker relied on the language of the '730 Patent and the RSA Patent, Newegg documents and industry documents related to the relevant technology, TQP documents and testimony, Newegg transaction data, and comparable license agreements. (*Id.* at 38:2–19.) Newegg clearly believes Dr. Becker's approach was wrong, but Newegg never bothered to show what the right approach would be. While TQP obviously had the burden of proof on damages, a party, like Newegg, who fails to affirmatively offer an alternative basis for damages before a jury does so with the knowledge that it has squandered an opportunity to persuade the jury that it is right, as opposed to limiting itself to showing that the other party is wrong. The Court finds that Dr. Becker's conclusions are supported by substantial evidence, and his royalty structure is relevant to the facts of the case.

**C. Remaining Evidence Does Not Preclude TQP's Damages Position**

Finally, Newegg argues that other evidence precludes TQP's damages position as a matter of law. (Mot. at 58.) Such evidence includes the testimony of Lee Cheng, Newegg's corporate representative, that Newegg would have only entered into a lump sum license agreement, as well as testimony that Newegg could have inexpensively avoided infringement. (*Id.* at 59, 60.) Newegg also points to licenses entered into by TQP for the '730 Patent, including one in which Amazon paid a lump sum of $500,000. (*Id.* at 58–59.) In response, TQP disputes Newegg's characterization of a large part of this evidence. (Resp. at 58–60.)

The Court disagrees with Newegg. The jury was entitled to weigh all evidence presented at trial and decide which evidence it found to be most relevant and credible. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212 (Fed. Cir. 2010) (citing *i4i Ltd. P'ship, Infrastructure for Info. Inc. v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed.Cir.2010)). Here, the jury awarded damages totaling less than half of TQP's $5.1 million request. Having considered all record evidence, as well as the absence of a rebuttal damages expert, the Court finds that the jury reached a reasoned and supportable decision and declines to supplant the jury's judgment.

## CONCLUSION

For the reasons set forth above, the Court finds that the jury's verdict with regard to damages should stand. The jury's verdict in this respect is supported by substantial evidence and should not be disturbed. Accordingly, Newegg's Rule 50(b) Motion for Judgment as a Matter of Law (Dkt. No. 436) is **DENIED** as to damages.

**So ORDERED and SIGNED this 3rd day of November, 2015.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE